**RECORD NO. 14-1690**

# IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

## UNITED STATES EX REL. MARK W. PRINCE,

*Plaintiff-Appellant,*

v.

## VIRGINIA RESOURCES AUTHORITY,

*Defendant-Appellee.*

**SHENANDOAH COUNTY BOARD OF SUPERVISORS**
*Defendant*
**U. S. BANK NATIONAL ASSOCIATION**
*Defendant*
**SUNTRUST BANK**
*Defendant*
**SUNTRUST EQUIPMENT FINANCE & LEASING CORPORATION**
*Defendant*

## JOINT APPENDIX

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA AT HARRISONBURG**

Bradley Glenn Pollack
ATTORNEY AT LAW
753 South Main Street
Woodstock, Virginia 22664
(540) 459-8600 (Telephone)
bpollack@shentel.net

**Counsel for Plaintiff-Appellant**

Jeffrey Murray Summers
THE LAW OFFICE OF
JEFFREY M. SUMMERS, PLLC
Suite 410
6802 Paragon Place
Richmond, Virginia 23230-1655
(804) 477-1793 (Telephone)
jmsummers@summerslawoffice.com

**Counsel for Defendant-Appellee**

# <u>TABLE OF CONTENTS</u>

<u>**Appendix Page**</u>

Relevant Docket Entries ……………………………………………….....  1

Motion for Judgment, with Exhibits,
  filed on 4/15/2013 ……....…………………………………………….......  6

Motion to Dismiss, filed on 11/05/2013 ……………………………  157

Memorandum of Law in Support of Virginia Resources
  Authority's Motion to Dismiss, filed on 11/05/2013……………  159

Memorandum of Law- Rocker Feldman Doctrine,
  filed on 01/31/2014 …………………………………………………....  164

Motion to Intervene and Add an Additional Plaintiff,
  filed on 02/18/2014………………………………………………….  173

Supplemental Memorandum  of Law, with Exhibits,
  filed on 02/21/2014 ……………………………………………….....  175

Notice of Appeal, filed on 05/14/2014 …………………………….  306

Memorandum Opinion of the Hon. Michael F. Urbanski
  entered on 7-10-14 ……………………………………………………  308



- <u>Query</u>
- <u>Reports</u>
- <u>Utilities</u>
- <u>Logout</u>

CLOSED,APPEAL,CASREF

# U.S. District Court
## Western District of Virginia (Harrisonburg)
## CIVIL DOCKET FOR CASE #: 5:13-cv-00045-MFU

| | |
|---|---|
| United States of America, ex. rel. Mark W. Prince v. Virginia Resources Authority, et al. | Date Filed: 04/15/2013 |
| Assigned to: District Judge Michael F. Urbanski | Date Terminated: 04/15/2014 |
| Demand: $11,000 | Jury Demand: Plaintiff |
| Case in other court: 4CCA, 14-01690 | Nature of Suit: 890 Other Statutory Actions |
| Cause: 31:3729 False Claims Act | Jurisdiction: U.S. Government Plaintiff |

**Plaintiff**

| | | |
|---|---|---|
| **United States of America ex rel.** | represented by | **Sara Bugbee Winn** |
| | | United States Attorneys Office |
| | | BB&T Building |
| | | 310 First Street, S.W. Room 906 |
| | | Roanoke, VA 24008 |
| | | 857-2254 |
| | | Fax: 857-2283 |
| | | Email: sara.winn@usdoj.gov |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Mark W. Prince** | represented by | **Bradley Glenn Pollack** |
| *TERMINATED: 04/15/2014* | | 753 South Main Street |
| | | Woodstock, VA 22664 |
| | | 540-459-8600 |
| | | Fax: 540-459-8670 |
| | | Email: bpollack@shentel.net |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

V.

**Defendant**

1 of 5

1

9/24/2014 10:33 AM

**Virginia Resources Authority**     represented by **Jeffrey Murray Summers**
The Law Office of Jeffrey M. Summers,
PLLC
6802 Paragon Place, Suite 410
Richmond, VA 23230-1655
804-477-1793
Fax: 866-936-6906
Email:
jmsummers@summerslawoffice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Shenandoah County Board of
Supervisors**

**Defendant**

**U.S. Bank National Association**

**Defendant**

**Suntrust Bank**

**Defendant**

**SunTrust Equipment Finance &
Leasing Corporation**

| Date Filed | # | Docket Text |
|---|---|---|
| 04/15/2013 | 3 | COMPLAINT against Shenandoah County Board of Supervisors, SunTrust Equipment Finance & Leasing Corporation, Suntrust Bank, U.S. Bank National Association, Virginia Resources Authority (Filing fee $350.00; receipt no. 5-2014), filed by Mark W. Prince. 100 Day Notice due by 7/24/2013 120 Day Service due by 8/13/2013 (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Civil Cover Sheet)(jat) (Entered: 04/19/2013) |
| 07/26/2013 | 9 | NOTICE OF ELECTION BY THE UNITED STATES TO DECLINE INTERVENTION by United States of America ex rel. (kld) (Entered: 07/29/2013) |
| 07/29/2013 | 10 | Order to Unseal Complaint, this Order and Notice by United States. Signed by District Judge Michael F. Urbanski on 7/26/13. (kld) |
| 09/06/2013 | 11 | MOTION to Amend 3 Complaint, by Mark W. Prince. (Attachments: # 1 IRS, # 2 IRS, # 3 IRS, # 4 IRS, # 5 IRS, # 6 Return of Credit Payments to Issuers of Qualified Bonds, # 7 Virginia Resources Authority, # 8 Return of Credit Payments to Issuers of Qualified Bonds, # 9 Information Return for Tax-Exempt Government Obligations, # 10 Shenandoah County, Virginia Financing Lease, # 11 Local Lease Acquisition Agreement, # 12 UCC Financing Statement, # 13 Environmental Questionnaire and |

:M/ECF - U.S. District Court:vawd

Appeal: 14-1690    Doc: 15    Filed: 09/24/2014    Pg: 5 of 316    file:///C:/Users/John B/Desktop/CM ECF - U.S. District Court vawd.html

| | | Certificate, # 14 McGuire Woods)(jat) |
|---|---|---|
| 09/17/2013 | 12 | ORDER REFERRING CASE to Magistrate Judge James G. Welsh. Motions referred to James G. Welsh. Signed by District Judge Michael F. Urbanski on 9/17/2013. (jat) |
| 10/07/2013 | 13 | ORDER allowing 11 Motion to Amend/Correct Complaint. Signed by Magistrate Judge James G. Welsh on 10/7/13. (kld) |
| 10/10/2013 | 14 | Summons Issued as to Virginia Resources Authority.(jat) |
| 11/04/2013 | 15 | SUMMONS Returned Executed by Mark W. Prince. Virginia Resources Authority served on 10/15/2013, answer due 11/5/2013.(jat) |
| 11/05/2013 | 16 | First MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , First MOTION to Dismiss for Lack of Jurisdiction by Virginia Resources Authority.Motions referred to Judge James G. Welsh. (Summers, Jeffrey) |
| 11/05/2013 | 20 | Brief / Memorandum in Support re 16 First MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM First MOTION to Dismiss for Lack of Jurisdiction . filed by Virginia Resources Authority. (kld) (Entered: 12/11/2013) |
| 11/06/2013 | 18 | Roseboro Notice - Deadline set for 12/2/2013. (jat) |
| 11/27/2013 | 19 | Brief / Memorandum in Opposition re 16 First MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM First MOTION to Dismiss for Lack of Jurisdiction , filed by Mark W. Prince. (Pollack, Bradley) |
| 12/11/2013 | 21 | Notice of Correction: deleted doc #17, event docketed incorrectly as a motion, document refiled correctly at 20 Brief / Memorandum in Support (kld) |
| 12/19/2013 | 22 | NOTICE of Hearing on Motion 16 First MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM First MOTION to Dismiss for Lack of Jurisdiction : Motion Hearing set for Thursday 2/6/2014 02:00 PM in Harrisonburg before District Judge Michael F. Urbanski. (sd) |
| 12/20/2013 | 23 | Order to Vacate 12 Order Referring Case to Magistrate Judge James G. Welsh. Signed by District Judge Michael F. Urbanski on 12/20/2013. (mab) |
| 01/31/2014 | 24 | Brief/Memorandum *2014-01-31 Memo of Law - Rooker Feldman Doctrine*. filed by Virginia Resources Authority. (Attachments: # 1 Exhibit 2012-11-21 State Court Suit, Ex. 1, # 2 Exhibit 2013-04-22 Final Order - State Lawsuit, Ex. 2, # 3 Exhibit 2013-11-19 Order SCV Dismissing Appeal, Ex. 3)(Summers, Jeffrey) |
| 02/03/2014 | 25 | NOTICE Rescheduling Hearing on Motion (No Interpreter requested) 16 First MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM First MOTION to Dismiss for Lack of Jurisdiction : previously set for 2/6/2014 at 2:00 PM before Judge Urbanski in Harrisonburg: Motion Hearing reset for 2/6/2014 01:00 PM in Harrisonburg before District Judge Michael F. Urbanski. (jat) |
| 02/06/2014 | 26 | Brief/Memorandum . filed by Mark W. Prince. (Pollack, Bradley) |
| 02/06/2014 | 27 | Minute Order for Proceedings held before District Judge Michael F. Urbanski: taking under advisement 16 Motion to Dismiss for Failure to State a Claim; taking under advisement 16 Motion to Dismiss for Lack of Jurisdiction; Motion Hearing held on |

| | | |
|---|---|---|
| | | 2/6/2014 re 16 First MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM First MOTION to Dismiss for Lack of Jurisdiction filed by Virginia Resources Authority ; Set Deadlines as to 16 First MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM First MOTION to Dismiss for Lack of Jurisdiction :( Responses due by 2/19/2014). (Court Reporter Sonia Ferris.) (jat) |
| 02/18/2014 | 29 | MOTION to Intervene *for Michael A. Prince* by Mark W. Prince. (Pollack, Bradley) |
| 02/21/2014 | 30 | Brief/Memorandum *Supplemental.* filed by Virginia Resources Authority. (Attachments: # 1 Exhibit A, Cases sorted by case no., # 2 Exhibit B, Cases sorted by time of filing, # 3 Exhibit C, Cases sorted by claim, # 4 Exhibit D, Cases sorted by defendants, # 5 Exhibit E, Compl. CL12-276, # 6 Exhibit F, Compl. CL12-283, # 7 Exhibit G, Compl. CL12-406, # 8 Exhibit H, Mot. Amend CL12-276, # 9 Exhibit I, Mot. Amend CL12-283, # 10 Exhibit J, Mot. Amend CL12-406, # 11 Exhibit K, Final Order CL12-276, # 12 Exhibit L, Final Order CL12-283, # 13 Exhibit M, Final Order CL12-406)(Summers, Jeffrey) |
| 03/16/2014 | 31 | Response *to Defendant's Supplemental Memorandum of Law.* filed by Mark W. Prince. (Pollack, Bradley) |
| 03/23/2014 | 32 | Additional Evidence by Mark W. Prince *Exhibit K* (Pollack, Bradley) |
| 04/04/2014 | 33 | ORAL ORDER taking under advisement 29 Motion to Intervene; taking under advisement 16 Motion to Dismiss for Failure to State a Claim; taking under advisement 16 Motion to Dismiss for Lack of Jurisdiction. The parties are directed that no additional filings are necessary pending further order of court.. Entered by District Judge Michael F. Urbanski on 4/4/2014. (ssm) |
| 04/15/2014 | 34 | MEMORANDUM OPINION. Signed by District Judge Michael F. Urbanski on 4/15/2014. (jat) |
| 04/15/2014 | 35 | ORDER denying 29 Motion to Intervene; granting 16 Motion to Dismiss for Failure to State a Claim; denying 16 Motion to Dismiss for Lack of Jurisdiction. Signed by District Judge Michael F. Urbanski on 4/15/2014. (jat) Modified on 7/10/2014: Order entered 7/10/2014 amending this order to reflect that the dismissal of any and all claims are dismissed without prejudice as to the United States. (jat) |
| 04/16/2014 | 36 | Notice of Correction re 35 Order on Motion to Intervene, Order on Motion to Dismiss for Failure to State a Claim, Order on Motion to Dismiss/Lack of Jurisdiction - Modified docket text of order to reflect the motion to dismiss for Lack of Jurisdiction was denied and not moot. (jat) |
| 05/02/2014 | 37 | MOTION for Reconsideration by Mark W. Prince. (Pollack, Bradley) |
| 05/12/2014 | 38 | MOTION to Clarify Order of Dismissal re 35 Order on Motion to Intervene, Order on Motion to Dismiss for Failure to State a Claim, Order on Motion to Dismiss/Lack of Jurisdiction,,, by United States of America ex rel.. (Attachments: # 1 Text of Proposed Order)(Winn, Sara) |
| 05/12/2014 | 39 | Brief / Memorandum in Support re 38 MOTION to Clarify Order of Dismissal re 35 Order on Motion to Intervene, Order on Motion to Dismiss for Failure to State a Claim, Order on Motion to Dismiss/Lack of Jurisdiction,,, . filed by United States of |

| | | America ex rel.. (Winn, Sara) |
|---|---|---|
| 05/14/2014 | 40 | NOTICE OF APPEAL as to 34 Memorandum Opinion by Mark W. Prince. Filing fee $ 505, receipt number 0423-2001572. (Pollack, Bradley) |
| 05/15/2014 | 41 | Transmittal of Notice of Appeal to 4CCA re 40 Notice of Appeal NOTE: The Docketing Statement, Transcript Order Form and CJA-24(s) forms (if you are court appointed counsel) are available on the 4th Circuit Court of Appeals website at www.ca4.uscourts.gov. If CJA24(s) are applicable, complete items 1-14, 18 for each court reporter from whom you wish to order a transcript, and file each one separately in this case with the event *Appeal Transcript - Proposed CJA 24*. The CJA-24 forms will then be processed by the U.S. District Court Clerk's Office. (jat) |
| 05/15/2014 | 42 | USCA Notice of Pending Motions. (jat) |
| 06/12/2014 | 43 | USCA Notice Requesting Status of this Case. (jat) |
| 06/18/2014 | 44 | Order to Respond re 37 MOTION for Reconsideration . Virginia Resources Authority Responses due by 7/2/2014. Signed by District Judge Michael F. Urbanski on 6/18/14. (kld) |
| 06/27/2014 | 45 | RESPONSE in Opposition re 37 MOTION for Reconsideration *Memorandum*. filed by Virginia Resources Authority. (Summers, Jeffrey) |
| 07/10/2014 | 46 | MEMORANDUM OPINION. Signed by District Judge Michael F. Urbanski on 7/10/2014. (jat) |
| 07/10/2014 | 47 | ORDER denying 37 Motion for Reconsideration re 35 Order on Motion to Intervene, Order on Motion to Dismiss for Failure to State a Claim, Order on Motion to Dismiss/Lack of Jurisdiction; granting 38 Motion to Clarify Order of Dismissal re 35 ORDER denying 29 Motion to Intervene, granting 16 Motion to Dismiss for Failure to State a Claim; denying 16 Motion to Dismiss for Lack of Jurisdiction; amending re 35 Order to reflect that the dismissal of any and all claims are dismissed without prejudice as to the United States. Signed by District Judge Michael F. Urbanski on 7/10/2014. (jat) |
| 07/11/2014 | 48 | NOTICE of Docketing Record on Appeal from USCA re 40 Notice of Appeal filed by Mark W. Prince. USCA Case Number 14-1690. Case Manager: Sharon Wiley. (Attachments: # 1 Letter)(jat) (Entered: 07/14/2014) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/24/2014 10:04:55 | | |
| **PACER Login:** | al4043:3667305:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 5:13-cv-00045-MFU |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

THE UNITED STATES DISTRICT COURT FOR THE WESTERN

DISTRICT OF VIRGINIA,

CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

APR 15 2013

BY: JULIA C. DUDLEY, CLERK

DEPUTY CLERK

UNITED STATES OF AMERICA ex rel.,

Mark W. Prince

Relator/Plaintiffs,

v.

Virginia Resources Authority,

Shenandoah County Board of Supervisors

U.S. Bank National Association,

Suntrust Bank,

SunTrust Equipment Finance &

Leasing Corporation,

& Others to be determined,

Defendants.

Civil Case NO.

5:13CV00045

## MOTION FOR JUDGMENT

Mark William Prince brings this civil action against Defendants

Virginia Resources Authority, Shenandoah County Board of Supervisors,

U.S. Bank National Association, Suntrust Bank, SunTrust Equipment

6

Finance & Leasing Corporation and others in the name of the United States

of America, for violations of the FEDERAL FALSE CLAIMS ACT

31 USC 3729-3733, which is filed *in camera*:

PARTIES

1   Mr. Prince brings this action on behalf of the United States of America

pursuant to Federal Codes § 3729- 3733. Federal False Claims Act.  The

United States of America is therefore a party to this action. Mr. Prince has

taken all steps required by Federal Code § 3730 et seq., including serving

a Disclosure Memorandum and copies of all material evidence on the

United States Attorney General of the Western District of Virginia with the

filing this action pursuant to Federal Code § 3730 (b) (2).

2   Defendants:

   A   VIRGINIA RESOURCES AUTHORITY

   Principal Office:

   1111 E Main St # 1920

   Richmond, VA 23219

   B   SHENANDOAH COUNTY BOARD OF SUPERVISORS

   Principal Office:

   600 North Main Street, Suite 102

   Woodstock, VA  22664

C  U.S. Bank National Association

Principal Office:

800 NICOLLET MALL
MINNEAPOLIS, MN  55402

a  SCC ID: F1675265
b  Entity Type: **Foreign Corporation**
c  Jurisdiction of Formation: US
d  Date of Formation/Registration with Virginia SCC: 7/14/2006
e  Registered Agent/Registered Office
   CT CORPORATION SYSTEM
   4701 COX RD STE 301
   GLEN ALLEN, VA  23060

D  Suntrust Bank

Principal Office

303 PEACHTREE STREET NE
30TH FLOOR
ATLANTA, GA  30308

a  SCC ID: F1395864
b  Entity Type: **Foreign Corporation**
c  Jurisdiction of Formation: GA
d  Date of Formation/Registration with SCC: 10/1/1999
e  Registered Agent/Registered Office
   DANA S BRUCE
   919 E MAIN ST 13TH FL
   RICHMOND, VA  23219

E  SunTrust Equipment Finance & Leasing Corporation

Principal Office

300 EAST JOPPA ROAD STE. 700
TOWSON, MD  21286

a  SCC ID: 06848063

b   Entity Type: Corporation
c   Jurisdiction of Formation: VA
d   Date of Formation/Registration with SCC: 10/16/2007
e   Registered Agent/Registered Office
    SUNTRUST BANK
    919 E. MAIN ST, 18TH FL.
    RICHMOND, VA  23219

F   Others to be determined.

## JURISDICTION AND VENUE

2      This Court has jurisdiction over this qui tam action pursuant to

28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a) and 3730(b). Relator is the

original source of the facts and details contained in this Complaint and

institute this action in the name of the United States of America as

contemplated by the Civil False Claims Act, 31 U.S.C. §§ 3729-33

("False Claims Act").

3      Venue is appropriate as to each Defendant lender, in that each

of the Defendants can be found in, reside in, and/or transact business in

this judicial district. Additionally, acts proscribed by the False Claims Act

have been committed by one or more of the Defendants in this judicial

district. Therefore, within the meaning of 28 U.S.C. § 1391(c) and 31

U.S.C. § 3732(a), venue is proper.

4      Relator has presented the Government with timely disclosures regarding the False Claims Act violations described herein as required by 31 U.S.C. § 3730 (b )(2).

## APPLICABLE LAW

5      31 U.S.C. § 3729(a)(I)(A) provides that any person who knowingly presents or causes to be presented to the United States any false or fraudulent claim for payment or approval is liable to the United States Government both for a civil penalty and for three times the amount of damages which the Government sustains.  A false claim exists whenever the United States incurs any cost or is asked to pay any amount in connection with a fraudulently induced guaranty.

6      No proof of specific intent to defraud is required to prove a False Claims Act violation. The terms "knowing" and "knowingly" are defined to mean that a person (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(I).

7      31 U.S.C. § 3729(a)(1)(B) provides that any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim is liable to the United

States Government both for a civil penalty and for three times the amount of damages which the Government sustains because of the act of that person. The current civil penalty is not less than $5,500 and not more than $11,000 per false claim made. 20 C.F.R. § 356.3.

8    The False Claims Act defines a "claim" to include any request or demand made upon an agency of the United States for payment of money. 31 U.S.C. § 3729(b)(2). As a result of their request for federal Build America Bonds and tax exempt status the Defendants have caused the Government to expend substantial sums which also amount to a "claim." A false claim exists whenever the United States incurs any cost or is asked to pay any amount in connection with a fraudulently induced guaranty.

9    No proof of specific intent to defraud is required to prove a False Claims Act violation. The terms "knowing" and "knowingly" are defined to mean that a person (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(l).

10    In preparing official statements, municipal bond issuers are subject to the antifraud provisions of Section 17(a) of the federal

Securities Act and Section 10(b) of the federal Securities Exchange Act and provisions of Section 148 of the IRC and applicable regulations relating to "arbitrage bonds", which among other things prohibit misrepresentations or omissions of material facts in the offer or sale of securities.

## BACKGROUND

11    Defendants Virginia Resources Authority, Shenandoah County Board of Supervisors, U.S. Bank National Association, Suntrust Bank, SunTrust Equipment Finance & Leasing Corporation and Others have: Knowingly presented, or caused to be presented, false claims for approval for Build America Bonds and tax exempt status of other bonds that were secured illegally.

12    Within the Lease to Own Agreement between the Virginia Resources Authority and Shenandoah County Board of Supervisors under Section 4. Details of the Financing Lease, it states that the bonds issued are "Build America Bonds" (BABs) which were introduced in 2009 as part of President Obama's American Recovery and Reinvestment Act to create jobs and stimulate the economy. BABs attempt to achieve this

by lowering the cost of borrowing for state and local governments in financing new projects.

13    Section 1531 of Title I of Division B of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009) (enacted February 17, 2009) ("ARRA"), added § 54AA to the Code, authorizing state and local governments, at their option, to issue two general types of Build America Bonds as taxable governmental bonds with Federal subsidies for a portion of their borrowing costs. The subsidies take the form of either tax credits provided to holders of the bonds or refundable tax credits paid to state and local governmental issuers of the bonds. Build America Bonds have different levels of Federal subsidies and program requirements depending on the particular type of bond.

14    The first type of Build America Bond provides a Federal subsidy through Federal tax credits to investors in the bonds in an amount equal to 35 percent of the total coupon interest payable by the issuer on taxable governmental bonds (net of the tax credit), which represents a Federal subsidy to the state or local governmental issuer equal to approximately 25 percent of the total return to the investor (including the

coupon interest paid by the issuer and the tax credit). This type of Build America Bond will be referred to as "Build America Bonds (Tax Credit)."

15    The second type of Build America Bond provides a Federal subsidy through a refundable tax credit paid to state or local governmental issuers by the Treasury Department and the Internal Revenue Service ("IRS") in an amount equal to 35 percent of the total coupon interest payable to investors in these taxable bonds. This second type of Build America Bond will be referred to as "Build America Bonds (Direct Payment)." The level of the 35 percent Federal interest subsidy on Build America Bonds (Direct Payment) is deeper than the corresponding approximately 25 percent Federal interest subsidy on Build America Bonds (Tax Credit).  In general, there are two distinct types of Build America Bonds followed by a third less used type: tax credit bonds, direct payment bonds and recovery zone economic development bonds. Tax credit bonds offer a 35% federal subsidy of the interest paid to bondholders, while direct payment bonds offer a similar subsidy in the form of a tax credit paid to the bondholder.

16    In addition the final type bond authorized by § 1401 of ARRA, which added § 1400U-2 of the Code, provides for this third type of Build America Bond is also a (Direct Payment) type known as "Recovery Zone

Economic Development Bonds," which provides for a deeper Federal subsidy through a refundable tax credit paid to state or local governmental issuers in an amount equal to 45 percent of the total coupon interest payable to investors in these taxable bonds. This type of Build America Bond will be referred to as "Recovery Zone Economic Development Bonds (Direct Payment)."

17    Build America Bonds (BABs) address significant challenges existing in the tax-exempt bond market by providing state and local governments with a new, direct federal payment subsidy for a portion of their borrowing costs on taxable bonds.  BABs provide a deeper federal subsidy to state and local governments than traditional tax-exempt bonds which leads to lower net borrowing costs for state and local governments.

5    The *capital* projects these bonds fund include work on public buildings, courthouses, schools, transportation infrastructure, government hospitals, public safety facilities and equipment, water and sewer projects, environmental projects, energy projects, government housing projects and public utilities.  Just like other municipal bond issuances, BAB's issuances receive scrutiny from the IRS, consistent with practices in tax-exempt bond programs. *Emphasis noted. (Virginia*

*Resources Authority which is issuing these bonds is restricted by the*
*Virginia Constitution's Article X Section 10 to industrial development*
*only.)*

6    Within the Virginia Constitution Article X, Section 9 states: "No
debt shall be contracted by or in behalf of the Commonwealth except as
provided herein.", so all Virginia debt must be authorized by the Virginia
Constitution.

7    Pessimum casu is the violation of the Virginia Constitution
Article X, Section 10; where Section 10 states: "...This section shall not
be construed to prohibit the General Assembly from establishing an
authority *with power to insure and guarantee loans to finance industrial*
*development and industrial expansion* and from making appropriations
to such authority." *Emphasis noted.*

8   The Virginia Resources Authority, which was established in
1984 to insure and guarantee loans and receives its authorization and
restrictions for financing under Article X Section 10, has been using
powers exceeding those granted by the General Assembly and beyond
that which are authorized and restricted by the Virginia Constitution. The
Virginia Constitution limits or restricts these finance obligations to
*industrial development and industrial expansion only.* The various

financial instruments issued to local governments are being used for

*capital improvement and other non-industrial projects*, hence violating

Article X Section 10 of the Virginia Constitution thereby making the

projects illegal and in turn falsifying the Build America Bond (Direct

Payment and Tax Credit) applications. *Emphasis noted.*

9    The financial institutions and the Virginia Resources Authority

triggered a violation of the Federal Fraud Against Taxpayers Act when

they issued these bonds and the financial institutions purchased them.

*Emphasis noted.*

10    When we view these "Lease to Own" contracts we should view

them as what they really are which is an illegal tool to incur debt without

a referendum for with this instrument all local governments will never

have to go to the people for approval for any project, thereby nullifying

the taxpayers Virginia Constitutional right to vote on any debt burden

placed on the taxpayer.

11    "We must look to the *purpose of the instruments, their*

*substance and not their form.*  Merely giving to them a particular name

or form [does] not take away the nature and effect of the transaction.

Bolling v. Hawthorne Coal Co., 197 Va. 544, 566, 90 S.E.2d 159, 168

(1955). *Emphasis noted.*

12     On page 47 section 14 of the Shenandoah County Lease to Own Agreement dated November 19, 2009, there is the following statement: "It is to be noted that the County has disclosed to VRA (Virginia Resources Authority) the Mandamus of the Court for the County to provide a new courthouse, which facilities constitute a part of the Project and shall be constructed upon a portion of the Project Land." There was never a mandamus of the court ordering a new courthouse and this can be construed to be a false claim to gain financing. Commonwealth of Virginia v. Board of Supervisors, CL07000111-00 is the case in which this false mandamus was derived from.

13     Note a letter dated April 6, 2011 from Shenandoah County legal representative Donald Litten esquire to Shenandoah County Administrator Douglas Walker and copies sent to each Board Member that states "Although the Writ of Mandamus was requested it was never issued..."

14     The moral obligation pledges issued by Counties, Cities and Towns violate the Virginia Constitution Article VII, Section 10, and do so because these types of obligations, which do not incur the "full faith and credit of the Commonwealth," are only permitted to four entities of Virginia State Government granted through the Virginia Constitution

Article X, Section 9(d). These moral obligations are not granted to Local Governments, thereby making this type "moral" obligation illegal under Article VII of the Virginia Constitution.

15    When applying the Latin maxim expressio unius est exclusio alterius and the rule of statutory construction to Virginia Constitution Article X, Section 9(d), then looking back as required at the historical development of Local Government debt, local governments are not allowed to issue "Moral Obligations".  C. H. Morrissett, the author of the 1928 Proposed Amendments to the Constitution of Virginia states:

> "*The evil of the free issuance of bonds in counties and districts without a vote of the people is intended to be checked by a proposed new section numbered 115-a.  The gist of the section is the reasonable requirement that every proposal to issue bonds must have public support.*"

16    Note: there were no Moral Obligation Bonds, Moral Obligation Pledges, or agreements until the 1950's when John Newton Mitchell, later United States Attorney General under President Richard M. Nixon, invented a type of revenue bond that incorporated a moral obligation. (Mitchell was the only U.S. Attorney General ever to be convicted of illegal activities.)

17    The key phrase Morrissett states is a "reasonable requirement for public support" and this requirement was not changed when the new

Virginia Constitution was adopted in 1971 and the historical tracking of

Local Government debt, as follows, supports.  The Virginia House

Debates on the Constitutional Revision, page 506 - 507, under section

10. Debt, in the fourth paragraph states;

> "*The committee found that some counties did not want to be
> treated like cities for the purpose of issuing bonds, but preferred
> to continue issuing bonds without a limit but subject to a
> referendum.  Therefore the committee recommends that the
> counties be authorized to borrow as they now borrow under
> section 115 (a).*"

18    In the Virginia Senate Debates on Constitutional Revision,

page 313, when speaking on Local Government Debt Senator

Hopkins stated:

> "*On the sections pertaining to debt we rejected the Constitutional
> revision Commission's recommendation, and we adopt that of the
> old Constitution, merely updating the language and eliminating
> some of the verbiage that was kept in the transition of 1902…..We
> Understand that what we have done is exactly what every city in
> Virginia wants on this score.*"

19    Rules of statutory construction include, but are not limited to:

a    Statutes should be internally consistent. A particular section

of the statute should not be inconsistent with the rest of the

statute.

b    When the legislature enumerates an exception to a rule,

one can infer that there are no other exceptions.

c   When the legislature includes limiting language in an earlier
version of a statute, but deletes it prior to enactment of the
statute, it can be presumed that the limitation was not
intended by the legislature.

d   *The legislature is presumed to act intentionally and
purposely when it includes language in one section but
omits it in another. Emphasis noted.*

e   Where legislation and case law conflict, courts generally
presume that legislation takes precedence over case law.

20   When applying the legal doctrine above, Prince concludes that
"moral obligations" do not comport with and violate the Virginia
Constitution Article VII, Section 10 thereby making all "moral obligations"
issued by Local Governments illegal.

21   A. E. Dick Howard's Commentaries on the Virginia Constitution
state on pages 865 & 870 (notes).

27  Board of Supervisors of Fairfax county v. Massey, 210 Va. 253,
260, 169 S.E.2d 556 (1969). A long-term conditional sales contract
or *lease-purchase agreement was ruled to be debt* of a kind
coming within Const. of 1902, Section 127, and relevant statutes
on town debt.  1970-71 Ops. Va. Att'y Gen. 398.

28 210 Va. At 261.  This case also clearly established that the
term "*bond or other interest bearing obligation*" under section 127

*had the same meaning as "debt"* under section 115-a 210 VA at

259. This case is noted in 56 Va. L. Rev 1603 (1970)." *Emphasis*

*Added.*

22    Local Governments are still operating under the old 1902

Constitution with few changes. The "lease to own" contracts, which are

interest bearing obligations and also classified as lease-purchase

agreements, make this a debt incurred by the Local Governments. *Debt*

*requires a referendum under the Virginia Constitution Article VII Section*

*10, which was not held. Emphasis noted.*

23    The financial institutions had the opportunity at any time prior to

instituting these obligations to request a legal opinion from the Attorney

General's office through the Virginia Resources Authority or Local

Governments. The Virginia Resources Authority was the conduit for the

Local Governments to acquire funding for their projects.

24    As previously stated in A.E. Dick Howard's Commentaries on

the Virginia Constitution, it clearly states that the term "Bonds or other

interest bearing obligations has the same meaning as debt" and the

lease to own obligation is an interest bearing obligation, therefore debt,

requiring a referendum. Without a referendum, this was an obligation

that the officers of the Local Virginia Government were not lawfully able

to sell or pledge, violating Article VII, Section 10, and Virginia Code §
8.01-216.3.

25    Shenandoah County, and other counties, did not hold a
referendum authorizing payment for debt and the counties were selling
an obligation they were not authorized to sell, therefore the Defendants
knowingly purchased an obligation officers of the government were not
lawfully able to sell, violating the Fraud Against Taxpayers Act.

26    This scheme presented to governmental bodies for capital
improvement projects across the State of Virginia, and is hereafter
known as the "Lease to Own Agreement," whereby the Governmental
Agency pays yearly, foregoing the requirement of a referendum of the
voters.  The legal process, which is defined by Article VII, Section 10, of
the Constitution of Virginia, requires a referendum. Complying with the
Constitution requires that a referendum be held and passed, if long term
debt is assumed.  If a referendum is passed by the voters, General
Obligation Bonds for these capital improvements are issued at a low
interest rate, which is currently around 1.50%. The General Obligation
Bonds receive the lowest interest rate, because they are backed by the
"full faith and credit".  The bonds issued through this "Lease to Own
Agreement" are Moral Obligation bonds, which are not backed by with

the full faith and credit of the Commonwealth, and are therefore approximately twice the interest rate, or currently about 3.5%. Accordingly, this "Lease to Own Agreement" scheme does not comport with Article VII, Section 10, of the Virginia Constitution.

27     Defendant U S National Bank Association, Suntrust Bank and others were the Bond Purchasers and assigned as the Trustee in each "LEASE AGREEMENT".  As stated within the 'LEASE AGREEMENT' the "VRA has agreed to assign to the Trustee as security for the Bonds *all of its right title and interest in* and to the Lease and Financing Lease (Collectively, the "Basic Documents"), making the defendants responsible for ensuring compliance with State Law.  *Emphasis added.*

28     This type contract "LEASE to OWN AGREEMENT" is illegal in part because the debt incurred is binding on successive Boards of Supervisors or Governmental Agencies. An example is stated on page 295, Section 1. General Covenants (a) of the $15,760,000 SHENANDOAH COUNTY, VIRGINIA, FINANCING LEASE, (Courthouse and Social Services Building Project), Closing Date: November 19, 2009, hereafter known as the "LEASE AGREEMENT".  The "LEASE AGREEMENT"  states: "VRA acknowledges within this that the Financing Lease contains certain interest in the Real Estate and which

are *binding on successors* in interest in the Real Estate and which include matters relating to maintenance, repair, insurance, taxes, damage and destruction with respect to the Real Estate". This binding of future Board of Supervisors is illegal as stated in the Attorney General's Opinion OP. NO. 03-108, which states "Neither Virginia Constitution nor applicable state statutes allow governing body to adopt adequate public facilities ordinance that binds, directly or indirectly, future governing body to fund capital improvements program at specific level and authorizes approval of proposed to be deferred for a specified number of years." *Emphasis noted.*

29    An example of this future payment and prohibited long-term debt was found in 2012, within the next Fiscal Year 2013 Shenandoah County Budget, under *forecasted debt in the Shenandoah County FY 13 approved budget*, as line item 8254. If these debts are forecasted in future years then they must hold a referendum as required by Article VII Section 10. *Emphsis added.*

30    Within the "LEASE AGREEMENT", the Virginia Resources Authority represents, warrants, covenants and agrees that the Deed of Trust is lawfully executed and delivered in conformity with the Financing Lease and the Indenture and therefore the U.S. Bank National

Association, having purchased the Bonds and having been appointed by

the Virginia Resources Authority and accepted as its Successor Trustee,

also represents, warrants, covenants and agrees that this Deed of Trust

is lawfully executed and delivered in conformity with the Financing

Lease and the Indenture, when in fact the "Lease to Own Agreement"

scheme was in violation of  Article VII, Section 10(b), of the Constitution

of Virginia.

31    According to a McGuire Woods LLP, legal advisor for the

Virginia Resources Authority, attorney Arthur E. Anderson II stated in a

May 31, 2012 letter:

> "The lack of legal enforceability does not mean that the failure
> of a future Shenandoah County Board to fulfill its moral
> obligation would not carry serious repercussions.  The County's
> credit would be impaired, if not destroyed, for years to come.
> There would almost certainly be a breach in relations between
> the County and the Commonwealth. VRA's bonds are also
> supported by a moral obligation—that of the Commonwealth.
> The Commonwealth's moral obligation support provides the Jail
> Authority and its member jurisdictions, as well as hundreds of
> other Virginia communities, with low borrowing rates and
> excellent market access.  The General Assembly is extremely
> unlikely not to support VRA's bonds even if Shenandoah
> County disavows its moral obligation. And if the General
> Assembly has to find money to plug a hole caused by
> Shenandoah County, the General Assembly is going to look to
> its appropriations to Shenandoah County before it
> shortchanges other programs and localities. This "state-aid
> intercept" concept is codified in Virginia Code § 62.1-216.1."

32     This state-aid intercept concept of pulling money from Shenandoah County would make this "moral obligation" *legally enforceable* since the State would fulfill the moral obligation and *take* money through another source, making this an *enforceable debt* and triggering a requirement for a referendum required by Article VII, Section 10, of the Virginia Constitution.  *Emphasis noted.*

33     In the Virginia Constitution, Article X, Section 8, states, "Limit of tax or revenue; No other or greater amount of tax or revenues shall, at any time, be levied than may be required for the *necessary expenses* of the government, or to pay the *indebtedness* of the Commonwealth." *Emphasis noted.*

34     The obligations rendered by the Local Governments in this lease agreement are considered "moral obligations" and are not considered debt, therefore the expense is not classified as indebtedness when Article X, Section 8, is viewed; therefore, this obligation must fall under the necessary expense doctrine.  One of the requirements of the necessary expense doctrine is that the expenditure must not be otherwise provided for, that is, it must not be an item that falls within the scope of some other more specific appropriation funding scheme.

35    We have a statutory funding mechanism for local government which is Article VII, Section 10, that these capital improvement projects fall under, which is more specific.  If the obligation is not considered indebtedness or a necessary expense which meets the necessary expense doctrine, then the obligation fails under Article X, Section 8. The Local Government does not have the exemption that the Commonwealth has in Section X, Article 9(d), which allows such moral obligations.

36    Virginia Code § 15.2-2636 provides: "Except as otherwise provided in this section, whenever any municipality proposes to borrow money and issue its bonds under the provisions of Article VII, Section 10(a), of the Constitution of Virginia and this chapter, the governing body shall adopt an ordinance or *resolution, stating the maximum principal amount of the bonds to be issued and in brief and general terms the purpose or purposes for which the proceeds of the bonds are to be used.*" *Emphasis noted.*

37    Shenandoah County Supervisor Sharon Baroncelli stated in a public meeting on October 23, 2012, that the Board had already moved funds from the "Lease to Own Agreement" to fund renovation of the old courthouse.

38     A FOIA response from Shenandoah County Administrator Doug
Walker dated March 1, 2013, stated; "This April, the County will access
proceeds from the 2009 VRA financing lease, which funds are on
deposit in the County's local account.  We intend to use those funds to
reimburse the County for the interest portion of rental payments the
County has paid to VRA in that very same project.  *When this is done,
we anticipate that some cash will be available to be used for the Historic
Courthouse project and/or other projects the Board finds worthwhile."*
*Emphasis noted.*

39     In a letter dated November 11, 2012, from Shenandoah County
to U.S. Bank National Association, as Trustee, and Virginia Resources
Authority, it is stated in bold just before the signature line;

> **"The Local Government has agreed in the Financing Lease that
> any amounts it received pursuant to this Requisition will be (i)
> immediately applied to reimburse the Local Government for
> Project Cost it has already incurred and paid or (ii) actually
> spent to *pay Project Costs not later than five banking days after
> receipt."  Emphasis noted.***

If Shenandoah County has over one million dollars for the renovation
of the old courthouse in a local account, it has moved funds in violation
of multiple Virginia Codes and Federal Securities Codes.

40     Found within the Virginia Resources Authority lease agreement
with Shenandoah County dated November 1, 2009, Section 7.4 states

29

that the lease to own agreement allows the VRA and the Trustee to inspect the project and local government's books and records to ensure compliance so if the Shenandoah County nor the VRA ensured compliance the financial institutions had the responsibility and capability to do so.

41    These actions are in violation of Virginia Code § 15.2-2636 because the renovation of the Old Courthouse and other projects were not listed on the resolution. The Virginia Attorney General's Opinion dated September 28, 2012 response states:

> "It is my opinion that a county may not apply proceeds of general obligation bonds issued by the county for one project to a different project unless the resolution or ordinance adopted by the county and submitted to the qualified voters authorizes the application of the bond proceeds to the other project."

The financial institution knowingly and in reckless disregard allowed local government to have over a million dollars of taxpayer's money without the taxpayer's approval which classifies as fraud.  Money's were moved in violation of Virginia Code 15.2-2636 into a slush fund.

42    According to FOIA documents, there was no public hearing held before the issuance of the bonds for the Shenandoah County Lease to Own Agreement as required by Virginia Code § 15.2-2606.

43      Normal prudence and law required that any Lenders'
misconduct be brought forth when preparing official statements,
municipal bond issuers are subject to the antifraud provisions of Section
17(a) of the federal Securities Act and Section 10(b) of the federal
Securities Exchange Act, which prohibit misrepresentations or omissions
of material facts in the offer or sale of securities.  After several Virginia
Civil cases which brought this information forth, it was not brought to the
attention of the Federal Government.

44      Ignorant of the lenders' misconduct and of the fact loans tainted
by Defendant's misconduct did not qualify for the Build America Bonds
(Direct Payment & Tax Credit) type status, the Government has, through
these programs paid lenders and local governments on guarantees
which should not have been issued.


### DEFENDANT LENDERS PROVIDED MULTIPLE FALSE CERTIFICATIONS AND CLAIMS TO THE BUILD AMERICA PROGRAM IN ORDER TO OBTAIN GOVERNMENT GUARANTEES

### A. LENDER CERTIFICATIONS BEFORE THE LOANS ARE MADE

45    The bond purchase agreement between VRA and the underwriters requires VRA to deliver to the underwriters multiple copies of the final official statement for the Bonds within seven business days of the closing. The underwriters are required to include the seven business day requirement in the bond purchase agreement by Code of Federal Regulations Section 240.15c2-12 ("Rule 15c2-12") so the underwriters can fulfill another requirement of Rule 15c2-12, which is to provide to each of their customers who is purchasing a 2012C Bond a copy of the final official statement along with the confirmation that requests payment from the customer.

46    An official statement is a document prepared by an issuer of municipal bonds to provide information concerning the issuer and the proposed bonds being offered for sale. This information includes a description of the security for and the source of the payment of the debt service on the bonds.

47    In preparing official statements, municipal bond issuers are subject to the antifraud provisions of Section 17(a) of the Federal Securities Act and Section 10(b) of the Federal Securities Exchange Act, which prohibit misrepresentations or omissions of material facts in the offer or sale of securities.

48      The principal source of the payment of the Bonds is the debt service to be paid on the County Bond. A substantial question concerning the validity of the County Bond or the security therefore may be material to the potential purchasers of the Bonds.

## IMPACT OF BOND FRAUD ON AMERICAN TAXPAYERS

49      The recipients or purchasers of these bonds are purchasing a security that is invalid due to the underlying legal structure for the bond was violated.  The result on the recipients should the backers or (Taxpayers) default which is their right as this is an illegal debt being forced upon them, is catastrophic.

50      Virginia taxpayers are having their Virginia Constitutional Right to vote on debt, tread upon by these "Lease to Own Agreements", Moral Obligation Pledges, and various other conceived schemes by the Defendants to remove the requirement of the Referendum to enable the "Free issuance of Bonds".

51      There are at least 83 such "LEASE AGREEMENTS" that the defendants have issued throughout the State of Virginia within the last six years, totaling over 1.1 billion dollars. Prince currently does not have

access to all such agreements and requests that all of these "Lease to Own" schemes fall under the auspices of being revealed by him.

52    Mr. Prince claims to reveal all illegal obligations issued by the VRA for capital improvements which are not classified as industrial and the Defendant's filed for any federal tax incentives, or submitted any false statements or claims to the Federal Government claiming that the project complied with Virginia State Laws.  This equates to billions of dollars.

53    Mr. Prince claims to reveal all money moved illegally from bond issuances to slush funds in violation of Virginia Code§ 15.2-2636 as found in the Shenandoah County Lease to Own Agreement.

54    Finally all "moral obligation pledges" found within contracts issued by local units of government fall under the auspices of being revealed by Mr. Prince.

### PROOF OF EACH DEFENDANT'S FALSE CLAIM

55    Relator has attached to this Complaint the following:

Exhibit A, Virginia Constitution

Exhibit B, Electronic Copies of Each Agreement and Excerpts

Exhibit C, Letter stating that there was NO Mandamus

Exhibit D, Copies of applicable pages of A.E. Dick Howard's Commentaries on the Virginia Constitution.

Exhibit E, Virginia AG's Opinion No. 03-108 Binding Supervisors

Exhibit F, Virginia Attorney General's Opinion OP. John r. Roberts September 28, 2012 apply proceeds of bonds issued by county for one project to a different project.

Exhibit G, Address of C.H. Morrissett1928 Proposed Amendments to the Constitution of Virginia.

Exhibit H, Motion for Leave to file an Amicus Brief and Amicus Brief, D. Eric Wiseley Esquire.

Exhibit I, Shenandoah County Document showing requirement to apply money solely to payment or reimbursement of the Local Government for payment of Project Costs.

## MOTIVE FOR THE FRAUDULENT ACTIONS OF DEFENDANTS

### A. LENDERS

56     The lenders' motive is crystal clear. The lenders engaged in the fraudulent schemes outlined herein in order to illegally raise their profits by benefitting from the financial assistance and guarantees provided by the Government. The Defendant lenders' fraud enabled them to obtain

free access to Virginia local government obligations or loans without the requirement or in their case restriction of holding a referendum or following the Virginia Constitution. Nor did they ensure the Virginia Resources Authority abided by its Constitutional restriction of industrial projects since they too are required to follow the Virginia Constitution and cannot use ignorance and an excuse for not knowing. Using the Build America Bond program greatly reduced their risk and allowed greater access to capital investment in the bond market. But Defendant lenders also profited very directly from their fraudulent conduct because they illegally passed on to the taxpayers these burdens at a higher interest rate (almost double) when compared to the General Obligation Bonds, because they were not voted on in a referendum as required by the Virginia Constitution.

## B. Governmental Agencies

57    The Local Virginia Government was allowed free access to money to build and renovate all types of facilities from a New Courthouse, Social Services building to Local Government Buildings without having to go through the process of a referendum or in essence taxation without permission of those being taxed.

58     The Virginia Resources Authority a multi-billion dollar financial clearinghouse set up for the Financial Institutions, State Agencies, Authority's, Institutions and the Local Government which is currently directed by the very lawyer that prior to her current position with the VRA worked for the Banks and even wrote the Shenandoah County Lease to Own Agreement for the lending institutions as a firm lawyer advising the Banks and the VRA.

## VIOLATION OF CIVIL FALSE CLAIMS ACT, 31 USC §§ 3729-33 ET SEQ.

59     Paragraphs 1 through 58 are incorporated as if fully set forth herein.

60     Defendants knowingly or recklessly disregarded applicable laws, regulations, and rules to present false and fraudulent claims to the Build America Bond Program and other federal programs in direct violation of, inter alia 31 U.S.C. § 3729(a)(l)(A).

61     Defendants recklessly violated many Virginia Codes and Constitution when implementing these "Lease to Own Agreement" schemes, in violation of inter alia 31 U.S.C. § 3729(a)(1)(B).

62     Defendants made false statements to get false or fraudulent claims paid or approved, in violation of inter alia 31 U.S.C. § 3729(a)(1)(B).

63     More specifically, Defendants caused false certifications to be made and submitted to the Build America Bond Program. Truthful and accurate certifications are a condition precedent to both issuance of and payment under a guaranty of the Build America Bond Program, Federal Securities Act and Federal Securities Bond Act.

64     Had the Government or the Build America Bond Program Coordinator known that the Federal and Virginia State regulations were violated or that Defendants' statement certifications were false, the Build America Bonds could not have provided the substantial financial incentives guaranteed by the Federal Government. Federal regulations prohibit Defendants or other lenders from including unallowable and illegal projects in any Build America Bond Program.  The Government could not and would not have issued these bonds had it know about the fraudulent claims made.

65     Any guaranty which was issued based upon false certifications or with respect to which Defendant's failed to comply with federal regulations is void. Defendant's should be required to reimburse the

Government for all costs the Government has incurred following default of any such loan. These damages are trebled under the False Claims Act.

66    The False Claims Act requires that each Defendant lender pay the Government a civil penalty of between $5,500 and $11,000 for each false claim.

67    This means that a penalty should be imposed for each false claim submitted to the Build America Bond Program and the Securities and Exchange Commission in which the Defendants falsely claimed it had complied with federal regulations and guidelines.

WHEREFORE, the Relator prays for judgment against Defendants as follows:

(a) That Defendants be ordered to cease and desist from submitting and/or causing the submission of false claims, false certifications and illegal demands for payment in violation of 31 U.S.C. §§ 3729-33;

(b) That Defendants be ordered to cease and desist from imposing these huge financial burdens upon taxpayers of Virginia by the illegal use of moral obligation bonds and all obligations issued by the Virginia Resources Authority for other than industrial projects as

restricted by the Virginia Constitution or otherwise violating 31 U.S.C. §§ 3729-33;

(c) That judgment be entered in favor of the United States and the Relator and against Defendants for all damages available pursuant to 31 U.S.C. §§ 3729- 33, plus a civil penalty of not less than Five Thousand Five Hundred and No/lOO ($5,500.00) Dollars, and no more than Eleven Thousand and No/lOO ($11,000.00) Dollars per false claim, as provided by 31 U.S.C. § 3729(a);

(d) That the Relator be awarded the maximum amount permissible according to 31 U.S.C. § 3730(d);

(e) That judgment be granted for the United States of America and Relators and against Defendants for any and all costs including, but not limited to, court costs, expert fees, and all Relator's attorneys fees incurred to prosecute this action; and

(f) That the United States and the Relator be granted such other and further relief as the Court deems to be equitable and just.


Respectfully submitted this 15th day of April, 2013.

Mr. Prince demands a trial by jury.

Respectfully Submitted,


Mark W. Prince
Pro Se,
394 Brook Creek Road
Toms Brook, VA  22660
540-325-0750
mark@sunpeakusa.com

Certificate

I hereby certify that on the 15th day of April, 2013, the foregoing Motion for Judgment was submitted to the United States of America, Attorney General for the Western District of Virginia located at Federal Courthouse Building, 116 North Main Street, Room 130, Harrisonburg, Virginia 22802.


Mark W. Prince

Pro Se

394 Brook Creek Road

Toms Brook,  VA  22660

540-325-0750

mark@sunpeakusa.com

# Exhibit Table of Contents

**Exhibit A-** Constitution of Virginia Effective July 1, 1971 with Amendments-January 1, 2013.

**Exhibit B-** Electronic copy of each lease agreement and excerpts from the Financing Lease between Shenandoah County and the Virginia Resources Authority dated November 19, 2009.

**Exhibit C-** Letter from Shenandoah County Attorney stating that there was no mandamus for the building of the Shenandoah County Courthouse.

**Exhibit D-** Copy of applicable pages of A.E. Dick Howard's Commentaries on the 1971 Virginia Constitution.

**Exhibit E-** Virginia Attorney General's Opinion OP. NO. 03-108 Binding Future Board's of Supervisors

**Exhibit F-** Virginia Attorney General's Opinion OP. John R. Roberts September 28, 2012 apply proceeds of bonds issued by county for one project to a different project.

**Exhibit G-** Address of C. H. Morrisett 1928 Proposed Amendments to the Constitution of Virginia.

**Exhibit H-** Motion for Leave to file an Amicus Brief. D. Eric Wiseley esquire.

**Exhibit I-** Shenandoah County Document showing requirement to apply money solely to payment or reimbursement of the Local Government for payment of Project Costs.

# CONSTITUTION

# OF

# VIRGINIA



**Effective July 1, 1971**
with
**Amendments — January 1, 2013**

**Issued by the Clerk's Office**

**The House of Delegates**

**Commonwealth of Virginia**
**Richmond**
**January 2013**

5500120512

# CONSTITUTION OF VIRGINIA

## FOREWORD

The Virginia Constitution of 1971 was approved by vote of the people on November 3, 1970, and became effective on July 1, 1971. The 1971 Constitution is the fifth complete revision of Virginia's fundamental law since 1776--other complete revisions having been effective in 1830, 1851, 1870, and 1902.[1]

The revision which led to the adoption of the Constitution of 1971 began with the creation of the Commission on Constitutional Revision, authorized by joint resolution at the General Assembly's 1968 Session and appointed by Governor Mills E. Godwin, Jr. The Commission, chaired by former Governor Albertis S. Harrison, Jr., reported to the Governor and the General Assembly in January 1969. The revisions took the form of amendments--one of two ways to change the Virginia Constitution (the other way being by the calling of a constitutional convention).[2]

The General Assembly, at a special session called in 1969, approved amendments which, with two exceptions,[3] were approved for a second time at the Assembly's regular session in 1970 and then laid before the people at the general election in November 1970. There were four proposals on the November ballot--a general question containing the main body of the revised Constitution and three separate questions (one repealing the constitutional prohibition on lotteries, and two dealing with borrowing by the Commonwealth). All four questions passed.[4]

Since the Constitution's effective date in 1971, there have been additional amendments. [See Additional Notes.]

In addition to the body of Virginia constitutional law (including judicial decisions) already in being, several documents will be helpful to a fuller understanding of the Constitution of 1971. They include

(1) The Report of the Commission on Constitutional Revision (January 1, 1969). Many of the Commission's recommendations were adopted by the General Assembly; to that extent, the commentary in the Commission's report will be relevant.

(2) The debates in the 1969 Special Session and 1970 Regular Session of the General Assembly. It was at these sessions, especially that of 1969, that the revisions were debated in detail. The debates have been published in two volumes: Proceedings and Debates of the House of Delegates [Senate of Virginia] pertaining to Amendment of the Constitution, ed. Charles K. Woltz (Richmond, n.d.).

(3) The revised Constitution is commented on section by section in A. E. Dick Howard's Commentaries on the Constitution of Virginia (2 vols.; Charlottesville, 1975). These commentaries trace the historical origins and evolution of the Constitution's provisions, as well as discussing the present-day interpretation. The Commentaries are available from the University Press of Virginia, Charlottesville.

## FOOTNOTES

1. This does not count the Constitution of 1864, which was drafted under wartime conditions and whose legal status was never certain. This count also does not include the revision of 1928, in which fewer than half of the sections of the Constitution of 1902 were changed at all.

2. See Article XII, infra.

3. One amendment dealt with State aid to handicapped children in private schools, the other with the boundaries of the capital city; both failed of passage at the 1970 Session.

4. Proposal No. 1, generally revising the Constitution, passed by a vote of 576,776 to 226,219. Proposal No. 2, repealing Section 60 of the existing Constitution, passed by a vote of 491,124 to 290,168. Proposal No. 3, which appears as Article X, Section 9(b) of this Constitution, infra, was approved by a vote of 504,315 to 261,220. Proposal No. 4, which appears as Article X, Section 9(c) of this Constitution, infra, was approved by a vote of 484,274 to 265,784. (These figures do not include a small number of ballots whose validity depended on the outcome of pending federal court litigation involving residence requirements.)

III

CONSTITUTION OF VIRGINIA
Foreword

## ADDITIONAL NOTES

5. In November 1972, the people approved an amendment to Article II, Section 1, specifying the voting age as eighteen (thus conforming Virginia's Constitution to the Twenty-sixth Amendment to the Federal Constitution). The voters also approved an amendment to Article VII, Section 1, to preserve city and town status for those municipalities that had city or town status before July 1, 1971, even though they may fail to meet the population minimum otherwise required by Section 1.

6. In November 1974, the people approved an amendment to Article VIII, Section 11, authorizing the General Assembly to provide for grants to students in certain institutions of higher education (Section 11 had already permitted loans to such students) and, further, authorizing the Assembly to provide contracts between the Commonwealth or its political subdivisions and those educational institutions for the provision of educational or related services.

7. In November 1976, the people approved amendments to Article II, Sections 1, 2, 4, and 5, changing certain residence qualifications to vote, permitting absentee registration by persons temporarily residing outside the country, and requiring the residency for an office seeker to be at least one year prior to his election; an amendment to Article VI, Section 12, to permit judicial appointments of elected local officials to fill vacancies for less than sixty days; and an amendment to Article X, Section 6, to permit tax exemptions for certain property: subject to flooding, owned by disabled persons, used for solar energy, and tangible farm property and products. [The 1976 amendment to Article II, Section 4 was superseded by the 1994 amendment.]

8. In November 1978, the people approved an amendment to Article X, Section 6, to permit certain tax exemptions for property which due to age or use has been renovated, rehabilitated, or replaced.

9. In November 1980, the people approved amendments to Article IV, Section 6, and Article V, Section 6, to provide that the General Assembly reconvene after each session to consider legislation returned by the Governor without his signature; an amendment to Article IV, Section 11, relating to the signing of enrolled bills; an amendment to Article IV, Section 13, relating to the date on which laws shall take effect; an amendment to Article VII, Section 10, decreasing the maximum indebtedness of a city or town; and amendments to Article X, Section 6, permitting certain tax exemptions for personal property of the aged or disabled, and permitting certain tax exemptions for property whose purpose is to replace oil or natural gas generating equipment. [The 1980 amendment to Article V, Section 6 was superseded by the 1994 amendment.]

10. In November 1982, the people approved an amendment to Article II, Section 2, relating to information required from persons applying to register.

11. In November 1984, the people approved an amendment to Article VII, Section 6, relating to multiple offices; and an amendment to Article X, Section 7, relating to collection and disposition of State revenues.

12. In November 1986, the people approved an amendment to Article II, Section 4, relating to powers and duties of the General Assembly with respect to registration and voting; an amendment to Article II, Section 8, relating to elections and election officials; and amendments to Article VI, Section 1, pertaining to judicial power and jurisdiction. [The 1986 amendment to Article II, Section 4 was superseded by the 1994 amendment.]

13. In November 1990, the people approved an amendment to Article VIII, Section 8, relating to the Literary Fund; and an amendment to Article X, Section 1, relating to taxable property.

14. In November 1992, the people approved an amendment to Article X, Section 8, creating the Revenue Stabilization Fund.

15. In November 1994, the people approved amendments to Article II, Sections 2, 3, and 4, deleting the constitutional requirement for voters to register in person and allowing the General Assembly to revise laws for canceling a person's registration for not voting; an amendment to Article IV, Section 14, allowing the General Assembly to revise the time period for filing lawsuits involving past injuries to children; and an amendment to Article V, Section 6, revising the options available to the Governor for acting on bills presented to him and the procedures available to the General Assembly when acting on bills returned by the Governor.

IV

**CONSTITUTION OF VIRGINIA**
Foreword

16. In November 1996, the people approved an amendment to Article I by creating Section 8-A, relating to the rights of victims of crime; amendments to Article II, Sections 1 and 2, relating to voter franchise and registration; an amendment to Article VI, Section 1, authorizing the General Assembly to prohibit the Commonwealth's right to appeal; and an amendment to Article X, Section 11, relating to a governmental employees retirement system.

17. In November 1998, the people approved an amendment to Article II, Section 1, relating to qualifications of voters employed overseas; an amendment to Article VI, Section 10, relating to disclosure of information by the Judicial Inquiry and Review Commission concerning charges against judges; and an amendment to Article X, Section 6, relating to a local government option to exempt or partially exempt from taxation any business, occupational, or professional license or merchants' capital.

18. In November 2000, the people approved an amendment to Article X by creating Section 7-A, relating to distribution of lottery revenues to localities for public education purposes; and an amendment to Article XI by creating Section 4, relating to the right of the people to hunt, fish, and harvest game.

19. In November 2002, the people approved an amendment to Article VI, Section 1, relating to claims of actual innocence presented by convicted felons; and an amendment to Article X, Section 6, relating to allowing local governing bodies to grant tax exemptions for property used for charitable and certain other purposes.

20. In November 2004, the people approved an amendment to Article II, Section 6, relating to the effective date and implementation of decennial redistricting laws; and an amendment to Article V, Section 16, relating to the list of persons who may serve as Acting Governor and the waiver of eligibility requirements.

21. In November 2006, the people approved an amendment to Article I, Section 15-A, relating to marriage; an amendment to Article IV, Section 14, deleting the constitutional requirement that the General Assembly prohibit incorporation of churches; and an amendment to Article X, Section 6, relating to allowing localities to provide a partial real estate tax exemption for new structures and improvements located in conservation, redevelopment, or rehabilitation areas.

22. In November 2010, the people approved an amendment to Article X, Section 6, relating to allowing localities to establish income and/or financial worth limitations for certain persons in order to qualify for property tax relief; an amendment to Article X by creating Section 6-A, relating to property tax exemptions for certain veterans; and an amendment to Article X, Section 8, relating to the maximum amount of the Revenue Stabilization Fund.

23. In November 2012, the people approved an amendment to Article I, Section 11, relating to taking or damaging of private property; and an amendment to Article IV, Section 6, relating to legislative sessions.

**EDITOR'S NOTE**

The Foreword, Footnotes, and Additional Notes 5 and 6 were written by Professor A. E. Dick Howard, who was the Executive Director of the Commission on Constitutional Revision, and who presently is the White Burkett Miller Professor of Law and Public Affairs.

Appeal: 14-1690    Doc: 15    Filed: 09/24/2014    Pg: 51 of 316

Blank

VI

49

# CONSTITUTION OF VIRGINIA

## TABLE OF CONTENTS

### ARTICLE I
### Bill of Rights

Sec.  1.    Equality and rights of men ............................................................................1
Sec.  2.    People the source of power ............................................................................1
Sec.  3.    Government instituted for common benefit ....................................................1
Sec.  4.    No exclusive emoluments or privileges; offices not to be hereditary. ..........1
Sec.  5.    Separation of legislative, executive, and judicial departments; periodical elections ............1
Sec.  6.    Free elections; consent of governed ..............................................................1
Sec.  7.    Laws should not be suspended ......................................................................2
Sec.  8.    Criminal prosecutions ..................................................................................2
Sec.  8-A.  Rights of victims of crime ............................................................................2
Sec.  9.    Prohibition of excessive bail and fines, cruel and unusual punishment, suspension of habeas corpus, bills of attainder, and ex post facto laws ..........................................3
Sec.  10.   General warrants of search or seizure prohibited ..........................................3
Sec.  11.   Due process of law; obligation of contracts; taking or damaging of private property; prohibited discrimination; jury trial in civil cases ..........................3
Sec.  12.   Freedom of speech and of the press; right peaceably to assemble, and to petition ..............3
Sec.  13.   Militia; standing armies; military subordinate to civil power ........................3
Sec.  14.   Government should be uniform ......................................................................4
Sec.  15.   Qualities necessary to preservation of free government ................................4
Sec.  15-A. Marriage ........................................................................................................4
Sec.  16.   Free exercise of religion; no establishment of religion ..................................4
Sec.  17.   Construction of the Bill of Rights ................................................................4

### ARTICLE II
### Franchise and Officers

Sec.  1.    Qualifications of voters ................................................................................4
Sec.  2.    Registration of voters ..................................................................................5
Sec.  3.    Method of voting ..........................................................................................6
Sec.  4.    Powers and duties of General Assembly ......................................................6
Sec.  5.    Qualifications to hold elective office ............................................................6
Sec.  6.    Apportionment ..............................................................................................7
Sec.  7.    Oath or affirmation ......................................................................................7
Sec.  8.    Electoral boards; registrars and officers of election ....................................7
Sec.  9.    Privileges of voters during election ..............................................................8

### ARTICLE III
### Division of Powers

Sec.  1.    Departments to be distinct ............................................................................8

### ARTICLE IV
### Legislature

Sec.  1.    Legislative power ..........................................................................................8
Sec.  2.    Senate ............................................................................................................8

CONSTITUTION OF VIRGINIA
**Table of Contents**

Sec.  3.    House of Delegates .................................................................................. 8
Sec.  4.    Qualifications of senators and delegates .......................................... 8
Sec.  5.    Compensation; election to civil office of profit. ................................ 9
Sec.  6.    Legislative sessions. .................................................................................. 9
Sec.  7.    Organization of General Assembly. ....................................................... 9
Sec.  8.    Quorum. ........................................................................................................ 9
Sec.  9.    Immunity of legislators. ........................................................................ 10
Sec. 10.    Journal of proceedings. ......................................................................... 10
Sec. 11.    Enactment of laws. .................................................................................. 10
Sec. 12.    Form of laws. ............................................................................................ 11
Sec. 13.    Effective date of laws. ............................................................................ 11
Sec. 14.    Powers of General Assembly; limitations .......................................... 11
Sec. 15.    General laws. ............................................................................................ 12
Sec. 16.    Appropriations to religious or charitable bodies. ............................ 13
Sec. 17.    Impeachment. .......................................................................................... 13
Sec. 18.    Auditor of Public Accounts ................................................................... 13

**ARTICLE V**
**Executive**

Sec.  1.    Executive power; Governor's term of office. ..................................... 13
Sec.  2.    Election of Governor. ............................................................................. 13
Sec.  3.    Qualifications of Governor. ................................................................... 13
Sec.  4.    Place of residence and compensation of Governor. ......................... 14
Sec.  5.    Legislative responsibilities of Governor. ........................................... 14
Sec.  6.    Presentation of bills; powers of Governor; vetoes and amendments. ..... 14
Sec.  7.    Executive and administrative powers. ................................................ 15
Sec.  8.    Information from administrative officers. .......................................... 15
Sec.  9.    Administrative organization. ................................................................ 15
Sec. 10.    Appointment and removal of administrative officers ..................... 16
Sec. 11.    Effect of refusal of General Assembly to confirm an appointment by the Governor. ..... 16
Sec. 12.    Executive clemency. ............................................................................... 16
Sec. 13.    Lieutenant Governor; election and qualifications. .......................... 16
Sec. 14.    Duties and compensation of Lieutenant Governor. ......................... 16
Sec. 15.    Attorney General. .................................................................................... 16
Sec. 16.    Succession to the office of Governor. .................................................. 16
Sec. 17.    Commissions and grants. ....................................................................... 17

**ARTICLE VI**
**Judiciary**

Sec.  1.    Judicial power; jurisdiction. ................................................................. 18
Sec.  2.    Supreme Court. ........................................................................................ 18
Sec.  3.    Selection of Chief Justice. ...................................................................... 18
Sec.  4.    Administration of the judicial system. ............................................... 18
Sec.  5.    Rules of practice and procedure. ......................................................... 19
Sec.  6.    Opinions and judgments of the Supreme Court. ............................... 19
Sec.  7.    Selection and qualification of judges. ................................................ 19
Sec.  8.    Additional judicial personnel. .............................................................. 19
Sec.  9.    Commission; compensation; retirement. ............................................ 19
Sec. 10.    Disabled and unfit judges. .................................................................... 20
Sec. 11.    Incompatible activities. .......................................................................... 20
Sec. 12.    Limitation; judicial appointment. ....................................................... 20

VIII

51

CONSTITUTION OF VIRGINIA
Table of Contents

## ARTICLE VII
### Local Government

Sec. 1.     Definitions............................................................................................20
Sec. 2.     Organization and government...........................................................21
Sec. 3.     Powers................................................................................................21
Sec. 4.     County and city officers....................................................................21
Sec. 5.     County, city, and town governing bodies..........................................22
Sec. 6.     Multiple offices.................................................................................22
Sec. 7.     Procedures.........................................................................................22
Sec. 8.     Consent to use public property.........................................................22
Sec. 9.     Sale of property and granting of franchises by cities and towns........22
Sec. 10.    Debt...................................................................................................23

## ARTICLE VIII
### Education

Sec. 1.     Public schools of high quality to be maintained.................................24
Sec. 2.     Standards of quality; State and local support of public schools.........24
Sec. 3.     Compulsory education; free textbooks..............................................24
Sec. 4.     Board of Education............................................................................24
Sec. 5.     Powers and duties of the Board of Education....................................24
Sec. 6.     Superintendent of Public Instruction.................................................25
Sec. 7.     School boards....................................................................................25
Sec. 8.     The Literary Fund.............................................................................25
Sec. 9.     Other educational institutions...........................................................25
Sec. 10.    State appropriations prohibited to schools or institutions of learning not owned or exclusively
            controlled by the State or some subdivision thereof; exceptions to rule.........................26
Sec. 11.    Aid to nonpublic higher education....................................................26

## ARTICLE IX
### Corporations

Sec. 1.     State Corporation Commission..........................................................26
Sec. 2.     Powers and duties of the Commission................................................26
Sec. 3.     Procedures of the Commission...........................................................27
Sec. 4.     Appeals from actions of the Commission...........................................27
Sec. 5.     Foreign corporations.........................................................................27
Sec. 6.     Corporations subject to general laws.................................................27
Sec. 7.     Exclusions from term "corporation" or "company" ..........................28

## ARTICLE X
### Taxation and Finance

Sec. 1.     Taxable property; uniformity; classification and segregation............28
Sec. 2.     Assessments......................................................................................28
Sec. 3.     Taxes or assessments upon abutting property owners........................28
Sec. 4.     Property segregated for local taxation; exceptions............................29
Sec. 5.     Franchise taxes; taxation of corporate stock.....................................29
Sec. 6.     Exempt property................................................................................29
Sec. 6-A.   Property tax exemption for certain veterans......................................31
Sec. 7.     Collection and disposition of State revenues.....................................31
Sec. 7-A.   Lottery Proceeds Fund; distribution of lottery revenues...................31
Sec. 8.     Limit of tax or revenue; Revenue Stabilization Fund........................31

IX

**CONSTITUTION OF VIRGINIA**
**Table of Contents**

Sec. 9.     State debt.................................................................................................32
Sec. 10.    Lending of credit, stock subscriptions, and works of internal improvement. ........................34
Sec. 11.    Governmental employees retirement system.................................................34

**ARTICLE XI**
**Conservation**

Sec. 1.     Natural resources and historical sites of the Commonwealth. ...............................34
Sec. 2.     Conservation and development of natural resources and historical sites.......................35
Sec. 3.     Natural oyster beds..........................................................................35
Sec. 4.     Right of the people to hunt, fish, and harvest game.........................................35

**ARTICLE XII**
**Future Changes**

Sec. 1.     Amendments. ................................................................................35
Sec. 2.     Constitutional convention. ..................................................................35

**SCHEDULE**

Sec. 1.     Effective date of revised Constitution.......................................................36
Sec. 2.     Officers and elections........................................................................36
Sec. 3.     Laws, proceedings, and obligations unaffected. .............................................36
Sec. 4.     Qualifications of judges. .....................................................................36
Sec. 5.     First session of General Assembly following adoption of revised Constitution. ................36

INDEX.......................................................................................................37

x

# CONSTITUTION OF VIRGINIA

### ARTICLE I
### Bill of Rights

*A DECLARATION OF RIGHTS made by the good people of Virginia in the exercise of their sovereign powers, which rights do pertain to them and their posterity, as the basis and foundation of government.*

**Section 1. Equality and rights of men.**

That all men are by nature equally free and independent and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity; namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety.

**Section 2. People the source of power.**

That all power is vested in, and consequently derived from, the people, that magistrates are their trustees and servants, and at all times amenable to them.

**Section 3. Government instituted for common benefit.**

That government is, or ought to be, instituted for the common benefit, protection, and security of the people, nation, or community; of all the various modes and forms of government, that is best which is capable of producing the greatest degree of happiness and safety, and is most effectually secured against the danger of maladministration; and, whenever any government shall be found inadequate or contrary to these purposes, a majority of the community hath an indubitable, inalienable, and indefeasible right to reform, alter, or abolish it, in such manner as shall be judged most conducive to the public weal.

**Section 4. No exclusive emoluments or privileges; offices not to be hereditary.**

That no man, or set of men, is entitled to exclusive or separate emoluments or privileges from the community, but in consideration of public services; which not being descendible, neither ought the offices of magistrate, legislator, or judge to be hereditary.

**Section 5. Separation of legislative, executive, and judicial departments; periodical elections.**

That the legislative, executive, and judicial departments of the Commonwealth should be separate and distinct; and that the members thereof may be restrained from oppression, by feeling and participating the burthens of the people, they should, at fixed periods, be reduced to a private station, return into that body from which they were originally taken, and the vacancies be supplied by regular elections, in which all or any part of the former members shall be again eligible, or ineligible, as the laws may direct.

**Section 6. Free elections; consent of governed.**

That all elections ought to be free; and that all men, having sufficient evidence of permanent common interest with, and attachment to, the community, have the right of suffrage, and cannot be taxed, or deprived of, or damaged in, their property for public uses, without their own consent, or that of their representatives duly elected, or bound by any law to which they have not, in like manner, assented for the public good.

Appeal: 14-1690    Doc: 15    Filed: 09/24/2014    Pg: 57 of 316

**CONSTITUTION OF VIRGINIA**
Article I, Sections 7, 8, 8-A

**Section 7.  Laws should not be suspended.**

That all power of suspending laws, or the execution of laws, by any authority, without consent of the representatives of the people, is injurious to their rights, and ought not to be exercised.

**Section 8.  Criminal prosecutions.**

That in criminal prosecutions a man hath a right to demand the cause and nature of his accusation, to be confronted with the accusers and witnesses, and to call for evidence in his favor, and he shall enjoy the right to a speedy and public trial, by an impartial jury of his vicinage, without whose unanimous consent he cannot be found guilty.  He shall not be deprived of life or liberty, except by the law of the land or the judgment of his peers, nor be compelled in any criminal proceeding to give evidence against himself, nor be put twice in jeopardy for the same offense.

Laws may be enacted providing for the trial of offenses not felonious by a court not of record without a jury, preserving the right of the accused to an appeal to and a trial by jury in some court of record having original criminal jurisdiction.  Laws may also provide for juries consisting of less than twelve, but not less than five, for the trial of offenses not felonious, and may classify such cases, and prescribe the number of jurors for each class.

In criminal cases, the accused may plead guilty.  If the accused plead not guilty, he may, with his consent and the concurrence of the Commonwealth's Attorney and of the court entered of record, be tried by a smaller number of jurors, or waive a jury.  In case of such waiver or plea of guilty, the court shall try the case.

The provisions of this section shall be self-executing.

**Section 8-A.  Rights of victims of crime.**

That in criminal prosecutions, the victim shall be accorded fairness, dignity and respect by the officers, employees and agents of the Commonwealth and its political subdivisions and officers of the courts and, as the General Assembly may define and provide by law, may be accorded rights to reasonable and appropriate notice, information, restitution, protection, and access to a meaningful role in the criminal justice process.  These rights may include, but not be limited to, the following:

1.   The right to protection from further harm or reprisal through the imposition of appropriate bail and conditions of release;

2.   The right to be treated with respect, dignity and fairness at all stages of the criminal justice system;

3.   The right to address the circuit court at the time sentence is imposed;

4.   The right to receive timely notification of judicial proceedings;

5.   The right to restitution;

6.   The right to be advised of release from custody or escape of the offender, whether before or after disposition; and

7.   The right to confer with the prosecution.

This section does not confer upon any person a right to appeal or modify any decision in a criminal proceeding, does not abridge any other right guaranteed by the Constitution of the United States or this Constitution, and does not create any cause of action for compensation or damages against the Commonwealth or any of its political subdivisions, any officer, employee or agent of the Commonwealth or any of its political subdivisions, or any officer of the court.

The amendment ratified November 5, 1996, and effective January 1, 1997—Added a new section (8-A).

2

**CONSTITUTION OF VIRGINIA**
*Article I, Sections 9, 10, 11, 12, 13*

**Section 9.  Prohibition of excessive bail and fines, cruel and unusual punishment, suspension of habeas corpus, bills of attainder, and ex post facto laws.**

That excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted; that the privilege of the writ of habeas corpus shall not be suspended unless when, in cases of invasion or rebellion, the public safety may require; and that the General Assembly shall not pass any bill of attainder, or any ex post facto law.

**Section 10.  General warrants of search or seizure prohibited.**

That general warrants, whereby an officer or messenger may be commanded to search suspected places without evidence of a fact committed, or to seize any person or persons not named, or whose offense is not particularly described and supported by evidence, are grievous and oppressive, and ought not to be granted.

**Section 11. Due process of law; obligation of contracts; taking or damaging of private property; prohibited discrimination; jury trial in civil cases.**

That no person shall be deprived of his life, liberty, or property without due process of law; that the General Assembly shall not pass any law impairing the obligation of contracts; and that the right to be free from any governmental discrimination upon the basis of religious conviction, race, color, sex, or national origin shall not be abridged, except that the mere separation of the sexes shall not be considered discrimination.

That in controversies respecting property, and in suits between man and man, trial by jury is preferable to any other, and ought to be held sacred.  The General Assembly may limit the number of jurors for civil cases in courts of record to not less than five.

That the General Assembly shall pass no law whereby private property, the right to which is fundamental, shall be damaged or taken except for public use.  No private property shall be damaged or taken for public use without just compensation to the owner thereof.  No more private property may be taken than necessary to achieve the stated public use.  Just compensation shall be no less than the value of the property taken, lost profits and lost access, and damages to the residue caused by the taking.  The terms "lost profits" and "lost access" are to be defined by the General Assembly. A public service company, public service corporation, or railroad exercises the power of eminent domain for public use when such exercise is for the authorized provision of utility, common carrier, or railroad services. In all other cases, a taking or damaging of private property is not for public use if the primary use is for private gain, private benefit, private enterprise, increasing jobs, increasing tax revenue, or economic development, except for the elimination of a public nuisance existing on the property. The condemnor bears the burden of proving that the use is public, without a presumption that it is.

The amendment ratified November 6, 2012, and effective January 1, 2013—In the heading of the section, after "taking", added "or damaging".  In paragraph one, after "contracts", deleted ", nor any law whereby private property shall be taken or damaged for public uses, without just compensation, the term 'public uses' to be defined by the General Assembly".  Added a new paragraph after paragraph two.

**Section 12.  Freedom of speech and of the press; right peaceably to assemble, and to petition.**

That the freedoms of speech and of the press are among the great bulwarks of liberty, and can never be restrained except by despotic governments; that any citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; that the General Assembly shall not pass any law abridging the freedom of speech or of the press, nor the right of the people peaceably to assemble, and to petition the government for the redress of grievances.

**Section 13.  Militia; standing armies; military subordinate to civil power.**

That a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defense of a free state, therefore, the right of the people to keep and bear arms shall not be infringed; that standing armies, in time of peace, should be avoided as dangerous to liberty; and that in all cases the military should be under strict subordination to, and governed by, the civil power.

3

**CONSTITUTION OF VIRGINIA**
Article I, Sections 14, 15, 15-A, 16, 17; Article II, Section 1

### Section 14. Government should be uniform.

That the people have a right to uniform government; and, therefore, that no government separate from, or independent of, the government of Virginia, ought to be erected or established within the limits thereof.

### Section 15. Qualities necessary to preservation of free government.

That no free government, nor the blessings of liberty, can be preserved to any people, but by a firm adherence to justice, moderation, temperance, frugality, and virtue; by frequent recurrence to fundamental principles; and by the recognition by all citizens that they have duties as well as rights, and that such rights cannot be enjoyed save in a society where law is respected and due process is observed.

That free government rests, as does all progress, upon the broadest possible diffusion of knowledge, and that the Commonwealth should avail itself of those talents which nature has sown so liberally among its people by assuring the opportunity for their fullest development by an effective system of education throughout the Commonwealth.

### Section 15-A. Marriage.

That only a union between one man and one woman may be a marriage valid in or recognized by this Commonwealth and its political subdivisions.

This Commonwealth and its political subdivisions shall not create or recognize a legal status for relationships of unmarried individuals that intends to approximate the design, qualities, significance, or effects of marriage. Nor shall this Commonwealth or its political subdivisions create or recognize another union, partnership, or other legal status to which is assigned the rights, benefits, obligations, qualities, or effects of marriage.

The amendment ratified November 7, 2006, and effective January 1, 2007—Added a new section (15-A).

### Section 16. Free exercise of religion; no establishment of religion.

That religion or the duty which we owe to our Creator, and the manner of discharging it, can be directed only by reason and conviction, not by force or violence; and, therefore, all men are equally entitled to the free exercise of religion, according to the dictates of conscience; and that it is the mutual duty of all to practice Christian forbearance, love, and charity towards each other. No man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever, nor shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief; but all men shall be free to profess and by argument to maintain their opinions in matters of religion, and the same shall in nowise diminish, enlarge, or affect their civil capacities. And the General Assembly shall not prescribe any religious test whatever, or confer any peculiar privileges or advantages on any sect or denomination, or pass any law requiring or authorizing any religious society, or the people of any district within this Commonwealth, to levy on themselves or others, any tax for the erection or repair of any house of public worship, or for the support of any church or ministry; but it shall be left free to every person to select his religious instructor, and to make for his support such private contract as he shall please.

### Section 17. Construction of the Bill of Rights.

The rights enumerated in this Bill of Rights shall not be construed to limit other rights of the people not therein expressed.

**ARTICLE II**
**Franchise and Officers**

### Section 1. Qualifications of voters.

In elections by the people, the qualifications of voters shall be as follows: Each voter shall be a citizen of the United States, shall be eighteen years of age, shall fulfill the residence requirements set forth in this section, and shall be registered to vote pursuant to this article. No person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority. As prescribed by law, no person adjudicated to be mentally incompetent shall be qualified to vote until his competency has been reestablished.

4

## CONSTITUTION OF VIRGINIA
### Article II, Sections 1, 2

The residence requirements shall be that each voter shall be a resident of the Commonwealth and of the precinct where he votes. Residence, for all purposes of qualification to vote, requires both domicile and a place of abode. The General Assembly may provide for persons who are employed overseas, and their spouses and dependents residing with them, and who are qualified to vote except for relinquishing their place of abode in the Commonwealth while overseas, to vote in the Commonwealth subject to conditions and time limits defined by law. The General Assembly may provide for persons who are qualified to vote except for having moved their residence from one precinct to another within the Commonwealth to continue to vote in a former precinct subject to conditions and time limits defined by law. The General Assembly may also provide, in elections for President and Vice-President of the United States, alternatives to registration for new residents of the Commonwealth.

Any person who will be qualified with respect to age to vote at the next general election shall be permitted to register in advance and also to vote in any intervening primary or special election.

**The amendment ratified November 7, 1972, and effective January 1, 1973**—In paragraph one, the voting age, formerly "twenty-one", was reduced to "eighteen".

**The amendment ratified November 2, 1976, and effective January 1, 1977**—In paragraph two, substituted "be" for "have been" and removed the durational residency requirement of "six months" in the Commonwealth and "thirty days" in the precinct in the first sentence. The second sentence removed the language "fewer than thirty days prior to an election" and, after the word "may", added the language "in the following November general election and (in any) intervening". In the last sentence of the paragraph, the less-six-months residency requirement for presidential elections was removed to conform with the first sentence.

**The amendment ratified November 5, 1996, and effective January 1, 1997**—In paragraph two, deleted the second sentence: "A person who is qualified to vote except for having moved his residence from one precinct to another may in the following November general election and in any intervening election vote in the precinct from which he has moved.", added a next-to-the-last sentence: "The General Assembly may provide for persons who are qualified to vote . . .", and added "also" preceding "provide" in the last sentence.

**The amendment ratified November 3, 1998, and effective January 1, 1999**—In paragraph two, added the third sentence: "The General Assembly may provide for persons who are employed . . .".

## Section 2.  Registration of voters.

The General Assembly shall provide by law for the registration of all persons otherwise qualified to vote who have met the residence requirements contained in this article, and shall ensure that the opportunity to register is made available. Registrations accomplished prior to the effective date of this section shall be effective hereunder. The registration records shall not be closed to new or transferred registrations more than thirty days before the election in which they are to be used.

Applications to register shall require the applicant to provide the following information on a standard form: full name; date of birth; residence address; social security number, if any; whether the applicant is presently a United States citizen; and such additional information as may be required by law. All applications to register shall be completed by or at the direction of the applicant and signed by the applicant, unless physically disabled. No fee shall be charged to the applicant incident to an application to register.

Nothing in this article shall preclude the General Assembly from requiring as a prerequisite to registration to vote the ability of the applicant to read and complete in his own handwriting the application to register.

**The amendment ratified November 2, 1976, and effective January 1, 1977**—In paragraph two, substituted "date of residence in the precinct" for "length of residence in the Commonwealth and in the precinct" and removed "time" of any previous registrations to vote.

**The amendment ratified November 2, 1982, and effective January 1, 1983**—In paragraph two, after "maiden", added "and any other prior legal" and deleted "of a woman, if married", and after "birth;" deleted "marital status; occupation;".

**The amendment ratified November 8, 1994, and effective January 1, 1995**—In paragraph two, after "to provide", deleted "under oath", after "has been restored.", deleted "Except as otherwise provided in this Constitution,", and after "shall be completed", deleted "in person before the registrar and".

**The amendment ratified November 5, 1996, and effective January 1, 1997**—In paragraph two, after "full name", deleted ", including the maiden and any other prior legal name; age"; after "date", deleted "and place"; added "residence address"; after "of birth;"; and substituted "and such additional information as may be required by law" for "address and place of abode and date of residence in the precinct; place of any previous registrations to vote; and whether the applicant has ever been adjudicated to be mentally incompetent or convicted of a felony, and if so, under what circumstances the applicant's right to vote has been restored".

5

**CONSTITUTION OF VIRGINIA**
Article II, Sections 3, 4, 5

**Section 3.  Method of voting.**

In elections by the people, the following safeguards shall be maintained:  Voting shall be by ballot or by machines for receiving, recording, and counting votes cast.  No ballot or list of candidates upon any voting machine shall bear any distinguishing mark or symbol, other than words identifying political party affiliation; and their form, including the offices to be filled and the listing of candidates or nominees, shall be as uniform as is practicable throughout the Commonwealth or smaller governmental unit in which the election is held.

In elections other than primary elections, provision shall be made whereby votes may be cast for persons other than the listed candidates or nominees.  Secrecy in casting votes shall be maintained, except as provision may be made for assistance to handicapped voters, but the ballot box or voting machine shall be kept in public view and shall not be opened, nor the ballots canvassed nor the votes counted, in secret.  Votes may be cast in person or by absentee ballot as provided by law.

The amendment ratified November 8, 1994, and effective January 1, 1995—In paragraph two, after "Votes may be cast", deleted "only in person, except as otherwise provided in this article" and added "in person or by absentee ballot as provided by law."

**Section 4.  Powers and duties of General Assembly.**

The General Assembly shall establish a uniform system for permanent registration of voters pursuant to this Constitution, including provisions for appeal by any person denied registration, correction of illegal or fraudulent registrations, penalties for illegal, fraudulent, or false registrations, proper transfer of all registered voters, and cancellation of registrations in other jurisdictions of persons who apply to register to vote in the Commonwealth. The General Assembly shall provide for maintenance of accurate and current registration records and may provide for the cancellation of registrations for such purpose.

The General Assembly shall provide for the nomination of candidates, shall regulate the time, place, manner, conduct, and administration of primary, general, and special elections, and shall have power to make any other law regulating elections not inconsistent with this Constitution.

The amendment ratified November 8, 1994, and effective January 1, 1995—In paragraph one, after "fraudulent registrations,", added "penalties for illegal, fraudulent, or false registrations," and replaced "shall provide for cancellation" with "may provide for the cancellation". Deleted provision for canceling a voter's registration for not having voted for four years, allowing the General Assembly to revise laws for canceling a person's registration for not voting. Deleted a paragraph relating to registration and voting by absentee application and ballot for those in the armed forces or temporarily employed out of the country, and for other qualified voters. [The amendment to this section ratified November 2, 1976, and effective January 1, 1977, and the amendment to this section ratified November 4, 1986, and effective July 1, 1987, were superseded by the 1994 amendment.]

**Section 5.  Qualifications to hold elective office.**

The only qualification to hold any office of the Commonwealth or of its governmental units, elective by the people, shall be that a person must have been a resident of the Commonwealth for one year next preceding his election and be qualified to vote for that office, except as otherwise provided in this Constitution, and except that:

(a) the General Assembly may impose more restrictive geographical residence requirements for election of its members, and may permit other governing bodies in the Commonwealth to impose more restrictive geographical residence requirements for election to such governing bodies, but no such requirements shall impair equal representation of the persons entitled to vote;

(b) the General Assembly may provide that residence in a local governmental unit is not required for election to designated elective offices in local governments, other than membership in the local governing body; and

(c) nothing in this Constitution shall limit the power of the General Assembly to prevent conflict of interests, dual officeholding, or other incompatible activities by elective or appointive officials of the Commonwealth or of any political subdivision.

The amendment ratified November 2, 1976, and effective January 1, 1977—In paragraph one, after "one year", added the language "next preceding his election".

6

**CONSTITUTION OF VIRGINIA**
**Article II, Sections 6, 7, 8**

### Section 6. Apportionment.

Members of the House of Representatives of the United States and members of the Senate and of the House of Delegates of the General Assembly shall be elected from electoral districts established by the General Assembly. Every electoral district shall be composed of contiguous and compact territory and shall be so constituted as to give, as nearly as is practicable, representation in proportion to the population of the district. The General Assembly shall reapportion the Commonwealth into electoral districts in accordance with this section in the year 2011 and every ten years thereafter.

Any such decennial reapportionment law shall take effect immediately and not be subject to the limitations contained in Article IV, Section 13, of this Constitution.

The districts delineated in the decennial reapportionment law shall be implemented for the November general election for the United States House of Representatives, Senate, or House of Delegates, respectively, that is held immediately prior to the expiration of the term being served in the year that the reapportionment law is required to be enacted. A member in office at the time that a decennial redistricting law is enacted shall complete his term of office and shall continue to represent the district from which he was elected for the duration of such term of office so long as he does not move his residence from the district from which he was elected. Any vacancy occurring during such term shall be filled from the same district that elected the member whose vacancy is being filled.

The amendment ratified November 2, 2004, and effective January 1, 2005—In paragraph one, after "year", substituted "2011" for "1971". In paragraph two, after "such", added "decennial". Added a new paragraph after paragraph two.

### Section 7. Oath or affirmation.

All officers elected or appointed under or pursuant to this Constitution shall, before they enter on the performance of their public duties, severally take and subscribe the following oath or affirmation:

"I do solemnly swear (or affirm) that I will support the Constitution of the United States, and the Constitution of the Commonwealth of Virginia, and that I will faithfully and impartially discharge all the duties incumbent upon me as ..................., according to the best of my ability (so help me God)."

### Section 8. Electoral boards; registrars and officers of election.

There shall be in each county and city an electoral board composed of three members, selected as provided by law. In the appointment of the electoral boards, representation, as far as practicable, shall be given to each of the two political parties which, at the general election next preceding their appointment, cast the highest and the next highest number of votes. The present members of such boards shall continue in office until the expiration of their respective terms; thereafter their successors shall be appointed for the term of three years. Any vacancy occurring in any board shall be filled by the same authority for the unexpired term.

Each electoral board shall appoint the officers of election and general registrar for its county or city. In appointing such officers of election, representation, as far as practicable, shall be given to each of the two political parties which, at the general election next preceding their appointment, cast the highest and next highest number of votes.

No person, nor the deputy of any person, who is employed by or holds any office or post of profit or emolument, or who holds any elective office of profit or trust, under the governments of the United States, the Commonwealth, or any county, city, or town, shall be appointed a member of the electoral board or general registrar. No person, nor the deputy or the employee of any person, who holds any elective office of profit or trust under the government of the United States, the Commonwealth, or any county, city, or town of the Commonwealth shall be appointed an assistant registrar or officer of election.

The amendment ratified November 4, 1986, and effective January 1, 1987—In paragraph two, after "officers", deleted the words "and registrars" and added "and general registrar" after "of election". In paragraph three, after "the electoral board or", added the word "general" before "registrar" and deleted a reference to officer of election, and added the last sentence: "No person, nor the deputy or the employee of any person . . .".

7

Appeal: 14-1690    Doc: 15    Filed: 09/24/2014    Pg: 63 of 316

CONSTITUTION OF VIRGINIA
Article II, Section 9; Article III, Section 1; Article IV, Sections 1, 2, 3, 4

**Section 9. Privileges of voters during election.**

No voter, during the time of holding any election at which he is entitled to vote, shall be compelled to perform military service, except in time of war or public danger, nor to attend any court as suitor, juror, or witness; nor shall any such voter be subject to arrest under any civil process during his attendance at election or in going to or returning therefrom.

## ARTICLE III
### Division of Powers

**Section 1. Departments to be distinct.**

The legislative, executive, and judicial departments shall be separate and distinct, so that none exercise the powers properly belonging to the others, nor any person exercise the power of more than one of them at the same time; provided, however, administrative agencies may be created by the General Assembly with such authority and duties as the General Assembly may prescribe. Provisions may be made for judicial review of any finding, order, or judgment of such administrative agencies.

## ARTICLE IV
### Legislature

**Section 1. Legislative power.**

The legislative power of the Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and House of Delegates.

**Section 2. Senate.**

The Senate shall consist of not more than forty and not less than thirty-three members, who shall be elected quadrennially by the voters of the several senatorial districts on the Tuesday succeeding the first Monday in November.

**Section 3. House of Delegates.**

The House of Delegates shall consist of not more than one hundred and not less than ninety members, who shall be elected biennially by the voters of the several house districts on the Tuesday succeeding the first Monday in November.

**Section 4. Qualifications of senators and delegates.**

Any person may be elected to the Senate who, at the time of the election, is twenty-one years of age, is a resident of the senatorial district which he is seeking to represent, and is qualified to vote for members of the General Assembly. Any person may be elected to the House of Delegates who, at the time of the election, is twenty-one years of age, is a resident of the house district which he is seeking to represent, and is qualified to vote for members of the General Assembly. A senator or delegate who moves his residence from the district for which he is elected shall thereby vacate his office.

No person holding a salaried office under the government of the Commonwealth, and no judge of any court, attorney for the Commonwealth, sheriff, treasurer, assessor of taxes, commissioner of the revenue, collector of taxes, or clerk of any court shall be a member of either house of the General Assembly during his continuance in office; and his qualification as a member shall vacate any such office held by him. No person holding any office or post of profit or emolument under the United States government, or who is in the employment of such government, shall be eligible to either house.

8

Appeal: 14-1690     Doc: 15     Filed: 09/24/2014     Pg: 64 of 316

**CONSTITUTION OF VIRGINIA**
Article IV, Sections 5, 6, 7, 8

### Section 5. Compensation; election to civil office of profit.

The members of the General Assembly shall receive such salary and allowances as may be prescribed by law, but no increase in salary shall take effect for a given member until after the end of the term for which he was elected. No member during the term for which he shall have been elected shall be elected by the General Assembly to any civil office of profit in the Commonwealth.

### Section 6. Legislative sessions.

The General Assembly shall meet once each year on the second Wednesday in January. Except as herein provided for reconvened sessions, no regular session of the General Assembly convened in an even-numbered year shall continue longer than sixty days; no regular session of the General Assembly convened in an odd-numbered year shall continue longer than thirty days; but with the concurrence of two-thirds of the members elected to each house, any regular session may be extended for a period not exceeding thirty days. Neither house shall, without the consent of the other, adjourn to another place, nor for more than three days.

The Governor may convene a special session of the General Assembly when, in his opinion, the interest of the Commonwealth may require and shall convene a special session upon the application of two-thirds of the members elected to each house.

The General Assembly shall reconvene on the sixth Wednesday after adjournment of each regular or special session for the purpose of considering bills which may have been returned by the Governor with recommendations for their amendment and bills and items of appropriation bills which may have been returned by the Governor with his objections. No other business shall be considered at a reconvened session. Such reconvened session shall not continue longer than three days unless the session be extended, for a period not exceeding seven additional days, upon the vote of the majority of the members elected to each house. The General Assembly may provide, by a joint resolution approved during a regular or special session by the vote of the majority of the members elected to each house, that it shall reconvene on a date after the sixth Wednesday after adjournment of the regular or special session but no later than the seventh Wednesday after adjournment.

**The amendment ratified November 4, 1980, and effective January 1, 1981**—After the first sentence in the first paragraph, added "Except as herein provided for reconvened sessions," and added a third paragraph "The General Assembly shall reconvene on the sixth Wednesday . . .".

**The amendment ratified November 6, 2012, and effective January 1, 2013**—In paragraph three, after "...upon the vote of the majority of the members elected to each house.", added the remainder of the paragraph.

### Section 7. Organization of General Assembly.

The House of Delegates shall choose its own Speaker; and, in the absence of the Lieutenant Governor, or when he shall exercise the office of Governor, the Senate shall choose from its own body a president pro tempore. Each house shall select its officers and settle its rules of procedure. The houses may jointly provide for legislative continuity between sessions occurring during the term for which members of the House of Delegates are elected. Each house may direct writs of election for supplying vacancies which may occur during a session of the General Assembly. If vacancies exist while the General Assembly is not in session, such writs may be issued by the Governor under such regulations as may be prescribed by law. Each house shall judge of the election, qualification, and returns of its members, may punish them for disorderly behavior, and, with the concurrence of two-thirds of its elected membership, may expel a member.

### Section 8. Quorum.

A majority of the members elected to each house shall constitute a quorum to do business, but a smaller number may adjourn from day to day and shall have power to compel the attendance of members in such manner and under such penalty as each house may prescribe. A smaller number, not less than two-fifths of the elected membership of each house, may meet and may, notwithstanding any other provision of this Constitution, enact legislation if the Governor by proclamation declares that a quorum of the General Assembly cannot be convened because of enemy attack upon the soil of Virginia. Such legislation shall remain effective only until thirty days after a quorum of the General Assembly can be convened.

9

**CONSTITUTION OF VIRGINIA**
Article IV, Sections 9, 10, 11

### Section 9. Immunity of legislators.

Members of the General Assembly shall, in all cases except treason, felony, or breach of the peace, be privileged from arrest during the sessions of their respective houses; and for any speech or debate in either house shall not be questioned in any other place. They shall not be subject to arrest under any civil process during the sessions of the General Assembly, or during the fifteen days before the beginning or after the ending of any session.

### Section 10. Journal of proceedings.

Each house shall keep a journal of its proceedings, which shall be published from time to time. The vote of each member voting in each house on any question shall, at the desire of one-fifth of those present, be recorded in the journal. On the final vote on any bill, and on the vote in any election or impeachment conducted in the General Assembly or on the expulsion of a member, the name of each member voting in each house and how he voted shall be recorded in the journal.

### Section 11. Enactment of laws.

No law shall be enacted except by bill. A bill may originate in either house, may be approved or rejected by the other, or may be amended by either, with the concurrence of the other.

No bill shall become a law unless, prior to its passage:

(a) it has been referred to a committee of each house, considered by such committee in session, and reported;

(b) it has been printed by the house in which it originated prior to its passage therein;

(c) it has been read by its title, or its title has been printed in a daily calendar, on three different calendar days in each house; and

(d) upon its final passage a vote has been taken thereon in each house, the name of each member voting for and against recorded in the journal, and a majority of those voting in each house, which majority shall include at least two-fifths of the members elected to that house, recorded in the affirmative.

Only in the manner required in subparagraph (d) of this section shall an amendment to a bill by one house be concurred in by the other, or a conference report be adopted by either house, or either house discharge a committee from the consideration of a bill and consider the same as if reported. The printing and reading, or either, required in subparagraphs (b) and (c) of this section, may be dispensed with in a bill to codify the laws of the Commonwealth, and in the case of an emergency by a vote of four-fifths of the members voting in each house, the name of each member voting and how he voted to be recorded in the journal.

No bill which creates or establishes a new office, or which creates, continues, or revives a debt or charge, or which makes, continues, or revives any appropriation of public or trust money or property, or which releases, discharges, or commutes any claim or demand of the Commonwealth, or which imposes, continues, or revives a tax, shall be passed except by the affirmative vote of a majority of all the members elected to each house, the name of each member voting and how he voted to be recorded in the journal.

Every law imposing, continuing, or reviving a tax shall specifically state such tax. However, any law by which taxes are imposed may define or specify the subject and provisions of such tax by reference to any provision of the laws of the United States as those laws may be or become effective at any time or from time to time, and may prescribe exceptions or modifications to any such provision.

10

Appeal: 14-1690    Doc: 15    Filed: 09/24/2014    Pg: 66 of 316

**CONSTITUTION OF VIRGINIA**
**Article IV, Sections 11, 12, 13, 14**

The presiding officer of each house or upon his inability or failure to act a person designated by a majority of the members elected to each house shall, not later than three days after each bill is enrolled, sign each bill that has been passed by both houses and duly enrolled. The fact of signing shall be recorded in the journal.

The amendment ratified November 4, 1980, and effective January 1, 1981—In the last paragraph, substituted "or upon his inability or failure to act a person designated by a majority of the members elected to each house shall, not later than three days after each bill is enrolled, sign each" for "shall, not later than twenty days after adjournment, sign every".

### Section 12. Form of laws.

No law shall embrace more than one object, which shall be expressed in its title. Nor shall any law be revived or amended with reference to its title, but the act revived or the section amended shall be reenacted and published at length.

### Section 13. Effective date of laws.

All laws enacted at a regular session, including laws which are enacted by reason of actions taken during the reconvened session following a regular session, but excluding a general appropriation law, shall take effect on the first day of July following the adjournment of the session of the General Assembly at which it has been enacted; and all laws enacted at a special session, including laws which are enacted by reason of actions taken during the reconvened session following a special session but excluding a general appropriation law, shall take effect on the first day of the fourth month following the month of adjournment of the special session; unless in the case of an emergency (which emergency shall be expressed in the body of the bill) the General Assembly shall specify an earlier date by a vote of four-fifths of the members voting in each house, the name of each member voting and how he voted to be recorded in the journal, or unless a subsequent date is specified in the body of the bill or by general law.

The amendment ratified November 4, 1980, and effective January 1, 1981—Rewrote the section so that all laws enacted at regular sessions and reconvened sessions which follow will take effect on July 1 rather than on the first day of the fourth month following the month of adjournment, and all laws enacted at special sessions and reconvened sessions which follow will take effect on the fourth month following the month of adjournment, excluding the general appropriation laws.

### Section 14. Powers of General Assembly; limitations.

The authority of the General Assembly shall extend to all subjects of legislation not herein forbidden or restricted; and a specific grant of authority in this Constitution upon a subject shall not work a restriction of its authority upon the same or any other subject. The omission in this Constitution of specific grants of authority heretofore conferred shall not be construed to deprive the General Assembly of such authority, or to indicate a change of policy in reference thereto, unless such purpose plainly appear.

The General Assembly shall confer on the courts power to grant divorces, change the names of persons, and direct the sales of estates belonging to infants and other persons under legal disabilities, and shall not, by special legislation, grant relief in these or other cases of which the courts or other tribunals may have jurisdiction.

The General Assembly may regulate the exercise by courts of the right to punish for contempt.

The General Assembly's power to define the accrual date for a civil action based on an intentional tort committed by a natural person against a person who, at the time of the intentional tort, was a minor shall include the power to provide for the retroactive application of a change in the accrual date. No natural person shall have a constitutionally protected property right to bar a cause of action based on intentional torts as described herein on the ground that a change in the accrual date for the action has been applied retroactively or that a statute of limitations or statute of repose has expired.

The General Assembly shall not enact any local, special, or private law in the following cases:

(1) For the punishment of crime.

(2) Providing a change of venue in civil or criminal cases.

11

Appeal: 14-1690    Doc: 15    Filed: 09/24/2014    Pg: 67 of 316

**CONSTITUTION OF VIRGINIA**
**Article IV, Sections 14, 15**

(3) Regulating the practice in, or the jurisdiction of, or changing the rules of evidence in any judicial proceedings or inquiry before the courts or other tribunals, or providing or changing the methods of collecting debts or enforcing judgments or prescribing the effect of judicial sales of real estate.

(4) Changing or locating county seats.

(5) For the assessment and collection of taxes, except as to animals which the General Assembly may deem dangerous to the farming interests.

(6) Extending the time for the assessment or collection of taxes.

(7) Exempting property from taxation.

(8) Remitting, releasing, postponing, or diminishing any obligation or liability of any person, corporation, or association to the Commonwealth or to any political subdivision thereof.

(9) Refunding money lawfully paid into the treasury of the Commonwealth or the treasury of any political subdivision thereof.

(10) Granting from the treasury of the Commonwealth, or granting or authorizing to be granted from the treasury of any political subdivision thereof, any extra compensation to any public officer, servant, agent, or contractor.

(11) For registering voters, conducting elections, or designating the places of voting.

(12) Regulating labor, trade, mining, or manufacturing, or the rate of interest on money.

(13) Granting any pension.

(14) Creating, increasing, or decreasing, or authorizing to be created, increased, or decreased, the salaries, fees, percentages, or allowances of public officers during the term for which they are elected or appointed.

(15) Declaring streams navigable, or authorizing the construction of booms or dams therein, or the removal of obstructions therefrom.

(16) Affecting or regulating fencing or the boundaries of land, or the running at large of stock.

(17) Creating private corporations, or amending, renewing, or extending the charters thereof.

(18) Granting to any private corporation, association, or individual any special or exclusive right, privilege, or immunity.

(19) Naming or changing the name of any private corporation or association.

(20) Remitting the forfeiture of the charter of any private corporation, except upon the condition that such corporation shall thereafter hold its charter subject to the provisions of this Constitution and the laws passed in pursuance thereof.

The amendment ratified November 8, 1994, and effective January 1, 1995—Added a new paragraph after paragraph three.

The amendment ratified November 7, 2006, and effective January 1, 2007—Deleted the last paragraph relating to charters of incorporation to churches.

**Section 15. General laws.**

In all cases enumerated in the preceding section, and in every other case which, in its judgment, may be provided for by general laws, the General Assembly shall enact general laws. Any general law shall be subject to amendment or repeal, but the amendment or partial repeal thereof shall not operate directly or indirectly to enact, and shall not have the effect of enactment of, a special, private, or local law.

No general or special law shall surrender or suspend the right and power of the Commonwealth, or any political subdivision thereof, to tax corporations and corporate property, except as authorized by Article X. No private corporation, association, or individual shall be specially exempted from the operation of any general law, nor shall a general law's operation be suspended for the benefit of any private corporation, association, or individual.

12

CONSTITUTION OF VIRGINIA
Article IV, Sections 16, 17, 18; Article V, Sections 1, 2, 3

**Section 16.  Appropriations to religious or charitable bodies.**

The General Assembly shall not make any appropriation of public funds, personal property, or real estate to any church or sectarian society, or any association or institution of any kind whatever which is entirely or partly, directly or indirectly, controlled by any church or sectarian society.  Nor shall the General Assembly make any like appropriation to any charitable institution which is not owned or controlled by the Commonwealth; the General Assembly may, however, make appropriations to nonsectarian institutions for the reform of youthful criminals and may also authorize counties, cities, or towns to make such appropriations to any charitable institution or association.

**Section 17.  Impeachment.**

The Governor, Lieutenant Governor, Attorney General, judges, members of the State Corporation Commission, and all officers appointed by the Governor or elected by the General Assembly, offending against the Commonwealth by malfeasance in office, corruption, neglect of duty, or other high crime or misdemeanor may be impeached by the House of Delegates and prosecuted before the Senate, which shall have the sole power to try impeachments.  When sitting for that purpose, the senators shall be on oath or affirmation, and no person shall be convicted without the concurrence of two-thirds of the senators present.  Judgment in case of impeachment shall not extend further than removal from office and disqualification to hold and enjoy any office of honor, trust, or profit under the Commonwealth; but the person convicted shall nevertheless be subject to indictment, trial, judgment, and punishment according to law.  The Senate may sit during the recess of the General Assembly for the trial of impeachments.

**Section 18.  Auditor of Public Accounts.**

An Auditor of Public Accounts shall be elected by the joint vote of the two houses of the General Assembly for the term of four years.  His powers and duties shall be prescribed by law.

### ARTICLE V
### Executive

**Section 1.  Executive power; Governor's term of office.**

The chief executive power of the Commonwealth shall be vested in a Governor.  He shall hold office for a term commencing upon his inauguration on the Saturday after the second Wednesday in January, next succeeding his election, and ending in the fourth year thereafter immediately upon the inauguration of his successor.  He shall be ineligible to the same office for the term next succeeding that for which he was elected, and to any other office during his term of service.

**Section 2.  Election of Governor.**

The Governor shall be elected by the qualified voters of the Commonwealth at the time and place of choosing members of the General Assembly.  Returns of the election shall be transmitted, under seal, by the proper officers, to the State Board of Elections, or such other officer or agency as may be designated by law, which shall cause the returns to be opened and the votes to be counted in the manner prescribed by law.  The person having the highest number of votes shall be declared elected; but if two or more shall have the highest and an equal number of votes, one of them shall be chosen Governor by a majority of the total membership of the General Assembly.  Contested elections for Governor shall be decided by a like vote.  The mode of proceeding in such cases shall be prescribed by law.

**Section 3.  Qualifications of Governor.**

No person except a citizen of the United States shall be eligible to the office of Governor; nor shall any person be eligible to that office unless he shall have attained the age of thirty years and have been a resident of the Commonwealth and a registered voter in the Commonwealth for five years next preceding his election.

13

**CONSTITUTION OF VIRGINIA**
**Article V, Sections 4, 5, 6**

**Section 4.  Place of residence and compensation of Governor.**

The Governor shall reside at the seat of government.  He shall receive for his services a compensation to be prescribed by law, which shall neither be increased nor diminished during the period for which he shall have been elected.  While in office he shall receive no other emolument from this or any other government.

**Section 5.  Legislative responsibilities of Governor.**

The Governor shall communicate to the General Assembly, at every regular session, the condition of the Commonwealth, recommend to its consideration such measures as he may deem expedient, and convene the General Assembly on application of two-thirds of the members elected to each house thereof, or when, in his opinion, the interest of the Commonwealth may require.

**Section 6.  Presentation of bills; powers of Governor; vetoes and amendments.**

(a) Every bill which passes the Senate and House of Delegates, before it becomes law, shall be presented to the Governor.

(b) During a regular or special session, the Governor shall have seven days in which to act on the bill after it is presented to him and to exercise one of the three options set out below.  If the Governor does not act on the bill, it shall become law without his signature.

(i) The Governor may sign the bill if he approves it, and the bill shall become law.

(ii) The Governor may veto the bill if he objects to it by returning the bill with his objections to the house in which the bill originated.  The house shall enter the objections in its journal and reconsider the bill.  The house may override the veto by a two-thirds vote of the members present, which two-thirds shall include a majority of the members elected to that house.  If the house of origin overrides the Governor's veto, it shall send the bill and Governor's objections to the other house where the bill shall be reconsidered.  The second house may override the Governor's veto by a two-thirds vote of the members present, which two-thirds shall include a majority of the members elected to that house.  If both houses override the Governor's veto, the bill shall become law without his signature.  If either house fails to override the Governor's veto, the veto shall stand and the bill shall not become law.

(iii) The Governor may recommend one or more specific and severable amendments to a bill by returning it with his recommendation to the house in which it originated.  The house shall enter the Governor's recommendation in its journal and reconsider the bill.  If both houses agree to the Governor's entire recommendation, the bill, as amended, shall become law.  Each house may agree to the Governor's amendments by a majority vote of the members present.  If both houses agree to the bill in the form originally sent to the Governor by a two-thirds vote of all members present in each house, which two-thirds shall include a majority of the members elected to that house, the original bill shall become law.  If the Governor sends down specific and severable amendments then each house may determine, in accordance with its own procedures, whether to act on the Governor's amendments en bloc or individually, or any combination thereof.  If the house of origin agrees to one or more of the Governor's amendments, it shall send the bill and the entire recommendation to the other house.  The second house may also agree to one or more of the Governor's amendments.  If either house fails to agree to the Governor's entire recommendation or fails to agree to at least one of the Governor's amendments agreed to by the other house, the bill, as originally presented to the Governor, shall be returned to the Governor.  If both houses agree to one or more amendments but not to the entire recommendation of the Governor, the bill shall be reenrolled with the Governor's amendments agreed to by both houses and shall be returned to the Governor.  If the Governor fails to send down specific and severable amendments as determined by the majority vote of the members present in either house, then the bill shall be before that house, in the form originally sent to the Governor and may be acted upon in accordance with Article IV, Section 11 of this Constitution and returned to the Governor.  The Governor shall either sign or veto a bill returned as provided in this subsection or, if there are fewer than seven days remaining in the session, as provided in subsection (c).

(c) When there are fewer than seven days remaining in the regular or special session from the date a bill is presented to the Governor and the General Assembly adjourns to a reconvened session, the Governor shall have thirty days from the date of adjournment of the regular or special session in which to act on the bills presented to him and to exercise one of the three options set out below.  If the Governor does not act on any bill, it shall become law without his signature.

14

**CONSTITUTION OF VIRGINIA**
Article V, Sections 6, 7, 8, 9

(i) The Governor may sign the bill if he approves it, and the bill shall become law.

(ii) The Governor may veto the bill if he objects to it by returning the bill with his objections to the house in which the bill originated. The same procedures for overriding his veto are applicable as stated in subsection (b) for bills vetoed during the session.

(iii) The Governor may recommend one or more specific and severable amendments to a bill by returning it with his recommendation to the house in which it originated. The same procedures for considering his recommendation are applicable as stated in subsection (b) (iii) for bills returned with his recommendation. The Governor shall either sign or veto a bill returned to him from a reconvened session. If the Governor vetoes the bill, the veto shall stand and the bill shall not become law. If the Governor does not act on the bill within thirty days after the adjournment of the reconvened session, the bill shall become law without his signature.

(d) The Governor shall have the power to veto any particular item or items of an appropriation bill, but the veto shall not affect the item or items to which he does not object. The item or items objected to shall not take effect except in the manner provided in this section for a bill vetoed by the Governor.

(e) In all cases set forth above, the names of the members voting for and against the bill, the amendment or amendments to the bill, or the item or items of an appropriation bill shall be entered on the journal of each house.

The amendment ratified November 8, 1994, and effective January 1, 1995—Rewrote the section to provide that the Governor may offer only one set of amendments to any bill, to require the Governor to take action to veto a bill, to allow the General Assembly to sever the Governor's amendments, acting on them individually or en bloc, and to allow the General Assembly to propose its own amendments if it determines the Governor's amendments are not severable. [The amendment to this section ratified November 4, 1980, and effective January 1, 1981, was superseded by the 1994 amendment.]

## Section 7. Executive and administrative powers.

The Governor shall take care that the laws be faithfully executed.

The Governor shall be commander-in-chief of the armed forces of the Commonwealth and shall have power to embody such forces to repel invasion, suppress insurrection, and enforce the execution of the laws.

The Governor shall conduct, either in person or in such manner as shall be prescribed by law, all intercourse with other and foreign states.

The Governor shall have power to fill vacancies in all offices of the Commonwealth for the filling of which the Constitution and laws make no other provision. If such office be one filled by the election of the people, the appointee shall hold office until the next general election, and thereafter until his successor qualifies, according to law. The General Assembly shall, if it is in session, fill vacancies in all offices which are filled by election by that body.

Gubernatorial appointments to fill vacancies in offices which are filled by election by the General Assembly or by appointment by the Governor which is subject to confirmation by the Senate or the General Assembly, made during the recess of the General Assembly, shall expire at the end of thirty days after the commencement of the next session of the General Assembly.

## Section 8. Information from administrative officers.

The Governor may require information in writing, under oath, from any officer of any executive or administrative department, office, or agency, or any public institution upon any subject relating to their respective departments, offices, agencies, or public institutions; and he may inspect at any time their official books, accounts, and vouchers, and ascertain the conditions of the public funds in their charge, and in that connection may employ accountants. He may require the opinion in writing of the Attorney General upon any question of law affecting the official duties of the Governor.

## Section 9. Administrative organization.

The functions, powers, and duties of the administrative departments and divisions and of the agencies of the Commonwealth within the legislative and executive branches may be prescribed by law.

15

**CONSTITUTION OF VIRGINIA**
Article V, Sections 10, 11, 12, 13, 14, 15, 16

**Section 10.  Appointment and removal of administrative officers.**

Except as may be otherwise provided in this Constitution, the Governor shall appoint each officer serving as the head of an administrative department or division of the executive branch of the government, subject to such confirmation as the General Assembly may prescribe.  Each officer appointed by the Governor pursuant to this section shall have such professional qualifications as may be prescribed by law and shall serve at the pleasure of the Governor.

**Section 11.  Effect of refusal of General Assembly to confirm an appointment by the Governor.**

No person appointed to any office by the Governor, whose appointment is subject to confirmation by the General Assembly, under the provisions of this Constitution or any statute, shall enter upon, or continue in, office after the General Assembly shall have refused to confirm his appointment, nor shall such person be eligible for reappointment during the recess of the General Assembly to fill the vacancy caused by such refusal to confirm.

**Section 12.  Executive clemency.**

The Governor shall have power to remit fines and penalties under such rules and regulations as may be prescribed by law; to grant reprieves and pardons after conviction except when the prosecution has been carried on by the House of Delegates; to remove political disabilities consequent upon conviction for offenses committed prior or subsequent to the adoption of this Constitution; and to commute capital punishment.

He shall communicate to the General Assembly, at each regular session, particulars of every case of fine or penalty remitted, of reprieve or pardon granted, and of punishment commuted, with his reasons for remitting, granting, or commuting the same.

**Section 13.  Lieutenant Governor; election and qualifications.**

A Lieutenant Governor shall be elected at the same time and for the same term as the Governor, and his qualifications and the manner and ascertainment of his election, in all respects, shall be the same, except that there shall be no limit on the terms of the Lieutenant Governor.

**Section 14.  Duties and compensation of Lieutenant Governor.**

The Lieutenant Governor shall be President of the Senate but shall have no vote except in case of an equal division.  He shall receive for his services a compensation to be prescribed by law, which shall not be increased nor diminished during the period for which he shall have been elected.

**Section 15.  Attorney General.**

An Attorney General shall be elected by the qualified voters of the Commonwealth at the same time and for the same term as the Governor; and the fact of his election shall be ascertained in the same manner.  No person shall be eligible for election or appointment to the office of Attorney General unless he is a citizen of the United States, has attained the age of thirty years, and has the qualifications required for a judge of a court of record.  He shall perform such duties and receive such compensation as may be prescribed by law, which compensation shall neither be increased nor diminished during the period for which he shall have been elected.  There shall be no limit on the terms of the Attorney General.

**Section 16.  Succession to the office of Governor.**

When the Governor-elect is disqualified, resigns, or dies following his election but prior to taking office, the Lieutenant Governor-elect shall succeed to the office of Governor for the full term.  When the Governor-elect fails to assume office for any other reason, the Lieutenant Governor-elect shall serve as Acting Governor.

16

**CONSTITUTION OF VIRGINIA**
**Article V, Sections 16, 17**

Whenever the Governor transmits to the President pro tempore of the Senate and the Speaker of the House of Delegates his written declaration that he is unable to discharge the powers and duties of his office and until he transmits to them a written declaration to the contrary, such powers and duties shall be discharged by the Lieutenant Governor as Acting Governor.

Whenever the Attorney General, the President pro tempore of the Senate, and the Speaker of the House of Delegates, or a majority of the total membership of the General Assembly, transmit to the Clerk of the Senate and the Clerk of the House of Delegates their written declaration that the Governor is unable to discharge the powers and duties of his office, the Lieutenant Governor shall immediately assume the powers and duties of the office as Acting Governor.

Thereafter, when the Governor transmits to the Clerk of the Senate and the Clerk of the House of Delegates his written declaration that no inability exists, he shall resume the powers and duties of his office unless the Attorney General, the President pro tempore of the Senate, and the Speaker of the House of Delegates, or a majority of the total membership of the General Assembly, transmit within four days to the Clerk of the Senate and the Clerk of the House of Delegates their written declaration that the Governor is unable to discharge the powers and duties of his office. Thereupon the General Assembly shall decide the issue, convening within forty-eight hours for that purpose if not already in session. If within twenty-one days after receipt of the latter declaration or, if the General Assembly is not in session, within twenty-one days after the General Assembly is required to convene, the General Assembly determines by three-fourths vote of the elected membership of each house of the General Assembly that the Governor is unable to discharge the powers and duties of his office, the Lieutenant Governor shall become Governor; otherwise, the Governor shall resume the powers and duties of his office.

In the case of the removal of the Governor from office or in the case of his disqualification, death, or resignation, the Lieutenant Governor shall become Governor.

If a vacancy exists in the office of Lieutenant Governor when the Lieutenant Governor is to succeed to the office of Governor or to serve as Acting Governor, the Attorney General, if he is eligible to serve as Governor, shall succeed to the office of Governor for the unexpired term or serve as Acting Governor. If the Attorney General is ineligible to serve as Governor, the Speaker of the House of Delegates, if he is eligible to serve as Governor, shall succeed to the office of Governor for the unexpired term or serve as Acting Governor. If a vacancy exists in the office of the Speaker of the House of Delegates or if the Speaker of the House of Delegates is ineligible to serve as Governor, the House of Delegates shall convene and fill the vacancy.

In the event of an emergency or enemy attack upon the soil of Virginia and a resulting inability of the House of Delegates to convene to fill the vacancy, the Speaker of the House, the person designated to act in his stead as prescribed in the Rules of the House of Delegates, the President pro tempore of the Senate, or the majority leader of the Senate, in that designated order, shall serve as Acting Governor until such time as the House of Delegates convenes to elect a Governor.

The General Assembly may provide by law for the waiver of the eligibility requirements for the Attorney General, Speaker of the House, or acting Speaker to serve as Governor or Acting Governor in the event of an emergency or enemy attack upon the soil of Virginia as evidenced by a proclamation of the Governor or alternative authority prescribed by law.

The amendment ratified November 2, 2004, and effective January 1, 2005—Added two new paragraphs after paragraph six.

**Section 17. Commissions and grants.**

Commissions and grants shall run in the name of the Commonwealth of Virginia, and be attested by the Governor, with the seal of the Commonwealth annexed.

17

**CONSTITUTION OF VIRGINIA**
Article VI, Sections 1, 2, 3, 4

**ARTICLE VI**
Judiciary

## Section 1. Judicial power; jurisdiction.

The judicial power of the Commonwealth shall be vested in a Supreme Court and in such other courts of original or appellate jurisdiction subordinate to the Supreme Court as the General Assembly may from time to time establish. Trial courts of general jurisdiction, appellate courts, and such other courts as shall be so designated by the General Assembly shall be known as courts of record.

The Supreme Court shall, by virtue of this Constitution, have original jurisdiction in cases of habeas corpus, mandamus, and prohibition; to consider claims of actual innocence presented in such cases and *in such manner as may be provided by the General Assembly; in matters of judicial censure, retirement, and removal* under Section 10 of this article; and to answer questions of state law certified by a court of the United States or the highest appellate court of any other state. All other jurisdiction of the Supreme Court shall be appellate. Subject to such reasonable rules as may be prescribed as to the course of appeals and other procedural matters, the Supreme Court shall, by virtue of this Constitution, have appellate jurisdiction in cases involving the constitutionality of a law under this Constitution or the Constitution of the United States and in cases involving the life or liberty of any person.

The General Assembly may allow the Commonwealth the right to appeal in all cases, including those involving *the life or liberty of a person, provided such appeal would not otherwise violate this Constitution or the Constitution* of the United States.

Subject to the foregoing limitations, the General Assembly shall have the power to determine the original and appellate jurisdiction of the courts of the Commonwealth.

The amendment ratified November 4, 1986, and effective December 1, 1986—In paragraph two, after "mandamus, and prohibition", deleted "and" and added to the sentence ", and to answer questions of state law certified by a court of the United States . . .".

The amendment ratified November 4, 1986, and effective December 1, 1986—In paragraph three, after "relating to the State revenue.", added the last sentence "The General Assembly may also allow the Commonwealth . . .".

The amendment ratified November 5, 1996, and effective January 1, 1997—Deleted the third paragraph: "No appeal shall be allowed to the Commonwealth . . ." and added a next-to-the-last paragraph: "The General Assembly may allow the Commonwealth . . .".

The amendment ratified November 5, 2002, and effective November 15, 2002—In paragraph two, after "mandamus, and prohibition", deleted the comma and added "; to consider claims of actual innocence presented by convicted felons in such cases and in such manner as may be provided by the General Assembly;" and after "article", deleted the comma and added a semicolon.

## Section 2. Supreme Court.

The Supreme Court shall consist of seven justices. The General Assembly may, if three-fifths of the elected membership of each house so vote at two successive regular sessions, increase or decrease the number of justices of the Court, provided that the Court shall consist of no fewer than seven and no more than eleven justices. The Court may sit and render final judgment en banc or in divisions as may be prescribed by law. No decision shall become the judgment of the Court, however, except on the concurrence of at least three justices, and no law shall be declared unconstitutional under either this Constitution or the Constitution of the United States except on the concurrence of at least a majority of all justices of the Supreme Court.

## Section 3. Selection of Chief Justice.

The Chief Justice shall be selected from among the justices in a manner provided by law.

## Section 4. Administration of the judicial system.

The Chief Justice of the Supreme Court shall be the administrative head of the judicial system. He may temporarily assign any judge of a court of record to any other court of record except the Supreme Court and may assign a retired judge of a court of record, with his consent, to any court of record except the Supreme Court. The General Assembly may adopt such additional measures as it deems desirable for the improvement of the administration of justice by the courts and for the expedition of judicial business.

18

**CONSTITUTION OF VIRGINIA**
Article VI, Sections 5, 6, 7, 8, 9

### Section 5. Rules of practice and procedure.

The Supreme Court shall have the authority to make rules governing the course of appeals and the practice and procedures to be used in the courts of the Commonwealth, but such rules shall not be in conflict with the general law as the same shall, from time to time, be established by the General Assembly.

### Section 6. Opinions and judgments of the Supreme Court.

When a judgment or decree is reversed, modified, or affirmed by the Supreme Court, or when original cases are resolved on their merits, the reasons for the Court's action shall be stated in writing and preserved with the record of the case. The Court may, but need not, remand a case for a new trial. In any civil case, it may enter final judgment, except that the award in a suit or action for unliquidated damages shall not be increased or diminished.

### Section 7. Selection and qualification of judges.

The justices of the Supreme Court shall be chosen by the vote of a majority of the members elected to each house of the General Assembly for terms of twelve years. The judges of all other courts of record shall be chosen by the vote of a majority of the members elected to each house of the General Assembly for terms of eight years. During any vacancy which may exist while the General Assembly is not in session, the Governor may appoint a successor to serve until thirty days after the commencement of the next session of the General Assembly. Upon election by the General Assembly, a new justice or judge shall begin service of a full term.

All justices of the Supreme Court and all judges of other courts of record shall be residents of the Commonwealth and shall, at least five years prior to their appointment or election, have been admitted to the bar of the Commonwealth. Each judge of a trial court of record shall during his term of office reside within the jurisdiction of one of the courts to which he was appointed or elected; provided, however, that where the boundary of such jurisdiction is changed by annexation or otherwise, no judge thereof shall thereby become disqualified from office or ineligible for reelection if, except for such annexation or change, he would otherwise be qualified.

### Section 8. Additional judicial personnel.

The General Assembly may provide for additional judicial personnel, such as judges of courts not of record and magistrates or justices of the peace, and may prescribe their jurisdiction and provide the manner in which they shall be selected and the terms for which they shall serve.

The General Assembly may confer upon the clerks of the several courts having probate jurisdiction, jurisdiction of the probate of wills and of the appointment and qualification of guardians, personal representatives, curators, appraisers, and committees of persons adjudged insane or convicted of felony, and in the matter of the substitution of trustees.

### Section 9. Commission; compensation; retirement.

All justices of the Supreme Court and all judges of other courts of record shall be commissioned by the Governor. They shall receive such salaries and allowances as shall be prescribed by the General Assembly, which shall be apportioned between the Commonwealth and its cities and counties in the manner provided by law. Unless expressly prohibited or limited by the General Assembly, cities and counties shall be permitted to supplement from local funds the salaries of any judges serving within their geographical boundaries. The salary of any justice or judge shall not be diminished during his term of office.

The General Assembly may enact such laws as it deems necessary for the retirement of justices and judges, with such conditions, compensation, and duties as it may prescribe. The General Assembly may also provide for the mandatory retirement of justices and judges after they reach a prescribed age, beyond which they shall not serve, regardless of the term to which elected or appointed.

19

CONSTITUTION OF VIRGINIA
Article VI, Sections 10, 11, 12; Article VII Section 1

### Section 10.  Disabled and unfit judges.

The General Assembly shall create a Judicial Inquiry and Review Commission consisting of members of the judiciary, the bar, and the public and vested with the power to investigate charges which would be the basis for retirement, censure, or removal of a judge.  The Commission shall be authorized to conduct hearings and to subpoena witnesses and documents.  Proceedings and documents before the Commission may be confidential as provided by the General Assembly in general law.

If the Commission finds the charges to be well-founded, it may file a formal complaint before the Supreme Court.

Upon the filing of a complaint, the Supreme Court shall conduct a hearing in open court and, upon a finding of disability which is or is likely to be permanent and which seriously interferes with the performance by the judge of his duties, shall retire the judge from office.  A judge retired under this authority shall be considered for the purpose of retirement benefits to have retired voluntarily.

If the Supreme Court after the hearing on the complaint finds that the judge has engaged in misconduct while in office, or that he has persistently failed to perform the duties of his office, or that he has engaged in conduct prejudicial to the proper administration of justice, it shall censure him or shall remove him from office.  A judge removed under this authority shall not be entitled to retirement benefits, but only to the return of contributions made by him, together with any income accrued thereon.

This section shall apply to justices of the Supreme Court, to judges of other courts of record, and to members of the State Corporation Commission.  The General Assembly also may provide by general law for the retirement, censure, or removal of judges of any court not of record, or other personnel exercising judicial functions.

The amendment ratified November 3, 1998, and effective January 1, 1999—In paragraph one, third sentence, after "Proceedings", added "and documents" and substituted "Commission may be confidential as provided by the General Assembly in general law" for "Commission shall be confidential".

### Section 11.  Incompatible activities.

No justice or judge of a court of record shall, during his continuance in office, engage in the practice of law within or without the Commonwealth, or seek or accept any nonjudicial elective office, or hold any other office of public trust, or engage in any other incompatible activity.

### Section 12.  Limitation; judicial appointment.

No judge shall be granted the power to make any appointment of any local governmental official elected by the voters except to fill a vacancy in office pending the next ensuing general election or, if the vacancy occurs within one hundred twenty days prior to such election, pending the second ensuing general election, unless such election falls within sixty days of the end of the term of the office to be filled.

The amendment ratified November 2, 1976, and effective January 1, 1977—At the end of the section, after "election", added the language ", unless such election falls within sixty days of the end of the term of the office to be filled".

## ARTICLE VII
Local Government

### Section 1.  Definitions.

As used in this article (1) "county" means any existing county or any such unit hereafter created, (2) "city" means an independent incorporated community which became a city as provided by law before noon on the first day of July, nineteen hundred seventy-one, or which has within defined boundaries a population of 5,000 or more and which has become a city as provided by law, (3) "town" means any existing town or an incorporated community within one or more counties which became a town before noon, July one, nineteen hundred seventy-one, as provided by law or which has within defined boundaries a population of 1,000 or more and which has become a town as provided by law, (4) "regional government" means a unit of general government organized as provided by law within defined boundaries, as determined by the General Assembly, (5) "general law" means a law which on its effective date applies alike to all counties, cities, towns, or regional governments or to a reasonable classification thereof, and (6) "special act" means a law applicable to a county, city, town, or regional government and for enactment shall require an affirmative vote of two-thirds of the members elected to each house of the General Assembly.

20

**CONSTITUTION OF VIRGINIA**
**Article VII, Sections 1, 2, 3, 4**

The General Assembly may increase by general law the population minima provided in this article for cities and towns. Any county which on the effective date of this Constitution had adopted an optional form of government pursuant to a valid statute that does not meet the general law requirements of this article may continue its form of government without regard to such general law requirements until it adopts a form of government provided in conformity with this article. In this article, whenever the General Assembly is authorized or required to act by general law, no special act for that purpose shall be valid unless this article so provides.

The amendment ratified November 7, 1972, and effective January 1, 1973—Added language to the definition of "city" in (2) to include those communities which became cities before July 1, 1971. Added language to the definition of "town" in (3) to include those communities which became towns before July 1, 1971.

### Section 2. Organization and government.

The General Assembly shall provide by general law for the organization, government, powers, change of boundaries, consolidation, and dissolution of counties, cities, towns, and regional governments. The General Assembly may also provide by general law optional plans of government for counties, cities, or towns to be effective if approved by a majority vote of the qualified voters voting on any such plan in any such county, city, or town.

The General Assembly may also provide by special act for the organization, government, and powers of any county, city, town, or regional government, including such powers of legislation, taxation, and assessment as the General Assembly may determine, but no such special act shall be adopted which provides for the extension or contraction of boundaries of any county, city, or town.

Every law providing for the organization of a regional government shall, in addition to any other requirements imposed by the General Assembly, require the approval of the organization of the regional government by a majority vote of the qualified voters voting thereon in each county and city which is to participate in the regional government and of the voters voting thereon in a part of a county or city where only the part is to participate.

### Section 3. Powers.

The General Assembly may provide by general law or special act that any county, city, town, or other unit of government may exercise any of its powers or perform any of its functions and may participate in the financing thereof jointly or in cooperation with the Commonwealth or any other unit of government within or without the Commonwealth. The General Assembly may provide by general law or special act for transfer to or sharing with a regional government of any services, functions, and related facilities of any county, city, town, or other unit of government within the boundaries of such regional government.

### Section 4. County and city officers.

There shall be elected by the qualified voters of each county and city a treasurer, a sheriff, an attorney for the Commonwealth, a clerk, who shall be clerk of the court in the office of which deeds are recorded, and a commissioner of revenue. The duties and compensation of such officers shall be prescribed by general law or special act.

Regular elections for such officers shall be held on Tuesday after the first Monday in November. Such officers shall take office on the first day of the following January unless otherwise provided by law and shall hold their respective offices for the term of four years, except that the clerk shall hold office for eight years.

The General Assembly may provide for county or city officers or methods of their selection, including permission for two or more units of government to share the officers required by this section, without regard to the provisions of this section, either (1) by general law to become effective in any county or city when submitted to the qualified voters thereof in an election held for such purpose and approved by a majority of those voting thereon in each such county or city, or (2) by special act upon the request, made after such an election, of each county or city affected. No such law shall reduce the term of any person holding an office at the time the election is held. A county or city not required to have or to elect such officers prior to the effective date of this Constitution shall not be so required by this section.

The General Assembly may provide by general law or special act for additional officers and for the terms of their office.

21

**CONSTITUTION OF VIRGINIA**
*Article VII, Sections 5, 6, 7, 8, 9*

### Section 5.  County, city, and town governing bodies.

The governing body of each county, city, or town shall be elected by the qualified voters of such county, city, or town in the manner provided by law.

If the members are elected by district, the district shall be composed of contiguous and compact territory and shall be so constituted as to give, as nearly as is practicable, representation in proportion to the population of the district.  When members are so elected by district, the governing body of any county, city, or town may, in a manner provided by law, increase or diminish the number, and change the boundaries, of districts, and shall in 1971 and every ten years thereafter, and also whenever the boundaries of such districts are changed, reapportion the representation in the governing body among the districts in a manner provided by law.  Whenever the governing body of any such unit shall fail to perform the duties so prescribed in the manner herein directed, a suit shall lie on behalf of any citizen thereof to compel performance by the governing body.

Unless otherwise provided by law, the governing body of each city or town shall be elected on the second Tuesday in June and take office on the first day of the following September.  Unless otherwise provided by law, the governing body of each county shall be elected on the Tuesday after the first Monday in November and take office on the first day of the following January.

### Section 6.  Multiple offices.

Unless two or more units exercise functions jointly as authorized in Sections 3 and 4, no person shall at the same time hold more than one office mentioned in this article.  No member of a governing body shall be eligible, during the term of office for which he was elected or appointed, to hold any office filled by the governing body by election or appointment, except that a member of a governing body may be named a member of such other boards, commissions, and bodies as may be permitted by general law and except that a member of a governing body may be elected or appointed to fill a vacancy in the office of mayor or board chairman if permitted by general law or special act.

The amendment ratified November 6, 1984, and effective January 1, 1985—After "as may be permitted by general law", added "and except that a member of a governing body may be elected or appointed to fill a vacancy in the office of mayor or board chairman if permitted by general law or special act".

### Section 7.  Procedures.

No ordinance or resolution appropriating money exceeding the sum of five hundred dollars, imposing taxes, or authorizing the borrowing of money shall be passed except by a recorded affirmative vote of a majority of all members elected to the governing body.  In case of the veto of such an ordinance or resolution, where the power of veto exists, it shall require for passage thereafter a recorded affirmative vote of two-thirds of all members elected to the governing body.

On final vote on any ordinance or resolution, the name of each member voting and how he voted shall be recorded.

### Section 8.  Consent to use public property.

No street railway, gas, water, steam or electric heating, electric light or power, cold storage, compressed air, viaduct, conduit, telephone, or bridge company, nor any corporation, association, person, or partnership engaged in these or like enterprises shall be permitted to use the streets, alleys, or public grounds of a city or town without the previous consent of the corporate authorities of such city or town.

### Section 9.  Sale of property and granting of franchises by cities and towns.

No rights of a city or town in and to its waterfront, wharf property, public landings, wharves, docks, streets, avenues, parks, bridges, or other public places, or its gas, water, or electric works shall be sold except by an ordinance or resolution passed by a recorded affirmative vote of three-fourths of all members elected to the governing body.

22

**CONSTITUTION OF VIRGINIA**
**Article VII, Sections 9, 10**

No franchise, lease, or right of any kind to use any such public property or any other public property or easement of any description in a manner not permitted to the general public shall be granted for a longer period than forty years, except for air rights together with easements for columns of support, which may be granted for a period not exceeding sixty years.  Before granting any such franchise or privilege for a term in excess of five years, except for a trunk railway, the city or town shall, after due advertisement, publicly receive bids therefor.  Such grant, and any contract in pursuance thereof, may provide that upon the termination of the grant, the plant as well as the property, if any, of the grantee in the streets, avenues, and other public places shall thereupon, without compensation to the grantee, or upon the payment of a fair valuation therefor, become the property of the said city or town; but the grantee shall be entitled to no payment by reason of the value of the franchise.  Any such plant or property acquired by a city or town may be sold or leased or, unless prohibited by general law, maintained, controlled, and operated by such city or town.  Every such grant shall specify the mode of determining any valuation therein provided for and shall make adequate provisions by way of forfeiture of the grant, or otherwise, to secure efficiency of public service at reasonable rates and the maintenance of the property in good order throughout the term of the grant.

**Section 10.  Debt.**

(a)  No city or town shall issue any bonds or other interest-bearing obligations which, including existing indebtedness, shall at any time exceed ten per centum of the assessed valuation of the real estate in the city or town subject to taxation, as shown by the last preceding assessment for taxes.  In determining the limitation for a city or town there shall not be included the following classes of indebtedness:

(1)  Certificates of indebtedness, revenue bonds, or other obligations issued in anticipation of the collection of the revenues of such city or town for the then current year; provided that such certificates, bonds, or other obligations mature within one year from the date of their issue, be not past due, and do not exceed the revenue for such year.

(2)  Bonds pledging the full faith and credit of such city or town authorized by an ordinance enacted in accordance with Section 7, and approved by the affirmative vote of the qualified voters of the city or town voting upon the question of their issuance, for a supply of water or other specific undertaking from which the city or town may derive a revenue; but from and after a period to be determined by the governing body not exceeding five years from the date of such election, whenever and for so long as such undertaking fails to produce sufficient revenue to pay for cost of operation and administration (including interest on bonds issued therefor), the cost of insurance against loss by injury to persons or property, and an annual amount to be placed into a sinking fund sufficient to pay the bonds at or before maturity, all outstanding bonds issued on account of such undertaking shall be included in determining such limitation.

(3)  Bonds of a city or town the principal and interest on which are payable exclusively from the revenues and receipts of a water system or other specific undertaking or undertakings from which the city or town may derive a revenue or secured, solely or together with such revenues, by contributions of other units of government.

(4)  Contract obligations of a city or town to provide payments over a period of more than one year to any publicly owned or controlled regional project, if the project has been authorized by an interstate compact or if the General Assembly by general law or special act has authorized an exclusion for such project purposes.

(b)  No debt shall be contracted by or on behalf of any county or district thereof or by or on behalf of any regional government or district thereof except by authority conferred by the General Assembly by general law.  The General Assembly shall not authorize any such debt, except the classes described in paragraphs (1) and (3) of subsection (a), refunding bonds, and bonds issued, with the consent of the school board and the governing body of the county, by or on behalf of a county or district thereof for capital projects for school purposes and sold to the Literary Fund, the Virginia Supplemental Retirement System, or other State agency prescribed by law, unless in the general law authorizing the same, provision be made for submission to the qualified voters of the county or district thereof or the region or district thereof, as the case may be, for approval or rejection by a majority vote of the qualified voters voting in an election on the question of contracting such debt.  Such approval shall be a prerequisite to contracting such debt.

23

CONSTITUTION OF VIRGINIA
Article VII, Section10; Article VIII, Sections 1, 2, 3, 4, 5

Any county may, upon approval by the affirmative vote of the qualified voters of the county voting in an election on the question, elect to be treated as a city for the purposes of issuing its bonds under this section. If a county so elects, it shall thereafter be subject to all of the benefits and limitations of this section applicable to cities, but in determining the limitation for a county there shall be included, unless otherwise excluded under this section, indebtedness of any town or district in that county empowered to levy taxes on real estate.

The amendment ratified November 4, 1980, and effective January 1, 1981—In subsection (a), substituted "ten per centum" for "eighteen per centum".

# ARTICLE VIII
## Education

### Section 1. Public schools of high quality to be maintained.

The General Assembly shall provide for a system of free public elementary and secondary schools for all children of school age throughout the Commonwealth, and shall seek to ensure that an educational program of high quality is established and continually maintained.

### Section 2. Standards of quality; State and local support of public schools.

Standards of quality for the several school divisions shall be determined and prescribed from time to time by the Board of Education, subject to revision only by the General Assembly.

The General Assembly shall determine the manner in which funds are to be provided for the cost of maintaining an educational program meeting the prescribed standards of quality, and shall provide for the apportionment of the cost of such program between the Commonwealth and the local units of government comprising such school divisions. Each unit of local government shall provide its portion of such cost by local taxes or from other available funds.

### Section 3. Compulsory education; free textbooks.

The General Assembly shall provide for the compulsory elementary and secondary education of every eligible child of appropriate age, such eligibility and age to be determined by law. It shall ensure that textbooks are provided at no cost to each child attending public school whose parent or guardian is financially unable to furnish them.

### Section 4. Board of Education.

The general supervision of the public school system shall be vested in a Board of Education of nine members, to be appointed by the Governor, subject to confirmation by the General Assembly. Each appointment shall be for four years, except that those to fill vacancies shall be for the unexpired terms. Terms shall be staggered, so that no more than three regular appointments shall be made in the same year.

### Section 5. Powers and duties of the Board of Education.

The powers and duties of the Board of Education shall be as follows:

(a) Subject to such criteria and conditions as the General Assembly may prescribe, the Board shall divide the Commonwealth into school divisions of such geographical area and school-age population as will promote the realization of the prescribed standards of quality, and shall periodically review the adequacy of existing school divisions for this purpose.

(b) It shall make annual reports to the Governor and the General Assembly concerning the condition and needs of public education in the Commonwealth, and shall in such report identify any school divisions which have failed to establish and maintain schools meeting the prescribed standards of quality.

24

Appeal: 14-1690    Doc: 15    Filed: 09/24/2014    Pg: 80 of 316

**CONSTITUTION OF VIRGINIA**
Article VIII, Sections 5, 6, 7, 8, 9

(c) It shall certify to the school board of each division a list of qualified persons for the office of division superintendent of schools, one of whom shall be selected to fill the post by the division school board. In the event a division school board fails to select a division superintendent within the time prescribed by law, the Board of Education shall appoint him.

(d) It shall have authority to approve textbooks and instructional aids and materials for use in courses in the public schools of the Commonwealth.

(e) Subject to the ultimate authority of the General Assembly, the Board shall have primary responsibility and authority for effectuating the educational policy set forth in this article, and it shall have such other powers and duties as may be prescribed by law.

### Section 6. Superintendent of Public Instruction.

A Superintendent of Public Instruction, who shall be an experienced educator, shall be appointed by the Governor, subject to confirmation by the General Assembly, for a term coincident with that of the Governor making the appointment, but the General Assembly may alter by statute this method of selection and term of office. The powers and duties of the Superintendent shall be prescribed by law.

### Section 7. School boards.

The supervision of schools in each school division shall be vested in a school board, to be composed of members selected in the manner, for the term, possessing the qualifications, and to the number provided by law.

### Section 8. The Literary Fund.

The General Assembly shall set apart as a permanent and perpetual school fund the present Literary Fund; the proceeds of all public lands donated by Congress for free public school purposes, of all escheated property, of all waste and unappropriated lands, of all property accruing to the Commonwealth by forfeiture except as hereinafter provided, of all fines collected for offenses committed against the Commonwealth, and of the annual interest on the Literary Fund; and such other sums as the General Assembly may appropriate. But so long as the principal of the Fund totals as much as eighty million dollars, the General Assembly may set aside all or any part of additional moneys received into its principal for public school purposes, including the teachers retirement fund.

The General Assembly may provide by general law an exemption from this section for the proceeds from the sale of all property seized and forfeited to the Commonwealth for a violation of the criminal laws of this Commonwealth proscribing the manufacture, sale or distribution of a controlled substance or marijuana. Such proceeds shall be paid into the state treasury and shall be distributed by law for the purpose of promoting law enforcement.

The Literary Fund shall be held and administered by the Board of Education in such manner as may be provided by law. The General Assembly may authorize the Board to borrow other funds against assets of the Literary Fund as collateral, such borrowing not to involve the full faith and credit of the Commonwealth.

The principal of the Fund shall include assets of the Fund in other funds or authorities which are repayable to the Fund.

The amendment ratified November 6, 1990, and effective January 1, 1991—In paragraph one, after "forfeiture", added "except as hereinafter provided". Added a new paragraph after paragraph one.

### Section 9. Other educational institutions.

The General Assembly may provide for the establishment, maintenance, and operation of any educational institutions which are desirable for the intellectual, cultural, and occupational development of the people of this Commonwealth. The governance of such institutions, and the status and powers of their boards of visitors or other governing bodies, shall be as provided by law.

25

Appeal: 14-1690    Doc: 15    Filed: 09/24/2014    Pg: 81 of 316

CONSTITUTION OF VIRGINIA
Article VIII, Sections 10, 11; Article IX, Sections 1, 2

**Section 10.  State appropriations prohibited to schools or institutions of learning not owned or exclusively controlled by the State or some subdivision thereof; exceptions to rule.**

No appropriation of public funds shall be made to any school or institution of learning not owned or exclusively controlled by the State or some political subdivision thereof; provided, first, that the General Assembly may, and the governing bodies of the several counties, cities and towns may, subject to such limitations as may be imposed by the General Assembly, appropriate funds for educational purposes which may be expended in furtherance of elementary, secondary, collegiate or graduate education of Virginia students in public and nonsectarian private schools and institutions of learning, in addition to those owned or exclusively controlled by the State or any such county, city or town; second, that the General Assembly may appropriate funds to an agency, or to a school or institution of learning owned or controlled by an agency, created and established by two or more States under a joint agreement to which this State is a party for the purpose of providing educational facilities for the citizens of the several States joining in such agreement; third, that counties, cities, towns, and districts may make appropriations to nonsectarian schools of manual, industrial, or technical training, and also to any school or institution of learning owned or exclusively controlled by such county, city, town, or school district.

**Section 11.  Aid to nonpublic higher education.**

The General Assembly may provide for loans to, and grants to or on behalf of, students attending nonprofit institutions of higher education in the Commonwealth whose primary purpose is to provide collegiate or graduate education and not to provide religious training or theological education.  The General Assembly may also provide for a State agency or authority to assist in borrowing money for construction of educational facilities at such institutions, provided that the Commonwealth shall not be liable for any debt created by such borrowing.  The General Assembly may also provide for the Commonwealth or any political subdivision thereof to contract with such institutions for the provision of educational or other related services.

*The amendment ratified November 5, 1974, and effective January 1, 1975—Provided for "grants to or on behalf of" in addition to loans to students, in the first sentence.  Added the last sentence to permit "the Commonwealth or any political subdivision thereof to contract with" nonprofit institutions of higher education.*

## ARTICLE IX
### Corporations

**Section 1.  State Corporation Commission.**

There shall be a permanent commission which shall be known as the State Corporation Commission and which shall consist of three members.  The General Assembly may, by majority vote of the members elected to each house, increase the size of the Commission to no more than five members.  Members of the Commission shall be elected by the General Assembly and shall serve for regular terms of six years.  At least one member of the Commission shall have the qualifications prescribed for judges of courts of record, and any Commissioner may be impeached or removed in the manner provided for the impeachment or removal of judges of courts of record.  The General Assembly may enact such laws as it deems necessary for the retirement of the Commissioners, with such conditions, compensation, and duties as it may prescribe.  The General Assembly may also provide for the mandatory retirement of Commissioners after they reach a prescribed age, beyond which they shall not serve, regardless of the term to which elected or appointed.  Whenever a vacancy in the Commission shall occur or exist when the General Assembly is in session, the General Assembly shall elect a successor for such unexpired term.  If the General Assembly is not in session, the Governor shall forthwith appoint pro tempore a qualified person to fill the vacancy for a term ending thirty days after the commencement of the next regular session of the General Assembly and the General Assembly shall elect a successor for such unexpired term.

The Commission shall annually elect one of its members chairman.  Its subordinates and employees, and the manner of their appointment and removal, shall be as provided by law, except that its heads of divisions and assistant heads of divisions shall be appointed and subject to removal by the Commission.

**Section 2.  Powers and duties of the Commission.**

Subject to the provisions of this Constitution and to such requirements as may be prescribed by law, the Commission shall be the department of government through which shall be issued all charters, and amendments or extensions thereof, of domestic corporations and all licenses of foreign corporations to do business in this Commonwealth.

26

**CONSTITUTION OF VIRGINIA**
**Article IX, Sections 2, 3, 4, 5, 6**

Except as may be otherwise prescribed by this Constitution or by law, the Commission shall be charged with the duty of administering the laws made in pursuance of this Constitution for the regulation and control of corporations doing business in this Commonwealth. Subject to such criteria and other requirements as may be prescribed by law, the Commission shall have the power and be charged with the duty of regulating the rates, charges, and services and, except as may be otherwise authorized by this Constitution or by general law, the facilities of railroad, telephone, gas, and electric companies.

The Commission shall in proceedings before it ensure that the interests of the consumers of the Commonwealth are represented, unless the General Assembly otherwise provides for representation of such interests.

The Commission shall have such other powers and duties not inconsistent with this Constitution as may be prescribed by law.

**Section 3. Procedures of the Commission.**

Before promulgating any general order, rule, or regulation, the Commission shall give reasonable notice of its contents.

In all matters within the jurisdiction of the Commission, it shall have the powers of a court of record to administer oaths, to compel the attendance of witnesses and the production of documents, to punish for contempt, and to enforce compliance with its lawful orders or requirements by adjudging and enforcing by its own appropriate process such fines or other penalties as may be prescribed or authorized by law. Before the Commission shall enter any finding, order, or judgment against a party it shall afford such party reasonable notice of the time and place at which he shall be afforded an opportunity to introduce evidence and be heard.

The Commission may prescribe its own rules of practice and procedure not inconsistent with those made by the General Assembly. The General Assembly shall have the power to adopt such rules, to amend, modify, or set aside the Commission's rules, or to substitute rules of its own.

**Section 4. Appeals from actions of the Commission.**

The Commonwealth, any party in interest, or any party aggrieved by any final finding, order, or judgment of the Commission shall have, of right, an appeal to the Supreme Court. The method of taking and prosecuting an appeal from any action of the Commission shall be prescribed by law or by the rules of the Supreme Court. All appeals from the Commission shall be to the Supreme Court only.

No other court of the Commonwealth shall have jurisdiction to review, reverse, correct, or annul any action of the Commission or to enjoin or restrain it in the performance of its official duties, provided, however, that the writs of mandamus and prohibition shall lie from the Supreme Court to the Commission.

**Section 5. Foreign corporations.**

No foreign corporation shall be authorized to carry on in this Commonwealth the business of, or to exercise any of the powers or functions of, a public service enterprise, or be permitted to do anything which domestic corporations are prohibited from doing, or be relieved from compliance with any of the requirements made of similar domestic corporations by the Constitution and laws of this Commonwealth. However, nothing in this section shall restrict the power of the General Assembly to enact such laws specially applying to foreign corporations as the General Assembly may deem appropriate.

**Section 6. Corporations subject to general laws.**

The creation of corporations, and the extension and amendment of charters whether heretofore or hereafter granted, shall be provided for by general law, and no charter shall be granted, amended, or extended by special act, nor shall authority in such matters be conferred upon any tribunal or officer, except to ascertain whether the applicants have, by complying with the requirements of the law, entitled themselves to the charter, amendment, or extension applied for and to issue or refuse the same accordingly. Such general laws may be amended, repealed, or modified by the General Assembly. Every corporation chartered in this Commonwealth shall be deemed to hold its charter and all amendments thereof under the provisions of, and subject to all the requirements, terms, and conditions of, this Constitution and any laws passed in pursuance thereof. The police power of the Commonwealth to regulate the affairs of corporations, the same as individuals, shall never be abridged.

27

Appeal: 14-1690    Doc: 15    Filed: 09/24/2014    Pg: 83 of 316

CONSTITUTION OF VIRGINIA
Article IX, Section 7; Article X, Sections 1, 2, 3

**Section 7. Exclusions from term "corporation" or "company."**

The term "corporation" or "company" as used in this article shall exclude all municipal corporations, other political subdivisions, and public institutions owned or controlled by the Commonwealth.

**ARTICLE X**
**Taxation and Finance**

**Section 1. Taxable property; uniformity; classification and segregation.**

All property, except as hereinafter provided, shall be taxed. All taxes shall be levied and collected under general laws and shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, except that the General Assembly may provide for differences in the rate of taxation to be imposed upon real estate by a city or town within all or parts of areas added to its territorial limits, or by a new unit of general government, within its area, created by or encompassing two or more, or parts of two or more, existing units of general government. Such differences in the rate of taxation shall bear a reasonable relationship to differences between nonrevenue-producing governmental services giving land urban character which are furnished in one or several areas in contrast to the services furnished in other areas of such unit of government.

The General Assembly may by general law and within such restrictions and upon such conditions as may be prescribed authorize the governing body of any county, city, town or regional government to provide for differences in the rate of taxation imposed upon tangible personal property owned by persons not less than sixty-five years of age or persons permanently and totally disabled as established by general law who are deemed by the General Assembly to be bearing an extraordinary tax burden on said tangible personal property in relation to their income and financial worth.

The General Assembly may define and classify taxable subjects. Except as to classes of property herein expressly segregated for either State or local taxation, the General Assembly may segregate the several classes of property so as to specify and determine upon what subjects State taxes, and upon what subjects local taxes, may be levied.

The amendment ratified November 6, 1990, and effective January 1, 1991—Added a new paragraph after paragraph one.

**Section 2. Assessments.**

All assessments of real estate and tangible personal property shall be at their fair market value, to be ascertained as prescribed by law. The General Assembly may define and classify real estate devoted to agricultural, horticultural, forest, or open space uses, and may by general law authorize any county, city, town, or regional government to allow deferral of, or relief from, portions of taxes otherwise payable on such real estate if it were not so classified, provided the General Assembly shall first determine that classification of such real estate for such purpose is in the public interest for the preservation or conservation of real estate for such uses. In the event the General Assembly defines and classifies real estate for such purposes, it shall prescribe the limits, conditions, and extent of such deferral or relief. No such deferral or relief shall be granted within the territorial limits of any county, city, town, or regional government except by ordinance adopted by the governing body thereof.

So long as the Commonwealth shall levy upon any public service corporation a State franchise, license, or other similar tax based upon or measured by its gross receipts or gross earnings, or any part thereof, its real estate and tangible personal property shall be assessed by a central State agency, as prescribed by law.

**Section 3. Taxes or assessments upon abutting property owners.**

The General Assembly by general law may authorize any county, city, town, or regional government to impose taxes or assessments upon abutting property owners for such local public improvements as may be designated by the General Assembly; however, such taxes or assessments shall not be in excess of the peculiar benefits resulting from the improvements to such abutting property owners.

28

CONSTITUTION OF VIRGINIA
Article X, Sections 4, 5, 6

**Section 4.  Property segregated for local taxation; exceptions.**

Real estate, coal and other mineral lands, and tangible personal property, except the rolling stock of public service corporations, are hereby segregated for, and made subject to, local taxation only, and shall be assessed for local taxation in such manner and at such times as the General Assembly may prescribe by general law.

**Section 5.  Franchise taxes; taxation of corporate stock.**

The General Assembly, in imposing a franchise tax upon corporations, may in its discretion make the same in lieu of taxes upon other property, in whole or in part, of such corporations.  Whenever a franchise tax shall be imposed upon a corporation doing business in this Commonwealth, or whenever all the capital, however invested, of a corporation chartered under the laws of this Commonwealth shall be taxed, the shares of stock issued by any such corporation shall not be further taxed.

**Section 6.  Exempt property.**

(a) Except as otherwise provided in this Constitution, the following property and no other shall be exempt from taxation, State and local, including inheritance taxes:

(1) Property owned directly or indirectly by the Commonwealth or any political subdivision thereof, and obligations of the Commonwealth or any political subdivision thereof exempt by law.

(2) Real estate and personal property owned and exclusively occupied or used by churches or religious bodies for religious worship or for the residences of their ministers.

(3) Private or public burying grounds or cemeteries, provided the same are not operated for profit.

(4) Property owned by public libraries or by institutions of learning not conducted for profit, so long as such property is primarily used for literary, scientific, or educational purposes or purposes incidental thereto.  This provision may also apply to leasehold interests in such property as may be provided by general law.

(5) Intangible personal property, or any class or classes thereof, as may be exempted in whole or in part by general law.

(6) Property used by its owner for religious, charitable, patriotic, historical, benevolent, cultural, or public park and playground purposes, as may be provided by classification or designation by an ordinance adopted by the local governing body and subject to such restrictions and conditions as provided by general law.

(7) Land subject to a perpetual easement permitting inundation by water as may be exempted in whole or in part by general law.

(b) The General Assembly may by general law authorize the governing body of any county, city, town, or regional government to provide for the exemption from local property taxation, or a portion thereof, within such restrictions and upon such conditions as may be prescribed, of real estate and personal property designed for continuous habitation owned by, and occupied as the sole dwelling of, persons not less than sixty-five years of age or persons permanently and totally disabled as established by general law.  A local governing body may be authorized to establish either income or financial worth limitations, or both, in order to qualify for such relief.

(c) Except as to property of the Commonwealth, the General Assembly by general law may restrict or condition, in whole or in part, but not extend, any or all of the above exemptions.

(d) The General Assembly may define as a separate subject of taxation any property, including real or personal property, equipment, facilities, or devices, used primarily for the purpose of abating or preventing pollution of the atmosphere or waters of the Commonwealth or for the purpose of transferring or storing solar energy, and by general law may allow the governing body of any county, city, town, or regional government to exempt or partially exempt such property from taxation, or by general law may directly exempt or partially exempt such property from taxation.

29

**CONSTITUTION OF VIRGINIA**
Article X, Section 6

(e) The General Assembly may define as a separate subject of taxation household goods, personal effects and tangible farm property and products, and by general law may allow the governing body of any county, city, town, or regional government to exempt or partially exempt such property from taxation, or by general law may directly exempt or partially exempt such property from taxation.

(f) Exemptions of property from taxation as established or authorized hereby shall be strictly construed; provided, however, that all property exempt from taxation on the effective date of this section shall continue to be exempt until otherwise provided by the General Assembly as herein set forth.

(g) The General Assembly may by general law authorize any county, city, town, or regional government to impose a service charge upon the owners of a class or classes of exempt property for services provided by such governments.

(h) The General Assembly may by general law authorize the governing body of any county, city, town, or regional government to provide for a partial exemption from local real property taxation, within such restrictions and upon such conditions as may be prescribed, (i) of real estate whose improvements, by virtue of age and use, have undergone substantial renovation, rehabilitation or replacement or (ii) of real estate with new structures and improvements in conservation, redevelopment, or rehabilitation areas.

(i) The General Assembly may by general law allow the governing body of any county, city, or town to exempt or partially exempt from taxation any generating equipment installed after December thirty-one, nineteen hundred seventy-four, for the purpose of converting from oil or natural gas to coal or to wood, wood bark, wood residue, or to any other alternate energy source for manufacturing, and any co-generation equipment installed since such date for use in manufacturing.

(j) The General Assembly may by general law allow the governing body of any county, city, or town to have the option to exempt or partially exempt from taxation any business, occupational or professional license or any merchants' capital, or both.

The amendment ratified November 2, 1976, and effective January 1, 1977—After (a)(6), added subdivision "(7) Land subject to a perpetual easement . . .". In subsection (b), after "sixty-five years of age", added the language "or persons permanently and totally disabled as established by general law". In subsection (d), after "Commonwealth", added the language "or for the purpose of transferring or storing solar energy". In subsection (e), after "personal effects", added the language "and tangible farm property and products".

The amendment ratified November 7, 1978, and effective January 1, 1979—Added a new subsection (h).

The amendment ratified November 4, 1980, and effective January 1, 1981—In subsection (b), substituted "exemption from local property taxation" for "exemption from local real property taxation". After "of real estate", added "and personal property designed for continuous habitation". Substituted "property" for "real estate" near the end of subsection (b).

The amendment ratified November 4, 1980, and effective January 1, 1981—Added a new subsection (i).

The amendment ratified November 3, 1998, and effective January 1, 1999—Added a new subsection (j).

The amendment ratified November 5, 2002, and effective January 1, 2003—In paragraph (6), after "designation by", deleted "a three-fourths vote of the members elected to each house of the General Assembly" and added "an ordinance adopted by the local governing body". After "conditions as" deleted "may be prescribed" and added "provided by general law".

The amendment ratified November 7, 2006, and effective January 1, 2007—In subsection (h), added "(i)" after "prescribed" and "or (ii) of real estate with new structures and improvements in conservation, redevelopment, or rehabilitation areas" after "replacement" at the end of the paragraph.

The amendment ratified November 2, 2010, and effective January 1, 2011—In subsection (b), after "established by general law", deleted "who are deemed by the General Assembly to be bearing an extraordinary tax burden on said property in relation to their income and financial worth" and added "A local governing body may be authorized to establish either income or financial worth limitations, or both, in order to qualify for such relief." at the end of the paragraph.

30

**CONSTITUTION OF VIRGINIA**
Article X, Sections 6-A, 7, 7-A, 8

### Section 6-A. Property tax exemption for certain veterans.

Notwithstanding the provisions of Section 6, the General Assembly by general law, and within the restrictions and conditions prescribed therein, shall exempt from taxation the real property, including the joint real property of husband and wife, of any veteran who has been determined by the United States Department of Veterans Affairs or its successor agency pursuant to federal law to have a one hundred percent service-connected, permanent, and total disability, and who occupies the real property as his or her principal place of residence. The General Assembly shall also provide this exemption from taxation for real property owned by the surviving spouse of a veteran who was eligible for the exemption provided in this section, so long as the surviving spouse does not remarry and continues to occupy the real property as his or her principal place of residence.

The amendment ratified November 2, 2010, and effective January 1, 2011—Added a new section (6-A).

### Section 7. Collection and disposition of State revenues.

All taxes, licenses, and other revenues of the Commonwealth shall be collected by its proper officers and paid into the State treasury. No money shall be paid out of the State treasury except in pursuance of appropriations made by law; and no such appropriation shall be made which is payable more than two years and six months after the end of the session of the General Assembly at which the law is enacted authorizing the same.

Other than as may be provided for in the debt provisions of this Constitution, the Governor, subject to such criteria as may be established by the General Assembly, shall ensure that no expenses of the Commonwealth be incurred which exceed total revenues on hand and anticipated during a period not to exceed the two years and six months period established by this section of the Constitution.

The amendment ratified November 6, 1984, and effective July 1, 1986—Added the second paragraph.

### Section 7-A. Lottery Proceeds Fund; distribution of lottery revenues.

The General Assembly shall establish the Lottery Proceeds Fund. The Fund shall consist of the net revenues of any lottery conducted by the Commonwealth. Lottery proceeds shall be appropriated from the Fund to the Commonwealth's counties, cities and towns, and the school divisions thereof, to be expended for the purposes of public education.

Any county, city, or town which accepts a distribution from the Fund shall provide its portion of the cost of maintaining an educational program meeting the standards of quality prescribed pursuant to Section 2 of Article VIII of this Constitution without the use of distributions from the Fund.

The General Assembly shall enact such laws as may be necessary to implement the Fund and the provisions of this section.

The General Assembly may appropriate amounts from the Fund for other purposes only by a vote of four-fifths of the members voting in each house, the name of each member voting and how he voted to be recorded in the journal of the house.

The amendment ratified November 7, 2000, and effective July 1, 2001—Added a new section (7-A).

### Section 8. Limit of tax or revenue; Revenue Stabilization Fund.

No other or greater amount of tax or revenues shall, at any time, be levied than may be required for the necessary expenses of the government, or to pay the indebtedness of the Commonwealth.

The General Assembly shall establish the Revenue Stabilization Fund. The Fund shall consist of an amount not to exceed fifteen percent of the Commonwealth's average annual tax revenues derived from taxes on income and retail sales as certified by the Auditor of Public Accounts for the three fiscal years immediately preceding. The Auditor of Public Accounts shall compute the fifteen percent limitation of such fund annually and report to the General Assembly not later than the first day of December. "Certified tax revenues" means the Commonwealth's annual tax revenues derived from taxes on income and retail sales as certified by the Auditor of Public Accounts.

Appeal: 14-1690   Doc: 15   Filed: 09/24/2014   Pg: 87 of 316

CONSTITUTION OF VIRGINIA
*Article X, Sections 8, 9*

The General Assembly shall make deposits to the Fund to equal at least fifty percent of the product of the certified tax revenues collected in the most recently ended fiscal year times the difference between the annual percentage increase in the certified tax revenues collected for the most recently ended fiscal year and the average annual percentage increase in the certified tax revenues collected in the six fiscal years immediately preceding the most recently ended fiscal year. However, growth in certified tax revenues, which is the result of either increases in tax rates on income or retail sales or the repeal of exemptions therefrom, may be excluded, in whole or in part, from the computation immediately preceding for a period of time not to exceed six calendar years from the calendar year in which such tax rate increase or exemption repeal was effective. Additional appropriations may be made at any time so long as the fifteen percent limitation established herein is not exceeded. All interest earned on the Fund shall be part thereof; however, if the Fund's balance exceeds the limitation, the amount in excess of the limitation shall be paid into the general fund after appropriation by the General Assembly.

The General Assembly may appropriate an amount for transfer from the Fund to compensate for no more than one-half of the difference between the total general fund revenues appropriated and a revised general fund revenue forecast presented to the General Assembly prior to or during a subsequent regular or special legislative session. However, no transfer shall be made unless the general fund revenues appropriated exceed such revised general fund revenue forecast by more than two percent of certified tax revenues collected in the most recently ended fiscal year. Furthermore, no appropriation or transfer from such fund in any fiscal year shall exceed more than one-half of the balance of the Revenue Stabilization Fund. The General Assembly may enact such laws as may be necessary and appropriate to implement the Fund.

The amendment ratified November 3, 1992, and effective January 1, 1993—Added the second, third, and fourth paragraphs.

The amendment ratified November 2, 2010, and effective January 1, 2011—In the heading of the section, after "revenue", added "; Revenue Stabilization Fund". In paragraph two, deleted "ten" and added "fifteen" after "exceed" and after "compute the". In paragraph three, after "as the", deleted "ten" and added "fifteen" in the third sentence.

## Section 9.  State debt.

No debt shall be contracted by or in behalf of the Commonwealth except as provided herein.

(a) Debts to meet emergencies and redeem previous debt obligations.

The General Assembly may (1) contract debts to suppress insurrection, repel invasion, or defend the Commonwealth in time of war; (2) contract debts, or may authorize the Governor to contract debts, to meet casual deficits in the revenue or in anticipation of the collection of revenues of the Commonwealth for the then current fiscal year within the amount of authorized appropriations, provided that the total of such indebtedness shall not exceed thirty per centum of an amount equal to 1.15 times the average annual tax revenues of the Commonwealth derived from taxes on income and retail sales, as certified by the Auditor of Public Accounts, for the preceding fiscal year and that each such debt shall mature within twelve months from the date such debt is incurred; and (3) contract debts to redeem a previous debt obligation of the Commonwealth.

The full faith and credit of the Commonwealth shall be pledged to any debt created under this subsection. The amount of such debt shall not be included in the limitations on debt hereinafter established, except that the amount of debt incurred pursuant to clause (3) above shall be included in determining the limitation on the aggregate amount of general obligation debt for capital projects permitted elsewhere in this article unless the debt so incurred pursuant to clause (3) above is secured by a pledge of net revenues from capital projects of institutions or agencies administered solely by the executive department of the Commonwealth or of institutions of higher learning of the Commonwealth, which net revenues the Governor shall certify are anticipated to be sufficient to pay the principal of and interest on such debt and to provide such reserves as the law authorizing the same may require, in which event the amount thereof shall be included in determining the limitation on the aggregate amount of debt contained in the provision of this article which authorizes general obligation debt for certain revenue-producing capital projects.

(b) General obligation debt for capital projects and sinking fund.

32

**CONSTITUTION OF VIRGINIA**
**Article X, Section 9**

The General Assembly may, upon the affirmative vote of a majority of the members elected to each house, authorize the creation of debt to which the full faith and credit of the Commonwealth is pledged, for capital projects to be distinctly specified in the law authorizing the same; provided that any such law shall specify capital projects constituting a single purpose and shall not take effect until it shall have been submitted to the people at an election and a majority of those voting on the question shall have approved such debt. No such debt shall be authorized by the General Assembly if the amount thereof when added to amounts approved by the people or authorized by the General Assembly and not yet submitted to the people for approval, under this subsection during the three fiscal years immediately preceding the authorization by the General Assembly of such debt and the fiscal year in which such debt is authorized shall exceed twenty-five per centum of an amount equal to 1.15 times the average annual tax revenues of the Commonwealth derived from taxes on income and retail sales, as certified by the Auditor of Public Accounts, for the three fiscal years immediately preceding the authorization of such debt by the General Assembly.

No debt shall be incurred under this subsection if the amount thereof when added to the aggregate amount of all outstanding debt to which the full faith and credit of the Commonwealth is pledged other than that excluded from this limitation by the provisions of this article authorizing the contracting of debts to redeem a previous debt obligation of the Commonwealth and for certain revenue-producing capital projects, less any amounts set aside in sinking funds for the repayment of such outstanding debt, shall exceed an amount equal to 1.15 times the average annual tax revenues of the Commonwealth derived from taxes on income and retail sales, as certified by the Auditor of Public Accounts, for the three fiscal years immediately preceding the incurring of such debt.

All debt incurred under this subsection shall mature within a period not to exceed the estimated useful life of the projects as stated in the authorizing law, which statement shall be conclusive, or a period of thirty years, whichever is shorter; and all debt incurred to redeem a previous debt obligation of the Commonwealth, except that which is secured by net revenues anticipated to be sufficient to pay the same and provide reserves therefor, shall mature within a period not to exceed thirty years. Such debt shall be amortized, by payment into a sinking fund or otherwise, in annual installments of principal to begin not later than one-tenth of the term of the bonds, and any such sinking fund shall not be appropriated for any other purpose; if such debt be for public road purposes, such payment shall be first made from revenues segregated by law for the construction and maintenance of State highways. No such installment shall exceed the smallest previous installment by more than one hundred per centum. If sufficient funds are not appropriated in the budget for any fiscal year for the timely payment of the interest upon and installments of principal of such debt, there shall be set apart by direction of the Governor, from the first general fund revenues received during such fiscal year and thereafter, a sum sufficient to pay such interest and installments of principal.

(c) Debt for certain revenue-producing capital projects.

The General Assembly may authorize the creation of debt secured by a pledge of net revenues derived from rates, fees, or other charges and the full faith and credit of the Commonwealth, and such debt shall not be included in determining the limitation on general obligation debt for capital projects as permitted elsewhere in this article, provided that

(1) the creation of such debt is authorized by the affirmative vote of two-thirds of the members elected to each house of the General Assembly; and

(2) such debt is created for specific revenue-producing capital projects (including the enlargement or improvement thereof), which shall be distinctly specified in the law authorizing the same, of institutions and agencies administered solely by the executive department of the Commonwealth or of institutions of higher learning of the Commonwealth.

Before any such debt shall be authorized by the General Assembly, and again before it shall be incurred, the Governor shall certify in writing, filed with the Auditor of Public Accounts, his opinion, based upon responsible engineering and economic estimates, that the anticipated net revenues to be pledged to the payment of principal of and interest on such debt will be sufficient to meet such payments as the same become due and to provide such reserves as the law authorizing such debt may require, and that the projects otherwise comply with the requirements of this subsection, which certifications shall be conclusive.

33

**CONSTITUTION OF VIRGINIA**
Article X, Sections 9, 10, 11; Article XI, Section 1

No debt shall be incurred under this subsection if the amount thereof when added to the aggregate amount of all outstanding debt authorized by this subsection and the amount of all outstanding debt incurred to redeem a previous debt obligation of the Commonwealth which is to be included in the limitation of this subsection by virtue of the provisions of this article authorizing the contracting of debts to redeem a previous debt obligation of the Commonwealth, less any amounts set aside in sinking funds for the payment of such debt, shall exceed an amount equal to 1.15 times the average annual tax revenues of the Commonwealth derived from taxes on income and retail sales, as certified by the Auditor of Public Accounts, for the three fiscal years immediately preceding the incurring of such debt.

This subsection shall not be construed to pledge the full faith and credit of the Commonwealth to the payment of any obligation of the Commonwealth, or any institution, agency, or authority thereof, or to any refinancing or reissuance of such obligation which was incurred prior to the effective date of this subsection.

(d) Obligations to which section not applicable.

The restrictions of this section shall not apply to any obligation incurred by the Commonwealth or any institution, agency, or authority thereof if the full faith and credit of the Commonwealth is not pledged or committed to the payment of such obligation.

**Section 10.  Lending of credit, stock subscriptions, and works of internal improvement.**

Neither the credit of the Commonwealth nor of any county, city, town, or regional government shall be directly or indirectly, under any device or pretense whatsoever, granted to or in aid of any person, association, or corporation; nor shall the Commonwealth or any such unit of government subscribe to or become interested in the stock or obligations of any company, association, or corporation for the purpose of aiding in the construction or maintenance of its work; nor shall the Commonwealth become a party to or become interested in any work of internal improvement, except public roads and public parks, or engage in carrying on any such work; nor shall the Commonwealth assume any indebtedness of any county, city, town, or regional government, nor lend its credit to the same.  This section shall not be construed to prohibit the General Assembly from establishing an authority with power to insure and guarantee loans to finance industrial development and industrial expansion and from making appropriations to such authority.

**Section 11.  Governmental employees retirement system.**

The General Assembly shall maintain a retirement system for state employees and employees of participating political subdivisions and school divisions.  The funds of the retirement system shall be deemed separate and independent trust funds, shall be segregated from all other funds of the Commonwealth, and shall be invested and administered solely in the interests of the members and beneficiaries thereof.  Neither the General Assembly nor any public officer, employee, or agency shall use or authorize the use of such trust funds for any purpose other than as provided in law for benefits, refunds, and administrative expenses, including but not limited to legislative oversight of the retirement system.  Such trust funds shall be invested as authorized by law.  Retirement system benefits shall be funded using methods which are consistent with generally accepted actuarial principles.  The retirement system shall be subject to restrictions, terms, and conditions as may be prescribed by the General Assembly.

The amendment ratified November 5, 1996, and effective January 1, 1997—In the heading of the section, substituted "employees" for "employee" and deleted "fund" after "retirement system".  In the text, substituted "retirement system for state employees and employees of participating political subdivisions and school divisions" for "state employees retirement system to be administered in the best interest of the beneficiaries thereof and subject to such restrictions or conditions as may be prescribed by the General Assembly" and added the remainder of the paragraph.

**ARTICLE XI**
Conservation

**Section 1.  Natural resources and historical sites of the Commonwealth.**

To the end that the people have clean air, pure water, and the use and enjoyment for recreation of adequate public lands, waters, and other natural resources, it shall be the policy of the Commonwealth to conserve, develop, and utilize its natural resources, its public lands, and its historical sites and buildings.  Further, it shall be the Commonwealth's policy to protect its atmosphere, lands, and waters from pollution, impairment, or destruction, for the benefit, enjoyment, and general welfare of the people of the Commonwealth.

34

**CONSTITUTION OF VIRGINIA**
Article XI, Sections 2, 3, 4; Article XII, Sections 1, 2

**Section 2. Conservation and development of natural resources and historical sites.**

In the furtherance of such policy, the General Assembly may undertake the conservation, development, or utilization of lands or natural resources of the Commonwealth, the acquisition and protection of historical sites and buildings, and the protection of its atmosphere, lands, and waters from pollution, impairment, or destruction, by agencies of the Commonwealth or by the creation of public authorities, or by leases or other contracts with agencies of the United States, with other states, with units of government in the Commonwealth, or with private persons or corporations. Notwithstanding the time limitations of the provisions of Article X, Section 7, of this Constitution, the Commonwealth may participate for any period of years in the cost of projects which shall be the subject of a joint undertaking between the Commonwealth and any agency of the United States or of other states.

**Section 3. Natural oyster beds.**

The natural oyster beds, rocks, and shoals in the waters of the Commonwealth shall not be leased, rented, or sold but shall be held in trust for the benefit of the people of the Commonwealth, subject to such regulations and restriction as the General Assembly may prescribe, but the General Assembly may, from time to time, define and determine such natural beds, rocks, or shoals by surveys or otherwise.

**Section 4. Right of the people to hunt, fish, and harvest game.**

The people have a right to hunt, fish, and harvest game, subject to such regulations and restrictions as the General Assembly may prescribe by general law.

**The amendment ratified November 7, 2000, and effective January 1, 2001—Added a new section (4).**

**ARTICLE XII**
**Future Changes**

**Section 1. Amendments.**

Any amendment or amendments to this Constitution may be proposed in the Senate or House of Delegates, and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals, the name of each member and how he voted to be recorded, and referred to the General Assembly at its first regular session held after the next general election of members of the House of Delegates. If at such regular session or any subsequent special session of that General Assembly the proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the General Assembly to submit such proposed amendment or amendments to the voters qualified to vote in elections by the people, in such manner as it shall prescribe and not sooner than ninety days after final passage by the General Assembly. If a majority of those voting vote in favor of any amendment, it shall become part of the Constitution on the date prescribed by the General Assembly in submitting the amendment to the voters.

**Section 2. Constitutional convention.**

The General Assembly may, by a vote of two-thirds of the members elected to each house, call a convention to propose a general revision of, or specific amendments to, this Constitution, as the General Assembly in its call may stipulate.

The General Assembly shall provide by law for the election of delegates to such a convention, and shall also provide for the submission, in such manner as it shall prescribe and not sooner than ninety days after final adjournment of the convention, of the proposals of the convention to the voters qualified to vote in elections by the people. If a majority of those voting vote in favor of any proposal, it shall become effective on the date prescribed by the General Assembly in providing for the submission of the convention proposals to the voters.

35

Appeal: 14-1690    Doc: 15    Filed: 09/24/2014    Pg: 91 of 316

## SCHEDULE

### Section 1. Effective date of revised Constitution.

This revised Constitution shall, except as is otherwise provided herein, go into effect at noon on the first day of July, nineteen hundred and seventy-one.

### Section 2. Officers and elections.

Unless otherwise provided herein or by law, nothing in this revised Constitution shall affect the oath, tenure, term, status, or compensation of any person holding any public office, position, or employment in the Commonwealth, nor affect the date of filling any State or local office, elective or appointive, which shall be filled on the date on which it would otherwise have been filled.

### Section 3. Laws, proceedings, and obligations unaffected.

The common and statute law in force at the time this revised Constitution goes into effect, so far as not in conflict therewith, shall remain in force until they expire by their own limitation or are altered or repealed by the General Assembly. Unless otherwise provided herein or by law, the adoption of this revised Constitution shall have no effect on pending judicial proceedings or judgments, on any obligations owing to or by the Commonwealth or any of its officers, agencies, or political subdivisions, or on any private obligations or rights.

### Section 4. Qualifications of judges.

The requirement of Article VI, Section 7, that justices of the Supreme Court and judges of courts of record shall, at least five years prior to their election or appointment, have been members of the bar of the Commonwealth, shall not preclude justices or judges who were elected or appointed prior to the effective date of this revised Constitution, and who are otherwise qualified, from completing the term for which they were elected or appointed and from being reelected for one additional term.

### Section 5. First session of General Assembly following adoption of revised Constitution.

The General Assembly shall convene at the Capitol at noon on the first Wednesday in January, nineteen hundred and seventy-one. It shall enact such laws as may be deemed proper, including those necessary to implement this revised Constitution. The General Assembly shall reapportion the Commonwealth into electoral districts in accordance with Article II, Section 6, of this Constitution. The General Assembly shall be vested with all the powers, charged with all the duties, and subject to all the limitations prescribed by this Constitution except that this session shall continue as long as may be necessary; that the salary and allowances of members shall not be limited by Section 46 of the Constitution of 1902 as amended and that effective date limitation of Section 53 of the Constitution of 1902 as amended shall not be operative.

# INDEX TO THE CONSTITUTION OF VIRGINIA

### (References are to Articles and Sections)

Accusation, right to demand cause and nature of ................................................................ I, 8

Administrative agencies ................................................................................ III, 1; V, 10, 11

Administrative organization ..................................................................................... V, 9

Air (see Conservation)

Amendments (see Future changes)

Appeals ......................................................................................................... VI, 1

Appeals by Commonwealth ...................................................................................... VI, 1

Apportionment (see Reapportionment)

Appropriation laws ...................................................................................... IV, 11, 13
    Balanced budget ................................................................................................ X, 7
    Joint undertakings ........................................................................................... XI, 2
    Limits on ......................................................................................................... X, 7
    Religious or charitable bodies, appropriations to .................................................. IV, 16
    Veto power of Governor ................................................................................... V, 6

Armies, standing .............................................................................................. I, 13

Arms, right to bear in militia ............................................................................. I, 13

Assembly, right of peaceable ............................................................................. I, 12

Attorney General
    Compensation ............................................................................................. V, 15
    Duties ....................................................................................................... V, 15
    Election ..................................................................................................... V, 15
    Impeachment ............................................................................................. IV, 17
    Opinions at request of Governor ...................................................................... V, 8
    Qualifications .............................................................................................. V, 15
    Succession to office of Governor ..................................................................... V, 16
    Term ......................................................................................................... V, 15

Auditor of Public Accounts ............................................................................... IV, 18

Bail, excessive ................................................................................................. I, 9

Bill of attainder .............................................................................................. I, 9

Bill of Rights .............................................................................................. I, 1-17

Bills (see General Assembly; Laws)

Bonds (see Finance; Local government)

Borrowing (see Finance; Local government)

Cities (see Local government)

Citizens, duties of ............................................................................................ I, 15

Civil actions .................................................................................................. IV, 14

Color, discrimination on basis of ......................................................................... I, 11

## CONSTITUTION OF VIRGINIA
### Index

Commissions ............................................................................................V, 17

Commonwealth's attorneys (see Local government)

Confrontation, right of...........................................................................I, 8

Conservation ..................................................................................XI, 1-3
    Appropriations for joint undertakings .......................................XI, 2
    Oyster beds .............................................................................XI, 3
    Powers of General Assembly....................................................XI, 2
    Public policy of Commonwealth ...............................................XI, 1

Constitution
    Construction of........................................................................IV, 14
    Effective date of.............................................................Schedule, 1
    Future changes ...................................................................XII, 1, 2
    Implementation by General Assembly..............................Schedule, 5

Constitutional convention (see Future changes)

Consumers' interests ...............................................................IX, 2

Contracts, impairing the obligation of....................................I, 11

Corporations (see also State Corporation Commission)
    Charters..............................................................................IX, 2, 6
    Foreign corporations.........................................................IX, 2, 5
    Municipal corporations.........................................................IX, 7
    Rates, charges, services, and facilities of utilities ............IX, 2
    Regulation..........................................................................IX, 2, 6
    Subject to general laws and taxation ...................IV, 14, 15; IX, 6

Counties (see Local government)

Courts (see Judiciary)

Criminal prosecutions (see also Appeals)
    Rights in...........................................................................I, 8, 8-A

Debt, public (see Finance; Local government)

Discrimination by government .................................................I, 11

Due process of law .................................................I, 8, 11, 15

Education .......................................................................VIII, 1-11
    Board of Education
        Appointment and term ...........................................VIII, 4
        Powers and duties ..................................................VIII, 5
    Compulsory education..........................................................VIII, 3
    Funds ...................................................................................VIII, 2
    Instructional materials ...................................................VIII, 5(d)
    Literary Fund ......................................................................VIII, 8
    Local support .......................................................................VIII, 2
    Lottery Proceeds Fund, use of.............................................X, 7-A
    Nonpublic higher education, aid to...................................VIII, 11
    Nonpublic schools, aid to .................................................VIII, 10
    Other educational institutions .............................................VIII, 9
    Public schools to be provided ..............................................VIII, 1

**CONSTITUTION OF VIRGINIA**
**Index**

Relation to free government ...................................................... I, 15
School boards .................................................................... VIII, 7
School divisions ................................................................ VIII, 5(a)
Standards of quality ............................................................ VIII, 2
State support ................................................................... VIII, 2
Superintendent of Public Instruction ........................................... VIII, 6
Superintendents ................................................................ VIII, 5(c)
Textbooks ...................................................................... VIII, 3, 5(d)

**Elections**
Absentee voting ................................................................. II, 1, 3
Age ............................................................................. II, 1
Applications to register ........................................................ II, 2
Ballots ......................................................................... II, 3
Cancellation of registration .................................................... II, 4
Citizenship ..................................................................... II, 1
Effect of new Constitution ..................................................... Schedule, 2
Electoral boards ................................................................ II, 8
Felons .......................................................................... II, 1
General Assembly, powers and duties of .......................................... II, 4
Handicapped voters .............................................................. II, 3
Local government officers ....................................................... VII, 4, 5
Machines, voting ................................................................ II, 3
Mental incompetents ............................................................. II, 1
Primaries ....................................................................... II, 1
Public canvass and count ........................................................ II, 3
Registration .................................................................... II, 2, 4
Registration records ............................................................ II, 4
Regulation of ................................................................... II, 4
Residence ....................................................................... II, 1
Secrecy in voting ............................................................... II, 3
Voters, overseas ................................................................ II, 1
Voters, privileges during ....................................................... II, 9
Voters, qualifications of ....................................................... II, 1
Voting, methods of .............................................................. II, 3
Write-in candidates ............................................................. II, 3

**Elections, free** ............................................................. I, 6

**Elections, periodic** ......................................................... I, 5

**Environment (see Conservation)**

**Equality and rights of men** .................................................. I, 1

**Evidence, right to call for in criminal prosecution** ......................... I, 8

**Ex post facto laws** .......................................................... I, 9

**Exclusive emoluments or privileges** .......................................... I, 4

**Executive (see also Governor)** ............................................... V, 1-17

CONSTITUTION OF VIRGINIA
Index

**Finance (see also Appropriation laws; Education; Taxation)**
Assuming local indebtedness ...................................................................... X, 10
Balanced budget .............................................................................................. X, 7
Casual deficits ............................................................................................... X, 9(a)
Emergency debt ............................................................................................. X, 9(a)
Full-faith-and-credit debt ............................................................................ X, 9(b)
General obligation bonds ............................................................................ X, 9(b)
Industrial development authorities ............................................................ X, 10
Internal improvements, interest in ............................................................ X, 10
Lending public credit .................................................................................... X, 10
Local debt ....................................................................................................... VII, 10
Obligations to which full faith and credit is not pledged ...................... X, 9(d)
Redeeming previous debt obligations ...................................................... X, 9(a)
Revenue bonds to which full faith and credit is pledged ..................... X, 9(c)
Stock subscriptions by government ........................................................... X, 10

**Fines, excessive** ...................................................................................................... I, 9

**Fishing** ............................................................................................................... XI, 4

**Franchise (see Elections)**

**Future changes**
Amendments ............................................................................................... XII, 1
Constitutional convention ........................................................................ XII, 2

**Game, harvesting** ............................................................................................. XI, 4

**General Assembly**
Attendance, compelling ............................................................................ IV, 8
Bills ............................................................................................................. IV, 11
Bills returned by Governor, severable amendments to ........................ V, 6
Compensation ............................................................................................ IV, 5
Discipline or expulsion of members ....................................................... IV, 7
Election of members to civil office of profit ........................................ IV, 5
Immunities of members ............................................................................ IV, 9
Journal ......................................................................................................... IV, 10
Laws, effective date of .............................................................................. IV, 13
Laws, enactment of .................................................................................... IV, 11
Laws, form of .............................................................................................. IV, 12
Legislative continuity ................................................................................ IV, 7
Legislative power vested in ....................................................................... IV, 1
Limitations on powers ............................................................................... IV, 14
Officers ........................................................................................................ IV, 7
Organization ............................................................................................... IV, 7
Powers .......................................................................................................... IV, 14
Privileges of members ............................................................................... IV, 9
Qualifications of members ........................................................................ IV, 4, 7
Quorum ........................................................................................................ IV, 8
Reconvened sessions ................................................................................. IV, 6; V, 6
Rules of procedure ..................................................................................... IV, 7
Session to implement new Constitution ................................................ Schedule, 5

40

CONSTITUTION OF VIRGINIA
Index

Sessions ................................................................................................. IV, 6; V, 5, 6
Vacancies ............................................................................................................ IV, 7
Veto, overriding Governor's ............................................................................... V, 6
Votes, when recorded ........................................................... IV, 10, 11, 13; V, 6

**Governed, consent of** .......................................................................................... I, 6

**Government, change of** ......................................................................................... I, 3

**Government, instituted for common benefit** ........................................................ I, 3

**Government, qualities necessary to free** ............................................................ I, 15

**Government to be uniform** ................................................................................... I, 14

**Governor (see also Executive)**
Administrative officers, appointment and removal ..................................V, 10, 11
Administrative officers, information from .........................................................V, 8
Armed forces, commander-in-chief of ..............................................................V, 7
Bills presented to
Amendments to ...........................................................................................V, 6
Objections to ...............................................................................................V, 6
Signing of ....................................................................................................V, 6
Clemency .........................................................................................................V, 12
Compensation ....................................................................................................V, 4
Disability ..........................................................................................................V, 16
Election ..............................................................................................................V, 2
Executive power vested in ................................................................................V, 1
Foreign relations ...............................................................................................V, 7
General Assembly, power to convene .................................................. IV, 6; V, 5
Impeachment ....................................................................................................IV, 17
Insurrection, suppressing .................................................................................V, 7
Invasion, repelling ............................................................................................V, 7
Laws, enforcing the execution of .....................................................................V, 7
Messages and recommendations to the General Assembly ..............................V, 5
Pardons, reprieves, remissions, commutations ...............................................V, 12
Powers ...............................................................................................................V, 7
Qualifications ....................................................................................................V, 3
Residence ...........................................................................................................V, 4
Succession to office .........................................................................................V, 16
Term of office ....................................................................................................V, 1
Vacancies, power to fill ...................................................................................V, 16
Vacancy in office .............................................................................................V, 16
Veto power .........................................................................................................V, 6

**Grants** ....................................................................................................................V, 17

**Habeas corpus** ........................................................................................... I, 9; VI, 1

**Highways (see Public roads)**

**Historical sites (see Conservation)**

**House of Delegates (see also General Assembly)**
Composition and election ................................................................................ IV, 3
Governor, filling vacancy in office of ............................................................V, 16

41

CONSTITUTION OF VIRGINIA
Index

Qualifications of delegates ................................................................. IV, 4
Speaker
  In line of succession to office of Governor ................................... V, 16
  Selection of ............................................................................ IV, 7
**Hunting** ............................................................................................ XI, 4
**Impeachment** ................................................................................. IV, 17
**Industrial development authorities** ............................................... X, 10
**Jeopardy, privilege against double** ................................................. I, 8
**Judges (see Judiciary)**
**Judgment of peers** ............................................................................ I, 8
**Judiciary** ..................................................................................... VI, 1-12
  Additional judicial personnel ...................................................... VI, 8
  Administration of judicial system ................................................ VI, 4
  Appointing powers, limit on extent to which may be conferred on judges ................... I, 12
  Assignment of judges .................................................................. I, 4
  Chief Justice ............................................................................ VI, 3
  Courts, creation and jurisdiction ................................................ VI, 1
  General Assembly, power to create courts and determine jurisdiction .............. VI, 1, 8
  Judges
    Commission .......................................................................... VI, 9
    Compensation ....................................................................... VI, 9
    Disability .............................................................................. VI, 10
    Effect of new Constitution on qualifications ......................... Schedule, 4
    Impeachment ....................................................................... IV, 17
    Incompatible activities .......................................................... VI, 11
    Practice of law ..................................................................... VI, 11
    Qualifications ....................................................................... VI, 7
    Removal, retirement, censure ................................................ VI, 10
    Residence ............................................................................ VI, 7
    Retirement ........................................................................ VI, 9,10
    Selection ............................................................................. VI, 7
    Term ................................................................................... VI, 7
    Vacancies ............................................................................ VI, 7
  Judicial Inquiry and Review Commission ................................... VI, 10
    Confidentiality of proceedings ............................................... VI, 10
  Judicial power ............................................................................ VI, 1
  Rules of practice and procedure ................................................ VI, 5
  Supreme Court
    Commission of justices ......................................................... VI, 9
    Compensation ....................................................................... VI, 9
    Composition ......................................................................... VI, 2
    Creation .............................................................................. VI, 1
    Disability ............................................................................. VI, 10
    Judgments ......................................................................... VI, 2, 6
    Jurisdiction ......................................................................... VI, 1
    Opinions ............................................................................. VI, 6

42

## CONSTITUTION OF VIRGINIA
### Index

Qualifications of justices ................................................................. VI, 7
Removal, retirement, censure ...................................................... VI, 10
Retirement ............................................................................... VI, 9, 10
Rule-making power ........................................................................ VI, 5
Selection of justices ...................................................................... VI, 7
Term of justices ............................................................................ VI, 7

**Jury, trial by (civil cases)** ....................................................................... I, 11

**Jury, trial by (criminal cases)** .................................................................. I, 8

**Law of the land, trial according to** ........................................................... I, 8

**Laws**
Effect of new Constitution ................................................. Schedule, 3
Effective date of .......................................................................... IV, 13
Enactment of .............................................................................. IV, 11
Ex post facto laws ........................................................................... I, 9
Execution of ................................................................................... V, 7
Form of ....................................................................................... IV, 12
General, when required ......................................................... IV, 14, 15
Local, special, and private when prohibited ........................... IV, 14
Not to be suspended ........................................................................ I, 7
Regarding local government (**see Local government**)
Veto of bills .................................................................................... V, 6

**Legislature (see also General Assembly)** ............................................ IV, 1-18

**Lieutenant Governor**
Compensation ............................................................................... V, 14
Duties ........................................................................................... V, 14
Election ........................................................................................ V, 13
Impeachment ............................................................................... IV, 17
Qualifications .............................................................................. V, 13
Succession to office of Governor ................................................ V, 16
Term .............................................................................................. V, 13

**Literary Fund** ....................................................................................... VIII, 8

**Local government (see also Finance; Taxation)**
Bonds .......................................................................................... VII, 10
Boundary changes .......................................................................... VII, 2
"City" defined ................................................................................ VII, 1
Clerk .............................................................................................. VII, 4
Commissioner of revenue ............................................................... VII, 4
Commonwealth's attorneys ............................................................ VII, 4
Consolidation ................................................................................. VII, 2
"County" defined ........................................................................... VII, 1
Debt ............................................................................................. VII, 10
Definitions ..................................................................................... VII, 1
Dissolution ..................................................................................... VII, 2
Elections ..................................................................................... VII, 4, 5
Franchises ...................................................................................... VII, 9
"General law" defined .................................................................... VII, 1

43

## CONSTITUTION OF VIRGINIA
### Index

Governing bodies ............................................................. VII, 5
Multiple offices ............................................................... VII, 6
Officers ......................................................................... VII, 4
Optional forms of government .......................................... VII, 2
Ordinances and resolutions .............................................. VII, 7
Organization and government ........................................... VII, 2
Population minima of cities and towns ............................... VII, 1
Powers ...................................................................... VII, 2, 3
Public property, consent to use ......................................... VII, 8
Public property, sale of .................................................... VII, 9
Reapportionment ............................................................ VII, 5
"Regional government" defined ......................................... VII, 1
Representation ............................................................... VII, 5
Sheriff .......................................................................... VII, 4
"Special act" defined ...................................................... VII, 1
"Town" defined .............................................................. VII, 1
Treasurer ...................................................................... VII, 4

**Lottery Proceeds Fund** ..................................................... X, 7-A

**Marriage** ............................................................................ I, 15-A

**Military subordinate to civil power** ................................... I, 13

**Militia** .............................................................................. I, 13

**National origin, discrimination on basis of** ......................... I, 11

**Natural resources (see Conservation)**

**Oath or affirmation** .......................................................... II, 7

**Office, qualifications to hold elective** ................................. II, 5
Vacancies, powers of Governor to fill .................................. V, 7

**Officers' term, effect of new Constitution** ......................... Schedule, 2

**Offices not to be hereditary** .............................................. I, 4

**Oyster beds** ...................................................................... XI, 3

**Pardons** ............................................................................ V, 12

**Parks and recreation areas** ............................. VII, 9; X, 6(a)(b), 10

**Petition, right to** .............................................................. I, 12

**Pleas in criminal cases** ..................................................... I, 8

**Powers, division of** ..................................................... I, 5; III, 1

**Press, freedom of** ............................................................. I, 12

**Property, exempt from taxation** ...................................... X, 6, 6-A

**Property, taking or damaging without compensation** .......... I, 11

**Public roads**
Borrowing for ............................................................. X, 9(b)
State financing ........................................................... X, 10

**Public utilities (see Corporations; Taxation)**

**Public works; works of internal improvement** ..................... X, 10

**CONSTITUTION OF VIRGINIA**
Index

Punishments, cruel and unusual.............................................................................I, 9

Race, discrimination on basis of..........................................................................I, 11

Reapportionment.................................................................................Schedule, 5
    Congress..............................................................................................II, 6
    General Assembly..................................................................................II, 6
    Local governments..............................................................................VII, 5

Redress of grievances, right to petition for ............................................................I, 12

Regional government (see Local government)

Religion
    Appropriations to religious bodies prohibited ......................................................IV, 16
    Free exercise of....................................................................................I, 16
    No establishment of...............................................................................I, 16
    Religious conviction, discrimination on basis of....................................................I, 11
    Tax exemptions of religious property ...............................................................X, 6

Representation (see Reapportionment)

Retirement system, govermental employees................................................................X, 11

Revenue Stabilization Fund (see Taxation)

Revenues
    Balanced budget ................................................................................X, 7, 8

Schools (see Education)

Searches and seizures, when unlawful....................................................................I, 10

Self-incrimination, privilege against....................................................................I, 8

Senate (see also General Assembly)
    Composition and election .........................................................................IV, 2
    President pro tempore .............................................................................IV, 7
    Qualifications of senators ........................................................................IV, 4

Sex, discrimination on basis of.........................................................................I, 11

Speech, freedom of....................................................................................I, 12

State Corporation Commission (see also Corporations)
    Appeals and review ...............................................................................IX, 4
    Consumer representation ...........................................................................IX, 2
    Impeachment of members.......................................................................IV, 17; IX, 1
    Membership, term, qualifications, removal, retirement.............................................IX, 1
    Powers and duties .................................................................................IX, 2
    Procedures .........................................................................................IX, 3
    Removal, retirement, censure .....................................................................VI, 10
    Subordinates and employees .......................................................................IX, 1
    Vacancies ..........................................................................................IX, 1

Statute of limitations or repose ......................................................................IV, 14

Suffrage (see Elections)

Supreme Court (see Judiciary)

45

**CONSTITUTION OF VIRGINIA**
Index

**Taxation (see also Finance)**
    Abutting property owners ................................................................X, 3
    Agricultural, horticultural, forest, and open space lands ...............X, 2
    Assessments ....................................................................................X, 2, 4
    Corporate stock ...............................................................................X, 5
    Differential tax rates within unit of government ...........................X, 1
    Disabled persons, rate difference ..................................................X, 1
    Exemptions .....................................................................................X, 6, 6-A
    Franchise taxes ...............................................................................X, 5
    Laws respecting ..............................................................................IV, 11
    Limits on tax or revenues ..............................................................X, 8
    Local, special, or private laws ......................................................IV, 14(5)(7)
    Not without representation .............................................................I, 6
    Property to be taxed .......................................................................X, 1
    Public service corporation property, central assessment of ..........X, 2
    Revenue Stabilization Fund ...........................................................X, 8
    Segregation for state or local taxation ..........................................X, 1, 4
    Senior citizens, rate difference .....................................................X, 1
    Service charges on tax exempt property ........................................X, 6(g)
    State revenues ................................................................................X, 7, 8
    Uniformity of taxes .......................................................................X, 1
    Veterans ..........................................................................................X, 6-A

**Torts, intentional** ..............................................................................IV, 14

**Trial by jury** .....................................................................................I, 8, 11

**Trial, speedy and public** ...................................................................I, 8

**Trust funds** .......................................................................................X, 11

**Veterans (see Property, exempt from taxation; Taxation)**

**Victims of crime, rights of** ................................................................I, 8-A

**Voting (see Elections)**

**Warrants, general** ..............................................................................I, 10

**Water (see Conservation)**

46

# Exhibit B

**Exhibit B includes excerpts from the Financing Lease between Shenandoah County and the Virginia Resources Authority dated November 19, 2009.  The complete 308 page document was electronically delivered to the Attorney General's Office with the other 83 lease to own agreements.**

$15,760,000 SHENANDOAH COUNTY, VIRGINIA
FINANCING LEASE

(Courthouse and Social Services Building Project)

Closing Date:  November 19, 2009

Resolution of the Board of Supervisors of Shenandoah County, Virginia Number 4 Details of the Financing Lease States that the bonds issued shall be Build America Bonds.

4.   Details of the Financing Lease.  The Rental Payments set forth in the Financing Lease shall be composed of principal and interest components reflecting **an original aggregate principal amount not to exceed $17,115,000**, a "true" or "Canadian" interest cost not to exceed five and one-half percent (5.5%) per annum (taking into account any original issue discount or premium and, in the event any of the VRA Bonds shall be issued as Build America Bonds, taking into account the direct credit payments expected to be made by the United States to VRA, which direct credit payments shall be passed on to the County or the County otherwise shall receive the benefit thereof through a "netting" of the Rental Payments under the Financing Lease or through another pass-through benefit structure, in a manner deemed advisable by VRA in connection with its issuance of the VRA Bonds).  The term of the Financing Lease shall not exceed twenty-five (25) years.

9 Essentiality of the Project states that these are essential capital projects.

9.   Essentiality of Project.  The Board affirms and declares that the Project and the transactions contemplated thereby constitute essential capital projects for local governmental purposes, and the County anticipates that the Project will continue to be essential to the operation of the County during and beyond the term of the Financing Lease.

## 15. Disclosure Documents. Second paragraph states that the County has disclosed to VRA the Mandamus of the Court for the County to provide a new courthouse which facilities constitute a part of the Project and shall be constructed upon a portion of the Project Land.

15.     Disclosure Documents.  The County authorizes and consents to the inclusion of information with respect to the County to be contained in VRA's Preliminary Official Statement and VRA's Official Statement in final form, both prepared in connection with the sale of the VRA Bonds, a portion of the proceeds of which will be used to fund the Financing Lease as requested by the County.  If appropriate, such disclosure documents shall be distributed in such manner and at such times as any of them shall determine. The County authorizes and consents to the inclusion of information with respect to the County to be contained in any of VRA's public disclosure documentation, as may be advisable or required.  The County Administrator is authorized and directed to take whatever actions are necessary and/or appropriate to ensure compliance by VRA and the County, if any, with Securities and Exchange Commission Rule 15c2-12, all as may be required by VRA in connection with the issuance of the VRA Bonds and its execution and delivery of the Financing Lease and any continuing disclosure requirements thereafter, all as set forth in the Financing Lease and any other documentation in connection therewith.

It is to be noted that the County has disclosed to VRA the Mandumus of the Court for the County to provide a new courthouse, which facilities constitute a part of the Project and shall be constructed upon a portion of the Project Land.

## 16. Tax Documents. Requires compliance with federal tax provisions.

16.     Tax Documents. The County Representative, and such officer or officers of the County as any County Representative may designate, are each hereby authorized and directed to execute the Nonarbitrage Certificate and Tax Compliance Agreement and any related documentation as required by VRA and its counsel, and further, as advised by the County Attorney and Bond Counsel to the County, setting forth the expected use and investment of the proceeds of the Financing Lease and containing all such covenants as may be necessary in order to show compliance with the provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), including the provisions of Section 148 of the IRC and applicable regulations relating to "arbitrage bonds".   To such end, the Board hereby covenants and agrees on behalf of the County that (i) the proceeds from the Financing Lease will be expended and invested as set forth in the Tax Compliance Agreement and that the County shall comply with the covenants and representations contained therein, and (ii) the County shall comply with the provisions of the IRC so that interest on the VRA Bonds will remain excludible from gross income for Federal income tax purposes, in accordance with law.

101

Leasehold Deed of Trust and Security Agreement Dated November 1, 2009.

> THIS DOCUMENT AMENDS AND RESTATES THAT CERTAIN LEASEHOLD DEED
> OF TRUST AND SECURITY AGREEMENT DATED AS OF NOVEMBER 1, 2009
> FROM VRA (AS DEFINED BELOW) FOR THE BENEFIT OF TRUSTEE (AS DEFINED
> BELOW) WHICH IS RECORDED AS INSTRUMENT NUMBER 090007777, UPON
> WHICH NO RECORDATION TAXES WERE PAID BECAUSE SUCH INSTRUMENT
> WAS EXEMPT FROM RECORDING TAXES UNDER SECTION 58.1-811(B)(4) OF
> THE CODE OF VIRGINIA OF 1950, AS AMENDED (THE "VIRGINIA CODE").
>
> THIS AMENDED AND RESTATED LEASEHOLD DEED OF TRUST AND SECURITY
> AGREEMENT IS EXEMPT FROM RECORDING TAXES UNDER SECTION 58.1-
> 811(B)(4) OF THE VIRGINIA CODE.

**AMENDED AND RESTATED LEASEHOLD DEED OF TRUST
AND SECURITY AGREEMENT**

Within the Amended and Restated Leasehold Deed of Trust and Security
Agreement, below excerpt shows the bonds being financed by the VRA
through the issuance of the VRA Series 2009B Bonds and the Defendant
U.S. National Bank Association as the trustee.

WHEREAS, the Project was financed by VRA through the issuance of a portion of
VRA's $186,330,000 Infrastructure and State Moral Obligation Revenue Bonds (Virginia Pooled
Financing Program), Series 2009B (the "Series 2009B Bonds"), under a Master Indenture of
Trust dated as of December 1, 2003 as previously supplemented and amended and as further
supplemented by a Fifteenth Supplemental Series Indenture of Trust, dated as of November 1,
2009 (collectively, the "Indenture") both between VRA and U.S. Bank National Association, as
trustee (the "Trustee"). VRA has agreed to assign to the Trustee as security for the Bonds all of
its right, title and interest in and to the Lease and the Financing Lease (collectively, the "Basic
Documents").

1. General Covenants shows a binding agreement on Shenandoah County Board of Supervisors and The VRA represents, warrants, covenants and agrees that this Deed of Trust is lawfully executed.

1.    GENERAL COVENANTS.  (a)  VRA shall cause to be paid all amounts due under the Bonds and shall perform all covenants, conditions and agreements of VRA contained in the Bonds and the Basic Documents.  VRA acknowledges that the Financing Lease contains certain covenants by the County with respect to the Real Estate which are binding on successors in interest in the Real Estate and which include matters relating to maintenance, repair, insurance, taxes, damage and destruction with respect to the Real Estate.  The provisions of the Financing Lease are incorporated by reference in this Deed of Trust.

(b)    VRA represents, warrants, covenants and agrees that this Deed of Trust is lawfully executed and delivered in conformity with the Financing Lease and the Indenture.

Excerpt from the November 19, 2009 Official statement letter from McGuire Woods to Virginia Resources Authority approving the validity of the Bonds and Tax Exempt status of the interest on them and the enforceability of the Indenture.

Virginia Resources Authority
November 19, 2009
Page 4

Our services as Bond Counsel have been limited to rendering the foregoing opinion based on our review of such legal proceedings as we deem necessary to approve the validity of the Bonds and the tax-exempt status of the interest on them and the enforceability of the Indenture. The foregoing opinion is in no respect an opinion as to VRA's business or financial resources or its ability to provide for the payment of the Bonds or the accuracy or completeness of any information, including VRA's Preliminary Official Statement dated October 27, 2009, and Official Statement dated November 6, 2009, that anyone may have relied upon in making the decision to purchase the Bonds.

This opinion is given as of the date hereof, and we assume no obligation to revise or supplement this opinion to reflect any facts or circumstances that may hereafter come to our attention, or any changes in law that may hereafter occur.

Very truly yours,

McGuireWoods LLP

# BotkinRose, PLC

**CAROLYN MADDEN PERRY**
Attorney at Law

(540) 432-3667 (Phone)
(540) 432-3337 (Fax)
cperry@botkinrose.com

3210 Peoples Drive
Harrisonburg, Virginia 22801

---

November 19, 2009

Shenandoah County, Virginia
Board of Supervisors
600 North Main Street
Woodstock, Virginia 22664

U.S. Bank National Association, as Trustee
1021 East Cary Street, 18th Floor
Richmond, Virginia 23219

Virginia Resources Authority
1111 East Main Street, Suite 1920
Richmond, Virginia 23219

   Re: Prime Lease and Financing Lease, each dated as of November 1, 2009
     Shenandoah County, Virginia

Dear Ladies and Gentlemen:

  We have acted as a Special Counsel and Bond Counsel to Shenandoah County, Virginia (the "County") in connection with the County's approval, execution and delivery on the date hereof of the Prime Lease, dated as of November 1, 2009, by and between the County, as lessor, and Virginia Resources Authority ("VRA"), as lessee (the "Prime Lease"), and the Financing Lease, dated as of November 1, 2009, by and between VRA, as lessor, and the County, as lessee (the "Financing Lease", and sometimes referenced together with the Prime Lease, the "Leases").

Botkin Rose
STATEMENT
for
Shenandoah County

The Leases were approved pursuant to an authorizing resolution duly adopted by the Board of Supervisors of the County (the "Board") on October 19, 2009, setting forth, among other things, the form and details thereof (the "Authorizing Resolution").

Unless otherwise defined herein, capitalized terms shall be assigned the meaning set forth in the Financing Lease.

As more particularly described in the Authorizing Resolution, the County has entered into the Leases including the transactions contemplated thereby in order to finance on a permanent basis all or any portion of the capital costs to (i) acquire, construct and equip an approximately 30,000 square feet Shenandoah County District Courts Building to be located east of the existing Shenandoah County Administration Building in Woodstock, Virginia, in order to house the County's General District Court and Juvenile and Domestic Relations (J&DR) Court as well as the offices of the Commonwealth's Attorney and the Juvenile and Domestic Relations Court Services Unit; (ii) acquire, construct and equip an approximately 29,000 square feet Shenandoah County Human Services Building to be located in a former supermarket, on a parcel adjacent to the Shenandoah County Administration Building, in order to house the Social Services and Health Departments as well as facilities for the Northwestern Community Services Board; and (iii) pay issuance costs in connection with such financing (collectively, the "Project"). VRA is using a portion of the proceeds of the Taxable Series 2009B VRA Bonds and a portion of the Tax-Exempt Series 2009B VRA Bonds on the date hereof to purchase the Financing Lease, and accordingly, the County shall use such proceeds thereof to pay the Project Costs, all as further described in the Authorizing Resolution and the Financing Lease, among other things.

In connection with our opinion, we have examined the Constitution and applicable laws of the Commonwealth of Virginia, including Title 15.2 of the Code of Virginia (1950), as amended, copies of the proceedings and other papers relating to the approval, execution and due delivery of the Leases by the County. We refer you to the Authorizing Resolution and the Leases for a further description of the purpose for which the County has entered into such leasing arrangements with VRA, the specific terms thereof, and the security therefor.

As to questions of fact material to this opinion, we have relied upon representations of the County, including, without limitation, representations as to the use of the proceeds of the Financing Lease, and certifications and representations contained in certificates of the County, VRA and others being delivered on the date hereof. We have assumed that all signatures on documents, certificates, and instruments examined by us are genuine, all documents, certificates, and instruments submitted to us as originals are authentic, and all documents, certificates, and instruments submitted to us as copies conform to the originals. In addition, we have assumed that all documents, certificates, and instruments relating to this lease financing have been duly authorized, executed, and delivered by all parties thereto other than the County, and we have

- 2 -

further assumed the due organization, existence and powers of such other parties other than the County.

With respect to the ownership of the Real Estate by the County and other matters relating thereto, reference is hereby made to Commitment No. VST 02-7728 issued by Fidelity National Title Insurance Company of New York (a copy of which has been provided to VRA).

Based upon the foregoing and subject to the limitations set forth above and otherwise contained herein, we are of the opinion, as of the date hereof, that:

1.      The County is a political subdivision duly organized and existing under the laws of the Commonwealth of Virginia, and is authorized to (i) execute and deliver the Local Lease Acquisition Agreement, the Leases, and the Local Tax Document (sometimes referenced collectively as the "County Documents"), and (ii) consummate the transactions contemplated by, and perform its obligations under, the County Documents.  The officers of the County identified in the general incumbency certificate, among other closing papers delivered by the County on the date hereof, have been duly elected and appointed, respectively, and are qualified to serve as such.

2.      The Authorizing Resolution was duly adopted by the Board, is in full force and effect, and has not been repealed, revoked, rescinded or amended as of the date hereof.  The County Documents have been duly authorized, executed and delivered by the County, are in full force and effect, constitute valid and legally binding obligations and agreements of the County and are enforceable against the County in accordance with the respective terms, except as such enforceability may be limited by laws relating to bankruptcy, insolvency, reorganization, moratorium or similar laws, now or hereafter in effect, relating to or affecting the enforcement of creditors' rights generally, and by usual equity principles that may limit the specific enforcement of certain remedies but that do not affect the validity of the County Documents.

Certain indemnity provisions of the County Documents may be unenforceable as being beyond the power of the County to undertake such indemnification or pursuant to court decisions invalidating such indemnity agreements on grounds of public policy. The County's obligation to pay the cost of performing its obligations under the Leases, including, without limitation, its obligations to pay all Rental Payments and other amounts under the Financing Lease, are also subject to and dependent upon annual (or other timely) appropriations being made from time to time by the Board for such purpose, as described below.

3.      No additional or further approval, consent or authorization of any governmental or public agency or authority not already obtained is required by the County in connection with (i) the due adoption of the Authorizing Resolution, (ii) the execution and delivery of the County

- 3 -

Documents, or (iii) the transactions contemplated by the Authorizing Resolution or the County Documents.

4.     The adoption of the Authorizing Resolution and the execution, delivery and due performance by the County of its obligations under the County Documents will not, to the best of our knowledge, (i) constitute a breach or result in a violation of, or conflict with, any indenture or other agreement or instrument to which the County is a party or by which it or any of its properties are or may be bound, (ii) constitute a breach or result in a violation of, or conflict with, any federal or Virginia constitutional or statutory provision, any regulation, order or decree to which the County or any of its property is subject, (iii) result in the creation or imposition of any lien, charge or other security interest or encumbrance of any nature whatsoever upon any of the property or assets of the County except as contemplated by the County Documents, or (iv) result in a violation of, or conflict with, any resolution of the County. The enforceability of any indemnity provisions against the County may be limited by court decisions invalidating or limiting such provisions on grounds of applicable securities laws or public policy.

5.     Except as previously disclosed by the County in its application to VRA for financing in connection with the Project, and as otherwise set forth in the County Documents and closing papers being delivered on the date hereof, there is no action, suit, proceeding or investigation at law or in equity before or by any court or governmental agency or body pending or, to the best of our knowledge, threatened against the County, or is there any basis therefore, wherein an unfavorable decision, ruling or finding would adversely affect (i) the creation or existence of the County, (ii) the transactions contemplated by the Authorizing Resolution and the County Documents, (iii) the validity or enforceability of the Financing Lease including the security therefore, or any agreement or instrument to which the County is a party, or (iv) the title of the officers executing the County Documents.

6.     Nothing in the County Documents or otherwise contemplated thereunder constitutes a pledge of the faith and credit of the Commonwealth of Virginia or any of its political subdivisions, including the County, and nothing therein shall directly, indirectly or contingently obligate the Commonwealth of Virginia or any of its political subdivisions, including the County, to pledge their faith and credit or to levy any taxes for the payment of any amounts thereunder or other costs incident thereto or make any appropriation for payment thereof.

Further, however, pursuant to the Authorizing Resolution and the Financing Lease, the Board has covenanted and agreed to undertake a non-binding obligation to appropriate such amounts as may be requested from time to time, if any, in order to pay the Rental Payments and other amounts described in the Financing Lease. Such moral obligation pledge by the County was made to the fullest degree and in such manner as is consistent with the Constitution and laws of the Commonwealth of Virginia, *provided, however,* that such moral obligation pledge shall not be deemed to be a lending of the credit of the County to VRA or to any other person or deemed to be a pledge of the faith and credit or the taxing power of the County, and

- 4 -

such pledge shall not bind or obligate the Board to appropriate funds for the purposes described in the Authorizing Resolution, the Financing Lease or otherwise.

7.    At the direction of VRA, the Financing Lease is not being issued by the County as a tax-exempt obligation for federal income tax purposes.  Under current law, however, the current and expected use of the proceeds of sale of the Financing Lease to VRA (and the facilities financed therewith) will not (i) result in the Financing Lease being considered a "private activity bond" within the meaning of Section 141 of the Code, or (ii) cause any of the Taxable Series 2009B VRA Bonds to fail to be eligible to qualify as "build America bonds" that are "qualified bonds" within the meaning of Section 54AA of the Code.  In providing the opinion set forth in this paragraph, we are assuming continuing compliance with the Covenants (as hereinafter defined) by the County.  The Code and the regulations promulgated thereunder contain a number of requirements that must be satisfied after the date hereof in order for the Financing Lease to maintain its status.  These requirements include, by way of example and not limitation, restrictions on the use, expenditure and investment of the proceeds of the Financing Lease and the use of the property financed or refinanced by the Financing Lease and limitations on the source of the payment of and the security for the Financing Lease.    The Local Tax Document, among other documents, contains covenants (the "Covenants") under which the County has agreed to comply with such requirements.

We express no opinion herein as to the accuracy, adequacy or completeness of the Official Statement as such may relate to the County or the Leases.

Our services as Special Counsel and Bond Counsel to the County have been limited to rendering the foregoing opinions based on our review of such legal proceedings as we deem necessary to make the statements contained herein and to approve the validity of the Leases. We have not been engaged and have not undertaken to review the accuracy, completeness or sufficiency of any financial information related to the Financing Lease, or, further, any offering material in connection with the financing program(s) described in the Authorizing Resolution under which the Financing Lease is being purchased by VRA.  Therefore, we express no opinion as to the accuracy or completeness of any information that may have been relied upon by such purchaser of the Financing Lease, or otherwise, in connection with such financing program(s) for the purchase thereof.  Further, we express no opinion herein as to the compliance by the County with any terms and conditions that may be required as a condition to the purchase of the Financing Lease by VRA.

- 5 -

This letter is given as of the date hereof and we assume no obligation to update or otherwise supplement these opinions to reflect any facts and circumstances that may hereafter come to our attention or any changes in the law that may hereafter occur. The opinions expressed herein are solely for the benefit of the addressees. Such opinions may not be relied on by any other persons without our prior written approval. The opinions expressed in this letter are expressly limited to the matters set forth herein including the assumptions as set forth above, and accordingly, no other opinions of our law firm should be inferred beyond the matters expressly stated herein.

Very truly yours,

Botkin Rose, PLC

- 6 -

McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, VA 23219-4030
Phone: 804.775.1000
Fax: 804.775.1061
www.mcguirewoods.com

# McGuireWoods

November 19, 2009

Virginia Resources Authority
1111 East Main Street, Suite 1920
Richmond, Virginia 23219

**Virginia Resources Authority**

**$45,180,000 Infrastructure Revenue Bonds**
**(Virginia Pooled Financing Program)**
**Series 2009B (Taxable-Direct Pay Build America Bonds)**

**and**

**$20,785,000 State Moral Obligation Revenue Bonds**
**(Virginia Pooled Financing Program),**
**Series 2009B (Taxable-Direct Pay Build America Bonds)**

Ladies and Gentlemen:

We have served as Bond Counsel to the Virginia Resources Authority ("VRA") in connection with the issuance of VRA's $45,180,000 Infrastructure Revenue Bonds (Virginia Pooled Financing Program), Series 2009B (Taxable-Direct Pay Build America Bonds) (the "Infrastructure Revenue Bonds") and $20,785,000 State Moral Obligation Revenue Bonds (Virginia Pooled Financing Program) Series 2009B (Taxable-Direct Pay Build America Bonds) (the "Moral Obligation Bonds," and, together with the Infrastructure Revenue Bonds, the "Bonds"). The Bonds have been issued under (i) the Virginia Resources Authority Act, Chapter 21, Title 62.1, Code of Virginia of 1950, as amended (the "VRA Act"), (ii) a resolution adopted by VRA's Board of Directors on June 9, 2009, and (iii) a Master Indenture of Trust dated as of December 1, 2003 (the "Master Indenture"), between VRA and U.S. Bank National Association, as successor trustee (the "Trustee"), as previously supplemented and amended and as further supplemented by a Fifteenth Supplemental Series Indenture of Trust dated as of November 1, 2009 (the "Fifteenth Supplemental Series Indenture," and, together with the Master Indenture, the "Indenture"), between VRA and the Trustee. We refer you to the Bonds and the Indenture for a description of the purposes for which the Bonds are issued, their terms and the security for them. Unless otherwise defined, each capitalized term used in this opinion has the meaning given it in the Indenture.

10090935.3

*VRA STATEMENT By McGuire Woods*

Virginia Resources Authority
November 19, 2009
Page 2

In connection with our opinion, we have examined the Constitution of Virginia and the applicable laws of both the United States and the Commonwealth of Virginia, including without limitation the Internal Revenue Code of 1986, as amended (the "Code"), the VRA Act, and such certified proceedings and other documents of VRA as we deem necessary to render this opinion.

Without undertaking to verify them by independent investigation, as to questions of fact material to this opinion we have relied upon (i) representations of VRA contained in the Indenture and related documents and the certified proceedings and (ii) other certifications of public officials furnished to us.

In rendering this opinion, we have assumed that all documents, certificates and instruments relating to this financing have been duly authorized, executed and delivered by all parties to them other than VRA, and we have further assumed the due organization, existence and powers of such parties other than VRA.

Based on the foregoing, we are of the opinion that, under current law:

(1)    VRA is a public body corporate and a political subdivision of the Commonwealth of Virginia duly created by the VRA Act and vested with all of the rights and powers conferred by the VRA Act.

(2)    VRA has the requisite authority and power under the VRA Act to enter into the Indenture, to issue and sell the Bonds, and to apply the proceeds from the issuance and sale of the Bonds as set forth in the Indenture. All conditions precedent to the issuance of the Bonds as set forth in the VRA Act and the Indenture have been fulfilled.

(3)    The Infrastructure Revenue Bonds have been duly authorized, executed, and delivered in accordance with the VRA Act and the Indenture and constitute valid and binding limited obligations of VRA, payable solely from the revenues, money and property of VRA specifically pledged for such purpose under the Indenture on a parity with the other Outstanding Infrastructure Revenue Bonds heretofore or hereafter issued under the Indenture.

(4)    The Moral Obligation Bonds have been duly authorized, executed, and delivered in accordance with the VRA Act and the Indenture and constitute valid and binding limited obligations of VRA, payable solely from the revenues, money and property of VRA specifically pledged for such purpose under the Indenture, which pledge is (i) on a parity with the other Outstanding Moral Obligation Bonds heretofore or hereafter issued under the Indenture and (ii) subordinate as to certain revenues, money and property to the pledge thereof securing the Infrastructure Revenue Bonds issued on the date hereof and the other Outstanding Infrastructure Revenue Bonds heretofore or hereafter issued under the Indenture.

(5)    The principal of and premium, if any, and interest on the Bonds do not constitute a debt of the Commonwealth of Virginia or any of its political subdivisions other than VRA. Neither the Commonwealth of Virginia nor any of its political subdivisions, including VRA, is legally obligated to pay the principal of or premium, if any, or interest on the Bonds or other

Virginia Resources Authority
November 19, 2009
Page 3

costs incident to them except from the revenues, money and property of VRA pledged for such purpose, and neither the faith and credit nor the taxing power of the Commonwealth of Virginia or any of its political subdivisions, including VRA, is pledged to the payment of the principal of or premium, if any, or interest on the Bonds.

(6)    The Indenture has been duly authorized, executed and delivered by VRA, constitutes the valid and binding obligation of VRA, pledges the Revenues and the Infrastructure Bond Revenues to the Trustee as security for the Infrastructure Revenue Bonds, pledges the Revenues on a subordinate basis to the Moral Obligation Bonds, and is enforceable against VRA in accordance with its terms. The Fifteenth Supplemental Series Indenture is authorized and permitted by the Master Indenture and will have no adverse effect on the excludability of the interest on any of the Bonds Outstanding on the date hereof from gross income for federal income tax purposes.

(7)    Additional Infrastructure Revenue Bonds and Moral Obligation Bonds may be issued from time to time under the conditions, limitations, and restrictions set forth in the Indenture, and may be secured equally and ratably thereunder with the Infrastructure Revenue Bonds and the other Outstanding Infrastructure Revenue Bonds or the Moral Obligation Bonds and the other Outstanding Moral Obligation Bonds, as the case may be.

(8)    Interest on the Bonds is includible in the gross income of the holders thereof for purposes of federal income taxation. We express no opinion regarding other federal tax consequences arising with respect to the Bonds.

(9)    In accordance with Section 62.1-219 of the VRA Act, the Bonds and the income from them, including any profit made on their sale, are exempt from taxation by the Commonwealth of Virginia and any of its political subdivisions. We express no opinion regarding (i) other Virginia tax consequences arising with respect to the Bonds or (ii) any consequences arising with respect to the Bonds under the tax laws of any state or local jurisdiction other than the Commonwealth of Virginia and its political subdivisions.

(10)    Internal Revenue Service regulations require us to advise you that, unless otherwise specifically noted, any federal tax advice in this communication (including any attachments, enclosures, or other accompanying materials) was not intended or written to be used, and it cannot be used, by any taxpayer for the purpose of avoiding penalties that the Internal Revenue Service may impose on the taxpayer. This opinion is provided to support the promotion or marketing of the Bonds.

The rights of the registered owners of the Bonds and the enforceability of VRA's obligations under the Bonds and the Indenture may be limited or otherwise affected by bankruptcy, insolvency, reorganization, moratorium, and similar laws now or hereafter in effect affecting creditors' rights. The enforceability of those rights and obligations is also subject to the exercise of judicial discretion in accordance with general principles of equity.

Virginia Resources Authority
November 19, 2009
Page 4


Our services as Bond Counsel have been limited to rendering the foregoing opinion based on our review of such legal proceedings as we deem necessary to approve the validity of the Bonds and the tax-exempt status of the interest on them and the enforceability of the Indenture. The foregoing opinion is in no respect an opinion as to VRA's business or financial resources or its ability to provide for the payment of the Bonds or the accuracy or completeness of any information, including VRA's Preliminary Official Statement dated October 27, 2009, and Official Statement dated November 6, 2009, that anyone may have relied upon in making the decision to purchase the Bonds.

This opinion is given as of the date hereof, and we assume no obligation to revise or supplement this opinion to reflect any facts or circumstances that may hereafter come to our attention, or any changes in law that may hereafter occur.

Very truly yours,

McGuireWoods LLP

*Continuation*
*09-24*

## UCC FINANCING STATEMENT AMENDMENT

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Jessica C. Randolph (804) 775-1026

**B. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

Suzanne S. Long
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219
(804) 775-1865

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. ☑ |
|---|---|
| 090000024 | |

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**3.** ☒ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**4.** ☐ **ASSIGNMENT (full or partial):** Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

**5. AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.   ☐ DELETE name: Give record name to be deleted in item 6a or 6b.   ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

**6. CURRENT RECORD INFORMATION:**

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| County of Shenandoah, Virginia | | | |
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

**7. CHANGED (NEW) OR ADDED INFORMATION:**

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 7d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

**8. AMENDMENT (COLLATERAL CHANGE):** check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☑ restated collateral description, or describe collateral ☐ assigned.

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| U.S. Bank National Association | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

**10. OPTIONAL FILER REFERENCE DATA**
Local - County of Shenandoah, Virginia

**FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 07/29/98)**

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Jessica C. Randolph (804) 775-1026

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Suzanne S. Long
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219
(804) 775-1865

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #
090000024

1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the
☑ REAL ESTATE RECORDS.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.   ☐ DELETE name: Give record name to be deleted in item 6a or 6b.   ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Twin County Family Care Centers, Inc. | | | |
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 7d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☑ restated collateral description, or describe collateral ☐ assigned.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| U.S. Bank National Association | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA
Local - County of Shenandoah, Virginia

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 07/29/98)

# LITTEN & SIPE L.L.P.
## ATTORNEYS AT LAW
### 410 NEFF AVENUE
HARRISONBURG, VIRGINIA  22801-3434

Donald D. Litten

TELEPHONE (540) 434-5353
FACSIMILE  (540) 434-6069
EMAIL      ddl@littensipe.com
WWW        www.littensipe.com

April 6, 2011

Mr. Douglas C. Walker, Administrator
County of Shenandoah
600 North Main Street, Suite 102
Woodstock, Virginia  22664

RE:   *Commonwealth of Virginia v. the Board of Supervisors of Shenandoah County*
       Case No. CL07-111

Dear Doug:

I write you concerning the mandamus proceeding pending in the Circuit Court of Shenandoah County.  Although the Writ of Mandamus was requested it was never issued as I filed a response showing that the Board of Supervisors was proceeding to build a new courthouse.  I have tried to have this matter dismissed ever since the contract for the construction was entered into but the attorney for the State, Mr. Stephens, refuses to agree to this.  The mandamus is now scheduled to be dismissed on April 14th because nothing has happened within the last two years but again the other attorney is objecting.  I enclose a copy of his letter and response.  I do not intend to do anything on this since the Court cannot dismiss it without approval of both sides and I will simply wait until the construction of the Courthouse is completed.

I am sending a copy of this letter to the members of the Board of Supervisors.

Cordially,

Donald D. Litten

DDL/dlk/3360-25
Enclosures
Copy:    Ms. Mary T. Price, Asst. Administrator
         Members, Board of Supervisors

*exhc*

# A. E. Dick Howard Commentaries on the Virginia Constitution Pages 865 & 866

Page 865 (notes)

27 Board of Supervisors of Fairfax county v. Massey, 210 Va. 253, 260, 169 S.E.2d 556 (1969). **A long-term conditional sales contract or lease-purchase agreement was ruled to be debt of a kind coming within Const. of 1902, Section 127, and relevant statutes on town debt.** 1970-71 Ops. Va. Att'y Gen. 398.

28    210 Va. At 261. This case also clearly established that the term "bond or other interest bearing obligation" under section 127 had the same meaning as "debt" under section 115-a 210 VA at 259. This case is noted in 56 Va. L. Rev 1603 (1970).

117

## Commentaries on the Constitution of Virginia 1974
### A. E. Dick Howard Volume 2 Pages 858 to 876

franchising is mainly concerned with the use of streets, which in all but two counties (Arlington and Henrico) are not controlled by the county, section 9 has less relevance to the counties than to the cities. Moreover, once the decision had been made not to give the counties the rights section 8 gives to cities and towns, the convention saw no reason why they should be subjected to the restrictions of section 9. Counties' powers to sell public property and to grant franchises turn, then, on statute law. Although section 9 does not treat counties and cities alike, nothing prevents the General Assembly from legislating to put them on as nearly equal a plane as it wishes.[19]

Finally, it should be noted that Virginia is not alone among the state constitutions in placing some limitation upon localities' conveyances of property or granting of franchises.[20] And, although not of identical origin, the restraints imposed by section 9 bear an interesting resemblance to the "public trust" doctrine, which comes into play when the state attempts to dispose of its natural resources or otherwise to prejudice the public's interest in the public trust.[21]

SECTION 10.   DEBT.

(a) No city or town shall issue any bonds or other interest-bearing obligations which, including existing indebtedness, shall at any time exceed eighteen per centum of the assessed valuation of the real estate in the city or

[18] *Ibid.* See also Senate Debates, p. 310, House Debates, p. 510 (McNamara).

[19] For legislation regarding counties' selling or granting easements across public property, see Va. Code Ann. § 15.1-262 (1973). See also id. § 15.1-522 (1973), granting counties authority given by the Constitution and general law to cities and towns, and 1954–55 Op. Va. Att'y Gen. 54, ruling that Henrico County had the same power under § 15.1-522 (then § 15.10) to refuse permission to a private water company to lay mains in its streets as did cities.

[20] *E.g.,* Ky. Const. § 164 (requiring cities and counties to advertise for bids before granting franchises to public utilities; Ala. Const., Art. XII, § 228 (limiting franchises to 30 years); Mich. Const., Art. VII, § 30 (like limit).

[21] See Joseph L. Sax, "The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention," 68 *Mich. L. Rev.* 471 (1970), and cases there cited. See also discussion under Art. XI, § 1, *infra* pp. 1150–56.

# Commentaries on the Constitution of Virginia 1974

### A. E. Dick Howard Volume 2 Pages 858 to 876

859

... subject to taxation, as shown by the last preceding assessment for taxes. In determining the limitation for a city or town there shall not be included the following classes of indebtedness:

(1) Certificates of indebtedness, revenue bonds, or other obligations issued in anticipation of the collection of the revenues of such city or town for the then current year; provided that such certificates, bonds, or other obligations mature within one year from the date of their issue, be not past due, and do not exceed the revenue for such year.

(2) Bonds pledging the full faith and credit of such city or town authorized by an ordinance enacted in accordance with Section 7, and approved by the affirmative vote of the qualified voters of the city or town voting upon the question of their issuance, for a supply of water or other specific undertaking from which the city or town may derive a revenue; but from and after a period to be determined by the governing body not exceeding five years from the date of such election, whenever and for so long as such undertaking fails to produce sufficient revenue to pay for cost of operation and administration (including interest on bonds issued therefor), the cost of insurance against loss by injury to persons or property, and an annual amount to be placed into a sinking fund sufficient to pay the bonds at or before maturity, all outstanding bonds issued on account of such undertaking shall be included in determining such limitation.

(3) Bonds of a city or town the principal and interest on which are payable exclusively from the revenues and receipts of a water system or other specific undertaking or undertakings from which the city or town may derive a revenue or secured, solely or together with such revenues, by contributions of other units of government.

(4) Contract obligations of a city or town to provide payments over a period of more than one year to any publicly owned or controlled regional project, if the project has been authorized by an interstate compact or if the the General Assembly by general law or special act has authorized an exclusion for such project purposes.

(b) No debt shall be contracted by or on behalf of

## Commentaries on the Constitution of Virginia 1974

### A. E. Dick Howard Volume 2 Pages 858 to 876

860                                                                   Article VII

any county or district thereof or by or on behalf of any regional government or district thereof except by authority conferred by the General Assembly by general law. The General Assembly shall not authorize any such debt except the classes described in paragraphs (1) and (3) of subsection (a), refunding bonds, and bonds issued, with the consent of the school board and the governing body of the county, by or on behalf of a county or district thereof for capital projects for school purposes and sold to the Literary Fund, the Virginia Supplemental Retirement System, or other State agency prescribed by law, unless in the general law authorizing the same, provision be made for submission to the qualified voters of the county or district thereof or the region or district thereof, as the case may be, for approval or rejection by a majority vote of the qualified voters voting in an election on the question of contracting such debt. Such approval shall be a prerequisite to contracting such debt.

Any county may, upon approval by the affirmative vote of the qualified voters of the county voting in an election on the question, elect to be treated as a city for the purposes of issuing its bonds under this section. If a county so elects, it shall thereafter be subject to all of the benefits and limitations of this section applicable to cities, but in determining the limitation for a county there shall be included, unless otherwise excluded under this section, indebtedness of any town or district in that county empowered to levy taxes on real estate.

Section 10 enumerates the constitutional restrictions placed on the power of localities to incur debt. The Constitution does not itself grant any borrowing power to localities;[1] rather, it limits the power that the General Assembly may confer on the localities. Section 10(a) limits borrowing by cities and towns; section 10(b) applies to coun-

---

[1] See Robertson v. City of Staunton, 104 Va. 73, 75, 51 S.E. 178 (1905) (interpreting Const. of 1902, § 127). Power to borrow may be conferred either by statute, see, e.g., Public Finance Act, Va. Code Ann. §§ 15.1-170 to -227 (1973; 1973 supp.), or by city or town charter. In line with Dillon's Rule, the power to borrow, like other municipal power, is strictly construed. See Richmond & West Point Land, Navigation & Improvement Co. v. Town of West Point, 94 Va. 680, 27 S.E. 460 (1897), and Lynchburg & Rivermont Street Ry. v. Dameron, Va. 3(?), 28 S.E. 951 (1898).

# Commentaries on the Constitution of Virginia 1974
### A. E. Dick Howard Volume 2 Pages 858 to 876



# Commentaries on the Constitution of Virginia 1974

### A. E. Dick Howard Volume 2 Pages 858 to 876



# Commentaries on the Constitution of Virginia 1974

### A. E. Dick Howard Volume 2 Pages 858 to 876



*Local Government*                                                           863

assessed valuation of real estate in that municipality.[12] Passage of County borrowing was not the subject of constitutional mandate until the Byrd amendments of 1928. Before that time, counties often turned to the General Assembly to approve bond issues. Such "general acts of special application" were traditionally passed upon the mere request of the county's delegate; thus the ability to find willing buyers constituted the only practical restraint on county debt.[14] To safeguard the credit and fiscal integrity of the counties,[15] section 115-a, requiring voter approval of most county borrowing, was added to the Constitution in 1928. In response to the need for more schools, in 1958 a paragraph was added to section 115-a explicitly permitting county borrowing, without voter approval, from the state retirement fund to finance school construction.

The use of a debt ceiling for municipal borrowing and a requirement of local referendum for counties is unusual. Most states that impose such restrictions subject counties and municipalities to the same kind of limitations. Indeed, often the localities must face both a debt ceiling and a referendum requirement.[16] Virginia's dichotomy may turn on the historical periods when the respective limits were first adopted. In 1875 debt ceiling devices were commonly used;[17] a half century later, referendum had become a more popular method of controlling debt.[18]

*Circumvention of debt limits.* Formal constitutional limitations on local debt do not by any means fully reflect the actual borrowing power of localities.[19] Although it would overstate the point to imply that those limitations have had no impact, a number of techniques have been devised to circumvent the restrictions on local debt, including

[13] Excepted were certain revenue bonds and obligations issued in anticipation of current revenue.
[13] See Starner, *General Obligation Bond Financing*, p. 6.
[14] C. H. Morrissett, "Proposed Amendments to the Constitution of Virginia," 39 Va. State Bar Ass'n Rep. 371, 391-93 (1927).
[15] See American-La France v. Arlington County, 164 Va. 1, 7, 178 S.E. 783 (1935).
[15] See Starner, *General Obligation Bond Financing*, pp. 13-72.
[16] Id., p. 8
[18] Id., pp. 9-10
[19] As of 1961, at least one-third of all outstanding local bonded debt was outside the scope of constitutional and statutory restrictions. ACIR, *State Constitutional and Statutory Restrictions on Local Government Debt* (Washington, D.C., 1961), p. 35.

# Commentaries on the Constitution of Virginia 1974

## A. E. Dick Howard Volume 2 Pages 858 to 876



# Commentaries on the Constitution of Virginia 1974

### A. E. Dick Howard Volume 2 Pages 858 to 876



# Commentaries on the Constitution of Virginia 1974

### A. E. Dick Howard Volume 2 Pages 858 to 876



866                                                                 Article VII

several northern Virginia communities and the Washington Metropolitan Area Transit Authority illustrate the concept of a service contract. The Authority was created by interstate compact to provide mass transit in the Washington area. The Virginia counties and cities involved agreed, pursuant to the compact and implementing Virginia legislation, to underwrite their proportionate shares of operating deficits anticipated during the initial years of operation. The Supreme Court of Appeals held that this was not an instance of a service contract and that the localities' obligation amounted in effect to making payments on the Authority's bonds. Thus the requirements of section 115-a (for the counties) and 127 (for the cities) would have to be observed. Subsequently the counties and cities agreed to make payments based on the number of train miles operated within the respective localities and the number of local residents using the system. Although the actual payments might prove to be about the same in amount as would have been made under the earlier agreement, the Supreme Court of Appeals held that the agreement came within the service contract principle and thus did not run afoul of the constitutional debt restrictions.

*Exempted borrowing.* Besides the circumvention techniques that they have employed, Virginia localities have also made use of the explicit constitutional exceptions. Especially important to the counties was their extensive use of the exception existing in section 115-a of the 1902 Constitution by which a referendum was not required when bonds were sold to the State Literary Fund or to the

debt of a kind coming within Const. of 1902, § 127, and relevant statutes on state debt 1970–71, Ops. Fa. At's Gen. 398.

212 Va. at 261. This case also clearly established that the term "bond or other interest bearing obligation" under § 127 had the same meaning as "debt" under § 115-a. 210 Va. at 259. This case is noted in 56 Va. L. Rev. 1603 (1970).

Board of Supervisors of Fairfax County v. Massey, 210 Va. 680, 173 S.E.2d 869 (1970). The Court established certain criteria to be met before an agreement can be considered a service contract: (1) it must be for an essential public service; (2) the obligation must be conditioned upon the service being rendered; and (3) the obligations must be paid over a period of years in annual installments as service is rendered. 210 Va. at 683.

Counties have been reluctant to issue pure revenue bonds, probably because water and sewer facilities usually have been built by sanitary districts and because bond counsel have been reluctant to rely on the language in the *Farquhar* case in giving their opinion on the legality of such bonds without further clarification from the Supreme Court of Virginia.

# Commentaries on the Constitution of Virginia 1974

### A. E. Dick Howard Volume 2 Pages 858 to 876

*Local Government* 867

Virginia Supplemental Retirement System (VSRS). At the time of the 1969 revision, in fact, over 90 percent of the obligations in one-half of Virginia's counties had been issued to one of the two funds. For these counties, the exception was the rule, and no elections were held prior to the issuance of such bonds.

Unfortunately, selling bonds to the Literary Fund and the VSRS had several significant disadvantages. The bonds could be issued only by a county school board, and if they went to the VSRS (which most of them did since it possessed the lion's share of the funds), the money could be used only for the purpose of school "construction," a term which was perhaps susceptible of a somewhat restricted interpretation. Further, the counties paid a higher rate of interest to the VSRS than they would otherwise have had to pay, since VSRS sought to resell on the public market within several months any bonds it purchased from a county. Finally, this exception did not provide a great deal of relief to the larger, urban counties that most needed to borrow, since the amount of money that could be borrowed was extremely limited. Thus, for example, Fairfax County, which has a larger population than the City of Richmond and an even greater need for borrowing, had to resort to an election procedure each time it needed to borrow money.

*1969 revision.* In revising the constitutional provisions concerning local debt, the Commission on Constitutional Revision first had to ask itself whether any restrictions at all were desirable. Some commentators contend that such restrictions should be left to statute, where they can be flexible enough to meet changing conditions, and that a constitution should attempt only to establish certain principles that would guarantee repayment of local debt and promote sound municipal credit standing. The Commission decided, however, that something more than these general principles was needed in order to assure the fiscal integrity of local governments. The Commission's enquiry, therefore, was to see what changes ought to be made in the limitations found in the Constitution of 1902. *Cities and towns.* The use of a percentage of the assessed value of

taxable real estate, pledging the locality's full faith and credit, assuring bondholders that principal and interest will be paid on schedule, and requiring the retirement of a debt within the probable useful life of the object financed. Edward M. Kresky, "Taxation and Finance," Model State Constitution, pp. 136, 145.

# Commentaries on the Constitution of Virginia 1974

### A. E. Dick Howard Volume 2 Pages 858 to 876



# Commentaries on the Constitution of Virginia 1974

## A. E. Dick Howard Volume 2 Pages 858 to 876



# Commentaries on the Constitution of Virginia 1974

## A. E. Dick Howard Volume 2 Pages 858 to 876

870                                                                 *Article VII*

make pure revenue bond provisions uniform, the Commission proposed to extend the privilege to cities and towns by including section 10 a (3).[40] The General Assembly adopted this proposal with little opposition.

Section 10(a)(4) excepts from the 18 percent ceiling contract obligations of a city or town to provide payments for more than one year to a publicly owned or controlled regional project, if authorized by an interstate compact or by the General Assembly. This exception was the 1969 Assembly's response to certain problems raised in regard to the regional transit project proposed for the Washington metropolitan area. This project, agreed to by the General Assembly, established a massive, $2½ billion system of transportation for the District of Columbia and certain areas of Maryland and Virginia. Although it was to be paid for as much as possible from revenues, the system also required considerable financial support from the benefited localities.[41] Such support from Alexandria would have almost totally consumed the city's debt reserve capacity. The Northern Virginia Transit Commission therefore requested that some provision be inserted in the Constitution to exempt such debt.[42]

The General Assembly concurred. It felt that the importance of encouraging such ventures overrode the risk of burdening a locality with debt. Moreover, the Assembly realized that a large regional project should not be viewed as a normal local undertaking and hence should not be subject to the same debt limitations. Section 10(a)(4) carries a particular safeguard in that the section's exclusion is not operative until the General Assembly acts either to approve an interstate compact authorizing the project or to authorize, by general law or special act, an exclusion for such project purposes.

Although section 10(a)(4) was originally designed to accommodate an interstate project, it is not restricted to such projects. Any

[40] CCR, p. 242. In order clearly to distinguish between the bonds allowed by this provision and those allowed by § 10(a)(2)—old § 127(b)—the words "pledging the full faith and credit of such city or town" were added to the latter provision. This represents no substantive change from the Constitution of 1902, for those bonds allowed by § 127(b) were recognized as full faith and credit bonds.

[41] This project was involved in the two *Fairfax County* cases discussed *supra* pp. 865–66.

[42] Memorandum to General Assembly from Lee M. Rhoads, March 18, 1969; Statement of Lee M. Rhoads at hearings of March 6, 1969. At the time, Alexandria's share in the system was $29.8 million and its outstanding debt was $30.7 million out of a limit of $61.7 million. Memorandum from Jerome M. Alper to Lee M. Rhoads, Feb. 18, 1969 (in CCR files).

to 876

## Commentaries on the Constitution of Virginia 1974

### A. E. Dick Howard Volume 2 Pages 858 to 876

*Local Government* 871

regional project is included in this exception if an interstate compact has authorized it or if the General Assembly has authorized by *Constitution*. The most far-reaching proposal by the Commission on Constitutional Revision was to make uniform the provisions concerning counties, cities, and towns—specifically, to allow a county to borrow up to 18 percent of the assessed value of its real estate without an election. The Commission felt that such a proposal was justified by the increasing demands upon counties, especially urban ones, to provide the same services as do cities.[42] The General Assembly, however, saw fit not to follow the Commission's approach.

Several factors contributed to the rejection of the Commission's proposal. For one thing, some rural legislators were reluctant to drop the requirement of referenda, long associated with "pay-as-you-go." For another, several counties believed that an 18 percent limit would be too restrictive; even though they could raise the assessment ratio and lower the tax rate, they did not want to do this. There was also opposition to the fact that under the Commission's proposal, the debt of any town or district within a county would count against that county's debt limit. Faced with these objections, the General Assembly refused to discard the familiar provision.[43]

The Assembly chose instead a middle course, one which leaves it to the people of a county to choose whether they prefer the traditional method of having no percentage ceiling but requiring referendum, or whether they would rather have the county treated like a city, abolishing the requirement of referendum but imposing the 18 percent ceiling. This choice is made available by the last paragraph of section 10, which provides for a county, upon vote of its people in referendum, to be treated as a city for the purposes of issuing bonds. The choice is unilateral; once a county elects to be treated as a city, it cannot later choose to return to county status for the purpose of borrowing.[44] The shift to city debt status also carries the requirement that the indebtedness of any town or district within the county be included in computing the county's debt limit; the county board of

[42] CCR, pp. 243–44.
[43] In retaining the approach of § 115-a, the General Assembly preserved that section's requirement that the borrowing powers of counties be prescribed by general law. No such requirement applies to cities and towns, whose powers may be prescribed either by general law or by special act (normally charters).
[44] House Debates, p. 509 (J. D. Gray); Senate Debates, p. 314 (Hopkins).

# Commentaries on the Constitution of Virginia 1974

### A. E. Dick Howard Volume 2 Pages 858 to 876

872                                                                    *Article VII*

supervisors would no longer have sole control over how much the county is able to borrow. However, bonds previously issued for revenue-producing projects and approved by the people—*i.e.*, those bonds qualifying under old section 127(b)—would be excluded from the county's debt limit.

In addition to allowing counties to be treated as cities, the General Assembly also expanded the categories of debts for which no referendum is required. Section 10 now lists four such exceptions: (a) bonds issued in anticipation of the collection of revenues for the then current year; (b) pure revenue bonds; (c) refunding bonds; and (d) bonds issued for capital projects for schools and sold to the Literary Fund, the VSRS, or any other state agency prescribed by law. The first of these is worded so that it clearly includes the first two exceptions listed in section 115-a, but there is some question as to whether it includes debts issued "to redeem a previous liability," the third exception of that section. Probably it should be viewed as encompassing such debt, but only if the obligations issued fulfill the one-year maturity requirement and do not exceed the revenue for that year. The second exception merely makes express what the courts had already inferred, as discussed above. The third exception, for refunding bonds, is essentially equivalent to the "redeem a previous liability" provision of old section 115-a. Refunding occurs when a bond issue matures and is not paid and new bonds are issued to refund them, or in some cases when outstanding bonds are called prior to maturity and refunding bonds are substituted for them.

The final exception made in section 10(b) is probably the most important because of the counties' ever present need of school funds. It comes from the last paragraph of section 115-a but expands it somewhat. First, it allows borrowing for any capital school project, rather than simply for "school construction" as was the case under section 115-a.[16] Second, it allows funds to be borrowed from any state agency prescribed by law, not merely from the Literary Fund and the VSRS. Finally, it expressly provides for borrowing without referendum from the Literary Fund, a practice which has long been allowed but never expressly mentioned in the Constitution.[17]

Where referendum is required and a bond issue is approved by the voters, it still remains to the county's governing body to decide

[16] It would, for example, cover purchase of an existing building. Senate Debates, p. 313 Hopkins.

[17] For relevant statutes, see Va. Code Ann. §§ 15.1-228, -229; 22-29.6 (1973; 1973 supp.).

## Commentaries on the Constitution of Virginia 1974

### A. E. Dick Howard Volume 2 Pages 858 to 876

*Local Government*                                                     873

whether the bonds shall be issued at all. In other words, a favorable vote at referendum simply authorizes issuance of the bonds; it does not compel the governing body to issue them.[18] Moreover, it appears that there is no time limit on the issuance of bonds once approved at referendum (assuming no limit was spelled out in the referendum itself).[19] Other conditions may intervene to invalidate a bond issue, but the mere passage of time does not take away the authorization once conferred.

When the bonds are actually issued, the issue must adhere strictly to the terms of the referendum. The strictness of this rule is reflected by a decision holding that statutory limitations existing at the time of the referendum, such as the maximum interest rate chargeable, are engrafted into the referendum whether actually stated there or not. Thus, bonds authorized when the maximum interest rate was 6 percent could not be issued at 7 percent a year later even though the maximum rate had been changed in the meantime.[20]

*Procedural safeguards.* The Commission on Constitutional Revision recommended the adoption of three basic safeguards to ensure fiscal integrity when bonds other than those in anticipation of revenue are issued: (a) that bonds be issued only for capital projects or incident to transfers of jurisdiction or functions between units of general government; (b) that where a public election is not held, a public hearing be held on the question of the issuance of bonds; and (c) that the proceedings authorizing the issuance of bonds provide for payment into a sinking fund sufficient to pay the bonds at or before maturity. The Commission would have applied these safeguards to whatever unit of government issued bonds and believed that any loss of flexibility they might cause would be compensated by the measure of safety they would provide.[21]

The General Assembly deleted these safeguards proposed by the Commission. Its reason seems to have been that, since the debt provisions were not going to be changed as drastically as the Commission had proposed, the added safeguards were not necessary. There was also the feeling that provisions such as these were better left to statute and that they could easily be imposed if thought

[18] 1970–71 Op. Va. Att's Gen. 29; see also 1970–71 id. 8.
[19] See 1970–71 id. 8.
[20] Miller v. Ayres, 211 Va. 69, 175 S.E.2d 253 (1970).
[21] CCR, pp. #44–45.

8 to 876

# Commentaries on the Constitution of Virginia 1974

## A. E. Dick Howard Volume 2 Pages 858 to 876

*Local Government*                                                                                          875

at the same time on other questions (*e.g.*, elections for public office or referenda on other matters).

"Qualified voters," of course, are those qualified to vote in elections generally. Thus referenda could not, for example, be restricted to freeholders. Under a provision added to the Optional Forms Act in 1956,[57] the General Assembly allowed Arlington County to establish bond elections whereby a majority of the freeholders as well as a majority of all voters had to approve any bond issuance. The reasoning behind such a provision was that since the chief source of revenue to pay off a bond issue is the real property tax, the owners of real property should have a greater voice in determining whether to incur such debt and risk the possibility of a tax increase. The Supreme Court of Appeals, however, held the provision unconstitutional.[58] It ruled that the term "qualified voters" of section 115-a must be read in light of section 18 of the Franchise article and that giving added weight to freeholders' votes violated this section.[59] More recently the United States Supreme Court has held that state laws which give special status to freeholders in bond elections, whether for general obligation bonds or for revenue bonds, violate the equal protection clause of the Fourteenth Amendment.[60] It is clear then that referenda held under Article VII, section 10, must be decided by, and only by, a vote of those eligible to vote in elections generally.[61]

*Comparative provisions.* The local debt provisions of state constitutions vary so much in their particulars that generalizations are difficult.[62] Of the various kinds of local debt restrictions found in state constitutions, the two kinds used in the Virginia Constitution—requirement of referendum, and debt based on a percentage of assessed property value—are the two most common. On recent count, thirty-one state constitutions require a referendum by at least one unit of local government as a prerequisite to incurring at least one

57. Acts of Assembly, 1956, ch. 302.
58. *Smith v. Haman*, 199 Va. 771, 102 S.E.2d 273 (1958).
59. *See* Art. II, § 1, *supra* p. 336.
60. *City of Phoenix v. Kolodziejski*, 399 U.S. 204 (1970) (general obligation bonds); *Cipriano v. City of Houma*, 395 U.S. 701 (1969) (revenue bonds).
61. On limitation of Art. II, § 1, to referenda on issuance by local governments...

# Commentaries on the Constitution of Virginia 1974

### A. E. Dick Howard Volume 2 Pages 858 to 876



876                                                                 *Article VII*

type of local debt.[63] In some states the referendum requirement attaches to all political subdivisions; in others, to counties and municipalities. Thirteen state constitutions require a special majority in at least some bond referenda,[64] a special limitation which the United States Supreme Court upheld in a 1971 challenge to West Virginia's requirement that political subdivisions may not incur bonded indebtedness without the approval of 60 percent of those voting in a referendum.[65]

A substantial number of the states have percentage debt limitations in their constitutions, usually based on the assessed value of real property.[66] Sometimes it is cities that are governed by the percentage debt limitation, sometimes counties, sometimes both. The actual percentages vary considerably; 5 percent or 10 percent is a common figure.[67]

[63] Note, "Judicial Activism and Municipal Bonds: Killing Two-Thirds with One Stone," 56 *Va. L. Rev.* 295, 331-34 (1970).
[64] *Ibid.*
[65] Gordon v. Lance, 403 U.S. 1 (1971).
[66] ACIR, *State Constitutional and Statutory Restrictions on Local Government Debt*, p. 26, states that as of 1961, 34 of the 50 states had some such limitation.
[67] *E.g.*, Mich. Const., Art. VII, § 11 (10%); Iowa Const., Art. XI, § 3 (5%).

OP. NO. 03-108

**COUNTIES, CITIES AND TOWNS: PLANNING, SUBDIVISION OF LAND AND ZONING.**

**CONSTITUTION OF VIRGINIA: LOCAL GOVERNMENT (DEBT).**

**Neither Virginia Constitution nor applicable state statutes allow local governing body to adopt adequate public facilities ordinance that binds, directly or indirectly, future governing body to fund capital improvements program at specific level and authorizes approval of proposed development project to be deferred for specified number of years.**

The Honorable John C. Watkins
Member, Senate of Virginia
December 15, 2003

### Issue Presented

You ask whether a county may adopt an adequate public facilities ordinance[1] that would bind, directly or indirectly, future boards of supervisors to fund a capital improvement plan ("plan") at a specific level in conjunction with the authority to defer the approval of a proposed development for a specified number of years. Such a plan would bind the present and future county board of supervisors to fund capital improvements at a specific monetary amount over the specified number of years.

### Response

It is my opinion that the Constitution of Virginia and applicable state statutes currently do not allow a local board of supervisors to adopt an adequate public facilities ordinance that binds, directly or indirectly, the current or future board of supervisors to fund a capital improvements program at a specific level without submitting the matter to the qualified voters for approval pursuant to the requirements of Article VII, § 10(b) of the Virginia Constitution.

### Background

As cochairman of a legislative subcommittee that is investigating legislation dealing with the authorization of counties to adopt adequate public facilities ordinances, you seek clarification regarding the legislative authority of counties that may utilize such ordinances. You advise that the subcommittee is considering several legislative models that would authorize counties to adopt adequate public facilities ordinances. These models generally provide that standards for what constitutes adequate public facilities will be established in each ordinance in each authorized county. The ordinance also would provide for the review of any proposed development projects to determine whether such standards have been met and such adequacy exists in that particular county. You relate that, typically, the models provide a mechanism whereby the county is authorized to defer approval of a proposed project, such as a subdivision plan or site plan, for some number of years[2] with the assurance that the county in the

136



interim will fund and implement a capital improvements plan to construct specific infrastructure needed to support the development when it is approved and undertaken in the future. The models to which you refer require an assurance that the county will fund and implement a capital improvements plan that is binding on the county. Such a binding monetary obligation on the county, therefore, constitutes a debt of the county.

### Applicable Law and Discussion

Virginia's land use and zoning enabling statutes are detailed in Chapter 22 of Title 15.2.[3] Chapter 22 presents a connected system for local government planning, subdivision of land, and zoning. Various provisions within Chapter 22 detail the creation, powers, and responsibilities of the several bodies and officers charged with implementing the local land use regulation process, including local planning commissions. A local planning commission is required to prepare and recommend subdivision ordinances and amendments to such ordinances to the governing body of the locality,[4] to prepare and recommend a comprehensive plan for development of the area, and to specify the procedures for putting the plan into effect.[5] In addition, the planning commission may recommend amendments to zoning ordinances;[6] may have made, for approval by the governing body, an official map showing existing and proposed public streets, waterways and public areas;[7] and may prepare a five-year capital improvement program for the locality based on the comprehensive plan.[8]

Under the current statutory scheme, the local governing body may direct the local planning commission to prepare and submit annually a capital outlay program,[9] covering "a period not to exceed the ensuing five years," which may be used as the basis for developing a plan of current capital expenditures.[10] The capital outlay program is reviewed annually and projects may be shifted from one year to another as the need arises.[11] As each fiscal year passes, another fiscal year is added to the end of the capital outlay program. Through this process of annual review, the governing body can prepare for future construction needs. It can minimize the difficulty of providing money for the locality's capital growth requirements by setting aside a portion of the costs in reserve each year. The governing body also can anticipate the impact of capital projects on the locality's requirements for operating funds. Following hand-in-hand with capital expansion are increases in debt service, costs of additional personnel, and operation and maintenance expenditures that will be reflected in subsequent annual budgets.

Therefore, under the current statutory scheme, a capital budget is simply a plan for funding capital projects and a schedule of when such projects may be expected to be completed. It includes such construction as sewer and water systems, school and office buildings, parks and recreation facilities, sanitary landfills, and other projects requiring large capital outlays. Because capital budget items are nonrecurring expenses for major projects, they have no claim to legitimacy by precedent or tradition. Therefore, review of the capital budget focuses on the entire amount of each item considered for funding.

Article VII, § 10(b) of the Virginia Constitution limits the ability of a county to contract debt and otherwise incur financial obligations. Subject to certain exceptions, § 10(b) prohibits counties from contracting debt or establishing a fixed contractual obligation to make payments in future years, unless the proposed debt is authorized by general law and approved by the qualified voters of the county in a duly authorized referendum. The limitation imposed upon county debt by § 10(b) has been applied to unconditional long-term obligations

137

requiring the payment of money.[12] Contractual provisions which purport to bind a locality to a fixed obligation to make payments in future years generally are considered to be debts subject to the constitutional restrictions of Article VII, § 10.[13]

The position of this Office, as stated in numerous prior opinions, is that a local governing body may not enter into any agreement which provides for payments of county funds in future years, unless the agreement first is submitted to the qualified voters of the locality for approval in a referendum authorized by general law, or the payments to be made in future years are subject to the condition that the local governing body appropriate funds during each year in which a payment is to be made.[14] A "debt" is described as establishing an unconditional long-term obligation to make payments in future years.[15] The plan that you describe obligating a present and a future board of supervisors to fund capital improvements in conjunction with deferral of the approval of a proposed development for a specified number of years clearly constitutes a debt. Subject to certain exceptions in Article VII, § 10(b), the general law authorizing such a debt must provide that the question of such a debt must be submitted by referendum to the qualified voters of the county.[16]

Prior opinions of this Office also consistently conclude that a local governing body currently does not have the power to take actions that irrevocably bind its successors in office, unless such binding action is expressly authorized by statute.[17] No legislative body, federal, state or local, may limit the power of its successors to amend or repeal statutes or ordinances absent statutory authorization.[18] Therefore, any adequate public facilities ordinance adopted by a board of supervisors to fund a capital improvements program at a specific level must necessarily be subject to later amendment or repeal by the governing body or its successors in office under current law.

## Conclusion

Accordingly, I must conclude that the Constitution of Virginia and applicable state statutes currently do not allow a local board of supervisors to adopt an adequate public facilities ordinance that binds, directly or indirectly, the current or future board of supervisors to fund a capital improvements program at a specific level without submitting the matter to the qualified voters for approval pursuant to the requirements of Article VII, § 10(b) of the Virginia Constitution.

[1]In a separate opinion to you, dated December 15, 2003, I conclude that under current law, the provision of public services and facilities required by a new development is one of many factors a local governing body should consider in its deliberations concerning a rezoning application. See 2003 Va. Op. Att'y Gen. No. 03-109 (Dec. 15, 2003). I also conclude that the provision of public services and facilities required by a new development may not be the sole basis for the denial or deferral of an application for rezoning. Id. For the purposes of this opinion, I will assume that the General Assembly proposes to grant to a county the authority to adopt as the sole basis for the denial or deferral of a rezoning application the lack of public services and facilities required by a new development. I will also assume that the General Assembly desires to grant to a county the ability to obligate current and future boards of supervisors to a specific funding level in a capital improvement plan to guarantee public services and facilities at a specific level to accommodate all new development resulting from approval of a rezoning application.

138



# COMMONWEALTH of VIRGINIA

### Office of the Attorney General

Kenneth T. Cuccinelli, II
Attorney General

September 28, 2012

900 East Main Street
Richmond, Virginia 23219
804-786-2071
FAX 804-786-1991
Virginia Relay Services
800-828-1120
7-1-1

John R. Roberts, Esquire
County Attorney for Loudoun County
Office of the County Attorney
1 Harrison Street, S.E.
5th Floor, MSC#06
Leesburg, Virginia 20175-3102

Dear Mr. Roberts:

I am responding to your request for an official advisory opinion in accordance with § 2.2-505 of the Code of Virginia.

## Issue Presented

You inquire whether Loudoun County ("County") may apply proceeds of general obligation bonds issued by the County for one project, but no longer needed for that project, to a different project, when each project has been approved at referendum by the qualified voters of the County.

## Response

It is my opinion that a county may not apply proceeds of general obligation bonds issued by the county for one project to a different project unless the resolution or ordinance adopted by the county and submitted to the qualified voters authorizes the application of the bond proceeds to the other project.

## Background

You relate that the County has a Capital Improvement Program ("CIP") for a series of projects extending over a number of years. To fund that CIP, the County conducts a bond referendum each year to ask the voters to consider whether to approve the issuance of general obligation debt for specified projects. You also note that the County is very specific in its bond resolutions, typically reciting a specific amount to be authorized for each project listed in the referendum. In each fiscal year, the County projects the anticipated funding needed to construct approved projects and determines the amount of general obligation debt to be issued. In some instances, a project will be completed under budget, and the County may have issued more debt than needed for that project. You also indicate that the County can use the leftover funds to pay debt service on the bonds or use the funds to call or defease the bonds.

## Applicable Law and Discussion

The Constitution of Virginia provides that:

*eyh F*

John R. Roberts, Esq.
September 28, 2012
Page 2

> [n]o debt shall be contracted by or on behalf of any county or district thereof or by or on behalf of any regional government or district thereof except by authority conferred by the General Assembly by general law. The General Assembly shall not authorize any such debt ... unless in the general law authorizing the same, provision be made for submission to the qualified voters of the county or district thereof or the region or district thereof, as the case may be, for approval or rejection by a majority vote of the qualified voters voting in an election on the question of contracting such debt. Such approval shall be a prerequisite to contracting such debt.[1]

The authority of a county to contract debt is set forth in general law pursuant to the Public Finance Act of 1991 ("Public Finance Act").[2]  The Public Finance Act provides that "any locality may ... contract debts for any project, borrow money for any project and issue bonds to pay all or any part of the cost of acquiring, constructing, reconstructing, improving, extending, enlarging and equipping any project."[3]  As the constitutional provision requires, however, this authority is limited in that, generally, "no county has the power to contract any debt or to issue its bonds unless a majority of the voters of the county voting on the question at an election held in accordance with §§ 15.2-2610 and 15.2-2611 approve contracting the debt, borrowing the money and issuing the bonds."[4]

The Public Finance Act establishes the procedures a county must follow to contract debt and issue general obligation bonds. First, the county "shall adopt an ordinance or resolution setting forth in brief and general terms *the purpose or purposes for which the bonds are to be issued* and the maximum amount of the bonds to be issued."[5]  When voter approval is required, the ordinance or resolution must also "request the circuit court to order an election to be held pursuant to §§ 15.2-2610 and 15.2-2611 on the question of contracting the debt and issuing the proposed bonds."[6]  Once certified by the clerk of the governing body, a copy of such resolution or ordinance is to be filed with the circuit court serving the locality." Then, "[t]he circuit court shall order a special election . . . [to] take the sense of the voters of the locality on the question of contracting the debt and issuing bonds *for the purpose or purposes set forth in the resolution or ordinance*."[8]  Finally, "[i]f a majority of the voters of the locality voting on the question approve the bond issue . . . [t]he locality may then proceed to prepare, issue and sell its bonds up to the amount so authorized . . . ."[9]

Once the bond has been approved, the governing body is bound by the terms of the ordinance or resolution it submitted to the voters. The Supreme Court of Virginia has declared that "[t]he issuance of bonds pursuant to an election [by the voters of the respective county] must be in conformity with the terms and conditions of the submission [to such voters,]"[10] which, as noted above, is required to set forth

---

[1] VA. CONST. art. VII, § 10(b).

[2] VA. CODE ANN. §§ 15.2-2600 through 15.2-2663 (2012).

[3] VA. CODE ANN. § 15.2-2604(2).  *See* § 15.2-2602 (defining "cost" and "project" broadly).

[4] Section § 15.2-2638(A) (2012).  There are specific exceptions to the general requirement, but none of the exceptions are germane to the facts set forth underlying the question presented. *See* § 15.2-2638(B).

[5] Section 15.2-2640 (2012) (emphasis added).

[6] *Id.*

[7] Section 15.2-2610.

[8] *Id.* (emphasis added).

[9] Section 15.2-2611.

[10] Miller v. Ayres, 211 Va. 69, 78, 175 S.E.2d 253, 259 (1970).

John R. Roberts, Esq.
September 28, 2012
Page 3

*"the purpose or purposes for which the bonds are to be issued* and the maximum amount of the bonds to be issued."[11] As this office consistently has opined, the proceeds of a bond issue may be used only for the purpose for which the bonds were issued[12] as expressed in the submission to voters.[13] Although the question submitted to voters may be worded specifically or generally,[14] a board of supervisors is bound by that language and, therefore, may not use bond proceeds for any use other than that expressly approved by the voters, as set forth in the bond referendum.[15] Thus, if the resolution or ordinance approved by the voters sets forth a separate authorization amount for each project listed therein without language to permit the use of leftover bond funds authorized for one of the listed projects to be applied to another project listed in the resolution or ordinance, the governing body is bound by the language used and cannot reallocate those proceeds.

### Conclusion

Accordingly, it is my opinion that a county may not apply proceeds of general obligation bonds issued by the county for one project to a different project unless the resolution or ordinance adopted by the county and submitted to the qualified voters authorizes the application of the bond proceeds to the other project.

With kindest regards, I am

Very truly yours,

Kenneth T. Cuccinelli, II
Attorney General

---

[11] Section 15.2-2640 (emphasis added).

[12] *See* Ops. Va. Att'y Gen.: 1950-51 at 31; 1960-61 at 260; 1956-57 at 225; 1964-65 at 293.

[13] *See* 1956-57 Op. Va. Att'y Gen. 225; 2001 Op. Va. Att'y Gen. 44, 45 n.3 and citations therin.

[14] *See* 1960-61 Op. Va. Att'y Gen. 260, 263 (if question submitted to voters uses specific language, even if not required, school board's use of bond proceeds is confined by the specific language used).

[15] *Id. See also* 1970-71 Op. Va. Att'y Gen. 39, 40 (where bond referendum authorized $7.5 million in bonds for construction of two high schools and two elementary schools, school board may use bond proceeds for three of the voter-approved school buildings, although funds are insufficient to construct all four schools authorized); 2001 Op. Va. Att'y Gen. at 44 (where bond record indicated that a different site could be a possibility, the locality was authorized to build approved library on an alternate site).

Appeal: 14-1690   Doc: 15   Filed: 09/24/2014   Pg: 144 of 316
Case 5:13-cv-00045-MFU   Document 3-7   Filed 04/15/13   Page 1 of 3   Pageid#: 139

# PROPOSED AMENDMENTS TO THE CONSTITUTION OF VIRGINIA

### An Address by C. H. Morrissett

A quarter of a century is "but as a single heart-throb in the breast of time;" a quarter of a century is only a brief period in the lives of nations, but a quarter of a century is very material in the lives of men and of State constitutions.

Less than a month ago, Virginia's Constitution of 1902 celebrated the twenty-fifth anniversary of its birth. The Convention which framed it assembled in the City of Richmond on the twelfth day of June, 1901. It adjourned *sine die* on the twenty-sixth day of June, 1902. By proclamation, the Constitution went into effect at noon on the tenth day of July, 1902.

Many of the able men who framed the Constitution now sleep with their fathers. Many of its restrictive provisions are now retarding governmental progress. Conditions change so rapidly, and sometimes so unexpectedly, that mere legislation ordinarily has no place in the organic law of a State. Yet it has become customary in this country for the States to use their State constitutions for the purposes of ordinary legislation, and this is the reason why quarter of a century is very material in the lives of State constitutions.

Notwithstanding the criticism which has been directed against the Constitution of 1902, and notwithstanding the fact that in numerous instances it violates the principle that ordinary legislation has no place in the organic law of a State, yet on the whole that Constitution has served Virginia well. Most of the criticism has been directed against some of the restrictions upon the legislative power which the Constitution contains and which the State has outgrown. With the removal of these restrictions

Virginia will have a Constitution which will compare favorably with that of any other State.

The Constitution has been amended ten times since it went into effect. The sections amended are as follows: 32, 110, 117 (twice), 119, 120, 133, 136, 138 and 184. No amendments have been consummated since 1920.

From time to time there has been some demand for a Constitutional Convention to revise and amend the Constitution. This movement culminated in 1922 by the passage of an act submitting to the voters the question of calling a Constitutional Convention; but at the polls in the fall of that year, the proposition was overwhelmingly defeated. The people were not willing to call a Convention at an expense of approximately $1,000,000, but the sentiment for some material revision continued to grow, and in the gubernatorial campaign of 1925 the successful candidate suggested a feasible and an inexpensive plan, to-wit, the appointment of a qualified commission consisting of a limited number of able and patriotic Virginians to study the Constitution and to suggest needed amendments. Governor Byrd, in his inaugural address, repeated this suggestion to the General Assembly, and in 1926 the Assembly enacted a statute providing for the appointment of a Commission to Suggest Amendments to the Constitution of Virginia, the membership being limited to seven. In conformity with that act, Governor Byrd appointed the following distinguished Virginians: Robert R. Prentis, R. Gray Williams, William Minor Lile, Robert M. Hughes, Joseph H. Chitwood, H. C. Stuart, and William Meade Fletcher. The personnel of the commission thus assured a good report. Judge Prentis served as chairman and Mr. Williams as secretary.

The report of the Commission was laid before the General Assembly at its extra session of 1927, which had been called by Governor Byrd to consider the administrative reorganization of the State government as well as the proposed constitutional changes.

Under the matchless leadership of Governor Byrd, the General Assembly not only reorganized the administration of the State government, but formally proposed a majority of the sugges-

392                    ADDRESS OF C. H. MORRISSETT

appointment of such officers for two or more counties conjointly. The provisions for such conjointly elected or appointed officers shall apply only to such counties as may adopt the same by a majority vote of the qualified voters of each of such counties voting in an election held for such purpose.

"The General Assembly may provide for the consolidation by two or more counties, or by one or more counties with one or more cities, of their charitable and penal institutions. But such consolidation shall apply only to such counties and cities as may authorize the same, in such manner as has heretofore been, or may hereafter be, prescribed by law."

County treasurers, attorneys for the Commonwealth, county clerks, and commissioners of the revenue will be elected by the people. Their duties and compensation will be prescribed by general law. The number of commissioners of the revenue will be restricted to one for each county, thus conforming to the Act of 1926. (Acts 1926, p. 462.) There are now 222 commissioners of the revenue in the State. In the 100 counties there are 199; and in the 23 cities, 23. Forty-five counties now have one commissioner, and fifty-five now have more than one. The Act of 1926 therefore abolishes 99 commissioners of the revenue, such abolishment to become effective January 1, 1928. There is no necessity for more than one commissioner of the revenue for a county. One commissioner will be made responsible for the work in the entire county, and not only will efficiency be thereby promoted, but substantial financial saving to the State and counties will result.

Consequential changes are proposed in Sections 111 and 113.

The constitutional limitation upon the bonded indebtedness of cities and towns is eighteen per centum of the assessed valuation of the taxable real estate in such cities and towns, respectively. (Sec. 127.) There is no constitutional limitation upon the bonded indebtedness of counties and districts. The ability to find willing purchasers of bonds has been the only limitation, since the General Assembly has usually passed

PROPOSED AMENDMENTS TO THE CONSTITUTION          393

special acts for bond issues upon the mere request of the representatives in the Assembly from the county concerned, and more often than not, no vote of the people has been required. Generally, such special acts have been sought in order to avoid a vote of the people, such vote being necessary under the general statutes. In some instances, special acts have been sought in order that the general law limitations on the amounts might be exceeded. The evil of the free issuance of bonds in counties and districts without a vote of the people is intended to be checked by a proposed new section numbered 115-a. The gist of the section is the reasonable requirement that every proposal to issue bonds must have public support. Such public support being required, there will be no necessity for the passage of special acts, consequently it is provided that all future bond issues must be under general laws. The section is so salutary that it will be quoted in full:

"No debt shall be contracted by any county, or by or on behalf of any district of any county, or by or on behalf of any school board of any county, or by or on behalf of any school district in any county, except in pursuance of authority conferred by the General Assembly by general law; and the General Assembly shall not authorize any county, or any district of any county, or any school board of any county, or any school district in any county, to contract any debt except to meet casual deficits in the revenue, a debt created in anticipation of the collection of the revenue of the said county, board or district for the then current year, or to redeem a previous liability, unless in the general law authorizing the same, provision be made for the submission to the qualified voters of the proper county or district, for approval or rejection, by a majority vote of the qualified voters voting in an election, of the question of contracting such debt; and such approval shall be a prerequisite to contracting such debt. No scrip, certificate or other evidence of county or district indebtedness shall be issued except for such debts as are expressly au-

394          ADDRESS OF C. H. MORRISSETT

thorized in this Constitution or by the laws made in pursuance thereof."

## ARTICLE VIII

### ORGANIZATION AND GOVERNMENT OF CITIES AND TOWNS

Under a proposed amendment to Section 119, the duties and compensation of attorneys for the Commonwealth and commissioners of the revenue in cities will be prescribed "by general law," instead of "by law," thus prohibiting special acts. An immaterial omission of words is also proposed.

According to the present language of Section 121, the General Assembly may permit a city council to consist of one branch "in cities of under ten thousand population". This provision is quite harmless, because of the broad language of Section 117, but it is nevertheless proposed to strike out the words "in cities of under ten thousand population". An immaterial change in phraseology is also proposed.

Real estate and tangible personal property having been segregated by statute for local taxation only, and a constitutional amendment being pending to prohibit the State from reimposing a State tax for State purposes on such property, it is proposed to omit and thereby repeal Section 128 as no longer of value. That section declares that "In cities and towns the assessment of real estate and personal property for the purpose of municipal taxation, shall be the same as the assessment thereof for the purpose of State taxation, whenever there shall be a State assessment of such property."

## ARTICLE IX

### EDUCATION AND PUBLIC INSTRUCTION.

The general supervision of the public free school system is now vested by Section 130 in a State Board of Education, composed of the Governor, Attorney-General, Superintendent of Public Instruction, and three experienced educators who are

PROPOSED AMENDMENTS TO THE CONSTITUTION          395

elected quadrennially by the Senate, from a list of eligibles, consisting of one from each of the faculties, and nominated by the respective boards of visitors or trustees, of the University of Virginia, the Virginia Military Institute, the Virginia Polytechnic Institute, the State Teachers College at Farmville, the School for the Deaf and Blind, and the College of William and Mary. The board thus constituted selects and associates with itself two division superintendents of schools, one from a county and the other from a city, who hold office for two years, and whose powers and duties are identical with those of the other members, except that they are prohibited from participating in the appointment of any public school official. Any vacancy occurring during the term of any member of the board is filled for the unexpired term by the board.

This novel composition of the State Board of Education has been the subject of much discussion and unfavorable comment. One of the chief grounds of criticism is that five out of the eight members of the board are far removed from the people. Recognizing the dissatisfaction which exists, it is proposed to reorganize the State Board of Education by constitutional amendment. Under the proposed amendment to Section 130, seven members will constitute the board. They will be appointed by the Governor, subject to confirmation by the General Assembly. The first appointments will be, one member for a term of one year; two members for a term of two years; two members for a term of three years, and two members for a term of four years, and thereafter, all appointments will be for a term of four years, except appointments to fill vacancies which will be for the unexpired terms.

Under the existing Section 132 the State Board of Education appoints, subject to confirmation by the Senate, one division superintendent of schools for each school division. Such superintendent holds office for four years. This provision as to the appointment of division superintendents by the State Board of Education has given rise to insistent demands for some modification. It is now proposed to amend Section 132 so as to direct the State Board of Education to certify to the local school board or boards of each school division in the State, a list of persons

VIRGINIA:

IN THE CIRCUIT COURT OF SHENANDOAH COUNTY

MARK W. PRINCE
      Plaintiff,

v.

                                          Case No.: CL12000409-00
                                                      CL12000276-00
                                                      CL12000406-00
                                                     CL12000283-00
                                                     CL12000239-00

SHENANDOAH COUNTY BOARD
OF SUPERVISORS
      Defendant

## CERTIFICATE OF SERVICE

        I, D. Eric Wiseley, do hereby certify that I have served a true and correct copy of the foregoing **MOTION FOR LEAVE TO FILE AN AMICUS BRIEF** upon the below-named parties by depositing a true and correct copy in the Unites States Mail, first class postage prepaid, to the following address:

Shenandoah County Board of Supervisors
600 North Main Street
Woodstock, VA 22664

Mark W. Prince
CEO Sunpeak USA Inc.
394 Brook Creek Rd.
Toms Brook, VA  22660

Dated this _____ day of March, 2013.

                                          _____
                                          D. Eric Wiseley, Esq.
                                          VSB. No. 70727

5

exh H

VIRGINIA:

IN THE CIRCUIT COURT OF SHENANDOAH COUNTY

MARK W. PRINCE
     Plaintiff,

v.

                                Case No.: CL12000409-00
                                      CL12000276-00
                                      CL12000406-00
                                      CL12000283-00
                                      CL12000239-00

SHENANDOAH COUNTY BOARD
OF SUPERVISORS
     Defendant

## CERTIFICATE OF SERVICE

     I, D. Eric Wiseley, do hereby certify that I have served a true and correct copy of

the foregoing **MOTION FOR LEAVE TO FILE AN AMICUS BRIEF** upon the below-named

parties by depositing a true and correct copy in the Unites States Mail, first class postage prepaid,

to the following address:

Shenandoah County Board of Supervisors
600 North Main Street
Woodstock, VA 22664

Mark W. Prince
CEO Sunpeak USA Inc.
394 Brook Creek Rd.
Toms Brook, VA 22660

Dated this _____ day of March, 2013.

                                   _____
                                   D. Eric Wiseley, Esq.
                                   VSB. No. 70727

5

VIRGINIA:

## IN THE CIRCUIT COURT OF SHENANDOAH COUNTY

MARK W. PRINCE
    Plaintiff,

v.

                                     Case No.: CL12000409-00
                                                   CL12000276-00
                                                   CL12000406-00
                                                   CL12000283-00
                                                   CL12000239-00

SHENANDOAH COUNTY BOARD
OF SUPERVISORS
    Defendant

## MOTION FOR LEAVE TO FILE AN AMICUS BRIEF
## AND AMICUS BRIEF

**COMES NOW,** D. Eric Wiseley, duly licensed member of the Virginia State Bar #70727, on his own behalf as a private citizen of Shenandoah County, and moves this Honorable Court for entry of an order granting him leave to file an *amicus* brief on the question herein presented.  Such brief is attached hereto.

**Facts as presented and as relevant to this Brief and as understood by the Movant:**  The Resolution of the Board of Supervisors of Shenandoah County, Virginia Approved and dated on October 19, 2009 (Resolution) sets out a prospective lease to own agreement between the County Board and the Virginia Resources Authority (VRA) for "lease financing in a Maximum principal amount up to $17,115,000" for a Courthouse project (project). The County would lease the land and improvements and will make rental payments "corresponding in amount to the amount and timing to the debt service on the portion of the

147

VRA Bonds issued to finance the Project," with Rental Payments to be paid "out of appropriations from the County's General Fund." Paragraph 10 of the resolution, entitled "Nature of Obligations with respect to Rental Payments; 'Moral Obligation' Support Pledge of the County," identifies the Financing lease as a "rental obligation" of the county for "pledge and payment," and expressly states that nothing in the Resolution "shall constitute a general obligation debt of the County within the meaning of the Virginia Constitution or Virginia Statutory law." However, the final line of Paragraph 10 expressly contemplates principle, premium and interest on "corresponding VRA bonds" subject to the terms of the financing lease.

The first line of Art X § 9 of the Virginia Constitution states that "no debt shall be contracted by or on behalf of the Commonwealth except as provided herein," and the power to incur moral obligation debt is nowhere granted to counties. However, subsection d states that the restrictions in § 9 "shall not apply to any obligation incurred by the Commonwealth or any institution, agency, or authority thereof if the full faith and credit of the Commonwealth is not pledged or committed to the payment of such obligation."

**Question**: Does the Resolution Violate Article 7, § 10 of the Virginia Constitution. Specifically, **does the board of supervisors have the power to incur "moral obligation" debt?**

**Conclusion**: Despite the language intended to take this financing arrangement out of the ambit of Constitutionally cognizable debt, the lease to own agreement appears to create a "moral obligation debt." While the issue has not been addressed by the courts, there is a credible argument that counties have no such power to enter into this lease to own agreement.

2

Whether local governments can enter into a lease-to-own agreement as a means to side-step constitutional restraints is a matter of first impression.

**Analysis**:    The threshold question is whether lease-to-own constitutes a constitutionally cognizable debt.    If it is determined that the language "[nothing in this resolution] shall constitute a general obligation debt of the County within the meaning of the Virginia Constitution or Virginia Statutory law" can be regarded as having the intended effect, then the analysis ends there.    There is some case law to support this position.    See Dykes v. Northern Va. Transp. Dist. Comm'n,, 242 Va. 357 (1991).    But see Town of South Hill v. Allen, 177 Va. 154 (1941) (under the 1902 constitution, the court ruled that even though revenue certificates issued to buy a power plant were to be repaid from revenues derived from operation of the plant in question, the revenue certificates nonetheless constituted a constitutionally cognizable "debt").    (It should be noted that there has been no change to the 1902 constitution where it concerns local debt.    See Proceedings and Debate of the Senate of Virginia pertaining to Amendment of the Constitution, (1969) p 313 ("On the sections pertaining to debt we rejected [proposed revisions and] adopted that of the old constitution, merely updating the language….").    The plain language of the resolution itself, in its entirety, seems to suggest that an indebtedness will result, discussing that obligation in terms of principle, premium and interest, and a corresponding bond.    Paragraph 10 pledges payment, and imposes a "moral obligation" on the County and its successors.

In any event, the analysis ends if the resolution creates no constitutionally cognizable debt.

3

149

If the plain meaning of the agreement is accepted as incurring a constitutionally cognizable debt (as an obligation to repay would seem to suggest), the analysis continues. "Commonwealth agencies are expressly removed from the restrictions of Art X § 9." Because the Commonwealth and its agencies are "expressly removed," the Constitution's silence on counties and their boards should be regarded as an intentional exclusion (*expressio unius est exclusio alterius*).    The restrictions of Article X § 9 must therefore apply to counties. Accordingly, because the Virginia Constitution does not grant county boards of supervisors power to incur "moral obligation" debt, that power is seemingly denied them.

_____

D. Eric Wiseley VSB # 70727.

4

VIRGINIA:

IN THE CIRCUIT COURT OF SHENANDOAH COUNTY

MARK W. PRINCE
     Plaintiff,

v.

                                                      Case No.: CL12000409-00
                                                             CL12000276-00
                                                             CL12000406-00
                                                             CL12000283-00
                                                             CL12000239-00

SHENANDOAH COUNTY BOARD
OF SUPERVISORS
     Defendant

## **CERTIFICATE OF SERVICE**

       I, D. Eric Wiseley, do hereby certify that I have served a true and correct copy of

the foregoing **MOTION FOR LEAVE TO FILE AN AMICUS BRIEF** upon the below-named

parties by depositing a true and correct copy in the Unites States Mail, first class postage prepaid,

to the following address:

Shenandoah County Board of Supervisors
600 North Main Street
Woodstock, VA 22664

Mark W. Prince
CEO Sunpeak USA Inc.
394 Brook Creek Rd.
Toms Brook, VA 22660

Dated this _____ day of March, 2013.

                                     _____
                                     D. Eric Wiseley, Esq.
                                     VSB. No. 70727

5

# County of Shenandoah

**BOARD OF SUPERVISORS**

*DISTRICT 1 - DICK NEESE 540.740.3414*
*DISTRICT 2 - STEVE BAKER 540.477.3550*
*DISTRICT 3 - DAVID FERGUSON 540.984.8777*
*DISTRICT 4 - SHARON BARONCELLI 540.459.4165*
*DISTRICT 5 - DENNIS MORRIS 540.436.9149*
*DISTRICT 6 - CONRAD HELSLEY 540.481.6167*

**600 N. Main Street, Ste 102**
**WOODSTOCK, VA 22664**



Tel: 540.459.6165   Fax: 540.459.6168
www.shenandoahcountyva.us

**OFFICE OF COUNTY ADMINISTRATION**

*Douglas C. Walker*
*County Administrator*

*Mary T. Price*
*Assistant County Administrator*

**FORM OF REQUISITION**

Received
NOV 7 2012
VRA

Requisition No. #21

Date: 11/20/2012

U.S. Bank National Association, as Trustee
Attention: Corporate Trust Department
1021 East Cary Street – 18th Floor
Richmond, Virginia 23219

Virginia Resources Authority
111 East Main Street
Suite 1920
Richmond, Virginia 23219
Attention: Executive Director

This Requisition, including Schedule 1 hereto, is submitted in connection with the Financing Lease dated as of November 1, 2009 (the "Financing Lease") between the Virginia Resources Authority and the County of Shenandoah, Virginia (the "Local Government"). Unless otherwise defined in this Requisition, each capitalized term used herein shall have the meaning given it under Article I of the Financing Lease. The undersigned Local Representative hereby requests payment of the following amounts from the Local Account established for the Local Government in the Series 2009B Acquisition Fund established under the Fifteenth Supplemental Series Indenture.

Payee:          Shenandoah County

Address:        600 N. Main Street, Suite 102
                Woodstock, VA 22664

Amount to be paid:    $ 114,589.08

exh I

Form of Requisition
Page 2

Purpose (in reasonable detail) for which obligation(s) to be paid were incurred:

Courthouse: Building is complete.

Human Services:  Building is complete.

The undersigned certifies that the payment reflected herein related to improvements to be located on the Real Estate.

Garland Miller Jr - Local Representative

# County of Shenandoah

**BOARD OF SUPERVISORS**

*DISTRICT 1 - DICK NEESE 540.740.3414*
*DISTRICT 2 - STEVE BAKER 540.477.3550*
*DISTRICT 3 - DAVID FERGUSON 540.984.8777*
*DISTRICT 4 - SHARON BARONCELLI 540.459.4165*
*DISTRICT 5 - DENNIS MORRIS 540.436.9149*
*DISTRICT 6 - CONRAD HELSLEY 540.481.6167*

600 N. Main Street, Ste 102
WOODSTOCK, VA 22664



Tel: 540.459.6165   Fax: 540.459.6168
www.shenandoahcountyva.us

**OFFICE OF COUNTY ADMINISTRATION**

*DOUGLAS C. WALKER*
*COUNTY ADMINISTRATOR*

*MARY T. PRICE*
*ASSISTANT COUNTY ADMINISTRATOR*

Attached hereto is an invoice (or invoices) relating to the items for which payment is requested.

~~................................................~~ notice of any lien, right to lien or attachment upon, or claim affecting the right to receive payment of, any of the money payable under the Requisition to any of the persons, firms or corporations named in it has been received, or if any notice of any such lien, attachment or claim has been received, such lien, attachment or claim has been released or discharged or will be released or discharged upon payment of the Requisition, and (iii) this Requisition contains no items representing payment on account of any retained percentage entitled to be retained at this date.

If this Requisition included payments for labor or to contractors, builders or materialmen, the attached Certificate of Local Representative must be completed. If this Requisition includes payments for any lands or easements, rights or interest in or relating to lands, the attached Certificate of the Local Representative must be completed and there must be attached to this Requisition a certificate signed by a Local Representative stating that upon payment therefore the Local Government will have title in fee simple to, or easements, right or interest sufficient for the purposes of the construction portion of the Project over tor through such lands.

~~................................................~~ receipt.

_____
Local Representative

# County of Shenandoah

**BOARD OF SUPERVISORS**

*DISTRICT 1 - DICK NEESE 540.740.3414*
*DISTRICT 2 - STEVE BAKER 540.477.3550*
*DISTRICT 3 - DAVID FERGUSON 540.984.8777*
*DISTRICT 4 - SHARON BARONCELLI 540.459.4165*
*DISTRICT 5 - DENNIS MORRIS 540.436.9149*
*DISTRICT 6 - CONRAD HELSLEY 540.481.6167*

**600 N. Main Street, Ste 102**
**WOODSTOCK, VA 22664**



**Tel: 540.459.6165   Fax: 540.459.6168**
**Email: info@shenandoahcountyva.us**

**OFFICE OF COUNTY ADMINISTRATION**

*DOUGLAS C. WALKER*
*COUNTY ADMINISTRATOR*

*MARY T. PRICE*
*ASSISTANT COUNTY ADMINISTRATOR*

## CERTIFICATE OF LOCAL REPRESENTATIVE

The undersigned Local Representative for the Local Government hereby certifies that (i) insofar as the amounts covered by this Requisition include payments for labor or to contractors, builders or materialmen, such work was actually performed or such materials, supplies or equipment were actually furnished or installed in or about the Project, and (ii) insofar as the amounts covered by the Requisition include payments for land or easements, rights or interest in or relating to lands, such lands, easements, rights or interests are being acquired and are necessary or convenient for the construction of the construction portion of the Project.

Date: 11/20/12

Local Representative

155

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
United States of America, ex rel.
Mark W. Prince

**(b)** County of Residence of First Listed Plaintiff    Rockingham County
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Mark W. Prince  Pro Se
394 Brook Creek Road, Toms Brook Virginia 22660 (540-325-0750)

## DEFENDANTS
Virginia Resources Authority, Shenandoah County Board of Supervisors, U.S. Bank National Association, Suntrust Bank, SunTrust Equipment Finance & Leasing Corporation & Others

County of Residence of First Listed Defendant    Richmond Virginia
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☒ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus: | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
31 USC 3729-3733
Brief description of cause:
Fraud Against Taxpayers Act

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $  11,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):   JUDGE                    DOCKET NUMBER

DATE
04/15/2013

SIGNATURE OF ATTORNEY OF RECORD
Mark W. Prince

**FOR OFFICE USE ONLY**

RECEIPT #  5:2014    AMOUNT  350.00    APPLYING IFP _____    JUDGE  Urbanski    MAG. JUDGE _____
5:13cv45

156

## THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. | ) | |
| | ) | |
| Mark W. Prince | ) | |
| | ) | |
| Relator/Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Case No. 5:13-CV-00045 |
| | ) | |
| Virginia Resources Authority, | ) | |
| | ) | |
| & Others to be determined. | ) | |
| | ) | |
| Defendants. | ) | |

### Motion To Dismiss

COMES NOW Defendant Virginia Resources Authority, by counsel, pursuant to Fed. R. Civ. P. 12(b)(2) and (b)(6) and moves to dismiss the complaint against it for the reasons stated in the accompanying memorandum of law.

Respectfully submitted,

/s/ Jeffrey M. Summers
Of Counsel to the
Virginia Resources Authority

Jeffrey M. Summers, VSB#45905
The Law Office of Jeffrey M. Summers, PLLC
6802 Paragon Place, Suite 410
Richmond, Virginia 23230-1655
Tel: (804) 477-1793
Fax: (8660 936-6906
Email: jmsummers@appeals-va.com

1

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing was served via e-mail to the United States of America Attorney General for the Western District of Virginia to Sara Bugbee Winn, Assistant United States Attorney at Sara.Winn@usdoj.gov and Jay Majors, United States Attorney General's Office Civil Division at jay.majors@usdoj.gov and to Mark W. Prince, Pro Se at mark@sunpeakusa.com.

/s/ Jeffrey M. Summers
Jeffrey M. Summers

2

## THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA

UNITED STATES OF AMERICA ex rel.   )
                                              )

Mark W. Prince                         )
                                              )

                 Relator/Plaintiffs,    )
                                              )

v.                                       )    Civil Case No. 5:13-CV-00045
                                            )

Virginia Resources Authority,     )
                                             )

& Others to be determined.       )
                                             )

                      Defendants.     )

### Memorandum Of Law In Support of Virginia Resources Authority's Motion To Dismiss

This is a qui tam action under the Federal False Claims Act brought by relator, Mark W. Prince. Prince cannot maintain this action in this Court for a procedural reason and for a jurisdictional reason, laying aside – for now – the action's lack of merit.

### The Procedural Reason

A pro se nonlawyer party cannot bring a claim under the False Claims Act. "It is clear that pro se, *nonlawyer* relators lack standing to prosecute qui tam actions." *United States ex rel. Hixson v. Health Mgmt. Sys.*, 657 F. Supp. 2d 1039, 1059 (S.D. Iowa 2009), citing, *United States ex rel. Mergent Svcs. v. Flaherty*, 540 F.3d 89, 93 (2nd Cir. 2008)(emphasis added).

Case 5:13-cv-00045-MFU-JGW   Document 17   Filed 11/05/13   Page 2 of 5   Pageid#: 524

*United States ex rel. Hixson,* above, is only one of a body of court of appeals decisions holding that a pro se party may not prosecute a case under the False Claims Act. See *United States ex rel. Mergent Svcs.* at 93 ("Our holding is in accord with all of the circuits that have considered the issue . . ." citing cases from the Seventh, Eighth, Ninth and Eleventh Circuits.)  A qui tam action is not the relator's own case, in which he is permitted to represent himself under 28 U.S.C. § 1654. Id.  *See also, Ross-West v. Bank of N.Y. Mellon Corp.*, 523 Fed. Appx. 395, 396 (7th Cir. Ill. 2013).  ("Furthermore, the Wests could not bring a suit under the False Claims Act at all because they are not lawyers and were not represented by lawyers in the district court.")

Prince is not a proper relator as he is a nonlawyer. As such, this case is procedurally defective and the Court should dismiss it.

### *The Jurisdictional Reason*

The False Claims Act does not subject a state or state agency to liability in such actions*.  Vermont Agency of Nat'l Resources v. United States ex rel. Sherens*, 529 U.S. 765, 787-88 (2000). "[A] court should employ the Eleventh Amendment arm-of-the-state analysis in determining if an entity is properly regarded as the state or an agency of the state and so not subject to suit under the FCA." *United States ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp.*, 681 F.3d 575, 580 (4th Cir. 2012). This action is barred

2

under the Eleventh Amendment.  *Stoner v. Santa Clara Off. Of Educ.*, 502
F.3d 1116, 1123 (9th Circ. 2007), cert. denied 522 U.S. 1281 (2008).

The immunity of the Authority is both statutory and constitutional.
The Virginia Resources Authority is a political subdivision of the
Commonwealth of Virginia.  Va. Code § 62.1-200.  It is a state-created
governmental entity within the Commerce and Trade Secretariat for state
government organizational purposes.  2002 Op. Att. Gen. Va., 2002 Va. AG
LEXIS 155 (Va. AG 2002).  The exercise of its duties and powers is deemed
by the Virginia General Assembly to be the performance of an essential
governmental function of the Commonwealth.  Va. Code § 62.1-200

In *Vermont Agency of Natural Resources v. Stevens*, 529 U.S. 765
(2000), the Supreme Court considered whether as a matter of statutory
construction, the False Claims Act subjected a state or state agency to
liability.  The Court concluded that it does not.  529 U.S. at 787.  As to the
constitutional question, the Court said, "We of course express no view on the
question whether an action in Federal court by a qui tam relator against a
state would run afoul of the Eleventh Amendment, but we note that there is
'a serious doubt' on that score."  Id. (citing *Ashwander v. TVA*, 297 U.S.
288, 348 (1136) (Branders, J., concurring). In *Stoner*, 502 F.3d, 1116, the
Court reached the constitutional issues in a False Claims Act suit against a
California county office and a school district, holding that the Eleventh

3

Amendment posed an independent bar to a qui tam action against either entity.  502 F.3d at 1123.

The Authority is immune from this type of suit. As this case is jurisdictionally defective, the Court should dismiss it.

### The Rooker-Feldman Doctrine

Virginia Resources Authority further notes that the relator Prince pleads that the information in his suit is also the basis of his Virginia Fraud Against Taxpayers Act suit filed August 1, 2012.  (See Motion to Amend, Docket 11, at ¶ 3.)  Prince also discusses the same case in paragraph 99 of his Amended Complaint.  The Circuit Court of Shenandoah County dismissed that case and Prince challenged the dismissal in the Supreme Court of Virginia. If the Supreme Court of Virginia rules against Prince, the Authority will invoke the *Rooker-Feldman* Doctrine to support its motion to dismiss.

Federal courts, other than the United States Supreme Court, should not directly review state court decisions unless Congress has specifically authorized that relief. *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).  This Court must not sit as an appellate court for state court decisions. Prince has to find a remedy in the courts of Virginia, or obtain relief from the U.S. Supreme Court.

4

### *Conclusion*

Even if Prince's defective representation were cured, the False Claims Act itself and Eleventh Amendment immunity preclude maintenance of this suit. If the Supreme Court of Virginia turns away Prince's appeal, this court should not hear this matter.

WHEREFORE, the Defendant, Virginia Resources Authority, prays that the Court dismiss this action with prejudice and grant such other and further relief as the ends of justice may require.

Respectfully submitted,

/s/ Jeffrey M. Summers
Of Counsel to the
Virginia Resources Authority

Jeffrey M. Summers, VSB#45905
The Law Office of Jeffrey M. Summers, PLLC
6802 Paragon Place, Suite 410
Richmond, Virginia 23230-1655
Tel: (804) 477-1793
Fax: (8660 936-6906
Email: jmsummers@appeals-va.com

### *Certificate of Service*

I hereby certify that a true and correct copy of the foregoing was served via e-mail to the United States of America Attorney General for the Western District of Virginia to Sara Bugbee Winn, Assistant United States Attorney at Sara.Winn@usdoj.gov and Jay Majors, United States Attorney General's Office Civil Division at jay.majors@usdoj.gov and to Mark W. Prince, Pro Se at mark@sunpeakusa.com.

/s/ Jeffrey M. Summers
Jeffrey M. Summers

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. | ) | |
| | ) | |
| Mark W. Prince | ) | |
| | ) | |
| Relator/Plaintiffs, | ) | Civil Case No. 5:13-CV-00045 |
| | ) | |
| v. | ) | |
| | ) | |
| Virginia Resources Authority, | ) | |
| | ) | |
| & Others to be determined. | ) | |
| | ) | |
| Defendants. | ) | |

**Memorandum Of Law**

**1.     *The Court lacks jurisdiction under the Rooker–Feldman doctrine to hear this suit.***

In its initial Motion to Dismiss, the Virginia Resources Authority ("VRA") noted that the underlying state court suit stated by Plaintiff was identical to this action, that the Circuit Court of Shenandoah County had dismissed it, and that an appeal was pending. (See Ex. 1 (Complaint), Ex. 2 (Final Order)).  The Supreme Court of Virginia has now dismissed that appeal.  (See Ex. 3 (Order of the Supreme Court of Virginia).

Now, there is a final disposition of the state action. This suit is a request by the losing party in state court for this Court review the final judgment of the Virginia state courts disposing of the case.  Therefore, under the *Rooker-Feldman* doctrine, this Court lacks jurisdiction to entertain this suit.  Any claim barred by the *Rooker-Feldman* doctrine is properly dismissed for want of subject matter jurisdiction.  *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284 (2005).

In his opposition, Relator Prince, by counsel, has denied that this case is the same case as Shenandoah Circuit Court Case No. CL12-276, saying that that case and

Case 5:13-cv-00045-MFU   Document 24   Filed 01/31/14   Page 2 of 8   Pageid#: 558

this one are "completely separate causes of action under completely separate acts and the only thing tenuously linking them together are some disputed issues of fact that were never litigated." (Doc. 19, ¶ 37).

The VRA did not claim that the suits were the same; Prince did. (See Doc. 11, ¶ 3)

> "This information was also found in the state fraud against taxpayer suit filed August 1, 2012 and subsequent Motion to Amend filed January 14, 2013, which is currently residing at the Virginia Supreme Court. Prince originally submitted to the DOJ (Albert Smith) via e-mail on December 18, 2012, all information that he had at that time, concerning the State Fraud Against Taxpayers amended suit in order to seek the United States of America to intervene in the FATA cases."

Prince also stated, "Plaintiff has filed a Virginia State Fraud Against Taxpayers case and requests that that case be transferred to this jurisdiction." (Doc. 11, ¶ 99). In ¶ 102, Prince requests that all claims and requests that were brought under the Federal False Claims Act that are equivalent to the Virginia False Claims Act be enforced. (Doc. 11, ¶ 102).

The *Rooker-Feldman* doctrine denies federal court jurisdiction in "case brought by state court losers . . . inviting district court review and rejection of the state court's judgments." *Exxon Mobil*, 544 U.S. at 283. "In other words, the doctrine applies where a party in effect seeks to take an appeal of an unfavorable state-court decision to a lower federal court." *Adkins v. Rumsfeld*, 464 F.3d 456, 464 (4th Cir. 2006)(internal quotations omitted). A case could hardly fit the *Rooker-Feldman* model more closely. Prince, having had his case dismissed by the state court on March 28, filed the present case in this Court on April 15, asking this Court to take over the case and adjudicate it, presumably to conclusion more favorable to him.

2

Relator Prince noted that his appeal was pending in the Supreme Court of Virginia but did not note that the Shenandoah Circuit Court had dismissed his cases at a hearing on March 28, 2013.[1]   He simply repackaged his state law Fraud Against Taxpayers Act (FATA) claims under the analogous federal qui tam statute, the False Claims Act.  He specifically requested that (1) the United States intervene in the state FATA suit (Doc. 11, ¶ 3), (2) that the state FATA case be transferred to this Court, (Doc. 11, ¶ 99), and (3) that his claims in this suit be enforced, even though they were equivalent to his state FATA claims that were dismissed.  (Doc. 11, ¶102).

Thus, Prince's suit falls into the classic *Rooker-Feldman* paradigm, even after the narrowing of the doctrine in Exxon Mobil.  If in order to grant the federal plaintiff the relief sought the federal court must determine that the state court judgment was erroneously entered or must take action that would render the judgment ineffectual, the *Rooker-Feldman* doctrine applies.  *Smalley v. Shapiro & Burson*, 526 F. Appx. 231, 236 (4th Cir. 2013).  The doctrine extends not only to matters directly addressed by the state court, but to matters that are inextricably intertwined with the state court decisions.  Id. Any relief would require this Court to overrule the final judgment of the state courts that Prince's claims are meritless.  (*See* Ex. 1).

Moreover, the claims in the federal suit are inexplicably intertwined with the claims in the state suits.  In fact, the claims made in the two suits are the same.  *See* Ex. 1, Count One, ¶ 1.  *Compare* Doc. 11, ¶¶ 48, 54, 58, 113.  See Ex. 1 Count One, ¶ 2.  Compare Doc. 11, ¶ 73.  *See* Ex. 1, Count One, ¶ 3.  *Compare* Doc. 11, ¶¶ 35-39, 47.  *See* Ex. 1, Count One, ¶¶ 4, 5.  *Compare* Doc. 11, ¶¶ 26-28, 105.  *See* Ex. 1,

_____

[1] The final order was entered on April 22, 2013, based on the decision of the circuit court announced at the hearing.  See Ex. 2.

Case 5:13-cv-00045-MFU   Document 24   Filed 01/31/14   Page 4 of 8   Pageid#: 560

Count One, ¶ 6.  *Compare* Doc. 11, ¶¶ 72, 95.  *See* Ex. 1, Count One, ¶ 7.  *Compare*

Doc. 11, ¶¶ 31B, 110.  The fact that Prince has added many pages of extracts from

documents, citation to legal authorities and argument does not change the essential

nature of the action.

　　　　Prince's counsel now argues that *Rooker-Feldman* does not apply because VRA

was not named as a defendant in Case No. CL-276; however, VRA is specifically

mentioned in the suit, which was filed against VRA's bond trustee and "parties to be

named later".  (See Ex. 1, ¶ 2, Count One, ¶¶ 2, 3, 5).  But more importantly, the only

requirement for invocation of the *Rooker-Feldman* doctrine is that the *plaintiff* be the

same, not the defendants.  *Carter v. Countrywide Home Loans, Inc.*, No. 651, 2008 U.S.

Dist. LEXIS 22825, *10 (E.D. Va., Mar. 20, 2008).  *See also Lance v. Dennis*, 546 U.S.

459, (2006) ("The District Court erroneously conflated preclusion law with *Rooker-*

*Feldman*.  Whatever the impact of privity principles on preclusion rules, *Rooker-*

*Feldman* is not simply preclusion by another name.").

　　　　Relator Prince, in his initial attempt to induce the United States to take the case,

emphasized the identity of this case with the state law FATA case.  In an effort to avoid

that inconvenient fact, Relator Prince now asserts that the claim is different.  But it is

simply the same *qui tam* case brought under the False Claims Act, the federal

equivalent of the Virginia FATA.

　　　　The *Rooker-Feldman* doctrine applies here because the Court cannot grant relief

sought in this suit, one whose relief Prince himself has said is equivalent to that sought

in the state law FATA suits, without reviewing and reversing the decision of the

4

Case 5:13-cv-00045-MFU  Document 24  Filed 01/31/14  Page 5 of 8  Pageid#: 561

Shenandoah Circuit Court which is now the final disposition in the case after the Supreme Court of Virginia denied Prince's appeal.

**2.    *Apart from the Rooker-Feldman bar, were the Court to hold that it had jurisdiction, this case is precluded by res judicata.***

Were this case not barred by the lack of subject matter jurisdiction under the *Rooker-Feldman* doctrine, this case is also barred under the principles of claim preclusion. Under federal law, the final judgment of a state court has the same preclusive effect that the judgment would have in the courts of that state. *St. Louis Univ. v. United States*, 5 F. App'x 133, 130 (4th Cir. 2001) (citing, 28 U.S.C. § 1738). Under Virginia law, a dismissal with prejudice (as occurred here) is defined as an adjudication on the merits, and final disposition, barring the right to bring or maintain an action on the same claim or cause, operates as res judicata, and is as conclusive of the rights of the parties as if the suit had been prosecuted to a final disposition adverse to the plaintiff. *Reed v. Liverman*, 250 Va. 97, 99-100, 458 S.E.2d 446, 447 (1995).

This is particularly true here, where the final orders also recite that each suit, along with four others filed by Prince on similar grounds, has been rejected as meritless. (*See* Exs. 2, ¶ 2). Prince asserts that his state court cases involve "disputed issues of fact that were never litigated," (Doc. 19, ¶ 37), a position which cannot be seriously maintained in light of the recitations in the orders that the suits were "rejected ... as meritless." (*See* Ex. 2, ¶ 2).

Under Virginia preclusion law, now codified in *Va. Sup. Ct. R.* 1:6, the defendant must show that (1) there was a prior claim for relief decided on the merits by a valid and final judgment; (2) the parties are identical or in privity with each other; and (3) the claim made in the latter suit arises from the same conduct, transaction, or occurrence as the

5

Case 5:13-cv-00045-MFU   Document 24   Filed 01/31/14   Page 6 of 8   Pageid#: 562

claim in the first suit.  See *Blick v. Soundview Home Loan Trust 2006-WF1*, No. 62, 2013 U.S. Dist. LEXIS 4186, *5-*6 (W.D.Va., Jan. 10, 2103), *aff'd*, 2013 U.S. App. LEXIS 18260 (4th Cir., Sept. 3, 2013) (*per curiam*).

As noted above, there has been a final disposition on the merits in the prior suit. Prince's claims were specifically found "meritless."  Nor for preclusion purposes does it make any difference that VRA was not a named party in Shenandoah Circuit Court Case CL12-276.  VRA was identified in the body of the Complaint in CL12-276 (*see*, Ex. 1, Count One, ¶¶ 2, 3, 5).  More importantly, and dispositively, VRA is in privity with defendant U.S. Bank National Association, which Prince affirmatively pled was the assignee by VRA as security for the bonds of "all of its right, title and interest in and to the Lease and Financing Lease (Collectively, the 'Basic Documents')" (*See* Ex. 1, ¶ 2), and purchased the bonds and was appointed by VRA and accepted as its successor trustee and made the same representations, warranties and covenants as VRA, which are alleged to violate the Virginia Constitution.  (*See* Ex. 1, Count One ¶ 5).  For privity to exist for preclusion purposes, the partners' interests must be so identical with one another that they can be said to represent the same legal right.  *See, Historic Green Springs, Inc. v. U.S. E.P.A.*, 742 F.Supp.2d 837, 844 (W.D.Va. 2010) (citing, *State Farm Fire & Cas. Co. v. Mabry*, 255 Va. 286, 497 S.E. 2d 844 (1998)).  Plainly, the assignment involves the same legal right.

The suits also involve the "same conduct, transaction, or occurrence," the funding of public projects by or on behalf of Shenandoah County.  *See, e.g.*, Ex. 1, Count One, ¶ 2 ("$15,760,000 Shenandoah County, Virginia, Financing Lease, (Courthouse and Social Services Building Project), Closing Date: November 19, 2009").

6

Compare Doc. 11, ¶ 31B (same).  See also Ex. 1, Count One, ¶ 5 ("Fiscal Year 2013 Shenandoah County Budget, under forecasted debt in the Shenandoah County FY 13 [sic] approved budget as line item 8254.")).  *Compare* Doc. 11, ¶ 74.  *See also* Doc. 11, ¶¶ 22, 23, 26, 35-39, 52, 73, 82-85 (factual allegations dealing with funding of public projects by or on behalf of Shenandoah County).  The paragraph-by- paragraph comparison above shows that this case makes the same allegations as the dismissed state law FATA suit. Relator Prince was correct when he pled that the suits were the same.

### 3.    *Conclusion*

This case presents the quintessential *Rooker-Feldman* case where a loser in state court invites the federal court to review and reverse the state court decision.  As a result, this court lacks subject matter jurisdiction to entertain the case.  That analysis is dispositive, but the case is also subject to claim preclusion because the prior case was dismissed by final judgment, and the parties and issues were the same.

For these reasons, defendant Virginia Resources Authority prays that the Court will dismiss this case with prejudice and award it its costs and reasonable attorney's fees incurred in the defense of this action, together with such other and further relief as the ends of justice may require.

Respectfully submitted,

Virginia Resources Authority
By counsel

/s/ Jeffrey M. Summers
Jeffrey M. Summers
The Law Office of Jeffrey M. Summers PLLC
6802 Paragon Place, Suite 410
Richmond, Virginia 23230-1655
Tel:  (804) 441-6264

Fax: (866) 936-6906
Email: jmsummers@summerslawoffice.com


### CERTIFICATE


I hereby certify that a true and correct copy of the foregoing was served via e-mail to the United States of America Attorney General for the Western District of Virginia to Sara Bugbee Winn, Assistant United States Attorney at Sara.Winn@usdoj.gov and Jay Majors, United States Attorney General's Office Civil Division at Jay.Majors@usdoj.gov and to Brad Pollock, counsel for Mark W. Prince, at bpollack@shentel.net.


/s/ Jeffrey M. Summers


8

## VIRGINIA:

*In the Supreme Court of Virginia held at the Supreme Court Building in the City of Richmond on*  Tuesday  *the*  19th  *day of*  November, 2013.

Mark W. Prince,                                              Appellant,

    against      Record No. 131165
                  Circuit Court Nos. CL12-000276-00
                   and CL12-000406-00

U.S. Bank National Association, et al.,                      Appellees.

From the Circuit Court of Shenandoah County

Finding that the appeal was not perfected in the manner provided by law because assignment of error No. 1 is not sufficient to comply with the requirements of Rule 5:17(c)(1)(iii), the Court dismisses the petition as to that assignment of error.

Upon further consideration whereof, the Court finds that the appellant failed to file a transcript or written statement of facts and that, as a result of this failure, the record is not sufficient to enable the Court to evaluate and resolve assignment of error No. 2. Rule 5:11(a)(1); see Smith v. Commonwealth, 281 Va. 464, 706 S.E.2d 889 (2011).

Accordingly, as it pertains to assignment of error No. 1, the petition is dismissed. As it pertains to assignment of error No. 2, the petition is refused.

Justice Goodwyn took no part in the consideration of this case.

A Copy,

Teste:

Patricia L. Harrington, Clerk

By:

Deputy Clerk

172

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

UNITED STATES OF AMERICA ex rel.,
Mark W. Prince,

        Relator/Plaintiffs,

v.                         Civil Case No. 5:13-CV-00045

Virginia Resources Authority,
And others to be Determined,

        Defendants.

## MOTION TO INTERVENE AND ADD AN ADDITIONAL PLAINTIFF/RELATOR

1.    This is a qui tam action under the Federal False Claims Act brought

by    relator Mark W. Prince.

2.    Pursuant to Federal Rule For Civil Procedure 12(a), Michael A.

Prince desires to be added as a party plaintiff.

3.    Michael A. Prince, a recent graduate of Virginia Polytechnic

Institute and State University, currently residing at 3525 North Main

Street, Toms Brook, Virginia, along with Plaintiff Mark W. Prince (his

father), helped research much of this case and was essential to the

revelations set forth in the amended complaint.

4.    Mark W. Prince may not be able to adequately represent Michael's

interest in this case if the case before this court is estopped due to previous

rulings of the Shenandoah County Circuit Court.

5.      If this motion is granted, the Motions to Dismiss currently pending

before this Court should become moot.

WHEREFORE, Michael A. Prince hereby moves that he intervene

as the second Plaintiff/Relator.

Respectfully submitted,

Mark W. Prince

Michael A. Prince

By counsel

_Bradley G. Pollack_____

Bradley G. Pollack

Attorney at Law

753 South Main Street

Woodstock, Virginia 22664

Virginia State Bar No. 25290

bpollack@shentel.net

540-459-8600

540-459-8670 (fax)

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing was
served via e-mail to the United States of America Attorney General for the
Western District of Virginia to Sara Bugbee Winn, Assistant United States
Attorney at Sara.Winn@usdoj.gov, Jay Majors, United States Attorney
General's Office Civil Division at jay.majors@usdoj.gov, and to counsel to
the Virginia Resources Authority, Jeffrey M. Summers, Esquire, at
jmsummers@appeals-va.com .

*/s/Bradley G. Pollack/s/*

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

UNITED STATES OF AMERICA ex rel.   )
                                    )
Mark W. Prince                   )
                                    )
          Relator/Plaintiffs,   )    Civil Case No. 5:13-CV-00045
                                    )
v.                               )
                                    )
Virginia Resources Authority,   )
                                    )
& Others to be determined.   )
                                    )
          Defendants.   )

**Supplemental Memorandum Of Law**

**1.**    ***The State Lawsuits***

Mark Prince has sued various parties in the Courts of the Commonwealth of Virginia five times.  Exhibit A to this memorandum is a matrix of those cases, the parties, and the claims. Exhibit B to this memorandum is the matrix sorted by time of filing of the various documents.  Exhibit C to this memorandum is the matrix sorted by the claims in the various cases.  Exhibit D to this memorandum is the matrix sorted by the defendants and individual claims.

As the exhibits show, Prince filed five lawsuits in the span of nine months. He sued, or attempted to modify his existing suits to include, the Shenandoah County Board of Supervisors three times (CL12-239, CL12-406, CL12-409), The RSW Regional Jail Authority (CL12-239), SunTrust Bank (CL12-239, CL12-276, CL12-283), SunTrust Equipment Finance & Leasing Corp. (CL12-276), U.S. Bank NA (CL276, CL12-406), CEDE & Co. (CL12-283), and the Virginia Resources Authority (CL12-239, CL12-276 (not named as a defendant but conduct alleged throughout the Motion for Judgment). In CL12-406, he sued the lawyers for some of the parties as well.

175

As Exhibit C shows, Prince repeats his claims over several complaints. For instance, Prince alleges a violation of Article VII, Section 10 of the Virginia Constitution in CL12-276, CL12-283, and CL12-406. He alleges a violation of Article X, Section 8 of the Virginia in the same three cases. He alleges a violation of Va. Code § 8.01-216.3 in CL12-276, CL12-283, and CL12-406 as well.

Prince lost every case, but the reasoning behind those losses is important. The final orders in CL12-276, CL12-283, and CL12-406 are essential identical. "Following argument by counsel for the Commonwealth and the Plaintiff, the Court denied Plaintiff's motion to amend his complaint, and Plaintiff thereafter *consented* to a voluntary dismissal of this case." (Emphasis added). The state court then dismissed those cases with prejudice, with all three orders being entered on the same day.[1] The state court then went on caution Prince that future vexatious filings might face monetary sanctions.

In this case, Prince has also alleged the same facts as he did in his state court cases (¶¶ 26-28, 31B, 35-39, 48, 54, 58, 72-73, 95, 105, 110, 113).  In his original filing, Prince sued the same defendants with the exception of CEDE & Co. and the two lawyers for some of the defendants.  He has thus implicated the *Rooker-Feldman* Doctrine.

**2.      *The Rooker-Feldman Bar***

"The *Rooker-Feldman* doctrine is confined to cases of the kind from which it acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the federal district court proceedings

---

[1] CL12-239 died quickly, being disposed of by pleas in bar and successful demurrers. CL12-409 ended following a successful plea of the statute of limitations.

commenced and inviting district court review and rejection of those judgments. Rooker-Feldman does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines allowing federal courts to stay or dismiss proceedings in deference to state-court actions." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005).

The state court heard argument in CL12-276, CL12-283, and CL12-406 on March 28, 2013 ruling from the bench. Already knowing the outcome in state court, Prince filed this action about two weeks later on April 15, 2013.  The state court entered its final orders the next week on April 22, 2013.

The question then becomes whether this Court has jurisdiction despite the *Rooker-Feldman* Doctrine as the filing of this case follows the state court's decision but came before it entered the final orders.

"When there is parallel state and federal litigation, *Rooker-Feldman* is not triggered simply by the entry of judgment in state court. Comity or abstention doctrines may, in various circumstances, permit or require the federal court to stay or dismiss the federal action in favor of the state-court litigation. But neither *Rooker* nor *Feldman* supports the notion that properly invoked concurrent jurisdiction vanishes if a state court reaches judgment on the same or a related question while the case remains *sub judice* in a federal court." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (U.S. 2005)(internal citations omitted).

This case differs from *Exxon Mobil* because ExxonMobil filed its federal court action just two weeks after Saudi Basic Industries Corp. filed its state court suit.  Neither side knew how the state court proceeding would be resolved.  ExxonMobil's filing is

therefore a strategic hedge; Prince's filing here is an end run to avoid a known

unsatisfactory outcome that had not been finalized by the state court.

Prince did not file in this Court as a hedge, he filed to do exactly what *Rooker-*

*Feldman* acts to prevent – use a federal district court to overcome a state court

decision. "In both cases, the plaintiffs, alleging federal-question jurisdiction, called upon

the District Court to overturn an injurious state-court judgment. Because § 1257, as long

interpreted, vests authority to review a state-court judgment solely in this Court [United

States Supreme Court], e.g., *Feldman*, 460 U.S., at 476, 75 L. Ed. 2d 206, 103 S. Ct.

1303, the District Courts lacked subject-matter jurisdiction." *Exxon Mobil Corp. v. Saudi*

*Basic Indus. Corp.*, 544 U.S. 280 (2005).

This Court should rule that it lacks subject matter jurisdiction under the *Rooker-*

*Feldman* Doctrine. If this Court were to rule otherwise, it would open a back door

through which a stream of disgruntled state court litigants would flow.

### 3.    Apart from the Rooker-Feldman bar, were the Court to hold that it had jurisdiction, this case is precluded.

If this Court were to rule that it has subject matter jurisdiction, the case would still

be barred under the principles of claim preclusion.  "Under 28 U.S.C. § 1738, federal

courts must give the same preclusive effect to a state-court judgment as another court

of that State would give. Preclusion is not a jurisdictional matter. In parallel litigation, a

federal court may be bound to recognize the claim- and issue-preclusive effects of a

state-court judgment, but federal jurisdiction over an action does not terminate

automatically on the entry of judgment in the state court. Nor does § 1257 stop a district

court from exercising subject-matter jurisdiction simply because a party attempts to

litigate in federal court a matter previously litigated in state court. If a federal plaintiff

presents an independent claim, even one that denies a state court's legal conclusion in

a case to which the plaintiff was a party, there is jurisdiction, and state law determines

whether the defendant prevails under preclusion principles. *Exxon Mobil Corp. v. Saudi*

*Basic Indus. Corp.*, 544 U.S. 280 (2005). Under federal law, the final judgment of a state

court has the same preclusive effect that the judgment would have in the courts of that

state. *St. Louis Univ. v. United States*, 5 F. App'x 133, 130 (4th Cir. 2001) (citing, 28

U.S.C. § 1738).

Under Virginia preclusion law, now codified in *Va. Sup. Ct. R.* 1:6, the defendant

must show that (1) there was a prior claim for relief decided on the merits by a valid and

final judgment; (2) the parties are identical or in privity with each other; and (3) the claim

made in the latter suit arises from the same conduct, transaction, or occurrence as the

claim in the first suit.  See *Blick v. Soundview Home Loan Trust 2006-WF1*, No. 62,

2013 U.S. Dist. LEXIS 4186, *5-*6 (W.D.Va., Jan. 10, 2103), *aff'd*, 2013 U.S. App.

LEXIS 18260 (4th Cir., Sept. 3, 2013) (*per curiam*).

Under Virginia law, a dismissal with prejudice (as occurred here) is defined as an

adjudication on the merits, and final disposition, barring the right to bring or maintain an

action on the same claim or cause, operates as res judicata, and is as conclusive of the

n rights of the parties as if the suit had been prosecuted to a final disposition adverse to

the plaintiff.  *Reed v. Liverman*, 250 Va. 97, 99-100, 458 S.E.2d 446, 447 (1995).

Virginia courts have ruled that three of Prince's suits (CL12-276, CL12-283, and CL12-

406) are meritless. Prince *consented* to a voluntary dismissal, but nevertheless filed

objections to the final orders. The Complaints are attached to this memorandum as

Exhibits E, F, and G. The Motions to Amend are attached to this memorandum as

Exhibits H, I, and J. The Final Orders are attached to this memorandum as Exhibits K,

L, and M. The Supreme Court of Virginia did not grant Prince an appeal.

Plainly, the assignment involves the same legal right. As Exhibit C to this

memorandum shows, Prince has litigated the same issues over and over – even using

the same language across his pleadings.

In CL12-276, Prince wrote:

> "11 When applying the Latin maxim expressio unius est
> exclusio alterius and the rule of statutory construction to
> Article X, Section 9(d), then looking back at the historical
> development of Local Government debt, local governments
> are not allowed to issue "Moral Obligations". C. H.
> Morrissett, the author of the 1928 Proposed Amendments to
> the Constitution of Virginia states:

> > "The evil of the free issuance of bonds in counties and
> > districts without a vote of the people is intended to be
> > checked by a proposed new section numbered 115-a. The
> > gist of the section is the reasonable requirement that every
> > proposal to issue bonds must have public support."

> 12 Note: there were no Moral Obligation Bonds, Moral
> Obligation Pledges, or agreements until the 1950's when
> John Newton Mitchell, later United States Attorney General
> under President Richard M. Nixon, invented a type of
> revenue bond that incorporated a moral obligation.
> (Mitchell was the only U.S. Attorney General ever to be
> convicted of illegal activities.)

> 13 The key phrase Morrissett states is a "reasonable
> requirement for public support" and this requirement was not
> changed when the new Constitution was adopted in 1971
> and the historical tracking of Local Government debt, as
> follows, supports. The House Debates on the Constitutional
> Revision, page 506 - 507, under section 10. Debt, in the
> fourth paragraph states;

> > "The committee found that some counties did not
> > want to be treated like cities for the purpose of issuing
> > bonds, but preferred to continue issuing bonds without a limit
> > but subject to a referendum. Therefore the committee

recommends that the counties be authorized to borrow as they now borrow under section 115 (a)"

In CL12-283, he wrote:

6 When applying the Latin maxim expressio unius est exclusio alterius and the rule of statutory construction to Article X, Section 9(d), then looking back at the historical development of Local Government debt, local governments are not allowed to issue "Moral Obligations". C. H. Morrissett, the author of the 1928 Proposed Amendments to the Constitution of Virginia states:

"'The evil of the free issuance of bonds in counties and districts without a vote of the people is intended to be checked by a proposed new section numbered 115-a. The gist of the section is the reasonable requirement that every proposal to issue bonds must have public support. " Emphasis noted.

7 Note: there were no Moral Obligation Fronds, Moral Obligation Pledges, or agreements until the 1950's when John Newton Mitchell, later United States Attorney General under President Richard M. Nixon, invented a type of revenue bond that incorporated a moral obligation. (Mitchell was the only U.S. Attorney General ever to be convicted of illegal activities.)

8 The key phrase Morrissett states is a "reasonable requirement for public support" and this requirement was not changed when the new Constitution was adopted in 1971 and the historical tracking of Local Government debt, as follows, supports. The House Debates on the Constitutional Revision, page 506 - 507, under section 10. Debt, in the fourth paragraph states;

"The committee found that some counties did not want to be treated like cities for the purpose of issuing bonds, but preferred to continue issuing bonds without a limit but subject to a referendum. Therefore the committee recommends that the counties be authorized to borrow as they now borrow under section 115 (a)." Emphasis noted.

In CL12-406, he wrote:

"9 When applying the latin maxim expressio unius est exclusio alterius and the rule of statutory construction to Article X, Section 9(d), then looking back at the historical development of Local Government debt, as required, local governments are not allowed to issue "Moral Obligations". C. H. Morrissett, the author of the 1928 Proposed Amendments to the Constitution of Virginia states:

   "The evil of the free issuance of bonds in counties and districts without a vote of the people is intended to be checked by a proposed new section numbered 115-a. The gist of the section is the reasonable requirement that every proposal to issue bonds must have public support." Emphasis noted.

10 Note: there were no Moral Obligation Bonds Moral Obligation Pledges or agreements until the 1950's when John Newton Mitchell, later United States Attorney General under President Richard M. Nixon, invented a type of revenue bond that incorporated a moral obligation. (Mitchell was the only US Attorney General ever to be convicted of illegal activities.)

11 The key phrase Morrissett states is a "reasonable requirement for public support," and this requirement was not changed when the new Constitution was adopted in 1971. The historical tracking of Local Government debt, as follows, supports this. The House Debates on Constitutional Revision, on page 506 and 507, under section 10. Debt, in the fourth paragraph states:

   "The committee found that some counties did not want to be treated like cities for the purpose of issuing bonds, but preferred to continue issuing bonds without a limit but subject to a referendum. Therefore the committee recommends that the counties be authorized to borrow as they now borrow under section 115 (a)" Emphasis noted.

Other than paragraph numbers and a parenthetical comment about emphasis the wording is identical.  And this is not the only instance.

Prince has litigated the same claims against the same parties resulting in valid decisions on the merits in state court. Even if this Court has subject matter jurisdiction, Prince is precluded from re-litigating his claims here.

**4.    *The Sovereign Immunity Issue***

In his Memorandum of Law filed minutes before the hearing on February 6, 2014, Prince concedes that the VRA has sovereign immunity in state Fraud Against Taxpayers Act cases. Doc. 26, ¶ 29. He omits the reason why the VRA, the Shenandoah County Board of Supervisors, and other governmental entities are immune – they are arms of the Commonwealth of Virginia.

"The Eleventh Amendment to the United States Constitution provides: The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State. Eleventh Amendment immunity protects unwilling states from suit in federal court. This immunity also protects "state agents and state instrumentalities," meaning that it protects "arm[s] of the State" and State officials." *Bland v. Roberts*, 730 F.3d 368, 389-390 (4th Cir. Va. 2013) (citations omitted). "Although the language of the Eleventh Amendment does not explicitly apply to suits brought against a state by one of its own citizens, the Amendment has been construed to bar such suits." *Bland v. Roberts*, 730 F.3d 368, 390 n. 17 (4th Cir. Va. 2013), citing *Equity in Athletics, Inc. v. Department of Educ.*, 639 F.3d 91, 107 n.12 (4th Cir. 2011).

As noted in its memorandum supporting its motion to dismiss, "the Virginia Resources Authority is a political subdivision of the Commonwealth of Virginia. Va. Code § 62.1-200. It is a state-created governmental entity within the Commerce and

Trade Secretariat for state government organizational purposes. 2002 Op. Att. Gen. Va., 2002 Va. AG LEXIS 155 (Va. AG 2002). The exercise of its duties and powers is deemed by the Virginia General Assembly to be the performance of an essential governmental function of the Commonwealth. Va. Code § 62.1-200."

Because the VRA is immune in state court as an arm of the Commonwealth, it is necessarily immune in federal court under *Bland v. Roberts.* Thus, should this Court find that it has subject matter jurisdiction, it should still dismiss this case on the grounds that the VRA is immune from Prince's suit.

**5.     *The Denied Nonsuit in State Court***

Prince is asking this Court to decide the due process implications of Prince's failure to secure a nonsuit in state court in cases CL12-276, CL12-293, and CL12-406. Prince had ample due process in state court, including an appeal to the Supreme Court of Virginia.  As noted in VRA's prior filings, Prince appealed the state court decisions to the Supreme Court of Virginia.  He failed to prepare a sufficient appellate record and his first assignment of error was dismissed. His second assignment of error was refused, signifying there was no reversible error at the trial court level.

At its most elemental, due process is notice and the opportunity to be heard during a fair hearing. Prince had all that on March 28, 2013.  What Prince complains of is the state court's ruling that having consented to a voluntary dismissal, he was not then allowed to exercise his right to a nonsuit under Va. Code 8.01-380.  That's different and this Court should not be misled; it should decline Prince's invitation to consider a matter not germane to the underlying suit.

6.   **The Motion to Intervene and Add an Additional Plaintiff/Relator**

The Virginia Resources Authority opposes Mark Prince's motion to allow Michael W. Prince to intervene. Michael Prince is presumably a close relative of Mark Prince.

This is a transparent, if not absolutely stark naked, attempt to forestall an adverse ruling under the *Rooker-Feldman* Doctrine. *Rooker-Feldman* requires that the plaintiffs in the state and federal cases be identical. "The only requirement for invocation of the Rooker-Feldman doctrine is that the plaintiff be the same, not the defendants. *Carter v. Countrywide Home Loans, Inc.*, No. 651, 2008 U.S. Dist. LEXIS 22825, *10 (E.D. Va., Mar. 20, 2008). See also *Lance v. Dennis*, 546 U.S. 459, (2006) ("The District Court erroneously conflated preclusion law with *Rooker-Feldman*. Whatever the impact of privity principles on preclusion rules, *Rooker-Feldman* is not simply preclusion by another name."). Doc. 20, p. 4.

This Court should deny Prince's motion to intervene on behalf of his apparent relative.

7.   **Conclusion**

This case presents the quintessential *Rooker-Feldman* case where a loser in state court invites the federal court to review and reverse the state court decision. This Court lacks jurisdiction to hear this case. Even if it had jurisdiction, it should still dismiss this case on the grounds of claim preclusion and state sovereign immunity. Further it should refuse to consider Prince's due process claims and deny his motion to intervene.

For these reasons, defendant Virginia Resources Authority prays that the Court will dismiss this case with prejudice and award it its costs and reasonable attorney's fees incurred in the defense of this action, together with such other and further relief as the ends of justice may require.

Respectfully submitted,

Virginia Resources Authority
By counsel

/s/ Jeffrey M. Summers
Jeffrey M. Summers
The Law Office of Jeffrey M. Summers PLLC
6802 Paragon Place, Suite 410
Richmond, Virginia 23230-1655
Tel:  (804) 441-6264
Fax: (866) 936-6906
Email: jmsummers@summerslawoffice.com


### CERTIFICATE

I hereby certify that a true and correct copy of the foregoing was served via e-mail to the United States of America Attorney General for the Western District of Virginia to Sara Bugbee Winn, Assistant United States Attorney at Sara.Winn@usdoj.gov and Jay Majors, United States Attorney General's Office Civil Division at Jay.Majors@usdoj.gov and to Brad Pollock, counsel for Mark W. Prince, at bpollack@shentel.net.

/s/ Jeffrey M. Summers

Exhibit A

Case 5:13-cv-00045-MFU   Document 30-1   Filed 02/21/14   Page 1 of 4   Pageid#: 711

Sorted by Case No.

| Case No. | Plaintiff | Defendants | Date | Item | Claims |
|---|---|---|---|---|---|
| CL12-239 | Mark W. Prince | Sunstrust Bank, Virginia Resources Authority, RSW Regional Jail Authority, Shenandoah County BOS | 7/2/12 | Complaint | Count I - Motion to Declare RSW Regional Jail Authority Service Agreement Null and Void, Count II - Motion to Declare Bonds Issued to RSW Regional Jail Authority and Guaranteed by Shenandoah County BOS Null and Void, Count III - Motion to Declare Bonds Issued by Virginia Resources Authority to Purchase RSW Regional Jail Authority Bonds Null and Void, Count IV - Motion to Declare RSW Regional Jail Authority Note in Favor of Suntrust Bank Null and Void |
| CL12-239 | Mark W. Prince | Sunstrust Bank, Virginia Resources Authority, RSW Regional Jail Authority, Shenandoah County BOS | 10/17/12 | Final Order | Sustained Plea in Bar as to Counts II and III, Overrules Plea in Bar as to Counts I and IV, Sustains VRA Demurrer, Sustains RSW Regional Jail Authority as to Counts II and III, Overrules Plea in Bar of RSW Regional Jail Authority, Sustains the demurrer of RSW Regional Jail Authority to all Counts, Sustains the demurrer of Shenandoah BOS as to all Counts, Dismissed Complaint without leave to amend. Denies VRA motion for a protective order as moot. |
| CL12-276 | Mark W. Prince | U.S. Bank NA & Others to be determined, Commonwealth of Virginia | 8/12/12 | Motion for Judgment | Count I - Violation of the Virginia Fraud Against Taxpayer's Act - § 8.01-216.3.6, Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the Commonwealth who lawfully may not sell or pledge the property (VRA not named as party, but mentioned throughout the text) |
| CL12-276 | Mark W. Prince | U.S. Bank NA, Suntrust Bank, SunTrust Equipment Finance & Leasing Corporation, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Count I - Violation of the Virginia Fraud Against Taxpayers Act § 8.01-216.3(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, Count II - Violation of Article X, Section 10 of the Virginia Constitution, Lending of Credit, stock subscriptions, and works to internal improvement, Count III - Violation of Article VII, Section 10 Latin Maxim Expressio Unius Est Exclusio Alterius, Rule of Statutory Construction, Count IV - Violation of the Virginia Fraud Against Taxpayers Act - § 8.01-216.3.6, Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the Commonwealth who lawfully may not sell or pledge the property, Count V - Violation of the Virginia Constitution Article X, Section 8 Limit of tax or revenue; No other or greater amount of tax or revenues shall, at any time, be levied than may be required for the necessary expenses of government, or the pay the indebtedness of the Commonwealth, Count VI - Violation of Virginia Code §15.2-2636 Ordinance or resolution to provide for the issue of bonds, Count VII - Violation of Virginia Code § 15.2-2606 Public hearing before issuance of bonds |

Page 1

187

Exhibit A

Sorted by Case No.

| Case No. | Plaintiff | Defendant | Date | Type | | Description |
|---|---|---|---|---|---|---|
| CL12-276 | Mark W. Prince | U.S. Bank NA, & Others to be determined | 4/22/13 | Final Order | | Motion to Amend Complaint Denied, Plaintiff consents to voluntary dismissal, Dismissed and stricken from the docket. "Court admonishes Plaintiff that any further filings in this Court challenging the funding of public projects by or on behalf of Shenandoah County, based upon the same or substantially the same legal grounds as have been raised and rejected in this and four (4) other cases filed by Plaintiff as meritless, may subject Plaintiff significant monetary sanctions under Va. Code § 8.01-271.1." |
| CL12-283 | Mark W. Prince | Suntrust Bank and All other Bond Holders Demanding Payment from Virginia Government and Taxpayers for Moral Obligation Bonds. Commonwealth of Virginia | 8/5/12 | Complaint | | Count I - Violation of the Virginia Fraud Against Taxpayers Act - § 8.01-216.3.6, Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the Commonwealth who lawfully may not sell or pledge the property |
| CL12-283 | Mark W. Prince | Suntrust Bank, CEDE & Co., and All other Bond Holders Demanding Payment from Virginia Government and Taxpayers for Moral Obligation Bonds. Commonwealth of Virginia | 3/5/13 | Judgment | Motion to Amend, Ammended [sic] Motion for | Count I - Violation of the Virginia Fraud Against Taxpayers Act § 8.01-216.3(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, Count II - Violation of Article VII, Section 10 Latin Maxim Expressio Unius Est Exclusio Alterius, Rule of Statutory Construction, , Count III - Violation of the Virginia Fraud Against Taxpayers Act - § 8.01-216.3 (6), Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the Commonwealth who lawfully may not sell or pledge the property, Count IV - Violation of the Virginia Constitution Article X, Section 8 Limit of tax or revenue; No other or greater amount of tax or revenues shall, at any time, be levied than may be required for the necessary expenses of government, or the pay the indebtedness of the Commonwealth. |

Page 2

Exhibit A

Sorted by Case No.

| Case No. | | Party | Date | Type | Description |
|---|---|---|---|---|---|
| CL12-283 | Mark W. Prince | Suntrust Bank and Others to be Determined | 4/22/13 | Final Order | Motion to Amend Complaint Denied, Plaintiff consents to voluntary dismissal, Dismissed and stricken from the docket. "Court admonishes Plaintiff that any further filings in this Court challenging the funding of public projects by or on behalf of Shenandoah County, based upon the same or substantially the same legal grounds as have been raised and rejected in this and four (4) other cases filed by Plaintiff as meritless, may subject Plaintiff significant monetary sanctions under Va. Code § 8.01-271.1." |
| CL12-406 | Mark W. Prince | Shenandoah County BOS, Virginia Resources Authority, Carolyn Madden Perry of Bodkin Rose, Jay Litten of Litten & Sipe & Others to be Determined | 11/21/12 | Motion for Judgment | Count I - Violation of the Virginia Fraud Against Taxpayers Act § 8.01-216.3 A (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, Count II - Violation of the Virginia Fraud Against Taxpayers Act - § 8.01-216.3 A 6, Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the Commonwealth who lawfully may not sell or pledge the property, Count III - Violation fo Article VII Section 10 A (3) The Requirement to Produce Enough Revenue to Pay for the Undertaking. |
| CL12-406 | Mark W. Prince | U.S. Bank NA, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Count I - Violation of the Virginia Fraud Against Taxpayers Act § 8.01-216.3 A (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, Count II - Violation of Virginia Constitution Article VII Section 10(a)(3) Bonds of a city or town the principal and interest on which are payable exclusively from the revenues and receipts of a water system or other specific undertaking or undertakings from which the city or town may derive a revenue or secured, solely or together with such revenues, by contributions of other units of government, County III - Violation of Article VII, Section 10, Count IV - Violation of the Virginia Constitution Article X, Section 8 Limit of tax or revenue; No other or greater amount of tax or revenues shall, at any time, be levied than may be required for the necessary expenses of government, or the pay the indebtedness of the Commonwealth, Count V - Lending of credit, stock subscriptions and works of internal improvement, Count VI - Violation of the Virginia Fraud Against Taxpayers Act - § 8.01-216.3 A 6, Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the Commonwealth who lawfully may not sell or pledge the property. |

Page 3

Case 5:13-cv-00045-MFU    Document 30-1    Filed 02/21/14    Page 4 of 4    Pageid#: 714

Exhibit A

Sorted by Case No.

| Case No. | Judge | Parties | Date | Type | Description |
|---|---|---|---|---|---|
| CL12-406 | Mark W. Prince | Shenandoah County BOS, Virginia Resources Authority, Carolyn Madden Perry of Bodkin Rose, Jay Litten of Litten & Sipe & Others to be Determined | 4/22/13 | Final Order | Motion to Amend Complaint Denied, Plaintiff consents to voluntary dismissal, Dismissed and stricken from the docket. "Court admonishes Plaintiff that any further filings in this Court challenging the funding of public projects by or on behalf of Shenandoah County, based upon the same or substantially the same legal grounds as have been raised and rejected in this and four (4) other cases filed by Plaintiff as meritless, may subject Plaintiff significant monetary sanctions under Va. Code § 8.01-271.1." |
| CL12-409 | Mark W. Prince | Shenanhoah BOS | 11/26/12 | Motion for Judgment | Bond Contest under Va. Code § 15.2-2627 |
| CL12-409 | Mark W. Prince | Shenanhoah BOS | 2/14/13 | Final Order | Marsha Shruntz having intervened as party Plaintiff, by counsel Bradley G. Pollack. Sustained Shenandoah BOS Special Plea of Statute of Limitations. Shenandoah BOS demurrer rendered moot. Denied Shenandoah BOS motion for sanctions. Case dismissed with prejudice. |
| Case 5:13-cv-45 | Mark W. Prince | Virginia Resources Authority, Shenandoah BOS, U.S. Bank NA, Suntrust Bank, Suntrust Equipment Finance & Leasing Corporation & Others to be Determined | 4/15/13 | Motion for Judgment | Violation of Federal False Claims Act 31 U.S.C. § 3729, et seq. ¶¶ 7-8 Violation of the Virginia Constitution Article X, Section 10, ¶¶ 14, 30, Violation of Virginia Constitution Article VII, Section 10, ¶¶ 33-34 Violation of Virginia Constitution Article X, Section 8, Limit of tax or revenue; No other greater amount of tax or revenues shall, at any time, be levied than may be required for the necessary expenses of the government, or the pay the indebtedness of the Commonwealth. ¶¶ 36, 41 Virginia Code ¶15.2-2636, Defendant Lenders Provided Multiple False Certification and Claims to the Build America Program in Order to Obtain Government Guarantees, Impact of Bond Fraud on American Taxpayer, Motive for the Fraudulent Actions of Defendants |
| Case 5:13-cv-45 | Mark W. Prince | Virginia Resources Authority & Others to be determined | 9/3/13 | Motion to Amend, Amended Motion for Judgment | ¶ 32 Violation of Virginia Constitution Article 10, Section 10, ¶ 35Fraudulent Lease Purchase in violation of Va. Code § 15.2-1800. Violation of Virginia Fraud Against Taxpayer Act - ¶¶ 26-28, 31B, 35-39, 48, 54, 58, 72-73, 95, 105, 110, 113. |

Page 4

Case 5:13-cv-00045-MFU   Document 30-2   Filed 02/21/14   Page 1 of 6   PageId#: 715

Exhibit B

Sorted by Time of Filing

| Case No. | Plaintiff | Defendants | Date | Item | Claims |
|----------|-----------|------------|------|------|--------|
| CL12-239 | Mark W. Prince | Suntrust Bank, Virginia Resources Authority, RSW Regional Jail Authority, Shenandoah County BOS | 7/2/12 | Complaint | Count I - Motion to Declare RSW Regional Jail Authority Service Agreement Null and Void, Count II - Motion to Declare Bonds Issued to RSW Regional Jail Authority and Guaranteed by Shenandoah County BOS Null and Void, Count III - Motion to Declare Bonds Issued by Virginia Resources Authority to Purchase RSW Regional Jail Authority Bonds Null and Void, Count IV - Motion to Declare RSW Regional Jail Authority Note in Favor of Suntrust Bank Null and Void |
| CL12-276 | Mark W. Prince | U.S. Bank NA & Others to be determined, Commonwealth of Virginia | 8/1/12 | Motion for Judgment | Count I - Violation of the Virginia Fraud Against Taxpayer's Act - § 8.01-216.3.6, Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the Commonwealth who lawfully may not sell or pledge the property (VRA not named as party, but mentioned throughout the text) |
| CL12-283 | Mark W. Prince | Suntrust Bank and All other Bond Holders Demanding Payment from Virginia Government and Taxpayers for Moral Obligation Bonds. Commonwealth of Virginia | 8/3/12 | Complaint | Count I - Violation of the Virginia Fraud Against Taxpayers Act - § 8.01-216.3.6, Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the Commonwealth who lawfully may not sell or pledge the property |

Page 1

191

Case 5:13-cv-00045-MFU   Document 30-2   Filed 02/21/14   Page 2 of 6   PageID#: 716

Exhibit B

Sorted by Time of Filing

| Case | Judge | Parties | Date | Type | Description |
|---|---|---|---|---|---|
| CL12-239 | Mark W. Prince | Sunstrust Bank, Virginia Resources Authority, RSW Regional Jail Authority, Shenandoah County BOS | 10/17/12 | Final Order | Sustained Plea in Bar as to Counts II and III, Overrules Plea in Bar as to Counts I and IV, Sustains VRA Demurrer, Sustains RSW Regional Jail Authority as to Counts II and III, Overrules Plea in Bar of RSW Regional Jail Authority, Sustains the demurrer of RSW Regional Jail Authority to all Counts, Sustains the demurrer of Shenandoah BOS as to all Counts, Dismissed Complaint without leave to amend. Denies VRA motion for a protective order as moot. |
| CL12-406 | Mark W. Prince | Shenandoah County BOS, Virginia Resources Authority, Carolyn Madden Perry of Bodkin Rose, Jay Litten of Litten & Sipe & Others to be Determined | 11/21/12 | Motion for Judgment | Count I - Violation of the Virginia Fraud Against Taxpayers Act § 8.01-216.3 A (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, Count II - Violation of the Virginia Fraud Against Taxpayers Act - § 8.01-216.3 A 6, Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the Commonwealth who lawfully may not sell or pledge the property, Count III - Violation fo Article VII Section 10 A (3) The Requirement to |
| CL12-409 | Mark W. Prince | Shenanhoah BOS | 11/26/12 | Motion for Judgment | Bond Contest under Va. Code § 15.2-2627 |
| CL12-409 | Mark W. Prince | Shenandoah BOS | 2/14/13 | Final Order | Marsha Shruntz having intervened as party Plaintiff, by counsel Bradley G. Pollack. Sustained Shenandoah BOS Special Plea of Statute of Limitations. Shenandoah BOS demurrer rendered moot. Denied Shenandoah BOS motion for sanctions. Case dismissed with prejudice. |

Page 2

192

Case 5:13-cv-00045-MFU    Document 30-2    Filed 02/21/14    Page 3 of 6    Pageid#: 717

Exhibit B

Sorted by Time of Filing

| | | | | |
|---|---|---|---|---|
| CL12-276 | Mark W. Prince | U.S. Bank NA, Suntrust Bank, SunTrust Equipment Finance & Leasing Corporation, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Count I - Violation of the Virginia Fraud Against Taxpayers Act § 8.01-216.3(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, Count II - Violation of Article X, Section 10 of the Virginia Constitution, Lending of Credit, stock subscriptions, and works fo internal improvement, Count III - Violation of Article VII, Section 10 Latin Maxim Expressio Unius Est Exclusio Alterius, Rule of Statutory Construction, Count IV - Violation of the Virginia Fraud Against |
| CL12-406 | Mark W. Prince | U.S. Bank NA, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Count I - Violation of the Virginia Fraud Against Taxpayers Act § 8.01-216.3 A (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, Count II - Violation of Virginia Constitution Article VII Section 10(a)(3) Bonds of a city or town the principal and interest on which are payable exclusively from the revenues and receipts of a water system or other specific undertaking or undertakings from which the city or town may derive a revenue or secured, solely or together with such revenues, by contributions of other units of government, County III - Violation of |

Page 3

193

Exhibit B

Sorted by Time of Filing

| ID | Name | Parties | Date | Title | Description |
|---|---|---|---|---|---|
| CL12-283 | Mark W. Prince | Suntrust Bank, CEDE & Co., and All other Bond Holders Demanding Payment from Virginia Government and Taxpayers for Moral Obligation Bonds. Commonwealth of Virginia | 3/5/13 | Motion to Amend, Ammended [sic] Motion for Judgment | Count I - Violation of the Virginia Fraud Against Taxpayers Act § 8.01-216.3(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, Count II - Violation of Article VII, Section 10 Latin Maxim Expressio Unius Est Exclusio Alterius, Rule of Statutory Construction, , Count III - Violation of the Virginia Fraud Against Taxpayers Act - § 8.01-216.3 (6), Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the Commonwealth who lawfully may not sell or pledge the property, Count IV - Violation of the Virginia Constitution Article X, Section 8 Limit of tax or revenue; No other or greater amount of tax or revenues shall, at any time, be levied than may be required for the necessary expenses of government, or the pay the indebtedness of the Commonwealth. |
| Case 5:13-cv-45 | Mark W. Prince | Virginia Resources Authority, Shenandoah BOS, U.S. Bank NA, Suntrust Bank, Suntrust Equipment Finance & Leasing Corporation & Others to be Determined | 4/15/13 | Motion for Judgment | Violation of Federal False Claims Act 31 U.S.C. § 3729, et seq. ¶¶ 7-8 Violation of the Virginia Constitution Article X, Section 10, ¶¶ 14, 30, Violation of Virginia Constitution Article VII, Section 10, ¶¶ 33-34 Violation of Virginia Constitution Article X, Section 8, Limit of tax or revenue; No other greater amount of tax or revenues shall, at any time, be levied than may be required for the necessary expenses of the government, or the pay the indebtedness of the Commonwealth. ¶¶ 36, 41 Virginia Code ¶15.2- |
| CL12-276 | Mark W. Prince | U.S. Bank NA, & Others to be determined | 4/22/13 | Final Order | Motion to Amend Complaint Denied, Plaintiff consents to voluntary dismissal, Dismissed and |

Page 4

Case 5:13-cv-00045-MFU   Document 30-2   Filed 02/21/14   Page 5 of 6   Pageid#: 719

Exhibit B

Sorted by Time of Filing

| | | | | |
|---|---|---|---|---|
| CL12-283 | Mark W. Prince | Suntrust Bank and Others to be Determined | 4/22/13 | Final Order | Motion to Amend Complaint Denied, Plaintiff consents to voluntary dismissal, Dismissed and stricken from the docket. "Court admonishes Plaintiff that any further filings in this Court challenging the funding of public projects by or on behalf of Shenandoah County, based upon the |
| CL12-406 | Mark W. Prince | Shenandoah County BOS, Virginia Resources Authority, Carolyn Madden Perry of Bodkin Rose, Jay Litten of Litten & Sipe & Others to be Determined | 4/22/13 | Final Order | Motion to Amend Complaint Denied, Plaintiff consents to voluntary dismissal, Dismissed and stricken from the docket. "Court admonishes Plaintiff that any further filings in this Court challenging the funding of public projects by or on behalf of Shenandoah County, based upon the same or substantially the same legal grounds as have been raised and rejected in this and four (4) other cases filed by Plaintiff as meritless, may subject Plaintiff significant monetary sanctions under Va. Code § 8.01-271.1." |
| Case 5:13-cv-45 | Mark W. Prince | Virginia Resources Authority & Others to be determined | 9/3/13 | Motion to Amend, Amended Motion for Judgment | ¶ 32 Violation of Virginia Constitution Article 10, Section 10, ¶ 35Fraudulent Lease Purchase in violation of Va. Code § 15.2-1800, Violation of Virginia Fraud Against Taxpayer Act - ¶¶ 26-28, 31B, 35-39, 48, 54, 58, 72-73, 95, 105, 110, 113. |

Page 5

195

Sorted by Time of Filing

Page 6

Exhibit B

Case 5:13-cv-00045-MFU   Document 30-3   Filed 02/21/14   Page 1 of 8   Pageid#: 721

Exhibit C

Sorted by Claims

| Case No. | Plaintiff | Defendants | Date | Item | Claims |
|---|---|---|---|---|---|
| CL12-409 | Mark W. Prince | Shenanhoah BOS | 11/26/12 | Motion for Judgment | Bond Contest under Va. Code § 15.2-2627 |
| CL12-406 | Mark W. Prince | U.S. Bank NA, & Others to be determined | 3/4/13 | Motion to Amend, | Lending of credit, stock subscriptions and works of |
| CL12-409 | Mark W. Prince | Shenanhoah BOS | 2/14/13 | Final Order | Marsha Shruntz having intervened as party Plaintiff, by counsel Bradley G. Pollack. Sustained Shenandoah BOS Special Plea of Statute of |
| CL12-276 | Mark W. Prince | U.S. Bank NA, & Others to be determined | 4/22/13 | Final Order | Motion to Amend Complaint Denied, Plaintiff consents to voluntary dismissal, Dismissed and stricken from the docket. "Court admonishes Plaintiff that |
| CL12-283 | Mark W. Prince | Suntrust Bank and Others to be Determined | 4/22/13 | Final Order | Motion to Amend Complaint Denied, Plaintiff consents to voluntary dismissal, Dismissed and stricken from the docket. "Court admonishes Plaintiff that any further filings in this Court challenging the funding of public projects by or on behalf of Shenandoah County, based upon the same or substantially the same legal grounds as have been raised and rejected in this |

Page 1

197

Case 5:13-cv-00045-MFU   Document 30-3   Filed 02/21/14   Page 2 of 8   Pageid#: 722

Exhibit C

Sorted by Claims

| Case | Attorney | Parties | Date | Type | Description |
|---|---|---|---|---|---|
| CL12-406 | Mark W. Prince | Shenandoah County BOS, Virginia Resources Authority, Carolyn Madden Perry of Bodkin Rose, Jay Litten of Litten & Sipe & Others to be Determined | 4/22/13 | Final Order | Motion to Amend Complaint Denied, Plaintiff consents to voluntary dismissal, Dismissed and stricken from the docket. "Court admonishes Plaintiff that any further filings in this Court challenging the funding of public projects by or on behalf of Shenandoah County, based upon the same or substantially |
| CL12-239 | Mark W. Prince | Sunstrust Bank, Virginia Resources Authority, RSW Regional Jail Authority, Shenandoah County BOS | 7/2/12 | Complaint | Motion to Declare Bonds Issued by Virginia Resources Authority to Purchase RSW Regional Jail Authority Bonds Null and Void |
| CL12-239 | Mark W. Prince | Sunstrust Bank, Virginia Resources Authority, RSW Regional Jail Authority, Shenandoah County BOS | 7/2/12 | Complaint | Motion to Declare Bonds Issued to RSW Regional Jail Authority and Guaranteed by Shenandoah County BOS Null and Void |
| CL12-239 | Mark W. Prince | Sunstrust Bank, Virginia Resources Authority, RSW Regional Jail Authority, Shenandoah County BOS | 7/2/12 | Complaint | Motion to Declare RSW Regional Jail Authority Note in Favor of Suntrust Bank Null and Void |
| CL12-239 | Mark W. Prince | Sunstrust Bank, Virginia Resources Authority, RSW Regional Jail Authority, Shenandoah County BOS | 7/2/12 | Complaint | Motion to Declare RSW Regional Jail Authority Service Agreement Null and Void |

Page 2

Case 5:13-cv-00045-MFU   Document 30-3   Filed 02/21/14   Page 3 of 8   PageID#: 723

Exhibit C

Sorted by Claims

| Claim | Attorney | Defendants | Date | Final Order | Result |
|---|---|---|---|---|---|
| CL12-239 | Mark W. Prince | Suntrust Bank, Virginia Resources Authority, RSW | 10/17/12 | Final Order | Sustained Plea in Bar as to Counts II and III, Overrules Plea |
| CL12-406 | Mark W. Prince | Shenandoah County BOS, Virginia Resources Authority, Carolyn Madden Perry of Bodkin Rose, Jay Litten of Litten & Sipe & Others to be Determined | 11/21/12 | Motion for Judgment | Violation fo Article VII Section 10 A (3) The Requirement to Produce Enough Revenue to Pay for the Undertaking. |
| CL12-406 | Mark W. Prince | U.S. Bank NA, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Violation of Article VII, Section 10 |
| CL12-276 | Mark W. Prince | U.S. Bank NA, Suntrust Bank, SunTrust Equipment Finance & Leasing Corporation, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Violation of Article VII, Section 10 Latin Maxim Expressio Unius Est Exclusio Alterius, Rule of Statutory Construction |
| CL12-283 | Mark W. Prince | Suntrust Bank, CEDE & Co., and All other Bond Holders Demanding Payment from Virginia Government and | 3/5/13 | Motion to Amend, Ammended [sic] Motion for Judgment | Violation of Article VII, Section 10 Latin Maxim Expressio Unius Est Exclusio Alterius, Rule of Statutory Construction |
| CL12-276 | Mark W. Prince | U.S. Bank NA, Suntrust Bank, SunTrust Equipment Finance & Leasing Corporation, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Violation of Article X, Section 10 of the Virginia Constitution, Lending of Credit, stock subscriptions, and works fo internal improvement |

Page 3

Case 5:13-cv-00045-MFU   Document 30-3   Filed 02/21/14   Page 4 of 8   PageID#: 724

Exhibit C

Sorted by Claims

| Case | Name | Parties | Date | Motion | Claims |
|---|---|---|---|---|---|
| Case 5:13-cv-45 | Mark W. Prince | Virginia Resources Authority, Shenandoah BOS, U.S. Bank NA, Suntrust Bank, Suntrust Equipment Finance & Leasing Corporation & Others to be determined | 4/15/13 | Motion for Judgment | Violation of Federal False Claims Act 31 U.S.C. § 3729, et seq. ¶¶ 7-8 Violation of the Virginia Constitution Article X, Section 10, ¶¶ 14, 30, Violation of Virginia Constitution Article VII, |
| CL12-276 | Mark W. Prince | U.S. Bank NA, Suntrust Bank, SunTrust Equipment Finance & Leasing Corporation, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Violation of the Virginia Constitution Article X, Section 8 Limit of tax or revenue; No other or greater amount of tax or revenues shall, at any time, |
| CL12-283 | Mark W. Prince | Suntrust Bank, CEDE & Co., and All other Bond Holders Demanding Payment from Virginia Government and | 3/5/13 | Motion to Amend, Ammended [sic] Motion for Judgment | Violation of the Virginia Constitution Article X, Section 8 Limit of tax or revenue; No other or greater amount of tax or revenues shall, at any time, |
| CL12-406 | Mark W. Prince | U.S. Bank NA, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Violation of the Virginia Constitution Article X, Section 8 Limit of tax or revenue; No other or greater amount of tax or revenues shall, at any time, |
| CL12-276 | Mark W. Prince | U.S. Bank NA & Others to be determined, Commonwealth of Virginia | 8/1/12 | Motion for Judgment | Violation of the Virginia Fraud Against Taxpayer's Act - § 8.01-216.3.6, Knowingly buys or receives as a pledge of an obligation or debt, public |

Page 4

Exhibit C

Sorted by Claims

| | | | | |
|---|---|---|---|---|
| CL12-283 | Mark W. Prince | Suntrust Bank, CEDE & Co., and All other Bond Holders Demanding Payment from Virginia Government and Taxpayers for Moral Obligation Bonds. Commonwealth of Virginia | 3/5/13 | Motion to Amend, Ammended [sic] Motion for Judgment | Violation of the Virginia Fraud Against Taxpayers Act - § 8.01-216.3 (6), Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the Commonwealth who lawfully may not sell or pledge the property |
| CL12-406 | Mark W. Prince | Shenandoah County BOS, Virginia Resources Authority, Carolyn Madden Perry of Bodkin Rose, Jay Litten of Litten & Sipe & Others to be Determined | 11/21/12 | Motion for Judgment | Violation of the Virginia Fraud Against Taxpayers Act - § 8.01-216.3 A 6, Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the Commonwealth who lawfully may not sell or pledge the property |
| CL12-406 | Mark W. Prince | U.S. Bank NA, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Violation of the Virginia Fraud Against Taxpayers Act - § 8.01-216.3 A 6, Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or |

Page 5

201

Case 5:13-cv-00045-MFU    Document 30-3    Filed 02/21/14    Page 6 of 8    Pageid#: 726

Exhibit C

Sorted by Claims

| | | | | |
|---|---|---|---|---|
| CL12-276 | Mark W. Prince | U.S. Bank NA, Suntrust Bank, SunTrust Equipment Finance & Leasing Corporation, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Violation of the Virginia Fraud Against Taxpayers Act - § 8.01-216.3.6, Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the Commonwealth who lawfully may not sell or pledge the property |
| CL12-283 | Mark W. Prince | Suntrust Bank and All other Bond Holders Demanding Payment from Virginia Government and Taxpayers for Moral Obligation Bonds. Commonwealth of Virginia | 8/3/12 | Complaint | Violation of the Virginia Fraud Against Taxpayers Act - § 8.01-216.3.6, Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the Commonwealth who lawfully may not sell or pledge the |
| CL12-406 | Mark W. Prince | Shenandoah County BOS, Virginia Resources Authority, Carolyn Madden Perry of Bodkin Rose, Jay Litten of Litten & Sipe & Others to be Determined | 11/21/12 | Motion for Judgment | Violation of the Virginia Fraud Against Taxpayers Act § 8.01-216.3 A (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval |

Page 6

Exhibit C

Sorted by Claims

| Claim # | Name | Defendant | Date | Motion | Violation |
|---|---|---|---|---|---|
| CL12-406 | Mark W. Prince | U.S. Bank NA, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Violation of the Virginia Fraud Against Taxpayers Act § 8.01-216.3 A (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval |
| CL12-276 | Mark W. Prince | U.S. Bank NA, Suntrust Bank, SunTrust Equipment Finance & Leasing Corporation, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Violation of the Virginia Fraud Against Taxpayers Act § 8.01-216.3(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval |
| CL12-283 | Mark W. Prince | Suntrust Bank, CEDE & Co., and All other Bond Holders Demanding Payment from Virginia Government and Taxpayers for Moral | 3/5/13 | Motion to Amend, Ammended [sic] Motion for Judgment | Violation of the Virginia Fraud Against Taxpayers Act § 8.01-216.3(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval |
| CL12-276 | Mark W. Prince | U.S. Bank NA, Suntrust Bank, SunTrust Equipment Finance & Leasing Corporation, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Violation of Virginia Code § 15.2-2606 Public hearing before issuance of bonds |

Exhibit C

Sorted by Claims

| | | | | |
|---|---|---|---|---|
| CL12-276 | Mark W. Prince | U.S. Bank NA, Suntrust Bank, SunTrust Equipment Finance & Leasing Corporation, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Violation of Virginia Code §15.2-2636 Ordinance or resolution to provide for the issue of bonds |
| Case 5:13-cv-45 | Mark W. Prince | Virginia Resources Authority & Others to be determined | 9/3/13 | Motion to Amend, Amended Motion for Judgment | Violation of Virginia Constitution Article 10, Section 10, Fraudulent Lease Purchase in violation of Va. Code § 15.2-1800. Violation of Virginia Fraud |
| CL12-406 | Mark W. Prince | U.S. Bank NA, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Violation of Virginia Constitution Article VII Section 10(a)(3) Bonds of a city or town the principal and interest on which are payable exclusively from the revenues and receipts of a water system or other specific undertaking or undertakings from which the city or town may derive a revenue or secured, solely or together with such revenues, by contributions of other units of government. |

Page 8

204

Case 5:13-cv-00045-MFU   Document 30-4   Filed 02/21/14   Page 1 of 9   Pageid#: 729

Exhibit D

Sorted by Defendants

| Case No. | Plaintiff | Defendants | Date | Item | Claims |
|---|---|---|---|---|---|
| CL12-406 | Mark W. Prince | Shenandoah County BOS, Virginia Resources | 4/22/13 | Final Order | Motion to Amend Complaint Denied, Plaintiff consents to |
| CL12-406 | Mark W. Prince | Shenandoah County BOS, Virginia Resources Authority, Carolyn Madden Perry of Bodkin Rose, Jay Litten of Litten | 11/21/12 | Motion for Judgment | Violation to Article VII Section 10 A (3) The Requirement to Produce Enough Revenue to Pay for the Undertaking. |
| CL12-406 | Mark W. Prince | Shenandoah County BOS, Virginia Resources Authority, Carolyn Madden Perry of Bodkin Rose, Jay Litten of Litten & Sipe & Others to be Determined | 11/21/12 | Motion for Judgment | Violation of the Virginia Fraud Against Taxpayers Act - § 8.01-216.3 A 6, Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the Commonwealth who lawfully may not sell or pledge the property |
| CL12-406 | Mark W. Prince | Shenandoah County BOS, Virginia Resources Authority, Carolyn Madden Perry of Bodkin Rose, Jay Litten of Litten & Sipe & Others to be Determined | 11/21/12 | Motion for Judgment | Violation of the Virginia Fraud Against Taxpayers Act § 8.01-216.3 A (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval |

Page 1

205

Exhibit D

Sorted by Defendants

| CL12-409 | Mark W. Prince | Shenanhoah BOS | 2/14/13 | Final Order | Marsha Shruntz having intervened as party Plaintiff, by counsel Bradley G. Pollack. Sustained Shenandoah BOS Special Plea of Statute of Limitations. Shenandoah BOS demurrer rendered moot. Denied Shenandoah BOS motion for sanctions. Case dismissed with prejudice. |
| --- | --- | --- | --- | --- | --- |
| CL12-409 | Mark W. Prince | Shenanhoah BOS | 11/26/12 | Motion for Judgment | Bond Contest under Va. Code § 15.2-2627 |
| CL12-239 | Mark W. Prince | Suntrust Bank, Virginia Resources Authority, RSW Regional Jail Authority, Shenandoah County BOS | 7/2/12 | Complaint | Motion to Declare Bonds Issued by Virginia Resources Authority to Purchase RSW Regional Jail Authority Bonds Null and Void |
| CL12-239 | Mark W. Prince | Suntrust Bank, Virginia Resources Authority, RSW Regional Jail Authority, Shenandoah County BOS | 7/2/12 | Complaint | Motion to Declare Bonds Issued to RSW Regional Jail Authority and Guaranteed by Shenandoah County BOS Null and Void |
| CL12-239 | Mark W. Prince | Suntrust Bank, Virginia Resources Authority, RSW Regional Jail Authority, Shenandoah County BOS | 7/2/12 | Complaint | Motion to Declare RSW Regional Jail Authority Note in Favor of Suntrust Bank Null and Void |

Page 2

Exhibit D

Sorted by Defendants

| | | | | | |
|---|---|---|---|---|---|
| CL12-239 | Mark W. Prince | Sunstrust Bank, Virginia Resources Authority, RSW Regional Jail Authority, Shenandoah County BOS | 7/2/12 | Complaint | Motion to Declare RSW Regional Jail Authority Service Agreement Null and Void |
| CL12-239 | Mark W. Prince | Sunstrust Bank, Virginia Resources Authority, RSW Regional Jail Authority, Shenandoah County BOS | 10/17/12 | Final Order | Sustained Plea in Bar as to Counts II and III, Overrules Plea in Bar as to Counts I and IV, Sustains VRA Demurrer, Sustains RSW Regional Jail Authority as to Counts II and III, Overrules Plea in Bar of RSW Regional Jail Authority, Sustains the demurrer of RSW Regional Jail Authority to all Counts, Sustains the demurrer of Shenandoah BOS as to all Counts, Dismissed Complaint without leave to amend. Denies VRA motion for a protective order as moot. |
| CL12-283 | Mark W. Prince | Suntrust Bank and All other Bond Holders Demanding Payment from Virginia Government and Taxpayers for Moral Obligation Bonds. Commonwealth of | 8/3/12 | Complaint | Violation of the Virginia Fraud Against Taxpayers Act - § 8.01-216.3.6, Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the |

Page 3

Case 5:13-cv-00045-MFU　Document 30-4　Filed 02/21/14　Page 4 of 9　Pageid#: 732

Exhibit D

Sorted by Defendants

| Case | Plaintiff | Defendants | Date | Motion | Description |
|---|---|---|---|---|---|
| CL12-283 | Mark W. Prince | Suntrust Bank and Others to be Determined | 4/22/13 | Final Order | Motion to Amend Complaint Denied, Plaintiff consents to voluntary dismissal, Dismissed and stricken from the docket. "Court admonishes Plaintiff that |
| CL12-283 | Mark W. Prince | Suntrust Bank, CEDE & Co., and All other Bond Holders Demanding Payment from Virginia Government and | 3/5/13 | Motion to Amend, Ammended [sic] Motion for Judgment | Violation of Article VII, Section 10 Latin Maxim Expressio Unius Est Exclusio Alterius, Rule of Statutory Construction |
| CL12-283 | Mark W. Prince | Suntrust Bank, CEDE & Co., and All other Bond Holders Demanding Payment from Virginia Government and Taxpayers for Moral Obligation Bonds. Commonwealth of Virginia | 3/5/13 | Motion to Amend, Ammended [sic] Motion for Judgment | Violation of the Virginia Constitution Article X, Section 8 Limit of tax or revenue; No other or greater amount of tax or revenues shall, at any time, be levied than may be required for the necessary expenses of government, or the pay the indebtedness of the |
| CL12-283 | Mark W. Prince | Suntrust Bank, CEDE & Co., and All other Bond Holders Demanding Payment from Virginia Government and | 3/5/13 | Motion to Amend, Ammended [sic] Motion for Judgment | Violation of the Virginia Fraud Against Taxpayers Act - § 8.01-216.3 (6), Knowingly buys or receives as a pledge of an obligation or debt, public |

Page 4

Exhibit D

Sorted by Defendants

| | | | | | |
|---|---|---|---|---|---|
| CL12-283 | Mark W. Prince | Suntrust Bank, CEDE & Co., and All other Bond Holders Demanding Payment from Virginia Government and Taxpayers for Moral Obligation Bonds. Commonwealth of Virginia | 3/5/13 | Motion to Amend, Ammended [sic] Motion for Judgment | Violation of the Virginia Fraud Against Taxpayers Act § 8.01-216.3(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval |
| CL12-276 | Mark W. Prince | U.S. Bank NA & Others to be determined, Commonwealth of Virginia | 8/1/12 | Motion for Judgment | Violation of the Virginia Fraud Against Taxpayer's Act - § 8.01-216.3.6, Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the Commonwealth who lawfully may not sell or pledge the property (VRA not named as |
| CL12-276 | Mark W. Prince | U.S. Bank NA, & Others to be determined | 4/22/13 | Final Order | Motion to Amend Complaint Denied, Plaintiff consents to voluntary dismissal, Dismissed and stricken from the docket. "Court admonishes Plaintiff that any further filings in this Court challenging the funding of public projects by or on behalf of Shenandoah County, based upon the same or substantially |

Page 5

Case 5:13-cv-00045-MFU   Document 30-4   Filed 02/21/14   Page 6 of 9   Pageid#: 734

Exhibit D

Sorted by Defendants

| | | | | |
|---|---|---|---|---|
| CL12-406 | Mark W. Prince | U.S. Bank NA, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Lending of credit, stock subscriptions and works of internal improvement |
| CL12-406 | Mark W. Prince | U.S. Bank NA, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Violation of Article VII, Section 10 |
| CL12-406 | Mark W. Prince | U.S. Bank NA, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Violation of the Virginia Constitution Article X, Section 8 Limit of tax or revenue; No other or greater amount of tax or revenues shall, at any time, be levied than may be required for the necessary expenses of government, or the pay the indebtedness of the Commonwealth |
| CL12-406 | Mark W. Prince | U.S. Bank NA, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Violation of the Virginia Fraud Against Taxpayers Act - § 8.01-216.3 A 6, Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the Commonwealth who lawfully may not sell or pledge the property. |

Page 6

Case 5:13-cv-00045-MFU   Document 30-4   Filed 02/21/14   Page 7 of 9   PageId#: 735

Exhibit D

Sorted by Defendants

| | | | | | |
|---|---|---|---|---|---|
| CL12-406 | Mark W. Prince | U.S. Bank NA, & Others to be determined | Motion to Amend, Amended Motion for Judgment | 3/4/13 | Violation of the Virginia Fraud Against Taxpayers Act § 8.01-216.3 A (1) Knowlingly presents, or causes to be presented, a false or fraudulent claim for payment or approval |
| CL12-406 | Mark W. Prince | U.S. Bank NA, & Others to be determined | Motion to Amend, Amended Motion for Judgment | 3/4/13 | Violation of Virginia Constitution Article VII Section 10(a)(3) Bonds of a city or town the principal and interest on which are payable exclusively from the revenues and receipts of a water system or other specific undertaking or undertakings from which the city or town may derive a revenue or secured, |
| CL12-276 | Mark W. Prince | U.S. Bank NA, Suntrust Bank, SunTrust Equipment Finance & Leasing Corporation, & Others to be determined | Motion to Amend, Amended Motion for Judgment | 3/4/13 | Violation of Article VII, Section 10 Latin Maxim Expressio Unius Est Exclusio Alterius, Rule of Statutory Construction |
| CL12-276 | Mark W. Prince | U.S. Bank NA, Suntrust Bank, SunTrust Equipment Finance & Leasing Corporation, & Others to be determined | Motion to Amend, Amended Motion for Judgment | 3/4/13 | Violation of Article X, Section 10 of the Virginia Constitution, Lending of Credit, stock subscriptions, and works fo internal improvement |

Page 7

Case 5:13-cv-00045-MFU Document 30-4 Filed 02/21/14 Page 8 of 9 Pageid#: 736

Exhibit D

Sorted by Defendants

| | | | | | |
|---|---|---|---|---|---|
| CL12-276 | Mark W. Prince | U.S. Bank NA, Suntrust Bank, SunTrust Equipment Finance & Leasing Corporation, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Violation of the Virginia Constitution Article X, Section 8 Limit of tax or revenue; No other or greater amount of tax or revenues shall, at any time, be levied than may be required |
| CL12-276 | Mark W. Prince | U.S. Bank NA, Suntrust Bank, SunTrust Equipment Finance & Leasing Corporation, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Violation of the Virginia Fraud Against Taxpayers Act - § 8.01-216.3.6, Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or |
| CL12-276 | Mark W. Prince | U.S. Bank NA, Suntrust Bank, SunTrust Equipment Finance & Leasing Corporation, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Violation of the Virginia Fraud Against Taxpayers Act § 8.01-216.3(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval |
| CL12-276 | Mark W. Prince | U.S. Bank NA, Suntrust Bank, SunTrust Equipment Finance & Leasing Corporation, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Violation of Virginia Code § 15.2-2606 Public hearing before issuance of bonds |
| CL12-276 | Mark W. Prince | U.S. Bank NA, Suntrust Bank, SunTrust Equipment Finance & Leasing Corporation, & Others to be determined | 3/4/13 | Motion to Amend, Amended Motion for Judgment | Violation of Virginia Code §15.2-2636 Ordinance or resolution to provide for the issue of bonds |

Page 8

Case 5:13-cv-00045-MFU   Document 30-4   Filed 02/21/14   Page 9 of 9   Pageid#: 737

Exhibit D

Sorted by Defendants

| | | | | |
|---|---|---|---|---|
| Case 5:13-cv-45 | Mark W. Prince | Virginia Resources Authority & Others to be determined | 9/3/13 | Motion to Amend, Amended Motion for Judgment | Violation of Virginia Constitution Article 10, Section 10, Fraudulent Lease Purchase in violation of Va. Code § 15.2-1800. Violation of Virginia Fraud Against Taxpayer Act |
| Case 5:13-cv-45 | Mark W. Prince | Virginia Resources Authority, Shenandoah BOS, U.S. Bank NA, Suntrust Bank, Suntrust Equipment Finance & Leasing Corporation & Others to be Determined | 4/15/13 | Motion for Judgment | Violation of Federal False Claims Act 31 U.S.C. § 3729, et seq. ¶¶ 7-8 Violation of the Virginia Constitution Article X, Section 10, ¶¶ 14, 30, Violation of Virginia Constitution Article VII, Section 10, ¶¶ 33-34 Violation of Virginia Constitution Article X, Section 8, Limit of tax or revenue; No other greater amount of tax or revenues shall, at any time, be levied than may be required for the necessary expenses of the government, or |

Page 9

VIRGINIA: IN THE CIRCUIT COURT FOR THE COUNTY OF SHENANDOAH

COMMONWEALTH OF VIRGINIA,

                              Plaintiff,

Mark W. Prince

v.                                        $CL12-276$

U.S. Bank National Association

& Others to be determined

        [SERVE:    Attorney General Kenneth Thomas Cuccinelli II
                   900 East Main Street
                   Richmond, VA 23219]

                Defendants.

## MOTION FOR JUDGMENT

Mark William Prince brings this civil action against Defendants, U.S. Bank

National Association and others in the name of the Commonwealth of Virginia as well as

in his own name, for violations of the Virginia Fraud Against Taxpayers Act § 8.01-216.1

*et seq.,* pursuant to Virginia Code § 8.01-216.5(B), which is filed *in camera, and shall*

*remain under seal for at least 120 days, and shall not be served on the defendant until the*

*court so orders*:

## PARTIES

1. Mr. Prince brings this action on behalf of the Commonwealth of Virginia pursuant

to Virginia Code §8.01-216.1 *et seq.* The Commonwealth is therefore a party to this

action.  Mr. Prince has taken all steps required by Virginia Code §8.01-216.1 *et seq.*, including serving a Disclosure Memorandum and copies of all material evidence on the Commonwealth prior to filing this action pursuant to Virginia Code §8.01-216.5 (B).

2.  Defendant U S National Bank Association was the Bond Purchaser and assigned as the Trustee in the "LEASE AGREEMENT".  Within the 'LEASE AGREEMENT' the "VRA has agreed to assign to the Trustee as security for the Bonds all of its right title and interest in and to the Lease and Financing Lease (Collectively, the "Basic Documents"). U.S. Bank National Association operates as a bank which offers loans and depositary services. U.S. Bank National Association was formerly known as Firstar Bank, National Association and it changed its name to U.S. Bank National Association in August, 2001. The bank was founded in 1863 and is based in Cincinnati, Ohio. U.S. Bank National Association operates as a subsidiary of U.S. Bancorp.

3.  Others to be determined

**COUNT ONE-VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYER'S ACT-§ 8.01-216.3.6  Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the Commonwealth who lawfully may not sell or pledge the property.**

Defendants U.S. Bank National Association and Others have:

1. Knowingly presented, or caused to be presented, or facilitated to an officer or employee of the Commonwealth false information or a fraudulent scheme in which Shenandoah County Supervisors and other Governmental Agencies were convinced that a referendum as required by Article VII, Section 10, was not mandatory when they created long term debt by issuing Moral Obligation Bonds. This scheme presented to governmental bodies across the State of Virginia and is hereafter known as a "Lease to Own Agreement" whereby the Governmental Agency pays yearly, forgoing the requirement of a referendum of the voters. The legal process, which is defined by Article VII, Section 10 of the Constitution of Virginia, requires a referendum. Complying with the Constitution requires that a referendum is held and passes, if long term debt is assumed. If a referendum is passed by the Voters, General Obligation Bonds are issued at a low interest rate which is currently around 1.9%. The General Obligation Bonds receive the lowest interest rate, because they are backed by the full faith and backing of the State of Virginia. The Bonds, issued through this "Lease to Own Agreement" are Moral Obligation bonds which are not backed by the Commonwealth and are therefore approximately twice the interest rate or currently about 4%. This "Lease to Own Agreement" Scheme does not comport with Article VII, Section 10 of the Virginia Constitution.

2. This type contract "LEASE AGREEMENT' is illegal in part because the debt

incurred is binding on successive Boards of Supervisors or Governmental Agencies. An example is stated on page 295, Section 1. General Covenants (a) of the $15,760,000 SHENANDOAH COUNTY, VIRGINIA, FINANCING LEASE, (Courthouse and Social Services Building Project), Closing Date: November 19, 2009, hereafter known as the "LEASE AGREEMENT". The "LEASE AGREEMENT" states that "VRA acknowledges within this that the Financing Lease contains certain interest in the Real Estate and which are binding on successors in interest in the Real Estate and which include matters relating to maintenance, repair, insurance, taxes, damage and destruction with respect to the Real Estate". This binding of future Board of Supervisors is illegal as stated in the Attorney General's Opinion OP. NO. 03-108 which states "Neither Virginia Constitution nor applicable state statues allow governing body to adopt adequate public facilities ordinance that binds, directly or indirectly, future governing body to fund capital improvements program at specific level and authorizes approval of proposed to be deferred for a specified number of years."

3. The Virginia Resources Authority has not been provided the authority conferred by the General Assembly nor by general law to make such contracts or "LEASE AGREEMENTS" and U.S. Bank National Association the though Successor Trustee as stated in the "LEASE AGREEMENT" does not have the authority to issue such a contract.

4. These contracts are considered long term debt as defined by the Constitution and are being portrayed under the guise of a yearly payment in the "Lease to Own Agreement". This is in violation of Article VII, Section 10 of the Constitution of Virginia and an example of this prohibited long term debt is found in Fiscal Year 2013 Shenandoah County Budget, under forecasted debt in the Shenandoah County FY 13 approved budget as line item 8254.

5. The Virginia Resources Authority represents, warrants, covenants and agrees that the Deed of Trust is lawfully executed and delivered in conformity with the Financing Lease and the Indenture and therefore the U.S. Bank National Association, having purchased the Bonds and having been appointed by the Virginia Resources Authority and accepted as its Successor Trustee, also represents, warrants, covenants and agrees that this Deed of Trust is lawfully executed and delivered in conformity with the Financing Lease and the Indenture, when in fact the "Lease to Own Agreement" scheme was in violation of Article VII Section 10 (b) of the Constitution of Virginia.

6. There is an interest rate DIFFERENCE between the General Obligation Bonds and the Moral Obligation Bonds. This DIFFERENCE, which is almost 2%, is the amount that the Virginia Taxpayers are being defrauded by this "LEASE TO OWN" scheme. In this single "LEASE AGREEMENT" almost 5 million dollars are being defrauded from the Taxpayers by the Defendants.

7.  There are many such "LEASE AGREEMENTS" that the VRA has issued

throughout the State of Virginia within the last 6 years that we do not have access to and

request that all of these "Lease to Own" schemes fall under the auspices of being

revealed by Mr. Prince.

WHEREFORE, Mark William Prince and the Commonwealth of Virginia demand

judgment against Defendant U.S. Bank National Association and Others , for a civil

penalty of $11,000,  plus three times the amount of damages sustained by the

Commonwealth, and all other equitable relief allowed under the law, plus reasonable

expenses that the court finds to have been necessarily incurred, reasonable attorneys' fees,

costs and other relief allowed  by the Virginia Fraud Against Taxpayer's Act.

Mr. Prince demands a trial by jury.

Respectfully Submitted,

MARK WILLIAM PRINCE
390 Brook Creek Road
Toms Brook, VA  22660
540-325-0750
mark@sunpeakusa.com

A True Copy Teste:
DENISE B. ESTEP, CLERK

By: _____ D.C.



# COMMONWEALTH of VIRGINIA

### Office of the Attorney General

Kenneth T. Cuccinelli, II
Attorney General

September 28, 2012

900 East Main Street
Richmond, Virginia 23219
804-786-2071
FAX 804-786-1991
Virginia Relay Services
800-828-1120
7-1-1

John R. Roberts, Esquire
County Attorney for Loudoun County
Office of the County Attorney
1 Harrison Street, S.E.
5th Floor, MSC#06
Leesburg, Virginia 20175-3102

Dear Mr. Roberts:

I am responding to your request for an official advisory opinion in accordance with § 2.2-505 of the Code of Virginia.

### Issue Presented

You inquire whether Loudoun County ("County") may apply proceeds of general obligation bonds issued by the County for one project, but no longer needed for that project, to a different project, when each project has been approved at referendum by the qualified voters of the County.

### Response

It is my opinion that a county may not apply proceeds of general obligation bonds issued by the county for one project to a different project unless the resolution or ordinance adopted by the county and submitted to the qualified voters authorizes the application of the bond proceeds to the other project.

### Background

You relate that the County has a Capital Improvement Program ("CIP") for a series of projects extending over a number of years. To fund that CIP, the County conducts a bond referendum each year to ask the voters to consider whether to approve the issuance of general obligation debt for specified projects. You also note that the County is very specific in its bond resolutions, typically reciting a specific amount to be authorized for each project listed in the referendum. In each fiscal year, the County projects the anticipated funding needed to construct approved projects and determines the amount of general obligation debt to be issued. In some instances, a project will be completed under budget, and the County may have issued more debt than needed for that project. You also indicate that the County can use the leftover funds to pay debt service on the bonds or use the funds to call or defease the bonds.

### Applicable Law and Discussion

The Constitution of Virginia provides that:

John R. Roberts, Esq.
September 28, 2012
Page 2

[n]o debt shall be contracted by or on behalf of any county or district thereof or by or on behalf of any regional government or district thereof except by authority conferred by the General Assembly by general law. The General Assembly shall not authorize any such debt ... unless in the general law authorizing the same, provision be made for submission to the qualified voters of the county or district thereof or the region or district thereof, as the case may be, for approval or rejection by a majority vote of the qualified voters voting in an election on the question of contracting such debt. Such approval shall be a prerequisite to contracting such debt.[1]

The authority of a county to contract debt is set forth in general law pursuant to the Public Finance Act of 1991 ("Public Finance Act").[2]  The Public Finance Act provides that "any locality may ... contract debts for any project, borrow money for any project and issue bonds to pay all or any part of the cost of acquiring, constructing, reconstructing, improving, extending, enlarging and equipping any project."[3]  As the constitutional provision requires, however, this authority is limited in that, generally, "no county has the power to contract any debt or to issue its bonds unless a majority of the voters of the county voting on the question at an election held in accordance with §§ 15.2-2610 and 15.2-2611 approve contracting the debt, borrowing the money and issuing the bonds."[4]

The Public Finance Act establishes the procedures a county must follow to contract debt and issue general obligation bonds.  First, the county "shall adopt an ordinance or resolution setting forth in brief and general terms *the purpose or purposes for which the bonds are to be issued* and the maximum amount of the bonds to be issued."[5]  When voter approval is required, the ordinance or resolution must also "request the circuit court to order an election to be held pursuant to §§ 15.2-2610 and 15.2-2611 on the question of contracting the debt and issuing the proposed bonds."[6]  Once certified by the clerk of the governing body, a copy of such resolution or ordinance is to be filed with the circuit court serving the locality."  Then, "[t]he circuit court shall order a special election . . . [to] take the sense of the voters of the locality on the question of contracting the debt and issuing bonds *for the purpose or purposes set forth in the resolution or ordinance*."[8]  Finally, "[i]f a majority of the voters of the locality voting on the question approve the bond issue . . . [t]he locality may then proceed to prepare, issue and sell its bonds up to the amount so authorized . . . ."[9]

Once the bond has been approved, the governing body is bound by the terms of the ordinance or resolution it submitted to the voters.  The Supreme Court of Virginia has declared that "[t]he issuance of bonds pursuant to an election [by the voters of the respective county] must be in conformity with the terms and conditions of the submission [to such voters,]"[10] which, as noted above, is required to set forth

---

[1] VA. CONST. art. VII, § 10(b).

[2] VA. CODE ANN. §§ 15.2-2600 through 15.2-2663 (2012).

[3] VA. CODE ANN. § 15.2-2604(2).  *See* § 15.2-2602 (defining "cost" and "project" broadly).

[4] Section § 15.2-2638(A) (2012).  There are specific exceptions to the general requirement, but none of the exceptions are germane to the facts set forth underlying the question presented.  *See* § 15.2-2638(B).

[5] Section 15.2-2640 (2012) (emphasis added).

[6] *Id.*

[7] Section 15.2-2610.

[8] *Id.* (emphasis added).

[9] Section 15.2-2611.

[10] Miller v. Ayres, 211 Va. 69, 78, 175 S.E.2d 253, 259 (1970).

John R. Roberts, Esq.
September 28, 2012
Page 3

"*the purpose or purposes for which the bonds are to be issued* and the maximum amount of the bonds to be issued."[11]  As this office consistently has opined, the proceeds of a bond issue may be used only for the purpose for which the bonds were issued[12] as expressed in the submission to voters.[13]  Although the question submitted to voters may be worded specifically or generally,[14] a board of supervisors is bound by that language and, therefore, may not use bond proceeds for any use other than that expressly approved by the voters, as set forth in the bond referendum.[15]  Thus, if the resolution or ordinance approved by the voters sets forth a separate authorization amount for each project listed therein without language to permit the use of leftover bond funds authorized for one of the listed projects to be applied to another project listed in the resolution or ordinance, the governing body is bound by the language used and cannot reallocate those proceeds.

**Conclusion**

Accordingly, it is my opinion that a county may not apply proceeds of general obligation bonds issued by the county for one project to a different project unless the resolution or ordinance adopted by the county and submitted to the qualified voters authorizes the application of the bond proceeds to the other project.

With kindest regards, I am

Very truly yours,

Kenneth T. Cuccinelli, II
Attorney General

---

[11] Section 15.2-2640 (emphasis added).

[12] *See* Ops. Va. Att'y Gen.: 1950-51 at 31; 1960-61 at 260; 1956-57 at 225; 1964-65 at 293.

[13] *See* 1956-57 Op. Va. Att'y Gen. 225; 2001 Op. Va. Att'y Gen. 44, 45 n.3 and citations therin.

[14] *See* 1960-61 Op. Va. Att'y Gen. 260, 263 (if question submitted to voters uses specific language, even if not required, school board's use of bond proceeds is confined by the specific language used).

[15] *Id. See also* 1970-71 Op. Va. Att'y Gen. 39, 40 (where bond referendum authorized $7.5 million in bonds for construction of two high schools and two elementary schools, school board may use bond proceeds for three of the voter-approved school buildings, although funds are insufficient to construct all four schools authorized); 2001 Op. Va. Att'y Gen. at 44 (where bond record indicated that a different site could be a possibility, the locality was authorized to build approved library on an alternate site).

VIRGINIA: IN THE CIRCUIT COURT FOR THE COUNTY OF SHENANDOAH

COMMONWEALTH OF VIRGINIA,

                        Plaintiff,

Mark W. Prince

v.

Shenandoah County Board of Supervisors
Virginia Resources Authority
Carolyn Madden Perry of Bodkin Rose
Jay Litten of Litten and Sipe
& Others to be determined

        [SERVE:    Attorney General Kenneth Thomas Cuccinelli II
                    Attn: Guy Horsley
                    900 East Main Street
                    Richmond, VA 23219]

                Defendants.

## MOTION FOR JUDGMENT

Mark William Prince brings this civil action against Defendants, Shenandoah

County Board of Supervisors and others in the name of the Commonwealth of Virginia as

well as in his own name, for violations of the Virginia Fraud Against Taxpayers Act §

8.01-216.1 *et seq.,* pursuant to Virginia Code § 8.01-216.5(B), which is filed *in camera,*

*and shall remain under seal for at least 120 days, and shall not be served on the*

*defendant until the court so orders*:

## PARTIES

1. Mr. Prince brings this action on behalf of the Commonwealth of Virginia pursuant to Virginia Code §8.01-216.1 *et seq.* The Commonwealth is therefore a party to this action. Mr. Prince has taken all steps required by Virginia Code §8.01-216.1 *et seq.,* including serving a Disclosure Memorandum and copies of all material evidence on the Commonwealth prior to filing this action pursuant to Virginia Code §8.01-216.5 (B).

2. Defendant Shenandoah County Board of Supervisors located at 600 North Main Street, Suite 102, Woodstock Virginia  22664 was the bond issuer.

3. Virginia Resources Authority located at  1111 E Main Street Suite 1920, Richmond, Virginia 23219 was the bond purchaser for the Shenandoah County Board of Supervisors bond.

4. Carolyn Madden Perry of Bodkin Rose located at 3190 Peoples Drive, Harrisonburg, Virginia 22801 was the bond attorney for the Shenandoah County Board of Supervisors.

5. Jay Litten of Litten Sipe located at 410 Neff Avenue, Harrisonburg, Virginia 22801 was the attorney for the Shenandoah County Board of Supervisors.

6. To Be Determined.

## COUNT ONE-VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYER'S ACT-

**§ 8.01-216.3 A (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.**

Defendants Shenandoah County Board of Supervisors, Jay Litten and Carolyn Madden Perry have:

1.  Knowingly presented, or caused to be presented, or facilitated to an officer or employee of the Commonwealth false information or a fraudulent scheme in which Shenandoah County Supervisors sold a revenue bond that was in violation of Article VII, Section 10 (3) of the Virginia Constitution.  Subsection (3) states; "Bonds of a city or town the principal and interest on which are payable exclusively from the revenues and receipts of a water system or other specific undertaking or undertakings from which the city or town may derive a revenue or secured, solely or together with such revenues by contributions of other units of government".  Financial documents show the Shenandoah County Board of Supervisors used the same unit of government, both found in Shenandoah County's budget (Shenandoah Area Agency on Aging and the Shenandoah County Parks and Recreation), instead of "other units of government" to show revenue for the "Old Edinburg School Project" without the requirement of a referendum of the voters.  The legal process, that should have been followed is defined by Article VII,

Section 10 of the Constitution of Virginia, requires a referendum in this specific case.

Complying with the Constitution requires that "other units of Government" supply the

revenue for the project.  This is because if a county incurs long term debt, which an

obligation of this kind was to supply financing for a project, a referendum is required by

the county.  A referendum was not held as required by the Constitution.  Additionally the

moral obligation bonds that were purchased from the Virginia Resources Authority are

considered debt by Local Governments because the exclusion found in Article X, Section

9 (d) is not applicable to Local Government and only applies to "obligation incurred by

the Commonwealth or any institution, agency, or authority thereof if the full faith and

credit of the Commonwealth is not pledged or committed to the payment of such

obligation."

2.  Defendants were warned, in the public meeting held as required by Virginia Code,

on October 23, 2012 by the plaintiff to follow the Virginia Constitution and they each

stated that they were not violating any provisions of the Constitution.

### COUNT TWO-VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYER'S ACT-

**§ 8.01-216.3 A (6) Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the Commonwealth who lawfully may not sell or pledge the property;**

Defendants Virginia Resources Authority and "Others" have:

3.      Defendants knowingly purchased this obligation from the Shenandoah

County Board of Supervisors in violation of the Virginia Fraud Against

Taxpayer's Act on November 15, 2012.

## COUNT THREE-VIOLATION OF ARTICLE VII SECTION 10 A (3) THE REQUIREMENT TO PRODUCE ENOUGH REVENUE TO PAY FOR THE UNDERTAKING -

Defendant Shenandoah County Board of Supervisors and others did:

4.      Defendant knowingly violated "Article VII Section 10 A (3) Bonds of a

city or town the principal and interest on which are payable exclusively from

the revenues and receipts of a water system or other specific undertaking or

undertakings from which the city or town may derive a revenue or secured,

solely or together with such revenues, by contributions of other units of

governments" by not including all debts required in the financial documents.

In the Supreme Court case **Town of South Hill v. Allen Virginia Supreme**

**Court 1941  it states;**  "The purpose of the bond issue must be "for a supply of

water or other specific undertaking from which the city or town may derive a

revenue.  "the manner of creating the indebtedness must be by an ordinance

enacted in accordance with another constitutional mandate and "approved by

the affirmative vote of the majority of the qualified voters of the city or town

voting upon the question."

So careful were the framers of the Constitution to preserve and protect the

credit of municipalities that they were unwilling to leave the question of the

success of the proposed venture to the exclusive judgment of the voters of the

municipality, as the section provides that, if, after a certain period, not

exceeding five years from the date of the election, the "undertaking fails to

produce sufficient revenue to pay for cost of operation and administration

(including interest on bonds issued therefor), and the cost of insurance against

loss by injury to persons or property, and an annual amount to be covered into

a sinking fund sufficient to pay, at or before maturity, all bonds issued on

account to said undertaking, all such bonds outstanding shall be included in

determining the limitation of the power to incur indebtedness, 162* unless the

principal and interest thereof be made payable exclusively from the receipts of

the undertaking."  The revenue/debt stream for the proposed project did not

include insurance as required and the margin between profit and loss of this

revenue would put the project at a net deficit which therefore violates the

Constitution.


WHEREFORE, Mark William Prince and the Commonwealth of Virginia demand

judgment against Defendant Shenandoah County Board of Supervisors, Virginia

Resources Authority, Carolyn Madden Perry, Jay Litten and Others, for a civil penalty of

$11,000, plus three times the amount of damages sustained by the Commonwealth, and

all other equitable relief allowed under the law, plus reasonable expenses that the court

finds to have been necessarily incurred, reasonable attorneys' fees, costs and other relief

allowed by the Virginia Fraud Against Taxpayer's Act.

Mr. Prince demands a trial by jury.

Respectfully Submitted,

MARK WILLIAM PRINCE
390 Brook Creek Road
Toms Brook, VA  22660
540-325-0750
mark@sunpeakusa.com

A True Copy Teste:
DENISE B. ESTEP, CLERK

By: _____ D.C.

VALIDATE CASE PAPERS
RCPT : 12000013737
DATE : 11/31/12 TIME: 09:32
CASE : 171CL12000406-00
ACCT : PRINCE, MARK W
AMT. :        $141.00

Appeal: 14-1690    Doc: 15    Filed: 09/24/2014    Pg: 232 of 316

March 4, 2013

*CL 12-276*

MOTION TO AMEND

COMES NOW the Plaintiff, Mark W. Prince, and moves for to amend the Complaint filed in this matter, and in support thereof states:

1. On August 1, 2012, Plaintiff filed a Motion for Judgment for case number CL12-276

2. It has come to the attention of plaintiff that a number of things have been reviled through investigation and change the scope and basis of this suit dramatically.

WHEREFORE, Plaintiff prays that he be granted leave to file the Amended Motion for Judgment attached hereto.

Respectfully Submitted,

Mark W. Prince
Pro Se,
394 Brook Creek Road
Toms Brook, VA  22660
540-325-0750
mark@sunpeakusa.com

A True Copy Teste:
DENISE B. ESTEP, CLERK

By: _____ D.C.

VIRGINIA:

   IN THE CIRCUIT COURT FOR THE COUNTY OF SHENANDOAH

COMMONWEALTH OF VIRGINIA,

Mark W. Prince

            Plaintiff,

v.                                            Civil Case NO. CL 12-276

U.S. Bank National Association,

Suntrust Bank,

SunTrust Equipment Finance &

Leasing Corporation,

& Others to be determined,                    

            Defendants.

## AMENDED MOTION FOR JUDGMENT

   Mark William Prince brings this civil action against Defendants U.S.

Bank National Association, Suntrust Bank, SunTrust Equipment Finance &

Leasing Corporation and others in the name of the Commonwealth of

Virginia, for violations of the Virginia Fraud Against Taxpayers Act, Virginia

§ 8.01-216.1 et seq., specifically Virginia Code § 8.01-216.5(B), which is filed *in camera*:

PARTIES

1  Mr. Prince brings this action on behalf of the Commonwealth of Virginia pursuant to Virginia Code §8.01-216.1 et seq.  The Commonwealth is therefore a party to this action. Mr. Prince has taken all steps required by Virginia Code § 8.01-216.1 et seq., including serving a Disclosure Memorandum and copies of all material evidence on the Commonwealth prior to filing this amended action pursuant to Virginia Code §8.01-216.5(B).

2  Defendants:

A  U.S. Bank National Association

Principal Office:

800 NICOLLET MALL
MINNEAPOLIS, MN  55402

a  SCC ID: F1675265
b  Entity Type: **Foreign Corporation**
c  Jurisdiction of Formation: US
d  Date of Formation/Registration with Virginia SCC: 7/14/2006
e  Registered Agent/Registered Office
    CT CORPORATION SYSTEM
    4701 COX RD STE 301
    GLEN ALLEN, VA  23060

B  Suntrust Bank

Principal Office

303 PEACHTREE STREET NE
30TH FLOOR
ATLANTA, GA  30308

a  SCC ID: F1395864
b  Entity Type: **Foreign Corporation**
c  Jurisdiction of Formation: GA
d  Date of Formation/Registration with SCC: 10/1/1999
e  Registered Agent/Registered Office
   DANA S BRUCE
   919 E MAIN ST 13TH FL
   RICHMOND, VA  23219

C  SunTrust Equipment Finance & Leasing Corporation

Principal Office

300 EAST JOPPA ROAD STE. 700
TOWSON, MD  21286

a  SCC ID: 06848063
b  Entity Type: Corporation
c  Jurisdiction of Formation: VA
d  Date of Formation/Registration with SCC: 10/16/2007
e  Registered Agent/Registered Office
   SUNTRUST BANK
   919 E. MAIN ST, 18TH FL.
   RICHMOND, VA  23219

D  Others to be determined.

## COUNT ONE-VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT

### § 8.01-216.3 (1)  Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval

Defendants U.S. Bank National Association, Suntrust Bank, SunTrust

Equipment Finance & Leasing Corporation and Others have:

3   Knowingly presented, or caused to be presented, false claims for payments from Shenandoah County and/or various Local Government Units throughout the State of Virginia through contracts, obligations, or a "Lease to Own" scheme.  Lease to own contracts were found to create a type of debt within the 1902 Constitution Section 127, and relevant statutes on town debt.  1970-1971 Ops Va. Att'y Gen 398.

4   On page 47 of the Shenandoah County Lease to Own Agreement there is the following statement: "It is to be noted that the County has disclosed to VRA (Virginia Resources Authority) the Mandamus of the Court for the County to provide a new courthouse, which facilities constitute a part of the Project and shall be constructed upon a portion of the Project Land."  There was never a mandamus of the court ordering a new courthouse and this can be construed to be a false claim to gain financing. Commonwealth of Virginia v. Board of Supervisors, CL07000111-00.


### COUNT TWO - VIOLATION OF ARTICLE X, SECTION 10
### OF THE VIRGINIA CONSTITUTION

### Lending of credit, stock subscriptions, and works of internal improvement

5   Article X, Section 9 states: "No debt shall be contracted by or in behalf of the Commonwealth except as provided herein." Pessimum casu is

the violation of Article X, Section 10; where Section 10 states: "…This section shall not be construed to prohibit the General Assembly from establishing an authority *with power to insure and guarantee loans to finance industrial development and industrial expansion* and from making appropriations to such authority." *Emphasis noted.*

6   The Virginia Resources Authority, which was established in 1984 to insure and guarantee loans, has been using powers exceeding those granted by the General Assembly and beyond that which are authorized and restricted by the Constitution. The constitution limits or restricts these finance tools to industrial development and industrial expansion only. The various financial instruments issued to local governments are being used for *capital improvement and other non-industrial projects*, hence violating Article X Section 10 of the Virginia Constitution.  *Emphasis noted.*

7   The financial institutions triggered a violation of Virginia Code § 8.01-216.3(6) "*Knowingly buys* or receives as a *pledge of an obligation* or debt, public property *from an employee of the Commonwealth who lawfully may not* sell or *pledge the property*." Emphasis added. Virginia Code § 8.01-216.3(C) requires no proof of specific intent to defraud and Prince does not allege one. These have simply been illegal, and therefore false, claims,

which can be addressed by the inaptly named Virginia Fraud Against Taxpayers Act. *Emphasis noted.*

8   When we view these "Lease to Own" contracts we should view them as what they really are which is an illegal tool to incur debt without a referendum.  "We must look to the *purpose of the instruments, their substance and not their form.*  Merely giving to them a particular name or form [does] not take away the nature and effect of the transaction.  Bolling v. Hawthorne Coal Co., 197 Va. 544, 566, 90 S.E.2d 159, 168 (1955). *Emphasis noted.*

9   An Act to amend the Code of Virginia by adding in Chapter 3 of Title 8.01 an article numbered 19.1, consisting of sections numbered 8.01-216.1 through 8.01-216.19, relating to the Virginia Fraud Against Taxpayers Act was Approved April 17, 2002. This is the first case to test the Act to see if the Act can hold both the banks and the government liable for unlawfully taking billions of taxpayer dollars for capital improvement projects that were instituted in violation of the Virginia Constitution.


## COUNT THREE - VIOLATION OF ARTICLE VII, SECTION 10

### Latin Maxim Expressio Unius Est Exclusio Alterius, Rule of Statutory Construction

10 The moral obligation pledges issued by Counties, Cities and Towns violate Article VII, Section 10, and do so because these types of obligations, which do not incur the "full faith and credit of the Commonwealth," are only permitted to four entities of State Government granted through Article X, Section 9(d). These moral obligations are not granted to Local Governments, thereby making this type obligation illegal under Article VII of the Virginia Constitution.

11 When applying the Latin maxim expressio unius est exclusio alterius and the rule of statutory construction to Article X, Section 9(d), then looking back at the historical development of Local Government debt, local governments are not allowed to issue "Moral Obligations".  C. H. Morrissett, the author of the 1928 Proposed Amendments to the Constitution of Virginia states:

> *The evil of the free issuance of bonds in counties and districts without a vote of the people is intended to be checked by a proposed new section numbered 115-a.  The gist of the section is the reasonable requirement that every proposal to issue bonds must have public support."*

12 Note: there were no Moral Obligation Bonds, Moral Obligation Pledges, or agreements until the 1950's when John Newton Mitchell, later United States Attorney General under President Richard M. Nixon, invented a type of revenue bond that incorporated a moral obligation.

(Mitchell was the only U.S. Attorney General ever to be convicted of illegal activities.)

13 The key phrase Morrissett states is a "reasonable requirement for public support" and this requirement was not changed when the new Constitution was adopted in 1971 and the historical tracking of Local Government debt, as follows, supports.  The House Debates on the Constitutional Revision, page 506 - 507, under section 10. Debt, in the fourth paragraph states;

> "*The committee found that some counties did not want to be treated like cities for the purpose of issuing bonds, but preferred to continue issuing bonds without a limit but subject to a referendum.  Therefore the committee recommends that the counties be authorized to borrow as they now borrow under section 115 (a).*"

14  In the Senate Debates on Constitutional Revision, page 313, when speaking on Local Government Debt Senator Hopkins stated:

> "*On the sections pertaining to debt we rejected the Constitutional revision Commission's recommendation, and we adopt that of the old Constitution, merely updating the language and eliminating some of the verbiage that was kept in the transition of 1902…..We Understand that what we have done is exactly what every city in Virginia wants on this score.*"

15 Rules of statutory construction include, but are not limited to:

238

a   Statutes should be internally consistent. A particular section of the statute should not be inconsistent with the rest of the statute.

b   When the legislature enumerates an exception to a rule, one can infer that there are no other exceptions.

c   When the legislature includes limiting language in an earlier version of a statute, but deletes it prior to enactment of the statute, it can be presumed that the limitation was not intended by the legislature.

d   *The legislature is presumed to act intentionally and purposely when it includes language in one section but omits it in another. Emphasis noted.*

e   Where legislation and case law conflict, courts generally presume that legislation takes precedence over case law.

16      When applying the legal doctrine above, Prince concludes that "moral obligations" do not comport with and violate Article VII, Section 10.

17 A. E. Dick Howard's Commentaries on the Virginia Constitution state on pages 865 & 870 (notes).

27   Board of Supervisors of Fairfax county v. Massey, 210 Va. 253, 260, 169 S.E.2d 556 (1969). A long-term conditional sales contract

*56* 239

or *lease-purchase agreement was ruled to be debt* of a kind coming within Const. of 1902, Section 127, and relevant statutes on town debt.  1970-71 Ops. Va. Att'y Gen. 398.

28 210 Va. At 261.  This case also clearly established that the term "*bond or other interest bearing obligation*" under section 127 *had the same meaning as "debt"* under section 115-a 210 VA at 259.  This case is noted in 56 Va. L. Rev 1603 (1970)." *Emphasis Added.*

18 Local Governments are still operating under the old 1902 Constitution with few changes. The "lease to own" contracts, which are interest bearing obligations and also classified as lease-purchase agreements, make this a debt incurred by the Local Governments.  Debt requires a referendum under Article VII Section 10, which was not held.

## COUNT FOUR - VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT

**§ 8.01-216.3 (6) Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the Commonwealth who lawfully may not sell or pledge the property.**

19 The financial institutions had the opportunity at any time to request a legal opinion from the Attorney General's office through the Virginia Resources Authority or Local Governments. The Virginia Resources

Authority was the conduit for the Local Governments to acquire funding for their projects.

20 As previously stated in A.E. Dick Howard's Commentaries on the Constitution, it clearly states that the term "Bonds or other interest bearing obligations has the same meaning as debt" and the lease to own obligation is an interest bearing obligation, therefore debt, requiring a referendum. Without a referendum, this was an obligation that the officers of the Local Government were not lawfully able to sell or pledge, violating Article VII, Section 10, and Virginia Code § 8.01-216.3.

21 Shenandoah County, and other counties, did not hold a referendum authorizing payment for debt and the counties were selling an obligation they were not authorized to sell, therefore the Defendants knowingly purchased an obligation officers of the Commonwealth were not lawfully able to sell, violating the Virginia Fraud Against Taxpayers Act.

22 Shenandoah County Supervisors and other Governmental Agencies were convinced that a referendum as required by Article VII, Section 10, was not mandatory when they created long term debt by issuing Moral Obligation Pledges.  This scheme presented to governmental bodies for capital improvement projects across the State of Virginia, and is hereafter known as the "Lease to Own Agreement," whereby the Governmental

Agency pays yearly, foregoing the requirement of a referendum of the voters.  The legal process, which is defined by Article VII, Section 10, of the Constitution of Virginia, requires a referendum. Complying with the Constitution requires that a referendum be held and passed, if long term debt is assumed.  If a referendum is passed by the voters, General Obligation Bonds for these capital improvements are issued at a low interest rate, which is currently around 1.50%. The General Obligation Bonds receive the lowest interest rate, because they are backed by the "full faith and credit".  The bonds issued through this "Lease to Own Agreement" are Moral Obligation bonds, which are not backed by with the full faith and credit of the Commonwealth, and are therefore approximately twice the interest rate, or currently about 3.5%.  Accordingly, this "Lease to Own Agreement" scheme does not comport with Article VII, Section 10, of the Virginia Constitution.

23 Defendant U S National Bank Association, Suntrust Bank and others were the Bond Purchasers and assigned as the Trustee in each "LEASE AGREEMENT".  As stated within the 'LEASE AGREEMENT' the "VRA has agreed to assign to the Trustee as security for the Bonds *all of its right title and interest in* and to the Lease and Financing Lease (Collectively, the

"Basic Documents"), making the defendants responsible for ensuring compliance with State Law.  *Emphasis added*.

24 This type contract "LEASE to OWN AGREEMENT" is illegal in part because the debt incurred is binding on successive Boards of Supervisors or Governmental Agencies. An example is stated on page 295, Section 1. General Covenants (a) of the $15,760,000 SHENANDOAH COUNTY, VIRGINIA, FINANCING LEASE, (Courthouse and Social Services Building Project), Closing Date: November 19, 2009, hereafter known as the "LEASE AGREEMENT".  The  "LEASE AGREEMENT"  states: "VRA acknowledges within this that the Financing Lease contains certain interest in the Real Estate and which are *binding on successors* in interest in the Real Estate and which include matters relating to maintenance, repair, insurance, taxes, damage and destruction with respect to the Real Estate". This binding of future Board of Supervisors is illegal as stated in the Attorney General's Opinion OP. NO. 03-108, which states "Neither Virginia Constitution nor applicable state statutes allow governing body to adopt adequate public facilities ordinance that binds, directly or indirectly, future governing body to fund capital improvements program at specific level and authorizes approval of proposed to be deferred for a specified number of years." *Emphasis noted.*

25 An example of this future payment and prohibited long-term debt was found in 2012, within the next Fiscal Year 2013 Shenandoah County Budget, under *forecasted debt in the Shenandoah County FY 13 approved budget*, as line item 8254.  If these debts are forecasted in future years then they must hold a referendum as required by Article VII Section 10. *Emphsis added*.

26 Within the "LEASE AGREEMENT", the Virginia Resources Authority represents, warrants, covenants and agrees that the Deed of Trust is lawfully executed and delivered in conformity with the Financing Lease and the Indenture and therefore the U.S. Bank National Association, having purchased the Bonds and having been appointed by the Virginia Resources Authority and accepted as its Successor Trustee, also represents, warrants, covenants and agrees that this Deed of Trust is lawfully executed and delivered in conformity with the Financing Lease and the Indenture, when in fact the "Lease to Own Agreement" scheme was in violation of  Article VII, Section 10(b), of the Constitution of Virginia.

27 According to a McGuire Woods LLP, legal advisor for the Virginia Resources Authority, attorney Arthur E. Anderson II stated in a May 31, 2012 letter:

> "The lack of legal enforceability does not mean that the failure
> of a future Shenandoah County Board to fulfill its moral

obligation would not carry serious repercussions.  The County's credit would be impaired, if not destroyed, for years to come. There would almost certainly be a breach in relations between the County and the Commonwealth. VRA's bonds are also supported by a moral obligation—that of the Commonwealth. The Commonwealth's moral obligation support provides the Jail Authority and its member jurisdictions, as well as hundreds of other Virginia communities, with low borrowing rates and excellent market access.  The General Assembly is extremely unlikely not to support VRA's bonds even if Shenandoah County disavows its moral obligation. And if the General Assembly has to find money to plug a hole caused by Shenandoah County, the General Assembly is going to look to its appropriations to Shenandoah County before it shortchanges other programs and localities. This "state-aid intercept" concept is codified in Virginia Code § 62.1-216.1."

28 This state-aid intercept concept of pulling money from Shenandoah County would make this "moral obligation" *legally enforceable* since the State would fulfill the moral obligation and *take* money through another source, making this an *enforceable debt* and triggering a requirement for a referendum required by Article VII, Section 10, of the Virginia Constitution. *Emphasis noted.*


## COUNT FIVE-VIOLATION OF THE VIRGINIA CONSTITUTION
## ARTICLE X, SECTION 8

**Limit of tax or revenue; No other or greater amount of tax or revenues shall, at any time, be levied than may be required for the necessary expenses of the government, or to pay the indebtedness of the Commonwealth.**

29 In the Virginia Constitution, Article X, Section 8, states, "Limit of tax or revenue; No other or greater amount of tax or revenues shall, at any time, be levied than may be required for the *necessary expenses* of the government, or to pay the *indebtedness* of the Commonwealth." *Emphasis noted.*

30 The obligations rendered by the Local Governments in this lease agreement are considered "moral obligations" and are not considered debt, therefore the expense is not classified as indebtedness when Article X, Section 8, is viewed; therefore, this obligation must fall under the necessary expense doctrine.  One of the requirements of the necessary expense doctrine is that the expenditure must not be otherwise provided for, that is, it must not be an item that falls within the scope of some other more specific appropriation funding scheme.

31 We have a statutory funding mechanism for local government which is Article VII, Section 10, that these capital improvement projects fall under, which is more specific.  If the obligation is not considered indebtedness or a necessary expense which meets the necessary expense doctrine, then the obligation fails under Article X, Section 8. The Local Government does not have the exemption that the Commonwealth has in Section X, Article 9(d), which allows such moral obligations.

## COUNT SIX-VIOLATION OF VIRGINIA CODE § 15.2-2636.

### Ordinance or resolution to provide for issue of bonds.

32 Virginia Code § 15.2-2636 provides: "Except as otherwise provided in this section, whenever any municipality proposes to borrow money and issue its bonds under the provisions of Article VII, Section 10(a), of the Constitution of Virginia and this chapter, the governing body shall adopt an ordinance or *resolution, stating the maximum principal amount of the bonds to be issued and in brief and general terms the purpose or purposes for which the proceeds of the bonds are to be used."* Emphasis noted.

33   Shenandoah County Supervisor Sharon Baroncelli stated in a public meeting on October 23, 2012, that the Board had already moved funds from the "Lease to Own Agreement" to fund renovation of the old courthouse.

34 A FOIA response from Shenandoah County Administrator Doug Walker dated March 1, 2013, stated; "This April, the County will access proceeds from the 2009 VRA financing lease, which funds are on deposit in the County's local account.  We intend to use those funds to reimburse the County for the interest portion of rental payments the County has paid to VRA in that very same project.  *When this is done, we anticipate that some*

*cash will be available to be used for the Historic Courthouse project and/or*

*other projects the Board finds worthwhile." Emphasis noted.*

35 In a letter dated November 11, 2012, from Shenandoah County to

U.S. Bank National Association, as Trustee, and Virginia Resources

Authority, it is stated in bold just before the signature line;

> "The Local Government has agreed in the Financing Lease that
> any amounts it received pursuant to this Requisition will be (i)
> immediately applied to reimburse the Local Government for
> Project Cost it has already incurred and paid or (ii) actually
> spent to *pay Project Costs not later than five banking days after
> receipt." Emphasis noted.*

If Shenandoah County has over one million dollars for the renovation of the

old courthouse in a local account, it has moved funds in violation of multiple

Virginia Codes.

36 Found within the Virginia Resources Authority lease agreement with

Shenandoah County dated November 1, 2009, Section 7.4 states that the

lease to own agreement allows the VRA and the Trustee to inspect the

project and local government's books and records to ensure compliance so

if the Shenandoah County nor the VRA ensured compliance the financial

institutions had the responsibility and capability to do so.

37 These actions are in violation of Virginia Code § 15.2-2636 because

the renovation of the Old Courthouse and other projects were not listed on

the resolution. The Virginia Attorney General's Opinion dated September 28, 2012 response states:

> "It is my opinion that a county may not apply proceeds of general obligation bonds issued by the county for one project to a different project unless the resolution or ordinance adopted by the county and submitted to the qualified voters authorizes the application of the bond proceeds to the other project."  This triggers a violation of the Virginia Fraud Against Taxpayers Act. The financial institution knowingly and in reckless disregard allowed local government to have over a million dollars of taxpayer's money without the taxpayer's approval which classifies as fraud.  Money's were moved in violation of Virginia Code into a slush fund and currently we do not know if all money for the project is accounted for.

## COUNT SEVEN-VIOLATION OF VIRGINIA CODE § 15.2-2606.

### Public hearing before issuance of bonds.

38 According to FOIA documents, there was no public hearing held before the issuance of the bonds for the Shenandoah County Lease to Own Agreement as required by Virginia Code § 15.2-2606.

39 There are at least 83 such "LEASE AGREEMENTS" that the defendants have issued throughout the State of Virginia within the last six years, totaling over 1.1 billion dollars. Prince currently does not have access to all such agreements and requests that all of these "Lease to Own" schemes, obligations issued by the VRA for capital improvements which are not classified as industrial, money moved from bond issuances to slush

funds in violation of Virginia Code§ 15.2-2636, and all moral obligation pledges found within contracts issued by local units of government fall under the auspices of being revealed by Mr. Prince.

WHEREFORE, Mark William Prince and the Commonwealth of Virginia demand judgment against Defendant U.S. Bank National Association and others for a civil penalty of $10,000 plus three times the amount of damages sustained by the Commonwealth, and all other equitable relief allowed under the law, plus reasonable expenses that the court finds to have been necessarily incurred, reasonable attorneys' fees, costs and other relief allowed by the Virginia Fraud Against Taxpayers Act.

Mr. Prince demands a trial by jury.


Respectfully Submitted,


Mark W. Prince
Pro Se,
394 Brook Creek Road
Toms Brook, VA  22660
540-325-0750
mark@sunpeakusa.com

A True Copy Teste:
DENISE B. ESTEP, CLERK
By: _____ D.C.

## Certificate

I hereby certify that on the 4th day of March, 2013, the foregoing Motion to Amend was submitted via e-mail to Guy W. Horsley, Jr., Special Assistant Attorney General and Jimmy F. Robinson, Jr., esquire (VSB No. 43622), Counsel for U.S. Bank National Association.  A facsimile was sent to Jimmy R. Robinson at 804-697-6029.

## Amicus Brief

Facts:  The Resolution of the Board of Supervisors of Shenandoah County, Virginia Approved and dated on October 19, 2009 (Resolution) sets out a prospective lease to own agreement between the County Board and the Virginia Resources Authority (VRA) for "lease financing in a Maximum principal amount up to $17,115,000" for a Courthouse project (project).  The County would lease the land and improvements and will make rental payments "corresponding in amount to the amount and timing to the debt service on the portion of the VRA Bonds issued to finance the Project," with Rental Payments to be paid "out of appropriations from the County's General Fund."  Paragraph 10 of the resolution, entitled "Nature of Obligations with respect to Rental Payments; 'Moral Obligation' Support Pledge of the County,"  identifies the Financing lease as a "rental obligation" of the county for "pledge and payment," and expressly states that nothing in the Resolution "shall constitute a general obligation debt of the County within the meaning of the Virginia Constitution or Virginia Statutory law."  However, the final line of Paragraph 10 expressly contemplates principle, premium and interest on "corresponding VRA bonds" subject to the terms of the financing lease.

The first line of Art X § 9 of the Virginia Constitution states that "no debt shall be contracted by or on behalf of the Commonwealth except as provided herein,"  and the power to incur moral obligation debt is nowhere granted to counties.  However, subsection d states that the restrictions in § 9 "shall not apply to any obligation incurred by the Commonwealth or any institution, agency, or authority thereof if the full faith and credit of the

Commonwealth is not pledged or committed to the payment of such obligation."

Question:  Does the Resolution Violate Article 7, § 10 of the Virginia Constitution.  Specifically, does the board of supervisors have the power to incur "moral obligation" debt?

Conclusion:  Despite the language intended to take this financing arrangement out of the ambit of Constitutionally cognizble debt, the lease to own agreement appears to create a "moral obligation debt."   While the issue has not been addressed by the courts, there is a credible argument that counties have no such power to enter into this lease to own agreement.

Whether local governments can enter into a lease to own agreement as a means to side step constitutional restraints is a matter of first impression.

Analysis:   The threshold question is whether the lease to own constitutes a constitutionally cognizable debt.  If it is determined that the language "[nothing in this resolution] shall constitute a general obligation debt of the County within the meaning of the Virginia Constitution or Virginia Statutory law" can be regarded as having the intended effect, then the analysis ends there.  There is some case law to support this position.  See Dykes v. Northern Va. Transp. Dist. Comm'n, 242 Va. 357 (1991).  But see Town of South Hill v. Allen, 177 Va. 154 (1941) (under the 1902 constitution, the court ruled that even though revenue certificates issued to buy a power plant were to be repaid from revenues derived from operation of the plant in question, the revenue certificates nonetheless constituted a constitutionally

cognizable "debt").  (It should be noted that there has been no change to the 1902 constitution where it concerns local debt.  See Preceedings and Debate of the Senate of Virginia pertaining to Amendment of the Constitution, (1969) p 313 ("On the sections pertaining to debt we rejected [proposed revisions and] adopted that of the old constitution, merely updating the language…").  The plain language of the resolution itself, in its entirety, seems to suggest that an indebtedness will result, discussing that obligation in terms of principle, premium and interest, and a corresponding bond.  Paragraph 10 pledges payment, and imposes a "moral obligation" on the County and its successors.

In any event, the analysis ends if the resolution creates no constitutionally cognizable debt.

**If the plain meaning of the agreement is accepted as incurring a constitutionally cognizable debt (as an obligation to repay would seem to suggest), the analysis continues.  "Commonwealth agencies are expressly removed from the restrictions of Art X § 9."  Because the Commonwealth and its agencies are expressly removed, the Constitution's silence on counties should be regarded as an intentional exclusion (*expressio unius est exclusio alterius*).  The restrictions of Article X § 9 must therefore apply to counties.  Accordingly, because the Virginia Constitution does not grant county Boards of supervisors power to incur "moral obligation" debt, that power is seemingly denied them.**

D. Eric Wiseley, Esq.
The Wiseley Law Firm
210 E. Main St
Front Royal, Virginia 22630

March 5, 2013

MOTION TO AMEND

COMES NOW the Plaintiff, Mark W. Prince, and moves for to amend the Complaint filed in this matter, and in support thereof states:

1. On August 1, 2012, Plaintiff filed a Motion for Judgment for case number CL12-283

2. It has come to the attention of plaintiff that a number of things have been reviled through investigation and change the scope and basis of this suit dramatically.

WHEREFORE, Plaintiff prays that he be granted leave to file the Amended Motion for Judgment attached hereto.

Respectfully Submitted,

Mark W. Prince
Pro Se,
394 Brook Creek Road
Toms Brook, VA  22660
540-325-0750
mark@sunpeakusa.com

A True Copy Teste:
DENISE B. ESTEP, CLERK

By: _____ D.C.

254

VIRGINIA: IN THE CIRCUIT COURT FOR THE COUNTY OF SHENANDOAH

COMMONWEALTH OF VIRGINIA,

Mark W. Prince

          Plaintiff,

v.                                          Civil Case No. CL12-283

SUNTRUST BANK

CEDE & CO

AND ALL OTHER BOND HOLDERS

DEMANDING PAYMENT FROM VIRGINIA

LOCAL GOVERNMENT UNITS AND THEIR

TAXPAYERS FOR MORAL OBLIGATIONS

          Defendants.



## AMMENDED MOTION FOR JUDGMENT

Mark William Prince brings this civil action against Defendants, Suntrust Bank and others in the name of the Commonwealth of Virginia as well as in his own name, for violations of the Virginia Fraud Against Taxpayers Act § 8.01-216.1 *et seq.,* pursuant to

Virginia Code § 8.01-216.5(B), which is filed *in camera, and shall remain under seal for at least 120 days, and shall not be served on the defendant until the court so orders*:

## PARTIES

1.  Mr. Prince brings this action on behalf of the Commonwealth of Virginia pursuant to Virginia Code §8.01-216.1 *et seq.* The Commonwealth is therefore a party to this action. Mr. Prince has taken all steps required by Virginia Code §8.01-216.1 *et seq.,* including serving a Disclosure Memorandum and copies of all material evidence on the Commonwealth prior to filing this amended action pursuant to Virginia Code §8.01-216.5 (B).

2.  Defendants;

    A.      Suntrust Bank

          Principal Office

          303 PEACHTREE STREET NE

          30TH FLOOR

          ATLANTA, GA  30308

      a.  SCC ID: F1395864

      b.  Entity Type: **Foreign Corporation**

      c.  Jurisdiction of Formation: GA

      d.  Date of Formation/Registration with SCC: 10/1/1999

      e.  Registered Agent/Registered Office

          DANA S BRUCE

919 E MAIN ST 13TH FL

RICHMOND, VA   23219

B.    CEDE & CO. as defined on the bond RB-1 92818A NN2 Virginia

Resources Authority State Moral Obligation Revenue Bond, dated June 13,

2012.

C.    Others to be determined.


**COUNT ONE-VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYER'S ACT**

**-§ 8.01-216.3 (1)  Knowingly presents, or causes to be presented, a false or**

**fraudulent claim for payment or approval;**

Defendants Suntrust Bank, CEDE & CO.,

and Others have:

3    Knowingly presented, or caused to be presented, false claims for payment to

Shenandoah County and or various Local Government Units throughout the State of

Virginia through contracts, obligations containing moral obligations or moral pledges

which violate Article VII Section 10 of the Virginia Constitution.

4    The VRA Regional Jail Bonds sold on June 13, 2012, were illegally sold outside

the date stipulated in the RSW Regional Jail Resolution dated April 19, 2012.  Page 2,

4th paragraph states; "Whereas, VRA has advised the Authority that the sale date of the

VRA Bonds is tentatively scheduled for May 22, 2012 but may occur, subject to market

conditions, at any time between May 1, 2012 and June 1, 2012 (the "VRA Sale Date"),"

This action of selling the bonds outside the date authorized on the Resolution made this

an illegal transaction and the financial institutions continued presenting claims for payments on an illegal transaction subsequent to being notified of this violation by Civil Case 1200239-00  Prince v. Suntrust Bank, *et al.*

### COUNT TWO-VIOLATION OF ARTICLE VII SECTION 10

**Latin Maxim Expressio Unius Est Exclusio Alterius,**

**Rule of Statutory Construction**

5    The moral obligation pledges issued by Counties, Cities and Towns violate Article VII, Section 10, and do so because these types of obligations, which do not incur the "full faith and credit of the Commonwealth," are only permitted to four entities of State Government granted through Article X, Section 9(d). These moral obligations are not granted to Local Governments, thereby making this type obligation illegal under Article VII of the Virginia Constitution.

6    When applying the Latin maxim expressio unius est exclusio alterius and the rule of statutory construction to Article X, Section 9(d), then looking back at the historical development of Local Government debt, local governments are not allowed to issue "Moral Obligations".  C. H. Morrissett, the author of the 1928 Proposed Amendments to the Constitution of Virginia states:

> *The evil of the free issuance of bonds in counties and districts without a vote of the people is intended to be checked by a proposed new section numbered 115-a.  The gist of the section is the reasonable requirement that every proposal to issue bonds must have public support." Emphasis noted.*

7   Note: there were no Moral Obligation Bonds, Moral Obligation Pledges, or agreements until the 1950's when John Newton Mitchell, later United States Attorney General under President Richard M. Nixon, invented a type of revenue bond that incorporated a moral obligation.  (Mitchell was the only U.S. Attorney General ever to be convicted of illegal activities.)

8   The key phrase Morrissett states is a "reasonable requirement for public support" and this requirement was not changed when the new Constitution was adopted in 1971 and the historical tracking of Local Government debt, as follows, supports.  The House Debates on the Constitutional Revision, page 506 - 507, under section 10. Debt, in the fourth paragraph states;

> "The committee found that some counties did not want to be treated like cities for the purpose of issuing bonds, but preferred to continue issuing bonds without a limit but subject to a referendum.  *Therefore the committee recommends that the counties be authorized to borrow as they now borrow under section 115 (a)."  Emphasis noted.*

9   In the Senate Debates on Constitutional Revision, page 313, when speaking on Local Government Debt Senator Hopkins stated:

> "On the sections pertaining to debt we rejected the Constitutional revision Commission's recommendation, and *we adopt that of the old Constitution, merely updating the language and eliminating some of the verbiage that was kept in the transition of 1902.....We Understand that what we have done is exactly what every city in Virginia wants on this score." Emphasis*

*noted.*

10  Rules of statutory construction include, but are not limited to:

   a.      Statutes should be internally consistent. A particular section
           of the statute should not be inconsistent with the rest of the
           statute.

   b.      When the legislature enumerates an exception to a rule, one
           can infer that there are no other exceptions.

   c.      When the legislature includes limiting language in an earlier
           version of a statute, but deletes it prior to enactment of the
           statute, it can be presumed that the limitation was not intended by
           the legislature.

   *d.      The legislature is presumed to act intentionally and purposely
           when it includes language in one section but omits it in another.
           Emphasis noted.*

   e.      Where legislation and case law conflict, courts generally
           presume that legislation takes precedence over case law.

16  When applying the legal doctrine above, Prince concludes that "moral obligations"
do not comport with and violate Article VII, Section 10.

17  A. E. Dick Howard's Commentaries on the Virginia Constitution state on pages
865 & 870 (notes);

        27  Board of Supervisors of Fairfax county v. Massey, 210 Va. 253,
            260, 169 S.E.2d 556 (1969). A long-term conditional sales contract

or *lease-purchase agreement was ruled to be debt of a kind coming*

*within Const. of 1902, Section 127, and relevant statutes on town*

*debt.* 1970-71 Ops. Va. Att'y Gen. 398.

28 210 Va. At 261.  This case also clearly established that the term

"*bond or other interest bearing obligation" under section 127 had*

*the same meaning as "debt" under section 115-a* 210 VA at 259.

This case is noted in 56 Va. L. Rev 1603 (1970)." Emphasis Added.

18  Local Governments are still operating under the old 1902 Constitution with few

changes. The "lease to own" contracts, which are interest bearing obligations and also

classified as lease-purchase agreements, make this a debt incurred by the Local

Governments.  Debt requires a referendum under Article VII Section 10, which was not

held.

## COUNT THREE-VIOLATION OF THE VIRGINIA FRAUD AGAINST

## TAXPAYER'S ACT

**-§ 8.01-216.3 (6) Knowingly buys or receives as a pledge of an obligation or debt,**

**public property from an officer or employee of the Commonwealth who lawfully**

**may not sell or pledge the property.**


19  Service and support agreements containing moral obligations or pledges are illegal

because Local Governmental Units found under Article VII are unable to issue moral

obligations/pledges when viewed against the aforementioned Expressio Unius Est

Exclusio Alterius and the Rules of Statutory Construction and therefore violate Article

VII Section 10 which in turn triggers a violation of the Virginia Fraud Against Taxpayers Act.

20  The financial institutions triggered a violation of Virginia Code § 8.01-216.3(6) "*Knowingly buys* or receives as *a pledge of an obligation* or debt, public property *from an employee of the Commonwealth who lawfully may not sell or pledge the property*." Virginia Code § 8.01-216.3(C) *requires no proof of specific intent to defraud* and Prince does not allege one. These have simply been illegal, and therefore false, claims, which can be addressed by the inaptly named Virginia Fraud Against Taxpayers Act. *Emphasis noted.*

21  According to a McGuire Woods LLP, legal advisor for the Virginia Resources Authority, attorney Arthur E. Anderson II stated in a May 31, 2012 letter:

> "The lack of legal enforceability does not mean that the failure of a future Shenandoah County Board to fulfill its moral obligation would not carry serious repercussions.  The County's credit would be impaired, if not destroyed, for years to come. There would almost certainly be a breach in relations between the County and the Commonwealth. VRA's bonds are also supported by a moral obligation—that of the Commonwealth. The Commonwealth's moral obligation support provides the Jail Authority and its member jurisdictions, as well as hundreds of other Virginia communities, with low borrowing rates and excellent market access.  The General Assembly is extremely unlikely not to support VRA's bonds even if Shenandoah County disavows its moral obligation. And if the General

Assembly has to find money to plug a hole caused by Shenandoah County,

the General Assembly is going to look to its appropriations to Shenandoah

County before it shortchanges other programs and localities. This "state-aid

intercept" concept is codified in Virginia Code § 62.1-216.1."

This state-aid intercept concept of pulling money from Shenandoah County

would make this "moral obligation" *legally enforceable*, albeit indirectly,

since the State would fulfill the moral obligation and *take* money through

another source making this an *enforceable debt* and triggering a

requirement for a referendum thereby violating Article VII, Section 10.

*Emphasis noted.*

## COUNT FOUR-VIOLATION OF THE VIRGINIA CONSTITUTION
## ARTICLE X SECTION 8
**Limit of tax or revenue; No other or greater amount of tax or revenues shall, at any time, be levied than may be required for the necessary expenses of the government, or to pay the indebtedness of the Commonwealth.**

23  In the Virginia Constitution, Article X, Section 8, states, "Limit of tax or revenue;

No other or greater amount of tax or revenues shall, at any time, be levied than may be

required for the *necessary expenses* of the government, or to pay the *indebtedness* of the

Commonwealth." *Emphasis added.*

24  The obligations rendered by the Local Governments are considered "moral obligations" and are not considered debt, so it is therefore not indebtedness when Article X, Section 8, is viewed, therefore this obligation fails under the necessary expense doctrine.  One of the requirements of the necessary expense doctrine is that the expenditure must not be otherwise provided for, that is, it must not be an item that falls within the scope of some other more specific appropriation funding scheme.

25  We have a statutory funding mechanism for local government which is Article VII, Section 10, that these capital improvement projects fall under which is more specific. If the obligation is not considered indebtedness or a necessary expense which meets the necessary expense doctrine, then the obligation is illegal.  The Local Government does not have the exemption that the state does in Section X, Article 9(d). Accordingly, these moral obligations violate Article X, Section 8, of the Virginia Constitution.

26  This suit also challenges claims to payments for all moral obligation debt issued by local governmental units in Virginia as all such claims are based on unconstitutional and therefore illegal debt.


WHEREFORE, Mark William Prince and the Commonwealth of Virginia demand judgment against Defendant SUNTRUST BANK, CEDE & CO and Others , for a civil penalty of $10,000,  plus three times the amount of damages sustained by the Commonwealth, and all other equitable relief allowed under the law, plus reasonable expenses that the court finds to have been necessarily incurred, reasonable attorneys' fees, costs and other relief allowed  by the Virginia Fraud Against Taxpayer's Act.

Mr. Prince demands a trial by jury.

Respectfully Submitted,


MARK WILLIAM PRINCE
390 Brook Creek Road
Toms Brook, VA  22660
540-325-0750
mark@sunpeakusa.com


## CERTIFICATE


I certify that on the 5th day of March, 2013 a true copy of the foregoing Motion to

Amend was submitted via e-mail to Guy W. Horsley, Jr., Special Assistant Attorney

General and a copy was sent to David Gibson (VSB No. 40641) of Gentry Locke Rakes

& Moore, LLP, 10 Franklin Road, SE, Suite 800, Roanoke, Virginia  24011.


A True Copy Teste:
DENISE B. ESTEP, CLERK

By: _____ D.C.

Mark W. Prince
*Pro Se*
394 Brook Creek Road
Toms Brook, VA  22660
540-325-0750
mark@sunpeakusa.com

/// 265

**Amicus Brief**

Facts:  The Resolution of the Board of Supervisors of Shenandoah County, Virginia
Approved and dated on October 19, 2009 (Resolution) sets out a prospective lease to own
agreement between the County Board and the Virginia Resources Authority (VRA) for
"lease financing in a Maximum principal amount up to $17,115,000" for a Courthouse
project (project).  The County would lease the land and improvements and will make
rental payments "corresponding in amount to the amount and timing to the debt service
on the portion of the VRA Bonds issued to finance the Project," with Rental Payments to
be paid "out of appropriations from the County's General Fund."  Paragraph 10 of the
resolution, entitled "Nature of Obligations with respect to Rental Payments; 'Moral
Obligation' Support Pledge of the County,"  identifies the Financing lease as a "rental
obligation" of the county for "pledge and payment," and expressly states that nothing in
the Resolution "shall constitute a general obligation debt of the County within the
meaning of the Virginia Constitution or Virginia Statutory law."  However, the final line
of Paragraph 10 expressly contemplates principle, premium and interest on
"corresponding VRA bonds" subject to the terms of the financing lease.

The first line of Art X § 9 of the Virginia Constitution states that "no debt shall be
contracted by or on behalf of the Commonwealth except as provided herein,"  and the
power to incur moral obligation debt is nowhere granted to counties.  However,
subsection d states that the restrictions in § 9 "shall not apply to any obligation incurred
by the Commonwealth or any institution, agency, or authority thereof if the full faith and
credit of the Commonwealth is not pledged or committed to the payment of such
obligation."

Question:  Does the Resolution Violate Article 7, § 10 of the Virginia Constitution.
Specifically, does the board of supervisors have the power to incur "moral obligation"
debt?

Conclusion:  Despite the language intended to take this financing arrangement out of the
ambit of Constitutionally cognizable debt, the lease to own agreement appears to create a
"moral obligation debt."   While the issue has not been addressed by the courts, there is a
credible argument that counties have no such power to enter into this lease to own
agreement.

Whether local governments can enter into a lease to own agreement as a means to side
step constitutional restraints is a matter of first impression.

Analysis:  The threshold question is whether the lease to own constitutes a
constitutionally cognizable debt.  If it is determined that the language "[nothing in this

resolution] shall constitute a general obligation debt of the County within the meaning of the Virginia Constitution or Virginia Statutory law" can be regarded as having the intended effect, then the analysis ends there.  There is some case law to support this position.  See Dykes v. Northern Va. Transp. Dist. Comm'n, 242 Va. 357 (1991).  But see Town of South Hill v. Allen, 177 Va. 154 (1941) (under the 1902 constitution, the court ruled that even though revenue certificates issued to buy a power plant were to be repaid from revenues derived from operation of the plant in question, the revenue certificates nonetheless constituted a constitutionally cognizable "debt").  (It should be noted that there has been no change to the 1902 constitution where it concerns local debt.  See Preeceedings and Debate of the Senate of Virginia pertaining to Amendment of the Constitution, (1969) p 313 ("On the sections pertaining to debt we rejected [proposed revisions and] adopted that of the old constitution, merely updating the language….").  The plain language of the resolution itself, in its entirety, seems to suggest that an indebtedness will result, discussing that obligation in terms of principle, premium and interest, and a corresponding bond.  Paragraph 10 pledges payment, and imposes a "moral obligation" on the County and its successors.

In any event, the analysis ends if the resolution creates no constitutionally cognizable debt.

If the plain meaning of the agreement is accepted as incurring a constitutionally cognizable debt (as an obligation to repay would seem to suggest), the analysis continues.  "Commonwealth agencies are expressly removed from the restrictions of Art X § 9." Because the Commonwealth and its agencies are expressly removed, the Constitution's silence on counties should be regarded as an intentional exclusion (expressio unius est exclusio alterius).  The restrictions of Article X § 9 must therefore apply to counties.  Accordingly, because the Virginia Constitution does not grant county Boards of supervisors power to incur "moral obligation" debt, that power is seemingly denied them.

D. Eric Wiseley, Esq.
The Wiseley Law Firm
210 E. Main St
Front Royal, Virginia 22630

March 4, 2013

CL12-406

MOTION TO AMEND

COMES NOW the Plaintiff, Mark W. Prince, and moves for to amend the Complaint filed in this matter, and in support thereof states:

1. On August 1, 2012, Plaintiff filed a Motion for Judgment for case number CL12-406 Edinburg School Project

2. It has come to the attention of plaintiff that a number of things have been reviled through investigation and change the scope and basis of this suit dramatically.

WHEREFORE, Plaintiff prays that he be granted leave to file the Amended Motion for Judgment attached hereto.

Respectfully Submitted,

Mark W. Prince
Pro Se,
394 Brook Creek Road
Toms Brook, VA  22660
540-325-0750
mark@sunpeakusa.com

A True Copy Teste:
DENISE B. ESTEP, CLERK

By: _____ D.C.

VIRGINIA:

IN THE CIRCUIT COURT FOR THE COUNTY OF SHENANDOAH

COMMONWEALTH OF VIRGINIA,

|                                        |                        |
| -------------------------------------- | ---------------------- |
| Plaintiff,                             |                        |
| Mark W. Prince                         |                        |
| v.                                     | Case No. CL-12-406     |
| U.S. Bank National Association         |                        |
| & Others to be determined              |                        |
| Defendants.                            |                        |

<u>AMENDED MOTION FOR JUDGMENT</u>

Mark William Prince brings this civil action against Defendants U.S.

Bank National Association and others in the name of the Commonwealth of

Virginia as well as in his own name, for violations of the Virginia Fraud

Against Taxpayers Act, § 8.01-216.1 et seq., pursuant to Virginia Code §

8.01-216.5(B), which is filed *in camera*:

PARTIES

1. Mr. Prince brings this action on behalf of the Commonwealth of

Virginia pursuant to Virginia Code §8.01-216.1 et seq. The Commonwealth

is therefore a party to this action. Mr. Prince has taken all steps required by

Memorandum and copies of all material evidence on the Commonwealth

prior to filing this amended action pursuant to Virginia Code §8.01-216.5

(B).

    1  Defendants;
    A  U.S. Bank National Association
         Principal Office:
         800 NICOLLET MALL
         MINNEAPOLIS, MN  55402
        a  SCC ID: F1675265
        b  Entity Type: **Foreign Corporation**
        c  Jurisdiction of Formation: US
        d  Date of Formation/Registration with Virginia SCC: 7/14/2006
        e  Registered Agent/Registered Office

CT CORPORATION SYSTEM
4701 COX RD STE 301
GLEN ALLEN, VA  23060

    B  Others to be determined.

## COUNT ONE-VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT

### § 8.01-216.3(1)  Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval

Defendants U.S. Bank National Association and Others have:

    3  Knowingly presented, or caused to be presented, false claims for

payment from Shenandoah County and or various Local Government Units

throughout the State of Virginia through contracts, obligations or a Revenue

Bond scheme. Revenue bonds, according to the Virginia Constitution,

Article VII, Section 10, are to be "Pure Revenue" bonds and not hybrid

bonds that use a moral obligation that pledge to cover any shortfalls of the
revenue of the project as depicted in the Edinburg School Project bond
issuance.

4   The Constitution of Virginia, Virginia Commission on Constitutional
Revision, recommended on page 242, 3rd paragraph:

> [The Commission recommends one change in the election
> requirement of section 127 for cities and towns. This change
> affects the issuance of so-called *"pure revenue bonds,"* i.e.,
> those obligations guaranteed *solely* by the revenues of an
> undertaking financed by the issuance of the bonds.] *Emphasis
> noted.*

This is also reiterated by A.E. Dick Howard Commentaries on the
Constitution at page 869, second paragraph, to Page 870.

5   If the Shenandoah County Edinburg School Project is not a "pure
revenue bond" and, instead, is using the same unit of government to
secure financing, U.S. Bank National Association and others are knowingly
presenting a false claim for payment in violation of the Virginia Code §
8.01-216.3(6)  Knowingly buys or receives as a pledge of an obligation or
debt, public property from an employee of the Commonwealth who lawfully

may not sell or pledge the property. *Note that Virginia Code § 8.01-216.3(C) requires no proof of specific intent to defraud.  Emphasis noted.*

## COUNT TWO-VIOLATION OF VIRGINIA CONSTITUTION ARTICLE VII SECTION 10(a)(3)

**Bonds of a city or town the principal and interest on which are payable exclusively from the revenues and receipts of a water system or other specific undertaking or undertakings from which the city or town may derive a revenue or secured, solely or together with such revenues, by contributions of other units of government.**

6   Shenandoah County used the same unit of government, the Shenandoah County Department of Parks and Recreation, to derive a revenue for the Edinburg School Project in violation of Article VII, Section 10(a)(3).

7   Since Shenandoah County Parks and Recreation was used as a funding source, then the bond issuance was illegal and therefore tripped the requirement of the Virginia Fraud Against Taxpayers Act.

## COUNT THREE-VIOLATION OF ARTICLE VII SECTION 10

8   The moral obligation pledges issued by Counties, Cities and Towns violate Article VII, Section 10, and do so because these types of obligations, which do not incur the "full faith and credit of the Commonwealth," are only permitted to four entities of State Government granted through Article X,

Section 9(d). These moral obligations are not granted to Local
Governments, thereby making this type obligation fail under Article VII of
the Virginia Constitution.

9   When applying the latin maxim expressio unius est exclusio alterius
and the rule of statutory construction to Article X, Section 9(d), then
looking back at the historical development of Local Government debt, as
required, local governments are not allowed to issue "Moral Obligations".
C. H. Morrissett, the author of the 1928 Proposed Amendments to the
Constitution of Virginia states:

> "The evil of the free issuance of bonds in counties and districts
> without a vote of the people is intended to be checked by a
> proposed new section numbered 115-a.  *The gist of the section
> is the reasonable requirement that every proposal to issue
> bonds must have public support."*  Emphasis noted.

10 Note: there were no Moral Obligation Bonds Moral Obligation
Pledges or agreements until the 1950's when John Newton Mitchell, later
United States Attorney General under President Richard M. Nixon,
invented a type of revenue bond that incorporated a moral obligation.
(Mitchell was the only US Attorney General ever to be convicted of illegal
activities.)

11 The key phrase Morrissett states is a "reasonable requirement for
public support," and this requirement was not changed when the new

Constitution was adopted in 1971. The historical tracking of Local

Government debt, as follows, supports this.  The House Debates on

Constitutional Revision, on page 506 and 507, under section 10. Debt, in

the fourth paragraph states:

> "The committee found that some counties did not want to be
> treated like cities for the purpose of issuing bonds, but preferred
> to continue issuing bonds without a limit but subject to a
> referendum.  *Therefore the committee recommends that the
> counties be authorized to borrow as they now borrow under
> section 115 (a).*" *Emphasis noted.*

12 In the Senate Debates on Constitutional Revision on page 313 when

speaking on Local Government Debt Senator Hopkins stated:

> "On the sections pertaining to debt we rejected the
> Constitutional revision Commission's recommendation, and *we
> adopt that of the old Constitution*, merely updating the language
> and eliminating some of the verbiage that was kept in the
> transition of 1902.....*We Understand that what we have done is
> exactly what every city in Virginia wants on this score.*"
> *Emphasis noted.*

13 Rules of statutory construction include, but are not limited to:

a   Statutes should be internally consistent. A particular section of the

statute should not be inconsistent with the rest of the statute.

b   When the legislature enumerates an exception to a rule, one can

infer that there are no other exceptions.

c   When the legislature includes limiting language in an earlier

version of a statute, but deletes it prior to enactment of the statute,

it can be presumed that the limitation was not intended by the legislature.

d   *The legislature is presumed to act intentionally and purposely when it includes language in one section but omits it in another. Emphasis noted.*

e   Where legislation and case law conflict, courts generally presume that legislation takes precedence over case law.

14 When applying the legal doctrine above, we conclude that "moral obligations" do not comport with, and violate, Article VII, Section 10, of the Virginia Constitution.

## COUNT FOUR-VIOLATION OF THE VIRGINIA CONSTITUTION
## ARTICLE X SECTION 8

**Limit of tax or revenue; No other or greater amount of tax or revenues shall, at any time, be levied than may be required for the necessary expenses of the government, or to pay the indebtedness of the Commonwealth.**

15 In the Virginia Constitution, Article X, Section 8, states, "Limit of tax or revenue; No other or greater amount of tax or revenues shall, at any time, be levied than may be required for the necessary expenses of the government, or to pay the indebtedness of the Commonwealth.".

16 The obligations rendered by the Local Governments are considered "moral obligations" and are not considered debt, so it is therefore not indebtedness when Article X, Section 8, is viewed; therefore, this obligation falls under the *necessary expense doctrine*.  One of the requirements of the necessary expense doctrine is that the expenditure must not be otherwise provided for, that is, it must not be an item that falls within the scope of some other more specific appropriation funding scheme.  *Emphasis noted.*

15 We have a statutory funding mechanism for local government which is Article VII, Section 10, that these capital improvement projects fall under which is more specific.  If the obligation is not considered indebtedness or a necessary expense which meets the necessary expense doctrine, then the obligation is illegal.  The Local Government does not have the exemption that the Commonwealth does in Section X, Article 9(d). Accordingly, these moral obligations acquired by Local Governments violate Article X, Section 8, of the Virginia Constitution.

16 According to a McGuire Woods LLP, legal advisor for the Virginia Resources Authority, attorney Arthur E. Anderson II stated in a May 31, 2012 letter:

> "The lack of legal enforceability does not mean that the failure of a future Shenandoah County Board to fulfill its moral obligation would not carry serious repercussions.  The County's credit would be impaired, if not destroyed, for years to come.

There would almost certainly be a breach in relations between the County and the Commonwealth. VRA's bonds are also supported by a moral obligation—that of the Commonwealth. The Commonwealth's moral obligation support provides the Jail Authority and its member jurisdictions, as well as hundreds of other Virginia communities, with low borrowing rates and excellent market access.  The General Assembly is extremely unlikely not to support VRA's bonds even if Shenandoah County disavows its moral obligation. And if the General Assembly has to find money to plug a hole caused by Shenandoah County, the General Assembly is going to look to its appropriations to Shenandoah County before it shortchanges other programs and localities. This *"state-aid intercept" concept is codified in Virginia Code § 62.1-216.1."* Emphasis noted.

17 This state-aid intercept concept of pulling money from Shenandoah County would make this "moral obligation" legally enforceable, albeit indirectly, since the State would fulfill the moral obligation and take money through another source making this an enforceable debt and triggering a requirement for a referendum, thereby violating Article VII, Section 10.

## COUNT FIVE-VIOLATION OF ARTICLE X SECTION 10

### Lending of credit, stock subscriptions,

### and works of internal improvement.

18 Article X, Section 9, states: "No debt shall be contracted by on in behalf of the Commonwealth *except as provided herein*; and further defines

the ability to create and define the powers of an authority in Article X,
Section 10; …This section shall not be construed to prohibit the General
Assembly from establishing an authority with power to insure and
guarantee loans to finance *industrial development* and *industrial expansion*
and from making appropriations to such authority." *Emphasis noted.*

19 The Virginia Resources Authority, which was established in 1984 to
insure and guarantee loans, has been using powers granted by the
General Assembly beyond that which are authorized by the Constitution.
*The constitution limits these finance tools to industrial development and*
*industrial expansion only*. The various financial instruments issued to local
governments are being used for capital improvement projects, hence
violating Article X, Section 10, of the Virginia Constitution.  *Emphasis noted.*

20 Therefore, U.S. Bank National Association, and Others, being
required to follow the Constitution, triggered a violation of Virginia Codes §
8.01-216.3(6): "Knowingly buys or receives as a pledge of an obligation or
debt, public property from an employee of the Commonwealth who lawfully
may not sell or pledge the property;"


## COUNT SIX

## VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT

### § 8.01-216.3(6) Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the Commonwealth who lawfully may not sell or pledge the property.

21 The Shenandoah County Officers were not lawfully able to sell or pledge the moral obligation for seven reasons:

a   Latin Maxim Expressio Unius Est Exclusio Alterius (moral obligation);

b   The Rule of Statutory Construction (moral obligation);

c   Hybrid Revenue Bond fails under Article VII Section 10(a)(3);

d   Using the Same Unit of Government fails under Article VII Section 10(a)(3);

e   Moral obligation fails under Article X, Section 8, because of the Necessary Expense Doctrine;

f   State-aid intercept creating debt for the moral obligation;

g   Not an industrial project funded through VRA as required by Article 10, Section 10;

22 Mr. Prince currently does not have access to all Revenue Bond Agreements for Local Governments and request that all such Local Government Hybrid Revenues bond and/or Same Units of Government bond schemes fall under the auspices of being revealed by Mr. Prince.

WHEREFORE, Mark William Prince and the Commonwealth of Virginia demand judgment against Defendant U.S. Bank National Association and Others, for a civil penalty of $10,000, plus three times the amount of damages sustained by the Commonwealth, and all other equitable relief allowed under the law, plus reasonable expenses that the court finds to have been necessarily incurred, reasonable attorneys' fees, costs and other relief allowed by the Virginia Fraud Against Taxpayers Act.

Mr. Prince demands a trial by jury.

Respectfully Submitted,

MARK WILLIAM PRINCE
390 Brook Creek Road
Toms Brook, VA  22660
540-325-0750
mark@sunpeakusa.com

A True Copy Teste:
DENISE B. ESTEP, CLERK
By: _____ D.C.

## Certificate

I hereby certify that on the 4th day of March, 2013, the foregoing Motion to Amend was submitted via e-mail to Guy W. Horsley, Jr., Special Assistant Attorney General and to Jimmy F. Robinson, Jr., esquire (VSB No. 43622), Counsel for U.S. Bank National Association.  A facsimile was sent to Jimmy R. Robinson at 804-697-6029.

Amicus Brief

Facts:  The Resolution of the Board of Supervisors of Shenandoah County, Virginia Approved and dated on October 19, 2009 (Resolution) sets out a prospective lease to own agreement between the County Board and the Virginia Resources Authority (VRA) for "lease financing in a Maximum principal amount up to $17,115,000" for a Courthouse project (project). The County would lease the land and improvements and will make rental payments "corresponding in amount to the amount and timing to the debt service on the portion of the VRA Bonds issued to finance the Project," with Rental Payments to be paid "out of appropriations from the County's General Fund."  Paragraph 10 of the resolution, entitled "Nature of Obligations with respect to Rental Payments; 'Moral Obligation' Support Pledge of the County,"  identifies the Financing lease as a "rental obligation" of the county for "pledge and payment," and expressly states that nothing in the Resolution "shall constitute a general obligation debt of the County within the meaning of the Virginia Constitution or Virginia Statutory law." However, the final line of Paragraph 10 expressly contemplates principle, premium and interest on "corresponding VRA bonds" subject to the terms of the financing lease.

The first line of Art X § 9 of the Virginia Constitution states that "no debt shall be contracted by or on behalf of the Commonwealth except as provided herein,"  and the power to incur moral obligation debt is nowhere granted to counties.  However, subsection d states that the restrictions in § 9 "shall not apply to any obligation incurred by the Commonwealth or any institution, agency, or authority thereof if the full faith and credit of the Commonwealth is not pledged or committed to the payment of such obligation."

Question:  Does the Resolution Violate Article 7, § 10 of the Virginia Constitution.  Specifically, does the board of supervisors have the power to incur "moral obligation" debt?

Conclusion:  Despite the language intended to take this financing arrangement out of the ambit of Constitutionally cognizable debt, the lease to own agreement appears to create a "moral obligation debt."   While the issue has not been addressed by the courts, there is a credible argument that counties have no such power to enter into this lease to own agreement.

Whether local governments can enter into a lease to own agreement as a means to side step constitutional restraints is a matter of first impression.


Analysis:   The threshold question is whether the lease to own constitutes a constitutionally cognizable debt.  If it is determined that the language "[nothing in this resolution] shall constitute a general obligation debt of the County within the meaning of the Virginia Constitution or Virginia Statutory law" can be regarded as having the intended effect, then the analysis ends there.  There is some case law to support this position.  See Dykes v. Northern Va. Transp. Dist. Comm'n, 242 Va. 357 (1991).  But see Town of South Hill v. Allen, 177 Va. 154 (1941) (under the 1902 constitution, the court ruled that even though revenue certificates issued to buy a power plant were to be repaid from revenues derived from operation of the plant in question, the revenue certificates nonetheless constituted a constitutionally cognizable "debt").  (It should be noted that there has been no change to the 1902 constitution where it concerns local debt.  See Preceedings and Debate of the Senate of Virginia pertaining to Amendment of the Constitution, (1969) p 313 ("On the sections pertaining to debt we rejected [proposed revisions and] adopted that of the old constitution, merely updating the language….").  The plain language of the resolution itself, in its entirety, seems to suggest that an indebtedness will result, discussing that obligation in terms of principle, premium and interest, and a corresponding bond.  Paragraph 10 pledges payment, and imposes a "moral obligation" on the County and its successors.

In any event, the analysis ends if the resolution creates no constitutionally cognizable debt.

If the plain meaning of the agreement is accepted as incurring a constitutionally cognizable debt (as an obligation to repay would seem to suggest), the analysis continues.  "Commonwealth agencies are expressly removed from the restrictions of Art X § 9."  Because the Commonwealth and its agencies are expressly removed, the Constitution's silence on counties should be regarded as an intentional exclusion (expressio unius est exclusio alterius).  The restrictions of Article X § 9 must therefore apply to counties.  Accordingly, because the Virginia Constitution does not grant county Boards of supervisors power to incur "moral obligation" debt, that power is seemingly denied them.

D. Eric Wiseley, Esq.
The Wiseley Law Firm
210 E. Main St
Front Royal, Virginia 22630

LIBER 0018 PAGE 856

VIRGINIA:

### IN THE CIRCUIT COURT FOR THE COUNTY OF SHENANDOAH

COMMONWEALTH OF VIRGINIA,
MARK W. PRINCE,

        **Plaintiffs,**

V.                                       **CIVIL ACTION NO. CL12-000276-00**

U.S. BANK NATIONAL ASSOCIATION
AND OTHERS TO BE DETERMINED,

        **Defendants.**

### FINAL ORDER

This matter, filed as a claim pursuant to the Virginia Fraud Against Taxpayers Act, Va. Code § 8.01-216.1 *et seq.*, came before the Court on March 28, 2013, on Plaintiff's motion to amend his complaint, and the Commonwealth's motion to dismiss the complaint as a matter of law. Following argument by counsel for the Commonwealth and Plaintiff, the Court denied Plaintiff's motion to amend his complaint, and Plaintiff thereafter consented to a voluntary dismissal of this case. Accordingly, it is ORDERED that this case is hereby DISMISSED, with prejudice, and stricken from the docket.

In open court, and again by this order, the Court admonishes Plaintiff that any further filings in this Court challenging the funding of public projects by or on behalf of Shenandoah County, based upon the same or substantially the same legal grounds as have been raised and rejected in this and four (4) other cases filed by Plaintiff as meritless, may subject Plaintiff to significant monetary sanctions under Va. Code § 8.01-271.1.

LIBER 0018 PAGE 857

Because Plaintiff is not represented by counsel in this matter, the Court waives

endorsement as permitted by Rule 1:13 of the Rules of the Supreme Court of Virginia, and notes

Plaintiff's objections to this ruling. The Clerk is directed to provide copies of this order to

Plaintiff and all counsel of record. *The plaintiff may file specific objections in writing within ten (10) days of the date of entry to preserve issues for appeal.*

Entered:    APR 2 2 2013

_____
Judge

A True Copy Teste:
DENISE B. ESTEP, CLERK

By: _____ D.C.

LIBER 0018 PAGE 858

I ASK FOR THIS:

Guy W. Horsley, Jr.
Special Assistant Attorney General
Virginia Bar Number: 13846
Office of the Attorney General
900 East Main Street
Richmond, Virginia  23219
Telephone: (804) 786-0969
Facsimile: (804) 371-2087
E-mail:  ghorsley@oag.state.va.us

Counsel for the Commonwealth of Virginia

LIBER 0018 PAGE 859

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR THE COUNTY OF SHENANDOAH

COMMONWEALTH OF VIRGINIA,

MARK W. PRINCE,

          **Plaintiffs,**

V.

                      **CIVIL ACTION NO. CL 12000276-00**

U.S. BANK NATIONAL ASSOCIATION

And OTHERS TO BE DETERMINED,

          **Defendants.**



## OBJECTION TO FINAL ORDER

This matter, filed as a claim pursuant to the Virginia Fraud Against Taxpayers Act, VA. Code § 8.01-216.1 et seq., came before the Court on March 28, 2013, on Plaintiff's motion to amend his complaint, and the Commonwealth's motion to dismiss the complaint as a matter of law. There was no court reporter. Following argument by Counsel for the Commonwealth and Plaintiff, the Court denied Plaintiff's motion to amend his complaint, and Plaintiff thereafter stated that he felt that his case was not strong enough to proceed without the amended complaint and subsequent to the refusal of the motion to amend, asked that the case be non-suited. The Court refused to allow the amended complaint to be granted and refused the non-suit while stating that the case would proceed as originally submitted. The Court accepted the cover page of Federal case No. 1:06-CV-0547-MHS, which is a *twice amended* Fraud Against Taxpayers Suit as an Exhibit showing the ability to amend Fraud Against Taxpayers suits. The Court stated there was a difference between the Attorney General amending a suit and the Plaintiff (Mark W. Prince). *Emphasis noted.*

287

The Plaintiff asked the Court to accept a revised amended motion for Judgment for the

Fraud Against Taxpayers suit for the Edinburg School Project civil case no. 12000406-00,

because new information had been obtained since the original amended motion was submitted

to the court two weeks prior.  This amended filing was submitted to the Court and other Counsel.

Plaintiff.  Plaintiff asked for a Brief and 28 Exhibits be presented to the court which was to be

presented via power-point and the Court refused since it dealt primarily with the amended

complaint.

The Plaintiff was under the assumption that the case would therefore proceed and be

based off the merits of the initial complaint.  During argument, the Plaintiff explained to the court

that the Virginia Resources Authority was not authorized to issue any bonds for capital

improvement projects.  Plaintiff stated that both the Edinburg School Project and the "Lease to

Own" projects were capital improvement projects and the VRA was not allowed to issue bonds

for these projects because the VRA was restricted by the Virginia Constitution Article X Section

10 to industrial development only.  The Regional Jail is an industrial project, but the "Lease to

Own Scheme" and the Edinburg School Project are not which was stated in open court.

Additionally, the Plaintiff highlighted several areas that applied strictly to *legal arguments*

that were outlined within the motion to amend to include the Moral Obligation issued by

Shenandoah County for the Edinburg School Project Revenue Bond which Plaintiff claimed

violated the "pure revenue" requirement of the Constitution.  Plaintiff also remarked to the court

that an Amicus Brief had been submitted to the Court by Eric Wiseley esquire, which explained

Expressio Unius.

The Court and Defense Counsel both stated several times that the Supreme Court had

ruled on Plaintiff's legal arguments which they have not.  The Supreme Court is currently

reviewing a Petition for Rehearing for the Regional Jail Challenge civil case no. 12000239-00,

LIBER 0018 PAGE 861

which was filed on March 11, 2013, in which the main thrust of the revised Plaintiff's legal

arguments for the Regional Jail were presented.  In addition the Amicus Brief was filed

subsequently for the all of the cases Plaintiff has before the Court.  The appeal to the Supreme

Court was denied initially for the Regional Jail Challenge after only verbal and not written

revised legal argument was presented.  The Edinburg School Project Revenue Bond civil case

no. 12000409-00 is still before the Supreme Court and Plaintiff is awaiting status.


The Plaintiff warned the Circuit Court that if it approved the "Lease to Own" scheme it

would allow the local governments across the State "unfettered" access to the taxpayer's wallets

without the taxpayer's permission in violation of the Virginia Constitution.  The Court did warn

the Plaintiff that further filings that challenged funding of public projects based on the same legal

grounds may subject Plaintiff to significant monetary sanctions which would preclude the

Plaintiff from filing again, since the Court did not allow the amended suit or the non-suit.


Respectfully Submitted,

Mark W. Prince

Pro Se

394 Brook Creek Road

Toms Brook, VA  22660

540-325-0750

LIBER 0018 PAGE 862

## Certificate

I certify that a copy of this Objection to Final Order was sent via U.S. Postal service to the following:

**Guy W. Horsley, Jr.**
Special Assistant Attorney General
Virginia Bar Number: 13846
Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
Telephone: (804) 786-0969
Facsimile:  (804) 371-2087
E-mail: ghorsley@oag.state.va.us
Counsel for the Commonwealth of Virginia

LIBER 0018 PAGE 863

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR THE COUNTY OF SHENANDOAH

**COMMONWEALTH OF VIRGINIA,**
**MARK W. PRINCE,**

        **Plaintiffs,**

**V.**                                    **CIVIL ACTION NO. CL12-000283-00**

**SUNTRUST BANK**
**AND OTHERS TO BE DETERMINED,**

        **Defendants.**

## FINAL ORDER

This matter, filed as a claim pursuant to the Virginia Fraud Against Taxpayers Act, Va. Code § 8.01-216.1 *et seq.*, came before the Court on March 28, 2013, on Plaintiff's motion to amend his complaint, and the Commonwealth's motion to dismiss the complaint as a matter of law. Following argument by counsel for the Commonwealth and Plaintiff, the Court denied Plaintiff's motion to amend his complaint, and Plaintiff thereafter consented to a voluntary dismissal of this case. Accordingly, it is ORDERED that this case is hereby DISMISSED, with prejudice, and stricken from the docket.

In open court, and again by this order, the Court admonishes Plaintiff that any further filings in this Court challenging the funding of public projects by or on behalf of Shenandoah County, based upon the same or substantially the same legal grounds as have been raised and rejected in this and four (4) other cases filed by Plaintiff as meritless, may subject Plaintiff to significant monetary sanctions under Va. Code § 8.01-271.1.

LIBER 0018 PAGE 864

Because Plaintiff is not represented by counsel in this matter, the Court waives endorsement as permitted by Rule 1:13 of the Rules of the Supreme Court of Virginia, and notes Plaintiff's objections to this ruling. The Clerk is directed to provide copies of this order to Plaintiff and all counsel of record. *The Plaintiff may file specific objections in writing within ten (10) days of the date of entry of this order to preserve issues for appeal.*

Entered: APR 2 2 2013

_____
Judge

A True Copy Teste:
DENISE B. ESTEP, CLERK

By: _____ D.C.

2

LIBER 0018 PAGE 865

I ASK FOR THIS:

Guy W. Horsley, Jr.
Special Assistant Attorney General
Virginia Bar Number: 13846
Office of the Attorney General
900 East Main Street
Richmond, Virginia  23219
Telephone: (804) 786-0969
Facsimile: (804) 371-2087
E-mail:  ghorsley@oag.state.va.us

Counsel for the Commonwealth of Virginia

SEEN: and agreed

H. David Gibson, Esquire
Virginia Bar Number: 40641
Gentry Locke Rakes & Moore, LLP
10 Franklin Road, SE
Suite 800
Roanoke, Virginia  24011
Phone:  (540) 983-9300
Fax:  (540) 983-9400
gibson@gentrylocke.com

Counsel for Defendant SunTrust Bank

1293

LIBER 0018 PAGE 866

**VIRGINIA:**

IN THE CIRCUIT COURT FOR THE COUNTY OF SHENANDOAH

COMMONWEALTH OF VIRGINIA,

MARK W. PRINCE,

         **Plaintiffs,**

V.                                  CIVIL ACTION NO. CL 12000283-00

SUNTRUST BANK

And OTHERS TO BE DETERMINED,

         **Defendants.**

### OBJECTION TO FINAL ORDER

    This matter, filed as a claim pursuant to the Virginia Fraud Against Taxpayers Act, VA. Code § 8.01-216.1 et seq., came before the Court on March 28, 2013, on Plaintiff's motion to amend his complaint, and the Commonwealth's motion to dismiss the complaint as a matter of law.  There was no court reporter.  Following argument by Counsel for the Commonwealth and Plaintiff, the Court denied Plaintiff's motion to amend his complaint, and Plaintiff thereafter stated that he felt that his case was not strong enough to proceed without the amended complaint and subsequent to the refusal of the motion to amend, asked that the case be non-suited.  The Court refused to allow the amended complaint to be granted and refused the non-suit while stating that the case would proceed as originally submitted.  The Court accepted the cover page of Federal case No. 1:06-CV-0547-MHS, which is a *twice amended* Fraud Against Taxpayers Suit as an Exhibit showing the ability to amend Federal Fraud Against Taxpayers suits.  The Court stated there was a difference between the Attorney General amending a suit and the Plaintiff (Mark W. Prince).  *Emphasis noted.*

LIBER 0018 PAGE 867

The Plaintiff asked the Court to accept a revised amended motion for Judgment for the Fraud Against Taxpayers suit for the Edinburg School Project civil case no. 12000406-00, because new information had been obtained since the original amended motion was submitted to the court two weeks prior.  This amended filing was submitted to the Court and other Counsel. Plaintiff.  Plaintiff asked for a Brief and 28 Exhibits be presented to the court which was to be presented via power-point and the Court refused since it dealt primarily with the amended complaint.

The Plaintiff was under the assumption that the case would therefore proceed and be based off the merits of the initial complaint.  During argument, the Plaintiff explained to the court that the Virginia Resources Authority was not authorized to issue any bonds for capital improvement projects.  Plaintiff stated that both the Edinburg School Project and the "Lease to Own" projects were capital improvement projects and the VRA was not allowed to issue bonds for these projects because the VRA was restricted by the Virginia Constitution Article X Section 10 to industrial development only.  The Regional Jail is an industrial project, but the "Lease to Own Scheme" and the Edinburg School Project are not which was stated in open court.

Additionally, the Plaintiff highlighted several areas that applied strictly to *legal arguments* that were outlined within the motion to amend to include the Moral Obligation issued by Shenandoah County for the Edinburg School Project Revenue Bond which Plaintiff claimed violated the "pure revenue" requirement of the Constitution.  Plaintiff also remarked to the court that an Amicus Brief had been submitted to the Court by Eric Wiseley esquire, which explained Expressio Unius.

The Court and Defense Counsel both stated several times that the Supreme Court had ruled on Plaintiff's legal arguments which they have not.  The Supreme Court is currently reviewing a Petition for Rehearing for the Regional Jail Challenge civil case no. 12000239-00,

LIBER 0018 PAGE 868

which was filed on March 11, 2013, in which the main thrust of the revised Plaintiff's legal

arguments for the Regional Jail were presented.   In addition the Amicus Brief was filed

subsequently for the all of the cases Plaintiff has before the Court.   The appeal to the Supreme

Court was denied initially for the Regional Jail Challenge after only verbal and not written

revised legal argument was presented.   The Edinburg School Project Revenue Bond civil case

no. 12000409-00 is still before the Supreme Court and Plaintiff is awaiting status.


    The Plaintiff warned the Circuit Court that if it approved the "Lease to Own" scheme it

would allow the local governments across the State "unfettered" access to the taxpayer's wallets

without the taxpayer's permission in violation of the Virginia Constitution.   The Court did warn

the Plaintiff that further filings that challenged funding of public projects based on the same legal

grounds may subject Plaintiff to significant monetary sanctions which would preclude the

Plaintiff from filing again, since the Court did not allow the amended suit or the non-suit.


    Respectfully Submitted,

Mark W. Prince

Pro Se

394 Brook Creek Road

Toms Brook, VA  22660

540-325-0750

LIBER 0018 PAGE 869

**Certificate**

I certify that a copy of this Objection to Final Order was sent via U.S. Postal service to the following:

**Guy W. Horsley, Jr.**
Special Assistant Attorney General
Virginia Bar Number: 13846
Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
Telephone: (804) 786-0969
Facsimile: (804) 371-2087
E-mail: ghorsley@oag.state.va.us
Counsel for the Commonwealth of Virginia

H. David Gibson
Virginia Bar Number: 40641
Gentry Locke Rakes & Moore, LLP
10 Franklin Road, SE
Suite 800
Roanoke, Virginia 24011
Phone: (540) 983-9300
Facsimile: (540) 983 9400
Gibson@gentrylocke.com
Counsel for Defendant Sun Trust Bank

LIBER 0018 PAGE 870

VIRGINIA:

### IN THE CIRCUIT COURT FOR THE COUNTY OF SHENANDOAH

COMMONWEALTH OF VIRGINIA,
MARK W. PRINCE,

           Plaintiffs,

V.                               CIVIL ACTION NO. CL12000406-00

SHENANDOAH COUNTY
BOARD OF SUPERVISORS,
VIRGINIA RESOURCES AUTHORITY,
CAROLYN MADDEN PERRRY,
JAY LITTEN,
and OTHERS TO BE DETERMINED,

           Defendants.

### FINAL ORDER

This matter, filed as a claim pursuant to the Virginia Fraud Against Taxpayers Act, Va.

Code § 8.01-216.1 *et seq.*, came before the Court on March 28, 2013, on Plaintiff's motion to

amend his complaint, and the Commonwealth's motion to dismiss the complaint as a matter of

law.  Following argument by counsel for the Commonwealth and Plaintiff, the Court denied

Plaintiff's motion to amend his complaint, and Plaintiff thereafter consented to a voluntary

dismissal of this case.  Accordingly, it is ORDERED that this case is hereby DISMISSED, with

prejudice, and stricken from the docket.

In open court, and again by this order, the Court admonishes Plaintiff that any further

filings in this Court challenging the funding of public projects by or on behalf of Shenandoah

LIBER 0018 PAGE 871

County, based upon the same or substantially the same legal grounds as have been raised and rejected in this and four (4) other cases filed by Plaintiff as meritless, may subject Plaintiff to significant monetary sanctions under Va. Code § 8.01-271.1.

Because Plaintiff is not represented by counsel in this matter, the Court waives endorsement as permitted by Rule 1:13 of the Rules of the Supreme Court of Virginia, and notes Plaintiff's objections to this ruling. The Clerk is directed to provide copies of this order to Plaintiff and all counsel of record. *The Plaintiff may file specific objections in writing within ten (10) days of the date of entry of this order to preserve issues for appeal*

APR 2 2 2013

Entered: _____

_____
Judge

A True Copy Teste:
DENISE B. ESTEP, CLERK

By: _____ D.C.

2

LIBER 0018 PAGE 872

I ASK FOR THIS:

Guy W. Horsley, Jr.
Special Assistant Attorney General
Virginia Bar Number: 13846
Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
Telephone: (804) 786-0969
Facsimile: (804) 371-2087
E-mail: ghorsley@oag.state.va.us

Counsel for the Commonwealth of Virginia

SEEN:

Julia B. Judkins, Esquire
Virginia Bar Number: 22597
Bancroft McGavin Horvath &
 Judkins, PC
3920 University Drive
Fairfax, VA 22030
Telephone: (703) 385-1000
Facsimile: (703) 385-1555
jjudkins@bmhjlaw.com
www.bmhjlaw.com

Counsel for Defendant Shenandoah
Board of Supervisors

LIBER 0018 PAGE 873

Seen:

Robert L. Hodges (VSB #31396)
MCGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia  23219
Telephone: (804) 775-7513
Facsimile: (804) 698-2082

*Counsel for Virginia Resources Authority*

2

LIBER 0018 PAGE 874

SEEN:

_____
J. Jay Litten, Esquire
Virginia Bar Number: 24567
LITTEN & SIPE, LLP
410 Neff Avenue
Harrisonburg, Virginia  22801-3434
Telephone:  (540) 434-5353
Facsimile:  (540) 437-3043


Counsel for Defendant Jay Litten



SEEN:


_____
Robert L. Hodges, Esquire
Virginia Bar Number:
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, VA  23219-4030
Telephone:  (804) 775-1000
Fax:  (804) 775-1061
www.mcguirewoods.com


Counsel for Defendant Virginia
Resources Authority

LIBER 0018 PAGE 875

**VIRGINIA:**

### IN THE CIRCUIT COURT FOR THE COUNTY OF SHENANDOAH

| | |
|---|---|
| **COMMONWEALTH OF VIRGINIA,** | |
| **MARK W. PRINCE,** | |
| **Plaintiffs,** | |
| **V.** | **CIVIL ACTION NO. CL 12000406-00** |
| | |
| **SHENANDOAH COUNTY** | |
| **BOARD OF SUPERVISORS,** | |
| **VIRGINIA RESOURCES AUTHORITY,** | |
| **CAROLYN MADEN PERRY,** | |
| **JAY LITTEN,** | |
| **And OTHERS TO BE DETERMINED,** | |
| **Defendants.** | |



### OBJECTION TO FINAL ORDER

This matter, filed as a claim pursuant to the Virginia Fraud Against Taxpayers Act, VA. Code § 8.01-216.1 et seq., came before the Court on March 28, 2013, on Plaintiff's motion to amend his complaint, and the Commonwealth's motion to dismiss the complaint as a matter of law.  There was no court reporter.  Following argument by Counsel for the Commonwealth and Plaintiff, the Court denied Plaintiff's motion to amend his complaint, and Plaintiff thereafter stated that he felt that his case was not strong enough to proceed without the amended complaint and subsequent to the refusal of the motion to amend, asked that the case be non-suited.  The Court refused to allow the amended complaint to be granted and refused the non-suit while stating that the case would proceed as originally submitted.  The Court accepted the

LIBER 0018 PAGE 877

that an Amicus Brief had been submitted to the Court by Eric Wiseley esquire, which explained Expressio Unius.

The Court and Defense Counsel both stated several times that the Supreme Court had ruled on Plaintiff's legal arguments which they have not. The Supreme Court is currently reviewing a Petition for Rehearing for the Regional Jail Challenge civil case no. 12000239-00, which was filed on March 11, 2013, in which the main thrust of the revised Plaintiff's legal arguments for the Regional Jail were presented. In addition the Amicus Brief was filed subsequently for the all of the cases Plaintiff has before the Court. The appeal to the Supreme Court was denied initially for the Regional Jail Challenge after only verbal and not written revised legal argument was presented. The Edinburg School Project Revenue Bond civil case no. 12000409-00 is still before the Supreme Court and Plaintiff is awaiting status.

The Plaintiff warned the Circuit Court that if it approved the "Lease to Own" scheme it would allow the local governments across the State "unfettered" access to the taxpayer's wallets without the taxpayer's permission in violation of the Virginia Constitution. The Court did warn the Plaintiff that further filings that challenged funding of public projects based on the same legal grounds may subject Plaintiff to significant monetary sanctions which would preclude the Plaintiff from filing again, since the Court did not allow the amended suit or the non-suit.

Respectfully Submitted,

Mark W. Prince

Pro Se

394 Brook Creek Road

Toms Brook, VA  22660

540-325-0750

LIBER 0018 PAGE 878

Certificate

I certify that a copy of this Objection to Final Order was sent via U.S. Postal service to the following:

**Guy W. Horsley, Jr.**
Special Assistant Attorney General
Virginia Bar Number: 13846
Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
Telephone: (804) 786-0969
Facsimile: (804) 371-2087
E-mail: ghorsley@oag.state.va.us
Counsel for the Commonwealth of Virginia

**Julia B. Judkins**
Virginia Bar Number: 22597
Bancroft McGavin Horvath & Judkins, PC
3920 University Drive
Fairfax, VA 22030
Telephone: (703) 385-1000
Facsimile: (703) 385-1500
jjudkins@bmhjlaw.com
Counsel for Defendant Shenandoah County Board of Supervisors

**Robert L. Hodges**
Virginia Bar Number: 31396
McguireWoods LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219
Telephone: (804) 775-7513
Facsimile: (804) 698-2082
Counsel for Virginia Resources Authority

**J. Jay Litten**
Virginia Bar Number: 24567
Litten & Sipe, LLP
410 Neff Avenue
Harrisonburg, Virginia 22801-3434
Telephone (540) 434-5353
Facsimile: (540) 437-3043
Counsel for Defendant Jay Litten

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **ex. rel. Mark W. Prince,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No. 5:13cv00045** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **VIRGINIA RESOURCES** | ) | |
| **AUTHORITY, et al.,** | ) | |
| **& OTHERS** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Mark W. Prince, Relator in the above-named case, appeals to the United States Court of Appeals for the Fourth Circuit from the District Court's MEMORANDUM OPINION, Case 5:13-cv-00045-MFU, Document 34, Filed 04/15/14.

Respectfully submitted,

Mark W. Prince

By counsel

_Bradley G. Pollack_____

Bradley G. Pollack

Attorney at Law

753 South Main Street

Woodstock, Virginia 22664

Virginia State Bar No. 25290

bpollack@shentel.net

540-459-8600

540-459-8670 (fax)

Counsel for Defendant

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing was served via e-mail to the United States of America Attorney General for the Western District of Virginia to Sara Bugbee Winn, Assistant United States Attorney at Sara.Winn@usdoj.gov, Jay Majors, United States Attorney General's Office Civil Division at jay.majors@usdoj.gov, and to Counsel to the Virginia Resources Authority Jeffrey M. Summers, esquire at jmsummers@appeals-va.com .

s/*Bradley G. Pollack/s*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *ex. rel.* Mark W. Prince, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 5:13cv00045 |
| | ) | |
| v. | ) | |
| | ) | By:  Michael F. Urbanski |
| VIRGINIA RESOURCES | ) | United States District Judge |
| AUTHORITY, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This *qui tam* action is presently before the court on the Motion to Reconsider of the Relator, Mark W. Prince ("Prince"), Dkt. No. 37, and the Motion to Clarify of the United States.  Dkt. No. 38.  The court previously issued a Memorandum Opinion and accompanying Order dismissing this matter.  Dkt. Nos. 34 & 35.  Prince asks the court to reconsider its dismissal of his claims, while the United States seeks clarification that the court's dismissal was without prejudice as to the United States.  For the reasons stated herein, the court will **DENY** Prince's motion and **GRANT** the motion of the United States.

### I.

Prince originally alleged, on behalf of the United States, that the Virginia Resources Authority ("VRA") and others violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733 et seq., by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval related to federal subsidies and tax exempt status for certain bonds through the Build America Bonds program.  See 31 U.S.C. § 3729(a)(1)(A) (creating liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval").  VRA moved to dismiss Prince's claims on a number of grounds, including issue

preclusion, i.e., collateral estoppel.  Under Virginia Law, collateral estoppel is properly applied when the following four-factor test is met:

> (1) the parties to the two proceedings must be the same; (2) the factual issue sought to be litigated must have been actually litigated in the prior proceeding; (3) the factual issue must have been essential to the judgment rendered in the prior proceeding; and (4) the prior proceeding must have resulted in a valid, final judgment against the party to whom the doctrine is sought to be applied.

Mem. Op., Dkt. No. 34, at 8-9 (citing Martin-Bangura v. Virginia Dep't of Mental Health, 640 F. Supp. 2d 729, 736 (E.D. Va. 2009); Historic Green Springs, Inc. v. U.S. E.P.A., 742 F. Supp. 2d 837, 849 (W.D. Va. 2010)).  Based on the Final Order in Shenandoah County Circuit Court Case Number CL12000-406-00, Dkt. No. 30-13, the court concluded that all four factors applied as between Prince and VRA.  As such, the court found that Prince's claims were barred by collateral estoppel.  See generally, Mem. Op., Dkt. No. 34, at 6-11.[1]  The court dismissed Prince's claims with prejudice by Order entered April 15, 2014.  Dkt. No. 35.

Prince filed his Motion to Reconsider on May 2, 2014.  Dkt. No. 37.  The United States filed its Motion to Clarify on May 12, 2014.  Dkt. No. 38.  Prince filed a notice of appeal on May 14, 2014.[2]  Dkt No. 40.  Upon initial consideration of the pending motions, the court directed VRA to file a response to the Motion to Reconsider.  Dkt. No. 44.  The VRA filed its response in opposition on June 27, 2014.  Dkt. No. 45.  Accordingly, these motions are now ripe for decision.

---

[1] The court also denied VRA's jurisdictional challenge on the basis of the Rooker-Feldman doctrine and dismissed Prince's claims against a number of un-served defendants for failure to prosecute. Prince does not appear to seek reconsideration of this portion of the court's prior decision.  See Mot. for Recons., Dkt. No. 37, at 1 ("Plaintiff respectfully requests this court to reconsider its ruling in regard to collateral estoppel.").

[2] This court nevertheless retains jurisdiction pursuant to Federal Rule of Appellate Procedure 4(a)(4). See Fed. R. App. P. 4(a)(4); Asset Holding Co. 5, LLC v. Cornblum, No. 2:12-CV-00034-MR, 2013 WL 5883800, at *1 (W.D.N.C. Oct. 31, 2013) (explaining that the district court returns jurisdiction to decide a Rule 59(e) motion even after the filing of a notice of appeal); Couram v. S. Carolina Dep't of Motor Vehicles, No. CIV. 3:10-001-MJP, 2011 WL 1743264, at *1 (D.S.C. May 6, 2011) (same).

## II.

Prince styles his motion as a "Motion to Reconsider." He does not cite any Federal Rule of Civil Procedure as a basis for his motion. VRA argues that the court should thus construe the motion as a motion for relief from a judgment or order pursuant to Rule 60(b). See Mem. in Opp'n to Mot. for Recons., Dkt. No. 45, at 2. However, the Fourth Circuit has held that "if a post-judgment motion is filed within [twenty-eight] days of the entry of judgment and calls into question the correctness of that judgment it should be treated as a motion under Rule 59(e), however it may be formally styled." Dove v. CODESCO, 569 F.2d 807, 809 (4th Cir. 1978) (citation omitted); see also MLC Automotive, LLC v. Town of Southern Pines, 532 F.3d 269, 277-78 (4th Cir. 2008) (noting that CODESCO continues to apply notwithstanding the amendment to Federal Rule of Appellate Procedure 4). As such, because Prince filed his motion within twenty-eight days of the court's entry of the Order dismissing the case, the court will construes it as a Rule 59(e) motion.

Rule 59(e) states that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e). The Fourth Circuit has directed that "a court may grant a Rule 59 motion in three circumstances: '(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice.'" Bogart v. Chapell, 396 F.3d 548, 555 (4th Cir. 2005) (quoting United States v. Westinghouse Savannah River Co., 305 F.3d 284, 290 (4th Cir. 2002)). It is well settled that "Rule 59(e) 'may not be used to relitigate old matters' or to 'raise arguments which could have been raised prior to the issuance of the judgment.'" O'Connor v. Columbia Gas Transmission Corp., 643 F. Supp. 2d 799, 810 (W.D. Va. 2009) (quoting Pac. Ins. Co. v. Am. Nat. Fire Ins. Co., 148 F.3d 396, 404 (4th Cir. 1998)). "In other words, a motion for reconsideration under Rule 59(e) is inappropriate if it asks the court to 'reevaluate the basis upon which it made a prior ruling' or 'merely seeks to reargue a previous claim.'" Projects Mgmt. Co. v.

3

<u>DynCorp Int'l, LLC</u>, No. 1:13-CV-331, 2014 WL 1513267, at *1 (E.D. Va. Apr. 15, 2014) (quoting

<u>United States v. Smithfield Foods, Inc.</u>, 969 F. Supp. 975, 977 (E.D. Va. 1997)). Instead, a Rule

59(e) motion "is considered to be 'an extraordinary remedy that should be used sparingly.'" <u>Lee v.</u>

<u>Zom Clarendon, L.P.</u>, 665 F. Supp. 2d 603, 615-16 (E.D. Va. 2009) (quoting <u>Pac. Ins.</u>, 148 F.3d at

403), <u>aff'd sub nom.</u> <u>Sun Yung Lee v. Clarendon</u>, 453 F. App'x 270 (4th Cir. 2011).

In practice, this court has occasionally shown some laxity to *pro se* parties filing Rule 59(e)

motions rearguing a claim or asking the court to reevaluate the basis for its prior ruling, particularly

where a *pro se* party appears to be confused about the nature of the court's prior reasoning. Prince,

however, is not proceeding *pro se*. Prince (and his counsel) should be well aware of the requirements

of the Federal Rules. Instead, Prince merely argues in his Motion for Reconsideration that the court

was wrong in concluding that his claims are barred by collateral estoppel while providing no

justification for re-raising arguments previously made or for raising new arguments post-judgment.

Doing either is inappropriate in a Rule 59(e) motion. Nowhere in his motion does Prince assert

either a change in the law, the discovery of new evidence that was previously unavailable, or a legal

error so clear or the risk of an injustice so manifest that it provides a basis for invoking the

"extraordinary remedy" of altering or amending the final judgment of the court.

In short, Prince simply argues that the court got it wrong. This is plainly an insufficient basis

for a Rule 59(e) motion. Such an argument is properly made to the Fourth Circuit Court of

Appeals, not this court in a post-judgment motion.

### III.

The court's Order dismissing this case makes quite clear that the dismissal is with prejudice

as to Prince. <u>See</u> Dismissal Order, Dkt. No. 35. However, the Order is silent as to the prejudicial

effect, if any, as to the United States. The United States argues that any dismissal should be without

prejudice as to it. In support of this argument, the United States asserts that it is not barred by

collateral estoppel, noting that it was not a party to the Shenandoah County Circuit Court action and

that the case did not result in a valid, final judgment against it.  The court agrees and will clarify its

Dismissal Order accordingly.

Furthermore, the United States notes that the court dismissed Prince's claims as to four

other defendants, who had not been served, for failure to prosecute.  After assessing the factors set

forth in Davis v. Williams, 588 F.2d 69, 70 (4th Cir. 1978), the court did so with prejudice.  See

generally, Mem. Op., Dkt. No. 34, at 11-15.  The United States notes that courts have generally

found that dismissals for reasons unrelated to the merits of a FCA claim are appropriately entered

without prejudice to the United States.  For example, in United States ex rel. Rostholder v.

Omnicare, Inc., No. CIV. CCB-07-1283, 2012 WL 3399789 (D. Md. Aug. 14, 2012), aff'd, 745 F.3d

694 (4th Cir. 2014), the court dismissed the relator's claims pursuant to Rule 12(b)(6).  The court

then addressed the prejudicial effect of the dismissal as to the United States.

> The government has requested that any dismissal of relator's claim
> should be without prejudice as against the United States, and the
> court agrees.  The government's decision not to intervene in this case
> does not suggest that the government necessarily believed that no
> FCA case was viable.  As the Fourth Circuit has noted, a decision not
> to intervene may "not [necessarily be] an admission by the United
> States that it has suffered no injury in fact, but rather [the result of] a
> cost-benefit analysis."  United States ex rel. Berge v. Bd. of Trustees
> of the Univ. of Alabama, 104 F.3d 1453, 1458 (4th Cir. 1997); see
> also United States ex rel. Williams v. Bell Helicopter Textron Inc, 417
> F.3d 450, 455 (5th Cir. 2005) (holding that dismissal with prejudice as
> to the United States was improper where basis for dismissal was
> failure to meet heightened pleading standard under FRCP 9(b)).
> Accordingly, it would be inappropriate to dismiss with prejudice as to
> the United States or as to the states or localities on whose behalf
> relator brought this claim.

Id. at *15 (alterations in original) (full cites added).  Here, the claims against the un-served

defendants were dismissed on the basis of Prince's failure to prosecute.  Such a dismissal is the result

of Prince's failure to act, not any fault on the part of the United States, and is furthermore not a

dismissal on the merits. Thus, it is proper for the dismissal of these claims to be without prejudice as to the United States. Cf. United States ex rel. King v. DSE, Inc., No. 8:08-CV-2416-T-23EAJ, 2013 WL 610531, at *11 (M.D. Fla. Jan. 17, 2013) (citing Williams, 417 F.3d at 455-56) ("The Government requests that if the Court dismisses this action, it does so without prejudice to the United States because Defendants seek dismissal for the Relator's alleged procedural misconduct, not on the merits of the case. [] Accordingly, it is recommended that this case be dismissed without prejudice as to the Government."), report and recommendation adopted, No. 8:08-CV-2416-T-23EAJ, 2013 WL 608541 (M.D. Fla. Feb. 19, 2013), aff'd, No. 13-11026 (11th Cir. 2014); United States ex rel. Fay v. Northrop Grumman Corp., No. CIVA06CV00581EWN-MJW, 2008 WL 877180, at *10 (D. Colo. Mar. 27, 2008) ("Considering the breadth and generality of Relator's fifty-three page complaint, as well as the fact that this order does not constitute an adjudication on the merits of any of the allegations therein, I dismiss without prejudice as to the Government."). The court will therefore clarify its Dismissal Order accordingly.

## IV.

Prince has not put forward any basis to alter or amend the court's judgment cognizable under Rule 59(e). Instead, he asks the court to reevaluate the basis upon which it made its prior ruling based on the reassertion of old arguments and the introduction of new ones. Prince's complaints with the court's prior Memorandum Opinion are properly directed to the Fourth Circuit on appeal, not to this court via Rule 59(e). His motion will be denied.

As to the United States, it was not a party to the Shenandoah County Circuit Court action brought by Prince against VRA. Collateral estoppel therefore does not apply to the United States. Furthermore, the dismissal of the other defendants was not a dismissal on the merits. As such, the court's prior Order dismissing this case is properly amended to clarify that the dismissal is with

prejudice only as to Prince; the dismissal of any and all claims is without prejudice as to the United States.  The motion of the United States will accordingly be granted.

An appropriate Order will be entered this day.

The clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

Entered:  July 10, 2014

*/s/ Michael F. Urbanski*

Michael F. Urbanski
United States District Judge